TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel,
ELIZABETH G. PIANCA, SBN 241244
Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
SONIA N. WILLS, SBN 259892
RAJIV NARAYAN, SBN 334511
Deputy County Counsel
LEILY ARZY, SBN 364187, Litigation Fellow
OFFICE OF THE COUNTY COUNSEL
70 West Hedding Street, East Wing, Ninth
Floor
San José, California 95110-1770
Telephone: (408) 299-5900
Facsimile: (408) 292-7240
rajiv.narayan@cco.sccgov.org

WILLIAM J. WHITE, SBN 181441
MATTHEW D. ZINN, SBN 214587
CALEB E. HERSH, SBN 356318
SHUTE, MIHALY & WEINBERGER LLP
550 California Street, Suite 1200
San Francisco, California 94104
Telephone:    (415) 552-7272
Facsimile:    (415) 552-5816
White@smwlaw.com
Zinn@smwlaw.com
Chersh@smwlaw.com

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

ROB BONTA, Attorney General of California
ABIGAIL BLODGETT, Supervising Deputy
Attorney General
STACY LAU, SBN 254507
ASHLEY WERNER, SBN 282217
JESSICA DURNEY, SBN 326816
ERIN GANAHL, SBN 248472
Deputy Attorneys General
1515 Clay Street, 20th Floor
Oakland, California 94612-0550
Telephone: (510) 879-1973
Facsimile: (510) 622-2270
stacy.lau@doj.ca.gov

Attorneys for Plaintiff
STATE OF CALIFORNIA

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| COUNTY OF SANTA CLARA; STATE OF CALIFORNIA, by and through Attorney General Rob Bonta<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES GENERAL SERVICES ADMINISTRATION; UNITED STATES | No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF

DEPARTMENT OF HOMELAND SECURITY; EDWARD FORST, in his official capacity as Administrator of the General Services Administration; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; DAVID VENTURELLA, in his official capacity as Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement; and ECG 6 LLC, a California limited liability company,

Defendants.

**INTRODUCTION**

1.      Plaintiffs County of Santa Clara ("County") and the State of California ("State") bring this action to challenge Defendants' unlawful actions to lease, develop, and operate what appears to be an immigration holding facility at 7240 Holsclaw Road in unincorporated Santa Clara County near Gilroy, California ("Holsclaw Property"). The federal Defendants violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, by failing to analyze the project's environmental consequences before approving the lease and beginning construction; violated the Immigration and Nationality Act (INA), 8 U.S.C. § 1231(g), by selecting an unsuitable site for detention and failing to consider existing facilities; violated the Intergovernmental Cooperation Act (ICA), 31 U.S.C. § 6506(c), by failing to solicit or consider state and local viewpoints, while actively concealing the project's true purpose; acted contrary to law, without following required procedures, and arbitrarily and capriciously under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A) and (D); and violated the requirements of restrictive covenants on the property established by a contract under the Williamson Act, Cal. Gov't Code § 51200 *et seq.*, that has limited the Holsclaw Property to agricultural uses since 1967. Plaintiffs seek declaratory and injunctive relief to stop construction and operation of the facility and to vacate the federal Defendants' underlying decisions.

* * *

2.      On or around May 4, 2026, Defendants began demolition and construction work on the Holsclaw Property, a remote and rural 24.5-acre parcel. The property is served exclusively by

2

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

narrow County roadways with blind turns and few streetlights.  For generations, the Holsclaw Property, with its many greenhouses and fertile fields, has been used for agriculture.  Absent an injunction, it will soon be used to detain immigrants.

3.        Defendants are proceeding with a plan to quickly and surreptitiously develop an 18,700 square foot holding facility for U.S. Immigration and Customs Enforcement (ICE) that will hold up to an estimated 150 detainees and which is sited in an entirely inappropriate location.  ICE holding facilities, originally intended for only short-term detainment, are now the subject of lawsuits and investigative reports revealing overcrowding, long-term confinement, and inhumane conditions.[1] Defendants seek to build such a facility in an area that is home to several threatened and endangered species, is zoned for exclusive agriculture, has limited and inadequate waste disposal infrastructure,

[1] *E.g. Mercado v. Noem*, 800 F. Supp. 3d 526, 540-43, 547 (S.D.N.Y. 2025) (deeming likely unconstitutional the inhumane conditions in the "hold rooms" of ICE's New York City field office where detainees alleged, even after the court's issuance of a TRO, being packed into "incredibly overcrowded" spaces (with up to 90 people in a 20 square meter room) in extreme temperatures and denied adequate sleeping facilities (with some sleeping on concrete floors or while sitting up), food, water, and toilet and showering facilities); *see also Pablo Sequen v. Albarran*, 810 F. Supp. 3d 1084, 1100, 1104, 1127, 1129 (N.D. Cal. 2025) (finding conditions at ICE's San Francisco Field Office likely to be unconstitutional where ICE created "inhumane" and "dangerous" conditions in hold rooms that "humiliate[d] and degrade[d]" detainees, who were routinely held for more than 12 hours, and some for 72 hours or more, without access to mattresses or hygiene products and subject to continuous lighting and frigid temperatures) (internal quotation marks omitted); *D.N.N. v. Liggins*, No. 1:25-CV-01613-JRR, 2026 WL 632371, at *8, 28 (D. Md. Mar. 6, 2026) (granting a preliminary injunction where detainees in ICE's Baltimore Field Office were "often held [] for more than 72 hours," subjected to rampant overcrowding (with rooms designed for 56 people holding over 120), and denied basic hygienic items, adequate medical care, and sleeping facilities).  As for investigative reports in other jurisdictions, *see, e.g.,* ACLU of Georgia, *Urgent Demand to Stop Inhumane Conditions at Atlanta ICE Field Office* 1-2, (March 6, 2026), https://www.acluga.org/app/uploads/2026/03/Letter-from-ACLUGA-AAAJ-Project-South85.pdf (claiming that ICE's Atlanta Field Office is holding detainees "for extended periods of times—days and often weeks" without "beds, sufficient food, medications or medical care, hygiene products, access to showers, the ability to contact family members, or access to confidential communications with attorneys"); *see also* Jason Salzman, *Denver 'Hold Room' Revealed: ICE Has Detained Thousands of People at Its Field Office in Centennial*, Colorado Times Recorder (March 16, 2026), https://coloradotimesrecorder.com/2026/03/denver-hold-room-revealed-ice-has-detained-thousands-of-peope-at-its-field-office-in-centennial/77329/ (last accessed June 9, 2026) (reporting that individuals were detained in ICE's Denver Field Office for over 35 days); Angela Woolsey, *Advocates for immigrants allege 'degrading' conditions at ICE office in Chantilly*, FFX NOW, (Aug. 29, 2025), https://www.ffxnow.com/2025/08/29/advocates-for-immigrants-allege-degrading-conditions-at-ice-office-in-chantilly/ (last accessed June 9, 2026) ("[ICE's] Chantilly field office, typically used for administrative proceedings, is being turned into a 'makeshift' detention facility" wherein individuals are held for "'several days at a time' in a holding room intended to keep people just for a few hours").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

is likely contaminated with hazardous materials that were never properly disposed of, and likely lacks appropriate health and safety precautions for detainees—especially children.

4.    The project will create substantial harm to the surrounding environment—harm that the federal Defendants failed to analyze or consider before taking final action on the plan. Demolition and construction, which began on or around May 4, 2026, along with ongoing operation of the facility, threaten to permanently destroy the ecosystem, habitat, and agricultural value of land that the County and the State have recognized and protected for exclusive agricultural use since at least 1967.  In particular, the project poses a threat to a long list of protected local species, which may be harmed by groundwater contamination, increased noise, increased traffic, degradation of freshwater, exposure or release of hazardous materials, and light pollution.

5.    Several successive agricultural research companies that occupied the Holsclaw Property prior to the federal government's lease generated and managed hazardous waste, as well as stored and used hazardous materials regulated by State and County laws.  These companies vacated the property without following the proper closure procedures, which is an ongoing legal violation that poses significant risk and uncertainty regarding the continued presence and disturbance of hazardous materials that could cause irreparable harm to human and environmental health.  There are three decades of documented leaks and spills on the Holsclaw Property from hazardous materials, including thiram, a toxic fungicide, along with releases into the property's septic system of DNA extraction waste, ethidium bromide, calcium hypochlorite, and acid-based chemical wash water.  The federal government's apparent failure to address—much less mitigate—these risks endanger the construction workers building the site, detainees and employees who will be located at the site, and the environment beneath and surrounding the site.

6.    The project will also have severe impacts on vital infrastructure.  For instance, although no attempt was made to obtain required approvals for a septic system expansion, conservative County projections show that the system may need to be built at approximately *sixteen times* the size of the currently approved system to safely pump, treat, and disperse wastewater generated onsite.  The existing septic system, which was designed for modest daytime office use, is

4

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

simply inadequate for a facility that may house a significant number of detainees around the clock. Proceeding with an undersized septic system—as it appears Defendants are currently doing—could result in significant harms, including surfacing wastewater that could run into nearby Llagas Creek and contaminate habitat and drinking water, and which could backflow into the structures on the Holsclaw Property, creating direct human contact with pathogens including bacteria, viruses, and parasites. Additionally, at least some of the leased spaces on the Holsclaw Property, including portions of the existing, under-sized septic system, are located within designated Special Flood Hazard Areas (i.e., a 100-year floodplain), which further compounds the risk of system failure and poses significant safety concerns for detainees and other users of the facility, as well as neighboring residential properties. Heavy vehicles, including those that will be shuttling detainees and using the sally port called for in the project plans, will traverse County roads subject to low weight limits, degrading roadways on which the local agricultural community depends.

7.      Constructing and operating a facility designed to have detention capacity in a building and on a site last used for agricultural research, within the 100-year floodplain, and where hazardous materials likely remain, poses a substantial risk to environmental and public health. And the development of this kind of facility in disregard of applicable laws threatens to subject detainees to inhumane and unhealthy conditions, which have already tainted the federal government's immigration enforcement operations across the country.

8.      The federal government must exercise its immigration prerogatives within the bounds of federal statutes passed by Congress that govern agency actions. Federal statutes and regulations dictate the procedures that federal agencies must observe when developing and constructing projects. All federal agencies, including Defendants Department of Homeland Security (DHS), ICE, and the General Services Administration (GSA) (together, "the Federal Agency Defendants"), are bound by NEPA, the ICA, and the APA.

9.      Under NEPA, federal agencies and their agents must work in cooperation with state and local governments and the public to properly evaluate and disclose the potential environmental impacts of federal actions so that agencies can formulate their projects to protect the natural

5

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF

environment from the projects' impacts to the fullest extent practicable. NEPA requires that federal agencies thoroughly assess the environmental impact of a proposed project *prior* to taking final action on the project and requires such assessment to be made available to the public and stakeholder agencies, so they can provide input that informs decision-making about the project. Defendants have outright ignored these statutory obligations. Rather than carry out the required environmental review and information sharing with the public, Defendants simply began demolition and construction work on the Holsclaw Property.

10. Defendants' actions fly in the face of DHS's own guidance stating that agencies must "schedule sufficient time and make diligent efforts to ensure that potentially interested parties are identified and notified and have an opportunity to provide input in a manner that could have a practical influence on proposed DHS actions *before decisions are made*." Instruction Manual 023-01 at IV-6 (emphasis added). Had Defendants undertaken the mandatory NEPA review and shared their plans for the property with affected public entities as the statute demands, the State and County could have informed Defendants of the myriad environmental harms associated with building the project at this site, and Defendants could have considered appropriate changes or alternatives to the proposed project in light of those impacts.

11. The ICA likewise requires the federal government to solicit and consider the viewpoints of state and local governments when developing federal projects. Instead, the Federal Agency Defendants did the opposite, concealing the true nature of the project and seeking to evade local input. The Federal Agency Defendants' only apparent attempt at formal communication with the County regarding the project was a one-paragraph letter forwarded by a representative of private real estate company Elmwood Capital Group to mid-level County Planning and Development Department staff dated June 21, 2023, summarily stating that the GSA was planning "office and operations space" at the property and that the project should be exempt from local zoning and planning review. Almost three years later, demolition and construction started on the site without any further correspondence from the federal government regarding the proposed use.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

12.     The single, one-paragraph letter to mid-level County staff underscores the Federal Agency Defendants' total disregard for the ICA's mandates. The County cannot meaningfully weigh in under the ICA when the federal government makes no effort to solicit its views and indeed obscures the true purpose of a federal project. Federal Agency Defendants have deprived the County of meaningful consultation opportunities on this project. Moreover, there is no indication that the federal government made any attempt to consult with other affected local entities in the region, such as the Santa Clara Valley Habitat Agency, as required by the ICA.

13.     Likewise, the federal government failed to consider the views of or consult with State agencies. The Governor's Office of Land Use and Climate Innovation, formerly known as the Governor's Office of Planning and Research, is designated under State of California Executive Order D-24-83 as the State's Single Point of Contact for purposes of transmitting official State and local government comments on federal proposals under review pursuant to the ICA and its implementing directive, Executive Order 12372. On information and belief, the Governor's Office of Land Use and Climate Innovation has received no communication from the federal government relating to any plans to develop the Holsclaw Property.

14.     The federal government's failure to consult with state and local government agencies as required by the ICA is even more notable and alarming given the project's disharmony with state and local planning objectives to preserve the Property's agricultural and ecological qualities.

15.     The APA requires federal agencies to engage in reasoned decision-making. GSA and DHS, departing from their own policies and practices, have acted arbitrarily and capriciously by approving the development of a holding facility without the legally required environmental review, public disclosure, or state or local consultation, and without providing any reasoned analysis for their actions. The Federal Agency Defendants cannot, and have not attempted to, offer a rational explanation for why an agricultural property of this kind is needed or suitable for an ICE holding facility, especially in light of County and State policies prioritizing the preservation of agricultural uses on the site, the history of hazardous materials on the site, and the environmental harm and infrastructure impacts that will result from this project.

7

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

16.     DHS is additionally bound by the INA when it seeks to designate sites for immigration detention purposes.  At minimum, the INA requires that an immigration detention facility be *appropriate* for its intended purposes.  The Holsclaw Property—by any measure—is not appropriate for immigration detention.  The proposed facility is not only flatly inconsistent with the property's designation for exclusive agricultural use but lacks the appropriate wastewater and other infrastructure necessary to support a holding facility and is known to contain hazardous materials that may expose detainees—including children—to unacceptable health and safety risks.

17.     Defendants' actions also violate their own contractual obligations and California law.  Since 1967, the Holsclaw Property has been subject to a contract under the Williamson Act, Cal. Gov't Code § 51200 *et seq*., which restricts use of the land exclusively to agricultural uses in exchange for significant property tax benefits.  Defendants are now attempting to convert the property to an incompatible, non-agricultural use in violation of the enforceable covenants that have run with the land for more than 50 years.  The current landowner, ECG 6 LLC, acquired the property with full knowledge of the restrictions imposed by the recorded contract.  While it ignores those restrictions, ECG 6 LLC continues to enjoy the significant property tax relief that is supposed to compensate the landowner for protecting the property's agricultural character.  As lessee of the property, the federal government is fully subject to the restrictive covenants in the Williamson Act contract, just as it would be subject to any other limitation on the property's title.  For its part, the federal government did not take the necessary steps as a federal agency seeking to site a public improvement on Williamson Act land—it did not notify the County, provide an opportunity to comment on the potential effects of the project on agricultural resources, establish that its decision to site the facility at the property was not principally driven by cost savings, or establish that there is no other land outside of the preserve that is suitable for the project—all of which are required of the federal government.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

18.    Earlier this year, an ICE official proclaimed the agency's plan to reshape the immigration enforcement process into "[Amazon] Prime, but with human beings."[2]  But where Defendants want slapdash action, the law imposes a higher standard for government conduct.

19.    Plaintiffs seek relief from Defendants' unlawful decisions and ongoing efforts to lease, approve, and develop this ICE holding facility on the Holsclaw Property.  Plaintiffs request that the Court enjoin further actions to construct or establish the facility and vacate Defendants' unlawful decisions.

## JURISDICTION AND VENUE

20.    The Court has jurisdiction pursuant to 28 U.S.C. sections 1331 and 1367.  This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. sections 2201(a) and 2202 *et seq*.

21.    Venue properly lies within the Northern District of California under 28 U.S.C. sections 1391(b)(2) and 1391(e)(1), because Plaintiff County of Santa Clara is located therein and a substantial part of the events or omissions giving rise to this action occurred in this District.

22.    Assignment of this case is proper in the San Jose Division under Civil L.R. 3-2(c) and (e), because a substantial part of the events or omissions giving rise to the claims occurred in Santa Clara County.

## PARTIES

### I.    Plaintiffs

23.    Plaintiff County of Santa Clara is a charter county and political subdivision of the State of California.

24.    Plaintiff the State of California is a sovereign State of the United States.  Attorney General Bonta is the chief law officer of the State of California and head of the California Department of Justice.  He has the authority to file civil actions to protect California's rights and interests and the resources of this State.  Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510-11.

---

[2] Marina Dunbar, *ICE director wants to run deportations like 'Amazon Prime for human beings'*, The Guardian (Apr. 9, 2025) https://www.theguardian.com/us-news/2025/apr/09/ice-todd-lyons-deporation-amazon (last accessed June 9, 2026).

9

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**II.    Defendants[3]**

25.    Defendant U.S. Immigration and Customs Enforcement, a component of DHS, is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).  ICE is under the supervision of DHS.

26.    Defendant U.S. General Services Administration is a component of the United States government.  GSA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

27.    Defendant U.S. Department of Homeland Security is a department of the Executive Branch of the United States government.  DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

28.    Defendant Edward Forst is the Administrator of the General Services Administration. He is sued in his official capacity.

29.    Defendant Markwayne Mullin is the Secretary of Homeland Security and the head of the U.S. Department of Homeland Security.  He is sued in his official capacity.

30.    Defendant David Venturella is the Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement.  He is sued in his official capacity.

31.    Defendant ECG 6 LLC is a California limited liability company with its headquarters and principal place of business located at 9640 Wilshire Blvd, Beverly Hills, California 90212.

<strong>LEGAL BACKGROUND</strong>

**I.    NEPA Requires Federal Agencies to Evaluate the Environmental Impact of their Proposals in Cooperation with State and Local Governments and the Public**

32.    Congress enacted NEPA in recognition of "the profound impact of man's activity on . . . the natural environment."  42 U.S.C. § 4331.  NEPA demands that "the Federal Government, *in cooperation with State and local governments*, *and other concerned public and private organizations*, … use all practicable means and measures, . . . to create and maintain conditions under which man and nature can exist in productive harmony."  *Id.* (emphasis added).

---

[3] GSA, DHS, ICE, Secretary Mullin, Senior Official Performing the Duties of the Director Venturella, and Administrator Forst are hereinafter collectively referred to as Federal Agency Defendants.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

33.    "NEPA's dual mission is thus to generate federal attention to environmental concerns and to reveal that federal consideration for public scrutiny." *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001) (quoting *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 147 (D.C. Cir. 1985) (internal quotation marks omitted). At its core, NEPA is a "procedural statute that requires the federal government to take a *hard look* at the environmental consequences *before acting*." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 993 (9th Cir. 2025) (cleaned up) (emphasis added).

34.    To effectuate this mandate, federal agencies must, in advance of undertaking a proposed action or project, prepare one of the following documents: an environmental impact statement (EIS), 42 U.S.C. § 4336(b)(1), or an environmental assessment (EA). *Id*. § 4336(b)(2). Agencies may forego an EIS and EA only in rare instances, upon the valid invocation of a categorical exclusion *prior* to undertaking the federal action. *Id.* § 4336(a).

35.    Whether developing an EA or EIS, the agency's environmental document must be: (1) made publicly available; (2) conducted *prior* to undertaking the federal action; and (3) consider alternatives, including a no-action alternative, to the proposed action. 42 U.S.C. § 4336(b); *id.* § 4332(C), (2)(H).

36.    Executive Order 11988, titled "Floodplain Management" ("EO 11,988"), which was issued in "furtherance of" NEPA, imposes additional obligations prior to agency action. Exec. Order No. 11,988, *Floodplain Management*, 42 Fed. Reg. 26951 (May 24, 1977). EO 11,988 generally requires each agency to "minimize the impact of floods on human safety, health and welfare . . . in carrying out its responsibilities for [] acquiring, managing, and disposing of Federal lands and facilities [or] . . . providing Federally undertaken, financed, or assisted construction." *Id.* "[E]ach agency has a responsibility to evaluate the potential effects of any actions it may take in a floodplain." *Id.* Prior to taking an action, an agency must "determine whether the proposed action will occur in a floodplain." *Id.* If an agency proposes to conduct or support an action that would be located in a floodplain, it must "consider alternatives to avoid adverse effects and incompatible development in the floodplains." *Id.* If after such analysis an agency determines there is "no other

11

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

practicable alternative consistent with the law and with the policy set forth in [EO 11,988]" then the agency must (1) "design or modify its action in order to minimize potential harm to or within the floodplain" and (2) "prepare and circulate a notice containing an explanation of *why* the action is proposed to be located in the floodplain." *Id*. (emphasis added).  The floodplain notice is required to be circulated to designated state and regional entities within the affected geographic area.[4]  *Id.*

37.    DHS (including its component agency, ICE) has its own procedures for NEPA compliance.  DHS's Directive 023-01 and its Instruction Manual 023-01[5] (together, "DHS NEPA Procedures") establish the general "policy and procedures" that "DHS follows to comply with [NEPA]."  Instruction Manual 023-01 at III-1.  As the DHS NEPA Procedures state, "[e]nvironmental stewardship and DHS missions are compatible and complementary."  Directive 023-01 at 4.

38.    Consistent with NEPA, the DHS NEPA Procedures recognize that "[i]ntergovernmental collaboration . . . improve[s] the effectiveness of DHS missions and activities, as well as build[s] trust between DHS and the communities it serves."  Instruction Manual 023-01 at IV-6.  DHS states that it views this intergovernmental collaboration "[a]s an effective way to identify environmental issues that need to be considered in DHS planning and decision-making."  *Id.*  As such, the DHS NEPA Procedures instruct agency components to "schedule sufficient time and make diligent efforts to ensure that potentially interested parties are identified and notified and have an opportunity to provide input in a manner that could have a practical influence on proposed DHS actions *before decisions are made*."  *Id.* (emphasis added).

---

[4] EO 11988 refers to providing notice to state and areawide clearinghouses under Office of Management and Budget Circular A-95.  Circular A-95 was superseded by EO 12372, which requires federal agencies to coordinate with the state or local entities designated by the state for such purpose.  Exec. Order 12372, *Intergovernmental Review of Federal Programs*, 47 Fed. Reg. 30,959 (July 14, 1982).

[5] *See* DHS, DHS Directive 023-01, Revision 01, *Implementation of the National Environmental Policy Act* at 1 (Oct. 31, 2014), https://www.fema.gov/sites/default/files/2020-07/fema_dhs-directive-023-01.pdf (last accessed June 9, 2026); DHS, Instruction Manual 023-01-001-01, Revision 01, *Implementation of the National Environmental Policy Act (NEPA)* (Nov. 6, 2014) https://www.fema.gov/sites/default/files/2020-07/fema_dhs_instruction-manual_023-01-001-01.pdf (last accessed June 9, 2026).

12

39.     Similarly, consistent with NEPA's mandate that agencies make each EIS and the comments and views of the appropriate federal, state, and local agencies "available to . . . to the public," 42 U.S.C. § 4332(C), the DHS NEPA Procedures provide for public transparency of DHS's NEPA process.  Instruction Manual 023-01 at IV-6, IV-7 (recognizing that "open communication" is "DHS policy" and that "[w]hen DHS is the lead agency for a proposed action, DHS is responsible for the nature and extent of the public involvement effort" and that public involvement should "start[] early and continue[] throughout the NEPA process").

40.     GSA's conduct is similarly subject to internal NEPA procedures.  GSA, PBS NEPA Desk Guide (Oct. 1999) ("GSA Desk Guide").[6]  The GSA Desk Guide states that "local agencies with jurisdiction by law or expertise should . . . be consulted" during the scoping process through which GSA determines the scope and range of environmental analysis needed under NEPA.  GSA Desk Guide at 4-4; *see id.* at 4-1.  The GSA Desk Guide specifically lists "[f]armland [p]reservation [a]gencies," "[l]ocal land use and/or zoning departments," and "[c]ounty planning commissions" as pertinent local agencies with which to consult.  *Id.,* app. 4, at 1-2.  Scoping is to occur early, as part of the scoping process before NEPA analysis begins.  *Id.* at 5-5 (stating that "agencies with jurisdiction by law or expertise . . . must be consulted as needed" for scoping an analysis of whether a categorical exclusion applies); *id.* at 6-3 (same, for the scope of an EA); *id.* at 7-4 (same, for the scope of an EIS); *see id.* at 4-2 (defining scoping process).  "Consultation should be an ongoing process," and "[c]ontinued dialogue and discussions with relevant outside agencies is essential to good GSA decisions and smooth NEPA processes."  *Id.* at 4-4.

41.     The GSA Desk Guide further provides for disclosure to and involvement of the public in GSA NEPA review.  Public involvement can occur during scoping, the analysis of impacts and alternatives, and reviewing and interpreting the results of NEPA analysis.  *Id.* at 4-4 to 4-5.  "The important thing to remember is that public involvement . . . involves ongoing dialogue . . . *aimed to the extent feasible at reaching agreement*."  *Id.* at 4-5 (emphasis added).

---

[6] *See* https://www.gsa.gov/system/files/PBS_NEPA_Deskguide.pdf; *see also* ADM 1095.1F, https://www.govinfo.gov/content/pkg/FR-2000-11-17/pdf/00-29263.pdf (order establishing GSA's NEPA policy and adopting current version of Desk Guide).

13

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### 1. Environmental Impact Statement

42.    Where a proposed federal action would have a "reasonably foreseeable significant effect on the quality of the human environment," the agency proposing the action must prepare an EIS. 42 U.S.C. § 4336(b). An EIS is a "detailed written statement" analyzing the action's potentially significant environmental effects as well as a "reasonable range of alternatives" to the action. *Id.* §§ 4332(C), 4336(b)(1). The EIS must be made available to the public. *Id.* § 4332(C).

### 2. Environmental Assessment

43.    Even if the agency believes that its action will not have a reasonably foreseeable significant effect on the environment, or that the "significance of such effect is unknown," NEPA still requires agencies to analyze their proposals in an EA *prior* to undertaking the proposed action. 42 U.S.C. § 4336(b)(2). The EA is a "concise public document" that provides "sufficient evidence and analysis for the agency to determine whether" an EIS is "necessary," or sets "forth the basis of [the] agency's finding of no significant impact." 42 U.S.C. § 4336(b)(2); *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022) (cleaned up).

44.    Like in an EIS, in an EA, agencies are required to consider alternatives to the proposed action. 42 U.S.C. § 4332(2)(H) (requiring agencies to "study, develop, and describe appropriate alternatives to recommended courses of action"); *see also W. Watersheds Project v. Abbey,* 719 F.3d 1035, 1050 (9th Cir. 2013) ("The existence of a viable but unexamined alternative renders an [EA] inadequate."); *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228–29 (9th Cir. 1988) ("[C]onsideration of alternatives is critical to the goals of NEPA even where a proposed action does not trigger the EIS process.").

45.    An agency's determination that a full EIS is not necessary is subject to judicial review. *Env't Def. Ctr.*, 36 F.4th at 878–79 ("In challenging an agency decision not to prepare an EIS, plaintiffs need not prove that significant environmental effects *will* occur; they need only raise a substantial question that they might.") (internal quotation marks omitted).

### 3. Categorical Exclusions

46.    An agency must prepare either an EA or EIS for a final discretionary action unless the

14

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

agency finds *prior* to taking the proposed action that the action falls within a categorical exclusion (CE). 42 U.S.C. § 4336(a), (b)(2). A CE is "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of [42 U.S.C. §] 4332(2)(C)." 42 U.S.C. § 4336e(1).

47. The CEs employed by DHS are found in the DHS NEPA Procedures. Instruction Manual 023-01 at A-1 to A-29.

48. Even where an agency action otherwise meets the requirements of a DHS CE, the CE will not apply if "extraordinary circumstances" exist. Instruction Manual 023-01 at V-4 to V-6. Extraordinary circumstances include: a "potentially significant effect on public health or safety"; a "potentially significant effect on species or habitats protected by the ESA" or "other law protecting a species or habitat"; a "potentially significant effect on an environmentally sensitive area"; or "a potential or threatened violation of a Federal, State, or local law or requirement imposed to protect the environment." *Id.* at V-6.

49. The GSA's CEs are set forth in the GSA Desk Guide. These CEs are narrow in scope. For example, the CE for the acquisition of space by lease construction or improvement of an existing facility does not apply where the proposed use is inconsistent with local planning and zoning or applicable State requirements, or if there is evidence of community controversy or other environmental issues. GSA Desk Guide § 5.4(b).

**II.    The INA Requires that Federal Agencies Select Places Appropriate for Immigration Detention, Favoring the Use of Existing Detention Facilities**

50. The INA directs DHS to "arrange for *appropriate* places of detention." 8 U.S.C. § 1231(g)(1) (emphasis added).

51. The key statutory term "appropriate," though undefined in the INA, is generally understood to mean "specially suitable: fit, proper." Appropriate, *Webster's Third New International Dictionary* 106 (2002). The term is "the classic . . . all-encompassing term that naturally and traditionally includes consideration of all the relevant factors." *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (cleaned up). Thus, when a statute calls for an agency's determination to be "appropriate," the agency "may not 'entirely fai[l] to consider an important aspect of the problem.'"

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*See id.* at 752 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

52.    ICE's own detention standards are also instructive as to the meaning of "appropriate" in detention settings.[7]  For example, the National Detention Standards require that facilities "ensure appropriate temperatures, air and water quality, ventilation, lighting, noise levels, and detainee living space, in accordance with any applicable state and local jail/prison standards."  ICE National Detention Standards at 7.

53.    In addition to requiring appropriate facilities, the INA also *favors the use of existing detention facilities* over the construction of new ones.  "Prior to initiating any project for the construction of any new detention facility," DHS "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use." 8 U.S.C. § 1231(g)(2)[8]; *see also Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) ("Congress has expressed that the [DHS] should favor the use of existing facilities for immigration detention, whether through purchase or lease").

**III.    The ICA Requires that Agencies Solicit and Consider All Local and State Viewpoints Prior to Initiating Development Projects**

54.    The ICA requires "[t]o the extent possible" that "all national, regional, State, and local viewpoints . . . be considered in planning development programs and projects of the United States Government."  31 U.S.C. § 6506(c).  The ICA "constitut[es] a meaningful national recognition" from Congress "that the objectives of state and local governments and their planning agencies . . . be incorporated into the federal decisionmaking process."  *City of Rochester v. U.S. Postal Serv.*, 541 F.2d 967, 975 (2d Cir. 1976).

---

[7] *See* DHS, Immigr. & Customs Enf't, *National Detention Standards* at 7 (rev. 2025) ("ICE National Detention Standards"), https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf (last accessed June 9, 2026); *see also* DHS, Immigr. & Customs Enf't, Performance-Based National Detention Standards 2011 (rev. Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf (last accessed June 9, 2026).

[8] Although 8 U.S.C. § 1231(g)(2) refers to duties on the part of the "Commissioner" of Immigration and Naturalization, those duties were transferred to DHS through the Homeland Security Act of 2002.  Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(3), 116 Stat. 2135, 2177–2178 (2002).

16

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

55.    The ICA requires a federal agency to consider local and state viewpoints during the "planning stages of a project." *City of Waltham v. U.S. Postal Serv.*, 11 F.3d 235, 244 (1st Cir. 1993) (internal quotation marks omitted).  When evaluating whether these consultations meet ICA's standards, courts interrogate whether the agency's "specific contacts with [the relevant localities] constitute compliance 'to the extent possible'" as required under the statute. *Rochester*, 541 F.2d at 976.  Even multiple meetings with local officials will not meet ICA requirements if the interests of the local agencies are not given full consideration. *Id*.  "Local views [must] be 'fully considered' for the purposes of 'plan formulation, evaluation, and review'" to comply with the ICA.  *Id.*

56.    Critically, like other procedural statues such as the APA and NEPA, ICA imposes "an affirmative obligation" on federal agencies to consider local interests and "to develop a reviewable record" that includes an explanation of any "decision to act in disharmony with local planning objectives." *See Rochester*, 541 F.2d at 976.

57.    The ICA also directs the President to "prescribe regulations governing the formulation, evaluation, and review of United States Government . . . projects having a significant impact on area and community development" so that federal agencies make "reasoned choices" to ensure: "appropriate land uses for housing, commercial, industrial, governmental, institutional, and other purposes"; "wise development and conservation of all natural resources"; "adequate . . . open space"; and "properly planned community facilities" for the "safe[] dispos[al] of wastes" and other purposes.  31 U.S.C. § 6506(b).

58.    To that end, Executive Order 12,372 ("EO 12,372") was issued pursuant to the ICA and reiterates these directives.  47 Fed. Reg. 30,959.  The Order, which is still in effect, requires "federal agencies" to "provide opportunities for consultation by elected officials of those [s]tate and local governments . . . that would be directly affected by . . . direct [f]ederal development." *Id*.  The Order also directs federal agencies to "[u]tilize the [s]tate process to determine official views of [s]tate and local elected officials" and "[c]ommunicate with [s]tate and local elected officials as early in the program planning cycle as is reasonably feasible to *explain specific plans and actions*." *Id*.

17

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(emphasis added). For "those cases where the [local and state] concerns cannot be accommodated, [f]ederal officials shall explain the bases for their decision in a timely manner." *Id*.

59. Pursuant to California Government Code sections 65040.10 and 65040.11 and State Executive Order D-24-83, the Governor's Office of Office of Land Use and Climate Innovation is the State Clearinghouse and the Single Point of Contact for transmitting official State and local government comments on Federal proposals under review pursuant to EO 12372 and the ICA.

**IV.      The APA Prohibits Agency Actions that are Arbitrary, Capricious, an Abuse of Discretion, Contrary to Law, or that Fail to Observe Procedure Require by Law**

60. The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). The statute mandates that agency actions be "set aside" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

61. The "touchstone of arbitrary and capricious review . . . is reasoned decisionmaking." *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1080 (9th Cir. 2019) (internal quotation marks omitted). Agencies "must examine the relevant data and articulate a satisfactory explanation for [their] action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted).

62. Arbitrary and capricious agency action often arises when the "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*.

63. Agencies must also comply with their own rules, policies, and procedures. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). This principle is "not limited to rules attaining the status of formal regulation;" it also applies to "internal agency guidance." *Damus v. Nielsen*, 313 F. Supp. 3d 317, 336 (D.D.C. 2018); *see also Alcaraz v. INS*, 384 F.3d 1150, 1162

18

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF

(9th Cir. 2004) ("The legal proposition that agencies may be required to abide by certain internal policies is well-established.").

64. While agencies may still change policy positions, they "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  In addition to recognizing the change in position, the agency "must show that there are good reasons for the new policy" and provide a "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id*. at 515–516.

65. Agency actions are "subject to judicial review" under the APA once they are "final." 5 U.S.C. § 704.  An agency action is final when the agency reaches the "consummation of [its] decisionmaking process," and the action is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted).

**V. The Williamson Act Requires Properties Under Contract to Be Used Exclusively for Agriculture**

66. The Williamson Act, also known as the California Land Conservation Act of 1965, Cal. Gov't Code § 51200 *et seq*., seeks to preserve to the "maximum" extent the "limited supply of agricultural land" in the state, which "is necessary not only to the maintenance of the agricultural economy of the state, but also for the assurance of adequate, healthful and nutritious food for future residents of this state and nation." *Id.* § 51220(a).

67. The Williamson Act creates a tax benefit program in which the owners of agricultural land may significantly reduce their property taxes in exchange for limiting the use of their property to agriculture.  Under the Act, local governments may establish "agricultural preserves" and enter contracts restricting land use within those preserves to commercial agriculture.  *Id.* §§ 51230, 51240. In return for agreeing to those restrictions, the owner's property taxes are assessed at a rate based only on continued agricultural use, regardless of the highest and best use of the property.  *See id.* §§ 51243, 51243.6.  The contracts run with the land.  They are recorded, and benefit and bind all

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

successors in interest of the property owner, including upon sale or other transfers of the property under contract. *Id.* § 51243(b).

68.    Each Williamson Act contract is generally set for an initial term of at least 10 years and automatically renews each year for 10 additional years unless a party provides written notice of nonrenewal. *Id.* §§ 51244, 51245.

69.    A Williamson Act contract may be terminated through several processes set out in the Act. A landowner may initiate nonrenewal of a contract by providing a notice of nonrenewal at least 90 days prior to the annual renewal date, but the contract remains in effect for the balance of the 10-year term. *Id.* §§ 51245, 51246(a). A property owner may also seek immediate cancellation of a Williamson Act contract, but only in "extraordinary circumstances." *Id.* §§ 51280-87; *Sierra Club v. City of Hayward*, 28 Cal. 3d 840, 852–53 (1981). Cancellation requires a written petition to the Board of Supervisors, a noticed public hearing, payment of a cancellation fee of 12.5 percent of the unencumbered value of the property (or such higher fee as the contract may provide), and specified findings made by the Board. Cal. Gov't Code §§ 51282-84. Courts have emphasized that these are "extremely stringent" conditions. *See, e.g.*, *Sierra Club*, 28 Cal. 3d at 853.

70.    The Williamson Act includes specific procedural requirements for any "public agency" that seeks to locate a "public improvement" on land designated as an agricultural preserve, including land under a Williamson Act contract. Cal. Gov't Code § 51290 *et seq.* Whenever a "public agency," which includes "*any department or agency of the United States* or the state, and any county, city, school district, or other local public district," may require land within an agricultural preserve for a public use, the agency must notify the "local governing body responsible for the administration of the preserve of its intention to consider the location of a public improvement within the preserve" and provide an opportunity for the local government to comment on the potential effects of the proposal on agricultural resources and agricultural land use. *Id.* § 51291 (emphasis added). A public agency may not locate a facility within an agricultural preserve unless it makes the finding that the "location is not based primarily on a consideration of the lower

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

cost of acquiring land in an agricultural preserve" and "there is no other land within or outside the preserve on which it is reasonably feasible to locate the public improvement." *Id.* § 51292.

71.    A county may bring "any action in court necessary to enforce any contract" under the Williamson Act, with remedies "including, but not limited to, specific performance or injunction." Cal. Gov't Code § 51251.  The Williamson Act's remedies are explicitly flexible.  *See County of Humboldt v. McKee*, 165 Cal. App. 4th 1476, 1500–01 (2008).

**VI.    State and County Hazardous Materials Laws Establish Strict Requirements Governing the Generation, Storage, Use, Handling, and Disposal of Hazardous Substances**

72.    California's Hazardous Waste Control Law (HWCL), codified in California Health and Safety Code Division 20, Chapter 6.5, and implemented through regulations in title 22 of the California Code of Regulations, establishes a cradle-to-grave system governing hazardous waste generation, treatment, storage, transportation, and disposal.  The HWCL is the state analogue to the federal Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 *et seq*.  Pursuant to the Federal Facilities Compliance Act of 1992, the United States has waived immunity to suit under the state law equivalent to the RCRA.  Under Health and Safety Code section 25101(d), the Department of Toxic Substances Control (DTSC) administers the HWCL in lieu of federal administration.  Federal law prohibits California from imposing requirements less stringent than those under RCRA, and California's definition of hazardous waste is in several respects broader and more protective.

73.    A substance is a "hazardous waste" if it meets criteria established by DTSC, including if it is listed in Title 22 of the California Code of Regulations or if it exhibits characteristics of ignitability, corrosivity, reactivity, or toxicity.  These requirements ensure hazardous wastes are properly identified and managed to prevent releases and threats to human health or the environment.

74.    California also regulates hazardous materials management through the Hazardous Materials Release Response Plans and Inventory Law (HMRRPIL), set forth in California Health and Safety Code, Division 20, Chapter 6.95 and implemented in Title 19 of the California Code of Regulations. Businesses storing hazardous materials above specified thresholds must prepare and

21

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

maintain a Hazardous Materials Business Plan (HMBP) and submit it electronically to the California Environmental Reporting System.  The HMBP provides essential information to emergency responders, public officials, and the public about the types and quantities of hazardous materials located within their community, and it requires businesses to adopt safety measures, employee training protocols, and emergency procedures to prevent and mitigate releases.

75.    The Aboveground Petroleum Storage Act (APSA), codified at California Health and Safety Code section 25270 *et seq.*, regulates the storage and handling of petroleum in aboveground storage tanks.  APSA incorporates federal Spill Prevention, Control, and Countermeasure regulations contained in Title 40 of the Code of Federal Regulations Part 112.  Facilities subject to APSA must implement spill prevention plans, maintain adequate secondary containment, and follow operational standards designed to prevent petroleum releases.

76.    The County's Environmental Health Branch, through its Hazardous Materials Compliance Division (HMCD), serves as the Certified Unified Program Agency (CUPA) under California Health and Safety Code, Division 20, Chapter 6.11.  As the CUPA, HMCD administers and enforces six statewide environmental programs, including the HWCL, APSA, and HMRRPIL.  HMCD conducts inspections, enforces compliance, and oversees safe management of hazardous materials and wastes throughout the County.

<b>FACTUAL BACKGROUND</b>

**I.    The County's Commitments to Preserving Agricultural and Natural Land**

77.    The County has maintained a longstanding commitment to preserving and investing in the agricultural lands and habitat of the Santa Clara Valley (SCV).  This commitment recognizes the reality that California, especially the SCV, is "rapidly losing one of the Golden State's most valuable assets – its farmland."  Santa Clara Valley Agricultural Plan ("SCV Agricultural Plan"), at 1.[9]  Once "among the most productive farming areas in the country," the SCV has experienced a rapid loss in farmland—some 21,171 acres in the past 30 years (plus another 28,391 acres at

---

[9] County of Santa Clara and Santa Clara Valley Open Space Authority, *Santa Clara Valley Agricultural Plan* at 1 (Jan. 9, 2018), https://stgenpln.blob.core.windows.net/document/SCV_ActionPlan.pdf (last accessed June 9, 2026).

22

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

imminent risk)—due to increased development and the rise of Silicon Valley. *Id*.

78. Agriculture makes significant direct and indirect contributions to the county's economy, climate resilience, social vitality, food security, and environmental health. *Id*. at 19. From an economic standpoint alone, a 2014 Agricultural Commissioner's Office study estimated that SCV agricultural industries created $1.6 billion in output, contributed a total of $830 million annually to the county's economy, and created over 8,000 jobs at over 1,000 farms. *Id*.

79. For decades, the County's General Plan, which is a long-term roadmap for development within the unincorporated county required under the State Planning and Zoning Law, Cal. Gov't Code § 65300, has included policies to protect agricultural land and promote the long-term economic viability of agricultural activities.

80. Specifically, the General Plan decrees that "agricultural areas of greatest long term viability . . . such as the lands south and east of Gilroy should be considered for designation and preservation." General Plan, Book B, at O-36, R-RC 64.

81. The General Plan also specifically encourages use of Williamson Act contracts to both prevent the conversion of agricultural land and increase the financial feasibility of commercial agriculture by providing tax benefits to owners of agricultural property. General Plan, Book B, O-38, R-RC 65(b), R-RC 66.

82. In 2018, the County finalized its SCV Agricultural Plan, a regional effort led by the County and the Santa Clara Valley Open Space Authority to conserve Santa Clara Valley's farm and ranchland. SCV Agricultural Plan at 3. The SCV Agricultural Plan commits the County to a "comprehensive regional framework" designed to "preserve the remaining working lands and support a vibrant agricultural economy while [also] mitigating climate change." *Id*. at 2.

83. The top priority in the SCV Agricultural Plan is to prevent the conversion of working agricultural lands. SCV Agricultural Plan at 7, 36. This includes "prevent[ing] the establishment of incompatible uses" within agricultural lands, which would otherwise "increase land speculation and impair ongoing agricultural production." *Id*. at 47.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

84.     The County also participates in other coordinated efforts to preserve land and natural resources, including the Santa Clara Valley Habitat Plan, a 50-year regional plan to protect threatened and endangered species and natural resources from development in the County, and the regional Plan Bay Area, a state-mandated plan that seeks to produce sustainable strategies to reduce transportation-related pollution in the region.  SCV Agricultural Plan at 14.

85.     The State's Planning and Zoning Law affirms the State's alignment with the long-term preservation and protection of agricultural, ecological, and habitat uses of the Holsclaw Property.  Pursuant to California Government Code section 65041.1, the State's planning priorities include "protect[ing] environmental and agricultural resources" and "ensuring that any infrastructure associated with development . . . supports new development that . . . is located in an area appropriately planned for growth," and that "[mi]nimizes ongoing costs to taxpayers."

**II.        The Holsclaw Property**

86.     The Holsclaw Property, located at 7240 Holsclaw Road in unincorporated Santa Clara County near Gilroy, California, Assessor's Parcel Number 841-22-105, is an approximately 25-acre parcel with a main building, a "headhouse" (warehouse-type building), maintenance building, and greenhouses, as well as a large agricultural field that spans approximately 18 acres of the parcel.

87.     Because the Holsclaw Property is in unincorporated Santa Clara County, it is within the jurisdiction of County zoning and land use authority.  The Holsclaw Property is zoned A-40Ac, an exclusive agriculture zoning district.  The Holsclaw Property falls squarely within the SCV Agricultural Plan.

88.     The County's Ordinance Code establishes that the purpose of the exclusive agriculture zoning district is "to preserve and encourage the long-term viability of agriculture and agricultural lands, recognizing the vital contributions agriculture makes to the economy and quality of life within the County" and "to reserve those lands most suitable for agricultural production for agricultural and appropriate related uses."  County Zoning Ord. § 2.10.010.  Indeed, rigorous findings are required for the County to approve most new development in exclusive agriculture zones to ensure that the proposed use does not harm agricultural lands and is

24

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

compatible with agriculture.  Facilities that detain individuals are not an allowed use in exclusive agriculture zones.

89.    The Holsclaw Property has long been used for agriculture.  The area including the Holsclaw Property has been designated by the County as an agricultural preserve since 1967, when the County's Board of Supervisors adopted Ordinance No. NS-513.

90.    Since 1967, the Holsclaw Property has been subject to Williamson Act contract No. 67.030.  Exhibit 1 (Williamson Act Contract).  The contract requires the property owner to use the Holsclaw Property solely for "the production of agricultural commodities for commercial purposes."  The contract also prohibits "structures" from "being erected on the property except . . . as may be directly related to and compatible with the agricultural use," or as "residence buildings for such individuals as are directly engaged in the management of the property and their immediate families."  In return, each successive property owner subject to the contract—currently Defendant ECG 6 LLC—has received the benefit of significantly reduced property taxes.  Each property owner further agrees in the contract "that existence of an opportunity for another use of the property shall not be sufficient reason for the cancellation of this agreement."

91.    To date, ECG 6 LLC has not followed any of the statutory procedures in the Williamson Act to initiate nonrenewal or cancellation of the contract.

92.    The existing 18,700 square foot main building on the Holsclaw Property was permitted exclusively for agricultural research on vegetable and flower production pursuant to a Use Permit and Architectural and Site Approval granted by the County in 1993.  County File No. 5261-79-20-92P.  At the time, the County conducted environmental review of the proposed project based on a maximum of 40 employees onsite, and based on that proposed capacity of the facility, imposed conditions of approval that required the property owner to construct a 1,500-gallon septic tank and associated dispersal field with 1,000 feet of drainage lines to accommodate wastewater demands.  The County concluded that the agricultural research facility could be approved on the Holsclaw Property, which is zoned for exclusive agriculture, because an agricultural research center is consistent with agricultural activities and compatible with agriculture.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

93.     Defendant ECG 6 LLC became owner of record of the Holsclaw Property on or around January 30, 2025.

**III.      Elmwood Capital Group Communicates with County Department of Planning and Development Regarding the Holsclaw Property**

94.     Between late 2022 and early 2023, a representative of Elmwood Capital Group contacted mid-level staff in the County Department of Planning and Development (DPD) about the Holsclaw Property.  ECG 6 LLC is a subsidiary of Elmwood Capital Group.  The representative for Elmwood Capital Group conveyed that it was interested in leasing the Holsclaw Property to the federal government but did not indicate the level of construction that would take place or that the federal government intended to use the Holsclaw Property for detention purposes.  DPD staff provided general responses regarding federal government exemptions from local zoning regulations and permitting requirements.

95.     On June 21, 2023, Elmwood Capital Group produced a memorandum on GSA letterhead to DPD staff, regarding the potential lease.  Exhibit 2 (GSA Memorandum to DPD).  The memorandum stated, in its entirety:

> The United States General Services Administration (GSA) is seeking office and operations space under GSA Lease Solicitation No. 8CA3614.  Elmwood Capital Group (or its affiliate) is an offeror under said solicitation and proposes to provide GSA with the required space through a lease at a building located at 7240 Holsclaw Road, Gilroy, CA.  This lease will require construction work to be performed at the property.  Because this lease will be entirely for Federal Government use, the construction project and the property should receive any exemptions, immunities or other flexibility available for such Federal Government uses under local zoning, planning and permitting regulations.

*Id.*

96.     The memorandum from GSA did not indicate that the Holsclaw Property would be used by the federal government to hold detainees, nor did Elmwood Capital Group or GSA provide any additional site plans or details.

97.     On information and belief, no Defendant consulted with, sought input from, or coordinated with any other local government in the region or the State regarding the federal government's intended use of the Holsclaw Property or any plan or action that would allow informed

26

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

input on the proposed use of the Holsclaw Property.

**IV.      Federal Government Awards Office Space Contract to ECG 6 LLC for Holsclaw Property**

98.      On January 8, 2025, GSA awarded the lease for solicitation 8CA3614 to ECG 6 LLC for the Holsclaw Property ("Lease").  Exhibit 3 (Holsclaw Lease); *see also* Exhibit 4 (GSA Award Notice).

99.      The award amount totaled $26,551,532 for a 20-year lease (15 years firm term) with 60 parking spaces at 7240 Holsclaw Road, Gilroy, California, 95020-8027.  The Lease indicates that ECG 6 LLC is the fee owner of the property and that the United States of America, acting by and through the GSA, is the lessee.

100.      The Lease encompasses 18,700 rentable square feet of "office and related Space" and an additional 5,300 rentable square feet "of free space (for which the Government will not be charged rent, including operating cost escalations)."  The Lease stipulates that the "Government shall be responsible for any design, construction and related costs associated with modifying the outbuilding," and includes five exhibits: (A) Floor and Parking Plan; (B) Agency Requirements; (C) Security Requirements; (D) GSA Form 3517B General Clauses; and (E) Seismic Form A.

101.      The Lease requires ECG 6 LLC to provide a valid certificate of occupancy, "issued by the local jurisdiction, for the intended use of the Government."  It further stipulates, that "[i]f the local jurisdiction does not issue [certificate of occupancy] or if the [certificate of occupancy] is not available, ECG 6 LLC may satisfy this condition by providing a report prepared by a licensed fire protection engineer that indicates the Space and Building are compliant with all applicable local codes and ordinances and all fire protection and life safety-related requirements of this Lease."

102.      The Lease requires that the "leased Space shall be free of hazardous materials, hazardous substances, and hazardous wastes, as defined by and according to applicable Federal, state, and local environmental regulations."

103.      On information and belief, Exhibit D, or GSA FORM 3517B GENERAL CLAUSES, includes term GSAR 552.270-8, requiring that ECG 6 LLC "comply with all Federal, state, tribal, and local laws applicable to its ownership and leasing of the property, including, without limitation,

27

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

laws applicable to the construction, ownership, alteration or operation of all buildings, structures, and facilities located thereon, and obtain all necessary permits, licenses and similar items at its own expense." Exhibit 5 (General Clauses to Lease). The term notes that "[t]he Government will comply with all Federal, state, tribal, and local laws applicable to and enforceable against it as a tenant under this lease, provided that nothing in this lease shall be construed as a waiver of the sovereign immunity of the Government."

**V.      Federal Mass Deportation Agenda Escalates**

104.    On January 20, 2025, President Trump issued Executive Order 14,159 ("EO 14,159"), titled Protecting the American People Against Invasion. 90 Fed. Reg. 8443 (Jan. 20, 2025). The Order directs the DHS Secretary to "promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens." *Id*. at 8445. It further directs the DHS Secretary to "take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law." *Id.*

105.    On the same day, President Trump released Executive Order 14,165 ("EO 14,165"), titled Securing Our Borders. 90 Fed. Reg. 8467 (Jan. 20, 2025). The Order is premised on the federal government's perception that "the United States has endured a large-scale invasion at an unprecedented level" wherein "[m]illions of illegal aliens from nations and regions all around the world successfully entered the United States . . . , including potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent." *Id.* The Order directs the "Secretary of Homeland Security [to] take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law *until* their successful removal from the United States" and "issue new policy guidance or propose regulations regarding . . . the termination of the practice commonly known as *'catch-and-release,'* whereby illegal aliens are routinely released into the United States shortly after their apprehension for violations of immigration law." *Id*. at 8468 (emphasis added).

106.    Consistent with these directives and to fulfill the President's promise to carry out

28

what the federal administration characterizes as the "largest deportation program . . . in the history of America,"[10] media investigations of federal documents have concluded that DHS and ICE have begun "expanding across the United States at breakneck speed," often in "secret."[11]

107.    Under ICE's Detention Reengineering Initiative ("DRI"), the federal government is rapidly expanding its deportation capacity by purchasing or leasing unsuitable properties for detention purposes.  As ICE puts it, the DRI seeks to "fully implement a new detention model by the end of Fiscal Year 2026,"[12] which focuses on "non-traditional facilities."  DRI at 1.  This model includes acquiring and renovating "eight large-scale detention centers and 16 processing sites, as well as the acquisition of 10 existing 'turnkey' facilities" where ICE already operates. *Id*.

108.    But the rapid expansion of ICE's physical footprint is only one piece of this agenda; the *nature* of ICE detention has also shifted drastically in the past year, rendering ordinary Enforcement and Removal Operations (ERO) offices and other ICE facilities into de facto detention facilities,[13] a purpose for which these facilities were neither designed nor constructed.

109.    On June 24, 2025, ICE waived a core element of its own Directive 11087.2,[14] issued

---

[10] *See* Steve Inskeep & Christopher Thomas, *Trump Promised the 'Largest Deportation' in U.S. History. Here's How He Might Start*, NPR (Nov. 14, 2024), https://www.npr.org/2024/11/12/nx-s1-5181962/trump-promises-a-mass-deportation-on-day-1-what-might-that-look-like (last accessed June 9, 2026).

[11] Leah Feiger, *ICE Is Expanding Across the US at Breakneck Speed. Here's Where It's Going Next*, WIRED (Feb. 10, 2026) (cleaned up), https://www.wired.com/story/ice-expansion-across-us-at-heres-where-its-going-next/ (last accessed June 9, 2026).

[12] The United States federal fiscal year 2026 began on October 1, 2025, and will run through September 30, 2026.

[13] ICE detention facilities are governed by the Performance-Based National Detention Standards ("PBNDS").  *See* DHS, Immigr. & Customs Enf't, Performance-Based National Detention Standards 2011 (rev. Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf (last accessed June 9, 2026).  The PBNDS generally does not apply to holding cells, but court decisions issued during this presidential administration have recognized that its "standards serve as a valuable point of reference because [EROs] act[] as [] de facto detention center[s], where detainees are held for days or, in some cases, weeks."  *See Mercado*, 800 F. Supp. 3d at 576 n.293.

[14] *See* DHS, Immigr. & Customs Enf't, Office of Enf't and Removal Operations, *Directive 11087.2: Operations of ERO Holding Facilities* ("Directive 11087.2") at 7 (Jan. 31, 2024), https://www.ice.gov/doclib/foia/policy/directive11087.2.pdf (last accessed June 9, 2026).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

in January 2024 and which regulates ERO field office holding room operations,[15] to facilitate increased enforcement efforts.  Under the prior Directive 11087.2(5.1), ICE agents could detain individuals for *no more than 12 hours* in a field office holding room, which is designed for short-term confinement until an individual can be deported or transferred to a detention facility that is appropriately designed and developed for longer-term human habitation.

110.    The June 24, 2025 memorandum waiving the 12-hour rule explains that EOs 14,159 and 14,165 required a change in operating practice:

> As a result of increased enforcement efforts, EROs' average daily population has significantly increased to over 54,000.  This increase has put additional strain on finding and coordinating transfers of aliens to available beds within the required timeline detailed in Directive 11087.2.  Further, ERO field offices no longer have the option to discretionarily release aliens, nor decline to take aliens into custody from our counterparts in Homeland Security Investigations (HSI) or U.S. Customs and Border Protection (CBP).  As a result of these constraints, ERO field offices have had to resort to holding aliens in holding facilities beyond the 12-hour limit.

June 24, 2025 memorandum ("72-Hour Holding Policy") at 2.[16]

111.    With the June 24, 2025 waiver of Directive 11087.2(5.1),[17] ICE agents can now hold individuals in ERO field office holding rooms for *up to 72 hours*, or longer in exceptional circumstances.

112.    Reporting and lawsuits challenging confinement conditions in ERO field offices demonstrate the fallout from the June 24, 2025 memorandum's waiver of Directive 11087.2(5.1).  In the Baltimore ERO field office, for example, ICE routinely exceeds the maximum capacity of 56

---

[15] "Consistent with Directive 11087.2," the waiver applies to "all holding facilities operated by ERO, located in ERO field offices, or jointly operated by ERO and Homeland Security Investigations (HSI) in shared offices" but it "does not apply to detention facilities with hold rooms." *See* DHS, Immigr. & Customs Enf't, Memorandum for All ERO Field Office Directors: Nationwide Hold Room Waiver at 1 n.1 (June 24, 2025)("72-Hour Holding Policy"), 2025.06.24_Nationwide_Hold_Room_Waiver_Memo_-_ICE_.pdf (last accessed June 9, 2026).

[16] 72-Hour Holding Policy, *supra* note 15.

[17] While DHS waived section 5.1 of Directive 11087.2, as it relates to holding time policy, the remainder of the Directive still holds.  72-Hour Holding Policy, *supra* note 15, at 1.  That is, as the Waiver explains, "[a]ll other hold room and hold facilities requirements continue to apply to ensure the safety, security and humane treatment of those in custody in hold rooms and hold facilities." *Id.* at 2.  This includes the Directive's mandate, for example, that "hold rooms are safe, clean, [and] equipped with restroom facilities."  Directive 11087.2, *supra* note 14, at 6.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

individuals in holding rooms, instead detaining more than 120 individuals—or over 200 percent of maximum capacity.[18]

113.    Then, on July 8, 2025, ICE issued to its employees interim guidance regarding detention authority.  Previously, ICE field offices had the discretion to release detainees.[19]  Under the July 8, 2025 interim guidance, ICE instituted a "No Release Policy"[20] whereby DHS took the position that an "applicant for admission"—an alien who has not been admitted or who arrives in the United States per INA section 235(a)(1)—is "subject to detention under INA § 235(b) and may not be released from ICE custody except by INA § 212(d)(5) parole."  Further, these individuals "are also ineligible for a custody redetermination hearing ('bond hearing') before an immigration judge and may not be released for the duration of their removal proceedings absent a parole by DHS."

114.    One court described this as a "blanket policy" wherein ICE "detain[s] everyone who crossed the border, without regard to compliance history, criminal record, or actual risk." *Ambroladze v. Maldonado*, No. 26-CV-0473, 2026 WL 295405, at *1 & n.1 (E.D.N.Y. Feb. 4, 2026) (internal quotation marks omitted) (noting the substantial "toll" that the federal government has "exacted on the judiciary by continuing to pursue[its] new mandatory detention policy, despite its near-universal rejection" by federal courts); *see also Maldonado Vazquez v. Feeley*, 805 F. Supp. 3d 1112, 1124, 1150 (D. Nev. 2025) (framing the No Release Policy, which subjects "millions of noncitizens to mandatory prolonged detention without the opportunity for release on bond" as "upend[ing] decades of consistent agency practice").

115.    Federal courts have also faced challenges in monitoring injunctions against the inhumane treatment of detainees in ICE facilities.  For example, a district court judge in Minnesota

---

[18] *See supra* note 1.

[19] "ERO field offices no longer have the option to discretionarily release aliens, nor decline to take aliens into custody from our counterparts in Homeland Security Investigations (HSI) or U.S. Customs and Border Protection (CBP)."  72-Hour Holding Policy, *supra* note 15, at 2.

[20] On July 8, 2025, DHS issued a memo to ICE employees titled "Interim Guidance Regarding Detention Authority for Applicants for Admission."  *See* ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission, AILA Doc. No. 25071607 (July 8, 2025), https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission.  This memo, reflecting the No Release policy, came to the public's attention because it was leaked to the American Immigration Lawyers Association ("AILA").  *Id.*

31

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

identified 96 court orders that ICE has violated across 74 cases since January 2026 alone, acknowledging that these findings "certainly substantially understate[]" the "extent of ICE's noncompliance." *Juan T.R. v. Noem*, No. 26-CV-0107, 2026 WL 232015, at *1–2 (D. Minn. Jan. 28, 2026).

**VI.      County Investigation Reveals True Purpose of Defendants' Plans for the Holsclaw Property**

116.    Prompted by community concerns about the potential use of the Holsclaw Property, the County began in 2026 to investigate the true purpose of the Lease, which revealed these facts:

117.    ***Federal Government's Presolicitation Notice***.  On December 22, 2020, GSA issued a presolicitation announcing its search for "office and related space in San Jose, CA."

118.    The presolicitation sought a minimum of 15,000 square feet and a maximum of 17,000 square feet of occupiable area.  It also established several additional requirements, including: "[p]roof of zoning for a 4,000 SF Detention Center" that must be submitted with the expression of interest, as well as a "Sally Port, large enough to accommodate a large passenger bus."

119.    A sally port is a secured and controlled entryway to an enclosure, such as a detention facility, that consists of a series of locking doors or gates that facilitate the transfer of detainees from a vehicle into a building.  Prison facilities typically use sally ports to transfer imprisoned people from a bus into the prison enclosure.

120.    The notice stated that the offered space must "meet Government requirements for fire safety, accessibility, seismic, and sustainability standards per the terms of the Lease" and that the "space shall not be in the 100 year flood plain."

121.    The presolicitation was rendered inactive, and after several subsequent issues, was reissued again on August 9, 2024 with substantially similar terms, indicating that offers would be due on August 23, 2024.  Exhibit 6 (Solicitation Notice).  The 2024 solicitation included 10 exhibits, which included a template lease and several lease riders.

122.    ***Contracting Party Profiles.*** ECG 6 LLC, a subsidiary of Elmwood Capital Group, is a real estate investment firm headquartered in Beverly Hills, California, that specializes in acquiring,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

operating, and developing industrial and government-leased real estate assets across the United States. Elmwood Capital Group has leased at least two properties to DHS in Montana and Texas.

123. On June 26, 2025, DHS awarded $11,788 to Price Modern LLC, a Maryland-based corporation, to "purchase furniture design services for the enforcement and removal operations (ERO) office in Gilroy, CA." Exhibit 7 (Price Modern Purchase Order). These services were rendered by September 15, 2025. Plaintiffs are not aware of any existing ERO in Gilroy, California.

124. *Site Visits.* In early 2026, a County investigator began conducting site visits to the Holsclaw Property to observe the lot from publicly accessible locations. Between January 12 and April 13, 2026, the investigator did not observe any changes on the property. Exhibit 8 (Holsclaw Property (January 2026)). However, beginning on April 27, 2026, and over the course of multiple site visits between April 27 and June 5, 2026, the County investigator observed multiple changes to the property. These changes included the installation of a new privacy fence; a truck with signage indicating association with a company that advertises paving, grading, concrete, and demolition services; portable bathrooms commonly used at construction sites; equipment including a bulldozer, hauler trucks, a small "Bobcat" or Skid-Steer loader, and a subcompact tractor; piles of debris and what appeared to be older insulation material; and individuals who appeared to be construction workers engaged in activity at the site.

125. On May 29, 2026, the County investigator also observed that at least two of the smaller greenhouses' frames, which were intact during the past visits, had been dismantled and removed.

126. A drone-captured image of the Holsclaw Property, published by the *Mercury News* on May 29, 2026, also indicates that there are additional piles of debris and soil on the southwest corner of the Holsclaw Property, south of the main building:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



*Figure 1. Mercury News: A drone view of the Holsclaw Property taken on Friday, May 29, 2026. Available at https://www.mercurynews.com/2026/06/01/ice-detention-facility-gilroy-local-state-governments-stop-it/?share=to6eietcntv1nwwtfris.*

127.    ***Missing Agricultural Preserve Questionnaires***.  Under the County's Williamson Act Ordinance, property owner ECG 6 LLC is required to annually report to the County Office of the Assessor regarding the commercial agricultural use of the property under contract.  This information enables the County to confirm that property owners that are receiving the tax benefits of a Williamson Act contract are complying with the contract terms that require the property to be used for agriculture.  The County Office of the Assessor administers this process by requiring the submission of an annual Agricultural Preserve Questionnaire, which the County Agricultural Commissioner then reviews.[21]  As of early May 2026, ECG 6 LLC had not submitted annual questionnaires for 2024 or 2025.  So, on May 6, 2026, the County Agricultural Commissioner

---

[21] Ord. Code § C13-20.

34

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

requested, pursuant to the authority in County Ordinance Code section C13-21, that ECG 6 LLC complete the Agricultural Preserve Questionnaire and send copies of any active lease or rental agreements by May 29, 2026, so that the County could verify the compliance of the current use of the Holsclaw Property.  The County did not receive a response to this official request.

128.     *No Public Notices.*  The County is not aware of any public notice, including on the Federal Register, with respect to the federal government's activities on the Holsclaw Property.  On information and belief, Federal Agency Defendants have failed to publish any "notice of intent to prepare" an EIS or EA, failed to request public comment with respect to any agency action (whether proposed or underway), and have not yet conducted any required public consultation related to habitat, water, or flood control.  On information and belief, no Defendant has published any notice or information indicating that it searched for existing prisons, jails, or detention facilities to house individuals in its custody.  There is no indication that any Federal Agency Defendant has considered any state, regional or local views in developing or carrying out Defendants' plans for the Holsclaw Property, nor has any Federal Agency Defendant provided the County or the State any opportunity for consultation pursuant to the ICA.

129.     *Initial Media Comments*. On May 13, 2026, the *San José Spotlight* published an article titled: "Federal detention center planned in South County."[22]  Exhibit 9 (Spotlight Article (May)).  The article reviewed information obtained from the GSA solicitation and described community outrage at the prospect of an ICE facility.  When DHS was asked to comment, the agency neither confirmed nor denied the plans to build a facility with detention capacity.  As reported, the DHS spokesperson told the *San José Spotlight*: "We have no new detention centers to announce at this time," adding that "[i]t should not come as news that ICE will be making arrests in states across the U.S. and is actively working to expand detention space."

---

[22] Brandon Pho, *Federal Detention Center Planned in South County*, San José Spotlight (May 13, 2026), https://sanjosespotlight.com/federal-detention-center-planned-in-south-county/ (last accessed June 9, 2026).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

130.    ***Site Plans***. On June 4, 2026, the *San José Spotlight* published what it states it validated as the full 111-page site plans for the project.[23]  Exhibit 10 (Spotlight Article (June)); *see also* Exhibit 11 (GSA Site Plans (excerpts)).  The site plans, which are dated September 17, 2025, and which also bear the logos of GSA, ICE, and DHS, illustrate demolition and construction plans for the Holsclaw Property.  The publication of this news story marks the first time the County was able to review the full site plans for the Holsclaw Property.

131.    The site plans show a sally port enclosed by a fence, a "Man Trap" to serve as a secure entrance from the sally port, and six rooms with interior cinder block walls designed to serve as holding cells, each equipped with a toilet and sink.  The site plans also show detainee processing areas, interview and visitation rooms, an armory for weapons and ammunition, and a tactical equipment storage room.  To accommodate all these changes to the main building, most of the building's interior is marked for demolition.  The site plans also depict a new paved parking area, a portion of which is sited over the septic tank and dispersal field that serves the main building.

132.    The site plans depict detainee holding rooms consistent with the ICE Facility Design Guide, which sets out the purpose, building design, and materials specification for the construction of various rooms in ICE facilities.  Exhibit 12 (ICE Facility Design Guide).  The ICE Facility Design Guide describes detainee holding rooms as "[s]pace intended to be used for detaining illegal aliens, criminals and/or other apprehended individuals on a temporary basis in a secure confinement area." Of the three designs for detainee holding rooms, the "small" design holds up to 15 detainees, the "medium" design holds up to 30 detainees, and the "large" design holds up to 45 detainees.  Each design, at its maximum capacity, provides seven square feet for each detainee.

133.    The site plans display four holding rooms consistent with the design of the "small" holding room design and two holding rooms consistent with the design of the "large" holding room design, meaning that the ICE Facility Design Guide contemplates that these six detainee holding rooms will altogether detain up to 150 detainees.  Together with the GSA solicitation, the site plans

---

[23] Brandon Pho, *Blueprints confirm ICE involvement in South County facility*, San José Spotlight (June 4, 2026), https://sanjosespotlight.com/federal-detention-center-planned-in-south-county/ (last accessed June 9, 2026).

36

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF

indicate that the Holsclaw Property is being developed to accommodate 60 federal government employees and up to 150 detainees at any given time.

134.    ***Subsequent Media Acknowledgement***: When the *San José Spotlight* presented DHS with the 111-page site plans, an ICE spokesperson said: "The new Gilroy office will enable ICE to support local operations and enhance coordination with regional partners to ensure the enforcement of federal immigration laws at the operating standards of other offices nationwide."[24]  This June 4, 2026 media report marks the first time a Defendant acknowledged the existence of the facility, when demolition and construction were already underway.  Adding insult to legal injury, the spokesperson added that Defendant Mullin expressed a commitment to "work with community leaders" and "be good partners."  Yet no Defendant has since contacted Plaintiffs.

135.    Based on its own investigation and without the benefit of clear communication from Defendants, the County understands and believes that the Holsclaw Property has been leased and will be developed for use by ICE as a facility to hold detainees under short-term confinement.[25]

## VII.        The Holsclaw Property Is Unsuitable for Immigration Detention

136.    Federal Agency Defendants failed to consider a series of factors that render the Holsclaw Property wholly unsuitable for an ICE facility with detention capacity, including but not limited to: potential environmental harm to the longstanding agricultural land, threatened and endangered species, and water resources; infrastructural incompatibility for a mass deportation operation; wear and tear on County roads; and the presence of hazardous materials onsite.

137.    The County is not aware of any indication that Federal Agency Defendants conducted a NEPA evaluation in advance of pursuing the Holsclaw Property project.  Analysis of the project under NEPA would have revealed the substantial risk of environmental harm that will ensue from the construction and use of a new holding facility on the Holsclaw Property.

---

[24] *See* Pho, *supra* note 23.

[25]  ICE Directive 11087.2 defines a holding facility as a "facility that contains hold rooms that are primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other facility, or other agency."  *See* Directive 11087.2, *supra* note 14, at 2.  In this definition, "short-term" is "defined as a period not to exceed 12 hours, absent exceptional circumstances."  *Id*. at 2 n.3.  As noted above, ICE waived the 12-hour policy to allow confinement for up to 72 hours, absent exceptional circumstances. *See supra* ¶ 111.

37

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

***Threatened and Endangered Species***

138.    Developing the Holsclaw Property for immigration detention purposes poses a threat to local species, which may be harmed by the release and migration of toxic chemicals as a result of construction activities, increased noise, increased traffic, degradation of freshwater (including groundwater and the adjacent Llagas Creek), and the degradation of habitat due to light spillage.

139.    The potentially impacted species include South-Central California Coast steelhead, which is federally classified as threatened.  The National Marine Fisheries Service has designated Llagas Creek, which directly abuts the Holsclaw Property, as critical habitat for this species.  50 CFR § 226.211(i)(1)(iii).[26]  The federal Endangered Species Act defines critical habitat as those specific areas that are "essential to the conservation of the species."  16 U.S.C. § 1532(5)(A).

140.    Other potentially impacted sensitive species include the California red-legged frog, which is federally classified as threatened and is also designated by the California Department of Fish and Wildlife as a Species of Special Concern; northwestern pond turtle, which has been federally proposed as threatened, and which is also a California Species of Special Concern; least Bell's vireo, which is endangered under both federal and state classification; tricolored blackbird, which is deemed by the State as threatened (for nesting colonies) and as a Species of Special Concern (in areas used for foraging); and white-tailed kite, a Fully Protected Species under California law.

141.    At no point did any Defendant conduct any form of outreach to the California Department of Fish and Wildlife or the Santa Clara Valley Habitat Agency to consult on the potential impacts of the Holsclaw Property project on these species.

***Hazardous Materials***

142.    Prior to its current ownership, the Holsclaw Property was used from approximately 1993 through 2023 for agricultural research activities, including pesticide and fungicide seed processing and production.  These operations involved the storage, use, and handling of hazardous

---

[26] *See also* https://media.fisheries.noaa.gov/2022-05/ch_2021mapseries_Steelhead_SouthCentralCaliforniaCoastDPS.jpg (NOAA map depicting South-Central California Coast steelhead critical habitat).

38

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

materials, and they generated hazardous wastes over multiple decades.  Hazardous materials managed onsite included pesticides such as Thiram and Physan; DNA extraction reagents Puregene and ethidium bromide; calcium hypochlorite; acids; solvents; alkaline cleaners; and petroleum products including diesel fuel stored onsite in aboveground storage tanks (ASTs).  Hazardous wastes generated at the site included pesticide-contaminated seed waste, thiram-contaminated residues, spent solvents, oil and grease, acids, used oil, and laboratory chemical residues.  In particular, County inspectors found repeated evidence that laboratory and industrial process wastes were discharged to sinks and drains connected to the onsite septic system.

143.    County documents show three decades of mismanagement of hazardous materials and hazardous wastes at the Holsclaw Property.  Based on this history, the Holsclaw Property requires comprehensive hazardous materials inspection and likely environmental remediation before any construction, law enforcement operations, or detention uses may safely occur.

144.    In May 2026, a County investigator observed heavy construction equipment, including a Bobcat, and debris resembling concrete and insulation on the Holsclaw Property.  Heavy equipment uses diesel fuel and can release used oil and oily residues if not properly maintained and contained, posing risks to soil and groundwater and compromising agricultural use.

145.    Construction activities such as demolition, gutting, and rebuilding can disturb contaminated structures, soils, or septic components, increasing the risk of releasing hazardous materials into the environment.  Transporting debris from contaminated buildings to unauthorized landfills can also spread contamination.  Failure to remediate existing contamination endangers construction workers, future occupants, and detainees—especially vulnerable individuals such as children, elderly persons, and pregnant people.  These risks are compounded by onsite groundwater wells providing drinking water to workers and potentially future detainees.

146.    Despite the Holsclaw Property's documented risk profile, Defendants undertook demolition and construction activities without notifying or consulting the County regarding the intensity of construction or intended property use, or conducting a hazardous materials assessment.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

During its last inspection, the County identified substantial quantities of pesticides, laboratory chemicals, petroleum products, hazardous waste, and diesel ASTs onsite.[27]

***Water Quality and Septic System***

147.    The Holsclaw Property is not served by a municipal sewer system and relies entirely on an onsite wastewater treatment system (or septic system) to treat its wastewater.  Septic systems must be sized based on the anticipated capacity of the particular use or uses on a property.  The existing onsite septic system is sized for a relatively low-intensity agricultural research facility (also referred to as the main building) with up to 40 employees at the facility during normal business hours on weekdays.  It would be overwhelmed by the more intensive detention use envisioned by Defendants, including serving up to approximately 60 employees and 150 detainees, and remaining in active use 24 hours per day, seven days a week.

148.    At the time the agricultural research facility was permitted, the County required the property owner to construct and maintain a 1,500-gallon septic tank and an accompanying dispersal comprised of a 500-foot primary trench and 500-foot reserve trench to disperse wastewater safely from the main building, along with two small additional systems to serve floor drains in the adjacent buildings.

149.    According to the County's projections, the proposed detention use could require the septic system to be more than *sixteen times* the size of the currently approved system to safely pump, treat, and disperse the major increase in wastewater generated onsite.

150.    Neither Federal Agency Defendants nor Defendant ECG 6 LLC made any attempt to obtain State or County approvals to modify the existing septic systems or to build a new septic system, as required by law.  County Ord. Code §§ B11-71, B11-77.  Instead, they appear to have deferred to a later date consideration of whether and how the site can accommodate the required wastewater treatment and proceeded with modifications to establish and use a facility that will far

---

[27] On June 10, 2026, the County attempted to inspect the Holsclaw Property for releases or mishandling of hazardous materials, pursuant to its authority under the HWCL and California Fire Code.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

exceed the capacity of the existing septic system without any safeguards to ensure wastewater is appropriately treated and dispersed.

151.    The Holsclaw Property may never be suitable for this intensity of use, as a septic system that is properly sized for the proposed use of the facility may not even fit on the Holsclaw Property, and even if it could, it would almost certainly need to be built in the 100-year floodplain (see *infra* ¶¶ 153-58).

152.    Conversion of the Holsclaw Property to a detention use that far exceeds the capacity of the existing septic system could result in significant harms to both individuals on the Holsclaw Property and neighboring properties, such as surfacing wastewater that runs into nearby Llagas Creek and contaminates habitat, and backflow of wastewater into the main building, exposing detainees and employees to bacteria, viruses, parasites and other pathogens.  Surfacing wastewater and runoff from an overburdened septic system is also likely to harm the groundwater wells and drinking water on which this rural area depends.

***100-Year Floodplain***

153.    The GSA Solicitation that was ultimately awarded for the Holsclaw Property provided that "[o]ffered space shall not be in the 1-percent-annual chance floodplain," which is also known as the as the 100-year floodplain.[28]

154.    A floodplain "means any land area that is subject to flooding."  44 CFR § 9.4.  This term typically refers to relatively flat lowland that is adjacent to rivers and other bodies of water.[29] The 100-year floodplain is defined as the area that will be inundated by a flood event having a one percent chance of being equaled or exceeded in any given year, and is considered by the Federal Emergency Management Agency (FEMA) to be a special flood hazard area.  *See id.* § 59.1 (definition of "base flood" and "area of special flood hazard").  Because floods that occur in the 100-year floodplain can cause significant damage to ecosystems and human structures,[30] development in

[28] "The terms 'base flood elevation,' '1 percent annual change flood elevation,' and '100-year flood elevation' are synonymous and are used interchangeably."  44 CFR § 9.4.

[29] https://www.usgs.gov/water-science-school/science/100-year-flood

[30] https://www.epa.gov/system/files/documents/2022-03/flood-zone-indicator-reference-sheet-20220306.pdf

41

these areas pose greater risks.  On FEMA's flood insurance rate maps, special flood hazard areas are given an "A zone" designation, such as Zone A or Zone AE.[31]  *Id*. § 59.1 (definition of "area of special flood hazard").

155.    Most of the Holsclaw Property, including a portion of the Lease premises and one of the two main existing septic system dispersal fields serving the premises, is within the mapped 100-year floodplain (Zones A and AE).  The remainder of the property is mapped as an "area of undetermined flood hazard" (Zone D).

156.    The Holsclaw Property's location within the floodplain, including portions within the 100-year floodplain, poses significant safety concerns for the future inhabitants and users of the facility as well as neighboring properties.  One of the two main dispersal fields serving the main building is located in Zone A, and the site plans call for a parking lot to be constructed over a second existing dispersal field.  The only possible location for a new or expanded onsite wastewater treatment system to serve the facility's increased wastewater usage is within Zone A, or the 100-year floodplain.  During flood events, a septic system can become inundated, causing wastewater to surface and flow into nearby water bodies, and floodwaters can also displace system components, erode dispersal field areas, and deposit sediment that impairs drainage.  Flood-saturated soils can also substantially reduce the soil's capacity to absorb wastewater in a designated dispersal field even during non-flood periods, undermining the system's basic function.

157.    Additionally, flood hazards pose a heightened risk to detained individuals.  While individuals who are not confined—such as those who use the property for office or agricultural purposes—may be able to evacuate quickly in the face of a flood, detainees cannot control their movement and are wholly dependent on the facility staff to be quickly and safely evacuated.

---

[31] Other factors such as "sea level rise, climate change, and land development" are not accounted for in FEMA's flood risk assessment, which likely underestimates the possible frequency of flooding. https://www.epa.gov/system/files/documents/2022-03/flood-zone-indicator-reference-sheet-20220306.pdf. DHS itself recognizes that "many of the currently utilized flood maps are outdated, with much of the information based on very old terrain." https://www.dhs.gov/sites/default/files/publications/935_Flood-Apex_Flood-Analytics-FactSheet_180613-508.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

158.    Despite the location of the Holsclaw project within the 100-year floodplain, Federal Agency Defendants have not analyzed alternatives to the project that would avoid the floodplain, designed or modified the project to minimize potential harm within the floodplain, nor provided notice to the State or the County explaining why the project must be located in the floodplain.

*Infrastructure*

159.    The Holsclaw Property will require significant construction to accommodate its proposed use because the Holsclaw Property does not have the infrastructure to house, feed, bathe, or otherwise hold detainees overnight, especially if this facility joins the ranks of others that have become overcrowded due to zealous immigration enforcement activities.

160.    ICE's own National Detention Standards require "reasonably private bathing and toileting environment[s]," "[p]otable water available throughout the facility," and that "[e]nvironmental health conditions [] be maintained at a level that meets recognized standards of hygiene," including those set by "the Occupational Safety and Health Administration (OSHA), the Environmental Protection Agency (EPA), the Food and Drug Administration (FDA), the National Fire Protection Association (including the Life Safety Code (NFPA 101)), and the Centers for Disease Control and Prevention (CDC)." ICE National Detention Standards at 5–6, 25, 128. The Standards also provide that detention facilities "shall ensure appropriate temperatures, air and water quality, ventilation, lighting, noise levels, and detainee living space, in accordance with any applicable state and local jail/prison standards." *Id*. at 7.

161.    To the extent that the Holsclaw Property will be used as an ERO field office that includes detainee holding rooms, ICE Directive 11087.2 requires that detainees have "access to drinking water in hold rooms at all times," "have regular access to restroom facilities," and have accommodations for pregnant individuals, among a plethora of other requirements.

162.    The combination of recent ICE policy changes and the insufficient site plans for the Holsclaw Property pose a danger to its future detainees. For example, the site plans for the Holsclaw Property indicate that the holding rooms will be built with concrete benches. There are no apparent plans, either in the site plans or in the ICE Facility Design Guide, for beds or other sleeping

43

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

materials. And yet, ICE now permits its field office holding rooms to detain people for up to 72 hours, and longer in "exceptional circumstances," and prohibits discretionary releases of detainees. *See supra* ¶¶ 109-13.

### County Roads

163. The Holsclaw Property is served by six inbound and outbound County roads that each have a seven-ton weight restriction. These roadways are Dunlap Avenue (Gilman Road to Furlong Avenue); Ferguson Road (Leavesley Road to State Route 152); Furlong Avenue (State Route 152 to Dunlap Avenue); Gilman Road (Gilroy City Limit to Holsclaw Road); Holsclaw Road (State Route 152 to Leavesley Road); and Leavesley Road (Gilroy City Limit to Ferguson Road). Many of these County roadways are narrow and winding, with blind turns.

164. These roads, like other County roads in agricultural unincorporated County, constitute a reliable network by which local farmers can move equipment, labor, and supplies from field to field and transport their goods to processing plants and markets. However, increased traffic and the rural-urban interface impede the movement of slower farm equipment, thus affecting productivity, especially in the areas north of Gilroy. SCV Agricultural Plan at 29.

165. The weight of *empty* passenger buses can easily exceed the seven-ton weight restrictions on these roads, and fully loaded passenger buses can carry 20 or more tons. The regular use of County roads by passenger buses for immigration enforcement transportation would accelerate road disrepair and deterioration. The County incurs substantial costs to repair and maintain County roads, costs which occur with increased frequency when such roads are used by vehicles with specifications that far exceed their design.

### Public Health and Safety

166. The County also expects that the intended use of the Holsclaw Property will place additional burdens on essential public services in light of public reporting of conditions in detention facilities around the country revealing evidence of a measles outbreak, sewage problems, and generally unsanitary conditions.[32]

---

[32] *See, e.g.,* María Luisa Paúl, David Ovalle & David Nakamura, *Measles Cases Identified at ICE's Largest Detention Facility for Children*, Wash. Post (Feb. 3, 2026)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

167.    DHS detention facilities have a long and documented track record of poor public health conditions.[33]  This pattern of behavior is current and ongoing—including within the State of California.  The California Department of Justice recently reviewed conditions in the state's seven ICE detention centers, concluding that conditions had "worsened as the current administration's mass deportation campaign led to overcrowding and strained resources at new and existing facilities," which are increasingly violating ICE's own detention standards, especially with respect medical care services.[34]  This rampant overcrowding of detainees and understaffing of facilities has produced "unacceptable outcomes," including "chaotic [and] overwhelming" conditions and even an "increase in detainee deaths."[35]

168.    One independent report of detainee deaths in DHS facilities across the country found that the agency's facilities "provided incomplete, inappropriate, or delayed treatment and medication," engaged in "flawed or delayed emergency response[s]," failed to "take basic precautions during the COVID-19 pandemic," and did not provide adequate "staff who are trained and licensed to ensure patient health and safety."[36]

169.    Given the potential for disease outbreak, in combination with other public health risk factors, the use of the Holsclaw Property as a holding facility could cause public health emergencies that would require State and County response, resources, and coordination.  Notwithstanding the public health risks of DHS detention facilities, no Defendant attempted to seek input from or

https://www.washingtonpost.com/immigration/2026/02/03/ice-immigration-measles-texas-children/ (last accessed June 9, 2026); *see also* Rachel Handley, *Louisiana ICE Detainees Report Mice, Sewage, and Delayed Medical Care at Processing Facilities*, WWL Louisiana (Feb. 11, 2026), https://perma.cc/7RDF-YM7N (last accessed June 9, 2026).

[33] *See, e.g.*, Office of the Inspector Gen., U.S. Dep't of Homeland Sec., OIG-24-59, *Summary of Unannounced Inspections of ICE Facilities Conducted in Fiscal Years 2020-2023* at 10 (Sept. 24, 2024), https://www.oig.dhs.gov/sites/default/files/assets/2024-09/OIG-24-59-Sep24.pdf.

[34] California Department of Justice, *Immigration Detention in California* at 4 (May 2026), https://oag.ca.gov/system/files/media/immigration-detention-2026.pdf.

[35] *Id.* at 7, 168.

[36] ACLU, Am. Oversight & Physicians for Hum. Rts., *Deadly Failures: Preventable Deaths in U.S. Immigration Detention* at 8–10, 37, 41–44, 48 (June 21, 2024), https://www.aclu.org/publications/deadly-failures-preventable-deaths-in-usimmigrant- detention.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

coordinate with any State or local government entity for the appropriate siting and design of the facility now being developed at the Holsclaw Property.

## CAUSES OF ACTION

### COUNT 1
**Violation of NEPA, 42 U.S.C. § 4321 et seq.**
**APA, 5 U.S.C. § 706(2)**
**(Brought by Plaintiffs Against All Defendants)**

170.    Plaintiffs incorporate by reference all preceding allegations.

171.    Under the APA, a "court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

172.    Federal Agency Defendants' failure to comply with NEPA violates these prongs of the APA.

173.    Federal Agency Defendants' decision to enter a legally enforceable lease agreement and decision to construct an ICE facility at the Holsclaw Property are each a final agency action subject to judicial review under the APA.  *See* 5 U.S.C. § 704; *Bennett*, 520 U.S. at 177–78.  These agency actions are not exempt from NEPA.

174.    Under NEPA, an agency must prepare either an EIS or EA before taking final action—in other words, at the proposal stage.  42 U.S.C. § 4336e(12) (applying NEPA requirements to proposals).

175.    The Federal Agency Defendants' decisions to lease and construct the Holsclaw Property as an ICE holding facility are "major Federal actions significantly affecting the quality of the human environment" under NEPA.  *See* 42 U.S.C. §§ 4332(C), 4336e(10)(A).  It is reasonably foreseeable that the conversion and use of the Holsclaw Property into an ICE facility with detention capacity will have a significant effect on the surrounding environment in several ways, including but not limited to: degradation of agricultural land within an agricultural preserve; increased wastewater discharges beyond the capacity of the existing septic system; the existence and potential release of toxic chemicals and other hazardous materials on the property; health and safety impacts arising from contamination of surface waters and groundwater with hazardous materials and untreated

46

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

wastewater; impacts from development in a high flood hazard area; the degradation of County roads; and impacts to several threatened and endangered species and their habitats from construction activities, operational impacts, and contamination of aquatic habitats, including the federally threatened South-Central California Coast steelhead and its designated critical habitat.

176.    Federal Agency Defendants failed to perform the requisite "hard look" at the environmental consequences of the Holsclaw Property project before taking final action in violation of NEPA. *See Ctr. for Biological Diversity*, 141 F.4th at 993.

177.    Because it is reasonably foreseeable that building an ICE facility with detention capacity in this location will have significant environmental effects, an EIS was required. *See* 42 U.S.C. §§ 4332(C), 4336e(10)(A). And even if such impacts were not reasonably foreseeable, NEPA requires preparation of at least an EA. *See* 42 U.S.C. § 4336(b)(2). Federal Agency Defendants have not prepared either NEPA document—not an EIS or an EA—for the project.

178.    There is no applicable categorical exclusion that would relieve the Federal Agency Defendants from the requirement to prepare a NEPA document. The relevant CEs are inapplicable on numerous, independent grounds, including, without limitation, the facts that the project: is incompatible with local planning and zoning standards; far exceeds the site's infrastructure capacity; involves potentially significant effects on public health or safety, protected species or habitats, or environmentally sensitive areas; has potential to violate Federal, state, or local laws imposed to protect the environment; and is subject to significant community controversy. *See* Instruction Manual 023-01 at A-8, V-5 to V-7; *see also* GSA Desk Guide §§ 5.3(b), (g), (k), 5.4(b).

179.     In addition, on information and belief, Federal Agency Defendants have not invoked any CEs with respect to the Holsclaw Property. To rely on a CE, an agency must invoke it *before* taking final action. *See California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002) ("Post hoc invocation of a categorical exclusion does not provide assurance that the agency actually considered the environmental effects of its action before the decision was made").

180.    Federal Agency Defendants also have failed to comply with NEPA's provisions requiring collaboration with the State and County and disclosure to the public. *See* 42 U.S.C. §

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

4332(C); *see also* Instruction Manual 023-01 at IV-6, IV-7; GSA Desk Guide at 1-2, 4-1, 4-4, 4-5, 5-5, 6-3, 7-4.  Federal Agency Defendants never solicited the "comments and views" of the State or County.  Had Federal Agency Defendants undertaken the required NEPA process, the State, County, other local public agencies and the public would have had the opportunity to provide input about the consequences of the proposed development and any potential alternatives or mitigation measures.  *See* 42 U.S.C. § 4332(C).  The public and relevant public agencies, including Plaintiffs, were given no such opportunity in this case.

181.    In addition, because the Holsclaw Property is located, in part, within a 100-year floodplain, Federal Agency Defendants were required under EO 11,988 to consider alternatives to the proposed action that would avoid adverse effects and incompatible development in the floodplain, to design or modify the action to minimize adverse effects in the floodplain if no other alternative is practicable, and to provide notice to the State and County explaining why the action must be located in the floodplain.  *See* EO 11,988.  There is no indication that Federal Agency Defendants undertook any of these required actions.

182.    The Federal Agency Defendants' decisions to enter into the Lease and begin construction without preparing any NEPA documents were arbitrary and capricious, an abuse of discretion, not in accordance with the requirements of NEPA and the APA, and taken without observance of procedure required by law.  *See* 42 U.S.C. § 4332(2)(C); *see also* 5 U.S.C. § 706(2)(A), (D).

183.    Federal Agency Defendants' flagrant disregard for the process required under NEPA has harmed and will continue to harm Plaintiffs and the public, which have been denied opportunities to provide input on the Holsclaw Property development and its environmental impacts.  Unless enjoined, Federal Agency Defendants' failure to account for the environmental consequences of constructing and operating at the Holsclaw Property will do permanent and irreparable damage to the human environment.

184.    The Court should also enjoin Defendant ECG 6 LLC from further developing the Holsclaw Property until NEPA's procedural requirements are met.  An "injunction may issue against

48

a non-federal party in a NEPA action" when the party acts in concert with the federal government to advance a federal project. *See Sierra Club v. U.S. Fish & Wildlife Serv.*, 235 F. Supp. 2d 1109, 1123 (D. Or. 2002) (enjoining non-federal party conduct when it received "federal assistance for the challenged activity"); *see also Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1397 (9th Cir. 1992) ("Nonfederal defendants may be enjoined" where federal and nonfederal participation in a project is "sufficiently interrelated to constitute a single federal action for NEPA purposes") (internal quotation marks omitted).  As owner of the Holsclaw Property, ECG 6 LLC is working closely with Federal Agency Defendants to implement the project and would be compensated by Federal Agency Defendants in the amount of $26,551,532 over the term of the Lease.

185.    The Court should declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants are in violation of NEPA, should vacate and set aside Federal Agency Defendants' approval of the Lease and the ICE holding facility, should provide preliminary relief under 5 U.S.C. § 705, and should enjoin all Defendants from engaging in further construction of and from operating the facility on the Holsclaw Property unless and until proper NEPA review has been completed.

**COUNT 2**
**Violation of INA, 8 U.S.C. § 1231(g)(1)**
**APA, 5 U.S.C. § 706(2)**
**(Brought by Plaintiffs Against Federal Agency Defendants Only)**

186.    Plaintiffs incorporate by reference all preceding allegations.

187.    In leasing, constructing, and developing the Holsclaw Property into an ICE holding facility, Federal Agency Defendants have failed to "arrange" for an "appropriate" place of detention. *See* 8 U.S.C. § 1231(g)(1).  Federal Agency Defendants' decisions to enter a legally enforceable lease agreement and decision to begin construction on an ICE holding facility at the Holsclaw Property are each a final agency action subject to judicial review under the APA.  *See* 5 U.S.C. § 704.

188.    The Holsclaw Property is an inappropriate site for detention because Federal Agency Defendants' intended use of the Holsclaw Property would exceed the capacity of existing wastewater and roads infrastructure.  The Holsclaw Property has not been adequately designed for human habitation because it does not account for the true number of detainees who will be housed

49

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

there, nor does it account for the habitation needs of those detainees, who may be kept there for up to 72 hours or more, in certain circumstances.  In addition, the Holsclaw Property is located within a floodplain and portions of the septic system are in designated Special Flood Hazard Areas (within the high-risk 100-year floodplain), which, in the event of a flood, poses a significant risk to the surrounding natural environment.

189.    The Holsclaw Property is also an inappropriate site for an ICE holding facility because it is subject to a Williamson Act contract restricting the Holsclaw Property to agricultural uses, is designated for agricultural use in the County's General Plan, and is located in the County's exclusive agricultural zoning district—a zone with which immigrant processing and detention uses are flatly incompatible.  Constructing and operating an ICE facility on the Holsclaw Property will irreparably harm the agricultural use of the underlying land and will likely harm neighboring agricultural uses as well.

190.    For these reasons, the Property's development for an ICE facility is patently inconsistent with the State Planning Priorities and the County's General Plan, which respectively enshrine commitments to preserve agricultural land, focus infrastructure resources in areas planned for development, and avoid development in flood-prone areas.

191.    The Holsclaw Property is also an inappropriate site for the ICE facility because Federal Agency Defendants' intended use of the Holsclaw Property will likely expose construction workers, employees, and detainees to hazardous substances that threaten their health, including hazardous chemicals that are inappropriately remediated.

192.    The Holsclaw Property is not an "appropriate" location within the meaning of 8 U.S.C. § 1231(g)(1), rendering Federal Agency Defendants' decision to lease, construct, and develop the Holsclaw Property into an ICE holding facility arbitrary and capricious, an abuse of discretion, not in accordance with the requirements of law, and taken without observance of procedure required by law.  *See* 5 U.S.C. § 706(2)(A), (D).

193.    The Court should declare under 28 U.S.C. § 2201 and 5 U.S.C. § 706 that Federal Agency Defendants violated  8 U.S.C. § 1231(g)(1) by deciding to lease and develop the Holsclaw

50
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Property as an ICE holding facility despite it being inappropriate for detention purposes.

## COUNT 3
### Violation of INA, 8 U.S.C. § 1231(g)(2)
### APA, 5 U.S.C. § 706(2)
**(Brought by Plaintiffs Against Federal Agency Defendants Only)**

194.    Plaintiffs incorporate by reference all preceding allegations.

195.    "Prior to initiating any project for the construction of any new detention facility," DHS must "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use."  8 U.S.C. § 1231(g)(2).

196.    On information and belief, Federal Agency Defendants did not consider the availability of any other location for the ICE holding facility they are constructing at the Holsclaw Property.

197.    In addition, despite Congress's clear direction to consider the use of existing facilities for immigration detention, Federal Agency Defendants initiated construction on an ICE holding facility on land intended solely for agricultural use and with existing structures incompatible with and insufficient for detention purposes.  *See Geo Grp.,* 50 F.4th at 751.

198.    Federal Agency Defendants' failure to abide by the INA's requirements regarding the consideration of more suitable, existing detention facilities, *see* 8 U.S.C. § 1231(g)(2), is arbitrary and capricious, an abuse of discretion, not in accordance with law, and taken without observance of procedure required by law.  *See* 5 U.S.C. § 706(2)(A), (D).

199.    The Court should declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Federal Agency Defendants' decisions to lease and develop the Holsclaw Property as an ICE holding facility, without consideration of other suitable facilities, violate the INA.

## COUNT 4
### Violation of ICA, 31 U.S.C. § 6506(c)
### APA, 5 U.S.C. § 706(2)
**(Brought by Plaintiffs Against Federal Agency Defendants Only)**

200.    Plaintiffs incorporate by reference all preceding allegations.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

201.    Under the ICA, federal agencies have three primary statutory obligations: to "provide opportunities for consultation" with local government officials directly affected by their proposed actions; "[t]o the extent possible" consider "all national, regional, State, and local viewpoints . . . in planning its development programs and projects of the United States Government;" and to develop a "reviewable record." *City of Waltham v. U.S. Postal Serv.*, 786 F. Supp. 105, 141–42 (D. Mass. 1992), *aff'd,* 11 F.3d 235 (1st Cir. 1993) (internal quotation marks omitted).  The ICA also imposes "an affirmative obligation" on federal agencies "to develop a reviewable record" that includes an explanation of any "decision to act in disharmony with local planning objectives." *Rochester,* 541 F.2d at 975.

202.    The ICA applies to the Holsclaw Property because it is under the control of the federal government as a DHS "plann[ed]" development . . . project[]."  *See* 31 U.S.C. § 6506(c).

203.    Federal Agency Defendants failed to meet their statutory obligations under the ICA because they have not "[t]o the extent possible" solicited—nor considered—"[s]tate . . . and local viewpoints . . . in planning development" of the Holsclaw Property.  *See* 31 U.S.C. § 6506(c). Federal Agency Defendants failed to meet their "affirmative obligation" to invite Plaintiffs to weigh in on this project.  *See Rochester*, 541 F.2d at 976.

204.    Federal Agency Defendants had no communication sufficient for the purposes of the ICA with the State or County about the project.  The June 21, 2023 letter sent by Elmwood Capital Group to County staff did not constitute compliance to the extent possible as required under the statute.  *See id.*

205.    And at no point did GSA or ECG 6 LLC indicate to Plaintiffs that the Holsclaw Property would be used by the federal government to house detainees overnight, or the number of detainees who might be held at the facility.[37]  Defendants did not attempt to consult Plaintiffs about

---

[37] Plaintiffs have reason to believe that Federal Agency Defendants may have never planned to reveal their detention plans for the Holsclaw Property.  In Colorado, for example, it was not until 2026 that ICE "revealed . . . for the first time that it detains people" at its Field Office in the Denver suburb of Centennial.  Jason Salzman, "Denver 'Hold Room' Revealed: ICE Has Detained Thousands of People at Its Field Office in Centennial," Colorado Times Recorder (March 16, 2026), https://coloradotimesrecorder.com/2026/03/denver-hold-room-revealed-ice-has-detained-thousands-of-peope-at-its-field-office-in-centennial/77329/ (last accessed June 9, 2026) (reporting that the Denver Hold Room was "not identified in ICE documents"; "marked as a hold room or detention

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

the appropriate location for such a project, about any infrastructure requirements, about whether the development would impact local planning and surrounding land uses, or about what State and County services would be required to mitigate the impacts of developing the project in this location.

206.    Defendants' minimal contact with the County not only "falls far short of indicating that the[y] did anything to promote the purposes of, or to comply with the language of, the ICA," see *Rochester*, 541 F.2d at 976, but undermines the purpose of consultation under the ICA.  The lack of transparency with respect to Defendants' true intentions for the Holsclaw Property indicate that "local views" were not intended to be, and were not, "fully considered for the purposes of plan formulation, evaluation, and review." *Id.* (internal quotation marks omitted).

207.    DHS's conduct also violates EO 12,372, which implements ICA requirements and requires "federal agencies" to "provide opportunities for consultation by elected officials of those [s]tate and local governments . . . that would be directly affected by . . . direct [f]ederal development." *See* EO 12,372.  The County had no opportunity to provide input because the true purpose of the Holsclaw Property lease and development was concealed.  On information and belief, the Governor's Office of Land Use and Climate Innovation, which is the State's Single Point of Contact for the communications with the federal government under the ICA, has received no communication from the Federal Agency Defendants or Defendant ECG 6 LLC relating to any plans to develop the Holsclaw Property.  Federal Agency Defendants made no effort to "[c]ommunicate with [s]tate and local elected officials as early in the program planning cycle as . . . reasonably feasible to *explain specific plans and actions*." *Id*. (emphasis added).

---

center on building signage"; nor  listed on the official detention facilities page of ICE's website); *see also* Logan M. Davis, "EXCLUSIVE: Secret ICE Detention Facilities Exist Around Colorado, Data Shows" (March 4, 2026), https://coloradotimesrecorder.com/2026/03/exclusive-secret-ice-detention-facilities-exist-around-colorado-data-shows/76983/ (last accessed June 9, 2026) (discovering that, between January and October 2025, ICE had held 1,398 individuals, including 39 children, at the Denver Hold Room for varying lengths of time, with at least two men detained for over a month). Also without oversight, the Washington Field Office in Chantilly, Virginia, long used for administrative proceedings, was suddenly converted into a "'makeshift' detention facility." Angela Woolsey, "Advocates for immigrants allege 'degrading' conditions at ICE office in Chantilly," (Aug. 29, 2025), https://www.ffxnow.com/2025/08/29/advocates-for-immigrants-allege-degrading-conditions-at-ice-office-in-chantilly/ (last accessed June 9, 2026).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

208.    On information and belief, neither the Federal Agency Defendants nor Defendant ECG 6 LLC have provided complete or accurate information to and/or sought to consult with other state agencies with interests in the Holsclaw Property's use and/or development.

209.    Federal Agency Defendants' failure to consult with state and local government agencies as required by the ICA is particularly notable and alarming given the project's disharmony with state and local planning objectives to preserve the Holsclaw Property's agricultural and ecological qualities.

210.    Federal Agency Defendants' failure to comply with the ICA is arbitrary and capricious, an abuse of discretion, not in accordance with law, and taken without observance of procedure required by law.  *See* 5 U.S.C. § 706(2)(A), (D).

211.    Injunctive relief is appropriate "when agencies of the United States government . . . fail to comply with the Intergovernmental Cooperation Act." *Vill. of Palatine v. U.S. Postal Serv.*, 742 F. Supp. 1377, 1396 (N.D. Ill. 1990) (citing *Rochester*, 541 F.2d at 976).

212.    The Court should declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Federal Agency Defendants' decisions to enter into the Lease and establish an ICE holding facility at the Holsclaw Property without considering state and local views violate the ICA; vacate and set aside those decisions; provide preliminary relief under 5 U.S.C. § 705; and enjoin all Defendants from developing or operating the proposed ICE facility on the Holsclaw Property and from conducting any physical modifications and construction at the site to accomplish such purposes.

**COUNT 5**
**Breach of Williamson Act Contract**
**California Government Code § 51200 *et seq.***
**(Brought by County Only Against All Defendants)**

213.    Plaintiff County incorporates by reference all preceding allegations.

214.    California Government Code section 51251 authorizes the County to bring "any action in court necessary to enforce" a Williamson Act contract, including by specific performance or injunction.  Cal. Gov't Code § 51251.  A range of equitable remedies are available in such an action.

54

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

215.    Since 1967, the Holsclaw Property has been restricted by a Williamson Act contract that runs with the land.  The Williamson Act contract is an enforceable agreement between the County and the property owner that grants significant property tax relief to the owner in exchange for restricting the land's use exclusively to agricultural and compatible uses.

216.    Defendant ECG 6 LLC, as the owner of the Holsclaw Property, is both bound by and currently receiving the benefits of this Williamson Act contract, including a significant reduction in property taxes.

217.    At no point has ECG 6 LLC initiated nonrenewal or sought cancellation of the Williamson Act contract for the Holsclaw Property according to the procedures set out in state law. *See* Cal. Gov't Code §§ 51245, 51282.  Further, at no point has the federal government sought to void the contract by condemning an interest in the Holsclaw Property.  *See id.* § 51295.  Therefore, the Williamson Act contract remains in full force and effect.

218.    ECG 6 LLC's lease of the property to the Federal Agency Defendants for use as an ICE holding facility violates its contractual obligation that the Holsclaw Property "shall not be used for any purpose other than the production of agricultural commodities for commercial purposes." Exhibit 1, § 2 (Williamson Act Contract).  Additionally, the use or construction of buildings related to a holding facility on the Holsclaw Property violates the contractual requirement that "[n]o structures shall be erected upon the property except structures that are directly related to the agricultural use or those individuals engaged in agriculture."  *Id.*

219.    ECG 6 LLC has flatly disregarded its obligations under the Williamson Act contract by initiating the immediate conversion of the Holsclaw Property to an ICE facility with detention capacity, which is a non-agricultural use, is incompatible with surrounding agricultural uses, and will destroy the long-term viability of the property for agricultural use.  By continuing to receive tax benefits from its Williamson Act contract, ECG 6 LLC is depriving the County of the benefit of its bargain.

220.    Moreover, allowing ECG 6 LLC to convert agricultural land encumbered by a Williamson Act contract to an ICE holding facility, while continuing to receive significant property

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

tax benefits, would render the Williamson Act a "tax shelter for real estate speculators." *See Sierra Club*, 28 Cal. 3d at 853.

221.    Agricultural land, such as the Holsclaw Property, is a finite and irreplaceable natural resource and its conversion irreparably harms the County and its residents, in addition to depriving the County of the substantial property tax revenue that would otherwise accrue from the property.

222.    The Federal Agency Defendants leased the Holsclaw Property subject to the covenants imposed by the Williamson Act contract and are therefore themselves subject to those covenants.  In section 702 of the APA, Congress has waived the United States' sovereign immunity as to "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted . . . in an official capacity or under color of legal authority."  5 U.S.C. § 702.  Accordingly, the County may bring this cause of action against the Federal Agency Defendants to enforce the restrictions on the use of the property set forth in the Williamson Act contract.

223.    This Court should declare that Defendants' conversion and/or use of the Holsclaw Property as an ICE facility violates the Williamson Act contract for the property.  The Court should further enjoin Defendants' continued development of and construction on the Holsclaw Property as contrary to the requirements of its Williamson Act contract.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the Court grant the following relief:

i.    Declare unlawful, vacate, and set aside Federal Agency Defendants' decisions to enter into the Lease and to begin construction of an ICE facility at the Holsclaw Property on the basis that they are not in accordance with, without observance of procedure required by law, and arbitrary and capricious.

ii.    Declare that in Federal Agency Defendants' siting of the ICE holding facility at the Holsclaw Property, they have failed to "arrange" for an "appropriate" place of detention pursuant to 8 U.S.C. § 1231(g)(1).

iii.    Declare that Federal Agency Defendants violated 8 U.S.C. § 1231(g)(2) by failing to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

consider the availability of any other location for the ICE facility that will detain individuals at the Holsclaw Property.

iv.     Declare Defendants' intended use of the Holsclaw Property as violative of the restrictions imposed by the Williamson Act contract and enjoin Defendants' continued development, construction, and intended use of the Holsclaw Property.

v.      Stay Federal Agency Defendants' decision to enter into a lease of the Holsclaw Property, decision to begin construction of an ICE facility at the Holsclaw Property, and implementation of those decisions pursuant to 5 U.S.C. § 705 and issue all other necessary and appropriate process to preserve status or rights pending the conclusion of the proceedings;

vi.     Preliminarily and permanently restrain, enjoin, and stay Defendants from further implementing the Lease and the decision to begin construction of an ICE facility at the Holsclaw Property, including without limitation enjoining any further work, construction, or other physical modifications on the Holsclaw Property in connection with the proposed facility;

vii.    Award Plaintiffs reasonable costs and attorneys' fees; and

viii.   Grant such other relief as this Court may deem proper.

Dated:  June 10, 2026                          Respectfully submitted,

                                               TONY LOPRESTI
                                               County Counsel
                                               KAVITA NARAYAN
                                               Chief Assistant County Counsel
                                               ELIZABETH G. PIANCA
                                               Assistant County Counsel
                                               MEREDITH A. JOHNSON
                                               Lead Deputy County Counsel
                                               SONIA N. WILLS
                                               RAJIV NARAYAN
                                               Deputy County Counsels
                                               LEILY ARZY
                                               Litigation Fellow

                                        By:    _/s/ Tony LoPresti_
                                               TONY LOPRESTI
                                               County Counsel

                                               Attorneys for Plaintiff
                                               COUNTY OF SANTA CLARA

57

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ROB BONTA
Attorney General of California
ABIGAIL BLODGETT
Supervising Deputy Attorney General

By:      /s/ Stacy Lau
STACY LAU
ASHLEY WERNER
JESSICA DURNEY
ERIN GANAHL
Deputy Attorneys General

Attorneys for Plaintiff
STATE OF CALIFORNIA

I, Matthew D. Zinn, hereby attest that each of the other Signatories have concurred in the filing of this document.

Dated:  June 10, 2026                    SHUTE, MIHALY & WEINBERGER LLP


By:          /s/ Matthew D. Zinn
WILLIAM J. WHITE
MATTHEW D. ZINN
CALEB E. HERSH

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

2078657.3

58

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF