TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
ELIZABETH G. PIANCA, SBN 241244
Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
SONIA N. WILLS, SBN 259892
CRISTINA STELLA, SBN 305475
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
LEILY ARZY, SBN 364187
Litigation Fellow
OFFICE OF THE COUNTY COUNSEL
70 West Hedding St., East Wing, Ninth Fl.
San José, California 95110-1770
Telephone: (408) 299-5900
Facsimile: (408) 292-7240
cristina.stella@cco.sccgov.org

WILLIAM J. WHITE, SBN 181441
MATTHEW D. ZINN, SBN 214587
CALEB E. HERSH, SBN 356318
SHUTE, MIHALY & WEINBERGER LLP
550 California St., Ste. 1200
San Francisco, California 94104
Telephone: (415) 552-7272
Facsimile: (415) 552-5816
zinn@smwlaw.com

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

ROB BONTA, Attorney General of California
ABIGAIL BLODGETT, Supervising Deputy
Attorney General
STACY LAU, SBN 254507
ASHLEY WERNER, SBN 282217
JESSICA DURNEY, SBN 326816
ERIN GANAHL, SBN 248472
Deputy Attorneys General
1515 Clay St., 20th Fl.
Oakland, California 94612-0550
Telephone: (510) 879-1973
Facsimile: (510) 622-2270
jessica.durney@doj.ca.gov

Attorneys for Plaintiff
STATE OF CALIFORNIA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| COUNTY OF SANTA CLARA; STATE OF CALIFORNIA, by and through Attorney General Rob Bonta,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>Defendants. | No. 5:26-cv-05604-EKL<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:   October 7, 2026<br>Time:   10:00 a.m.<br>Crtrm:  7, 4th Floor<br><br>Hon. Eumi K. Lee |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................3

NOTICE OF MOTION...................................................................................................7

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................8

INTRODUCTION ........................................................................................................8

STATEMENT OF FACTS .............................................................................................9

I.      The Holsclaw Property Has Been Reserved Exclusively for Agriculture. ...............9

II.     Defendants Cloaked in Secrecy Their Plans to Build an Immigration Enforcement and
        Holding Facility. ...........................................................................................11

III.    Defendant ECG 6 Leased the Holsclaw Property to Defendant GSA. ...................12

IV.     Plaintiffs Discovered the Intended Use of the Holsclaw Property. .......................13

ARGUMENT ............................................................................................................16

I.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims. ..........................17

        A.      Defendants' Decision Violates NEPA. ....................................................17

                1.      Defendants' Decision Is a Major Federal Action. ..........................18

                2.      Defendants' Decision Will Have Reasonably Foreseeable Significant
                        Environmental Impacts That Defendants Should Have Studied and
                        Disclosed in an EIS or EA. ........................................................19

                3.      Defendants Improperly Relied on an Inapplicable Categorical
                        Exclusion..................................................................................22

        B.      Defendants' Actions Violate the ICA. .....................................................23

II.     Defendants' Actions Are Causing Plaintiffs Imminent and Irreparable Harm.........26

III.    The Balance of the Equities and the Public Interest Favor a Preliminary Injunction..............30

CONCLUSION.........................................................................................................31

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ........................................................................ 31

*Amoco Prod. Co. v. Vill. of Gambell, Alaska,*
    480 U.S. 531 (1987) ......................................................................................... 27

*Ariz. Dream Act Coal. v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014) ......................................................................... 27

*Azzolina v. USPS,*
    602 F. Supp. 859 (D.N.J. 1985) ...................................................................... 24

*Brady Campaign to Prevent Gun Violence v. Salazar,*
    612 F. Supp. 2d 1 (D.D.C. 2009) .................................................................... 27

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ........................................................................... 27

*Cascadia Wildlands v. Scott Timber Co.,*
    105 F.4th 1144 (9th Cir. 2024) ........................................................................ 29

*Citizens Advisory Comm. on Priv. Prisons, Inc. v. USDOJ,*
    197 F. Supp. 2d 226 (W.D. Pa. 2001) ............................................................. 19

*City of Rochester v. USPS,*
    541 F.2d 967 (2d Cir. 1976) ...................................................................... passim

*City of Sausalito v. O'Neill,*
    386 F.3d 1186 (9th Cir. 2004) ......................................................................... 26

*City of Waltham v. USPS,*
    11 F.3d 235 (1st Cir. 1993) ............................................................................. 26

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
    141 F.4th 976 (9th Cir. 2025) ..................................................................... 18, 27

*D.N.N. v. Liggins,*
    822 F. Supp. 3d 543 (D. Md. 2026) ................................................................ 16

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004) ......................................................................................... 18

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
    36 F.4th 850 (9th Cir. 2022) ...................................................................... 17, 19

3

*Envtl. Prot. Info. Ctr. v. Carlson*,
968 F.3d 985 (9th Cir. 2020) ............................................................................................... 31

*Envtl. Prot. Info. Ctr. v. Van Atta*,
692 F. Supp. 3d 879 (N.D. Cal. 2023) ................................................................................. 26

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
98 F.4th 1180 (9th Cir. 2024) .............................................................................................. 17

*Fund for Animals, Inc. v. Lujan*,
962 F.2d 1391 (9th Cir. 1992) ............................................................................................. 17

*Hamrick v. GSA*,
107 F. Supp. 3d 910 (C.D. Ill. 2015) ................................................................................... 19

*Herrera v. Knight*,
798 F. Supp. 3d 1184 (D. Nev. 2025) .................................................................................. 16

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
4 F.3d 819 (9th Cir. 1993) ................................................................................................... 30

*Konah v. District of Columbia*,
915 F. Supp. 2d 7 (D.D.C. 2013) ......................................................................................... 13

*League of Wilderness Defs./Blue Mtns. Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) .......................................................................................... 20, 30

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ................................................................................................. 31

*Los Padres Forestwatch v. U.S. Forest Serv.*,
776 F. Supp. 2d 1042 (N.D. Cal. 2011) ............................................................................... 27

*Maryland v. Mullin*,
No. CV 26-733-BAH, 2026 WL 1045503 (D. Md. Apr. 17, 2026) ................................ 24, 30

*Massachusetts v. EPA*,
549 U.S. 497 (2007) .............................................................................................................. 26

*Mercado v. Noem*,
800 F. Supp. 3d 526 (S.D.N.Y. 2025) .................................................................................. 16

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
402 F.3d 846 (9th Cir. 2005) ............................................................................................... 19

*Pablo Sequen v. Albarran*,
No. 25-CV-06487-PCP, 2026 WL 1805114 (N.D. Cal. June 23, 2026) .............................. 16

*Rattlesnake Coal. v. EPA*,
509 F.3d 1095 (9th Cir. 2007) ........................................................................................ 18, 19

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL

*Roman v. Wolf*,
  977 F.3d 935, 940–41 (9th Cir. 2020) ................................................................................ 16

*Sakr v. City of Portland*,
  821 F. Supp. 3d 1237 (D. Or. 2026) ................................................................................... 18

*Save the Yaak Comm. v. Block*,
  840 F.2d 714 (9th Cir. 1988) .............................................................................................. 29

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
  709 F.3d 1281 (9th Cir. 2013) ............................................................................................ 26

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
  235 F. Supp. 2d 1109 (D. Or. 2002) ................................................................................... 17

*Simula, Inc. v. Autoliv, Inc.*,
  175 F.3d 716 (9th Cir. 1999) .............................................................................................. 27

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016) ............................................................................................................ 18

*Vill. of Palatine v. USPS*,
  756 F. Supp. 1079 (N.D. Ill. 1991) ..................................................................................... 26

*W. Watersheds Project v. Bernhardt*,
  391 F. Supp. 3d 1002 (D. Or. 2019) ................................................................................... 27

*Winter v. Natural Res. Def. Council,
  Inc.*, 555 U.S. 7 (2008) .......................................................................................... 16, 19, 26

**FEDERAL STATUTES**

5 U.S.C. § 701 *et seq.* .................................................................................................................. 7

16 U.S.C. § 1532(5)(A) ........................................................................................................... 9, 21

31 U.S.C. § 6501 *et seq.* ................................................................................................................ 7

31 U.S.C. § 6506(c) .................................................................................................... 23, 24, 25

42 U.S.C. § 4321 *et seq.* ................................................................................................................ 7

42 U.S.C. § 4332 ................................................................................................... 17, 18, 20

42 U.S.C. § 4336 ............................................................................................... 17, 18, 19, 22

**CALIFORNIA STATUTES**

Cal. Gov't Code § 51200 *et seq.* .............................................................................................. 10

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL

Cal. Gov't Code § 51220(a) ................................................................................................. 10

Cal. Rev. & Tax. Code §§ 421–23 ......................................................................................... 10

**ADMINISTRATIVE MATERIALS**

50 CFR § 226.211(i)(1)(iii) ...................................................................................................... 9

GSA, *PBS National Environmental Policy Act Desk Guide* (Oct. 1999) ("Desk Guide") § 5.3(b) ..................................................................................................................... 22

ICE, *Facility Design Guide* (2016) ............................................................................... 15, 22

ICE, Policy No. 11087.2, *Operations of ERO Holding Facilities* (Jan. 31, 2024) ............................. 15

*Intergovernmental Review of Federal Programs*, 47 Fed. Reg. 30,959 (July 14, 1982) .............. 23, 24

**RULES OF COURT**

Fed. R. Civ. P. 65 ......................................................................................................... 7, 17

**MISCELLANEOUS**

Am. Immigration Lawyers Ass'n, *ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission*, (July 8, 2025) ........................................................ 16

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on October 7, 2026 at 10:00 a.m. or as soon thereafter as may be heard before the Honorable Judge Eumi K. Lee in Courtroom 7 of the United States District Court for the Northern District of California, 280 South 1st Street, San José, CA 95113, Plaintiffs will and hereby do move the Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction against: United States Immigration and Customs Enforcement (ICE); United States General Services Administration (GSA); United States Department of Homeland Security; Edward Forst, in his official capacity as Administrator of the GSA; Markwayne Mullin, in his official capacity as Secretary of Homeland Security; David Venturella, in his official capacity as Senior Official Performing the Duties of the Director of ICE; ECG 6, LLC; and their officers, agents, servants, and employees, and any other persons who are in active concert or participation with them (collectively, "Defendants").

Plaintiffs respectfully move the Court to enter a preliminary injunction prohibiting Defendants from developing the property at 7240 Holsclaw Road in unincorporated Santa Clara County near Gilroy, California ("Holsclaw Property"), which includes designing, procuring, renovating, retrofitting, demolishing, or constructing, or taking any other actions to physically alter the Holsclaw Property, during the pendency of this litigation, and prohibiting Defendants from operating the Holsclaw Property as an immigration holding, processing, or similar facility during the pendency of this litigation, unless and until Defendants lawfully discharge their obligations under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, the Intergovernmental Cooperation Act, 31 U.S.C. § 6501 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, including but not limited to completing environmental review and consulting with state, regional, and local entities on Defendants' plans to develop and operate the Holsclaw Property.

This preliminary injunction motion is based on this Notice of Motion and Motion, the accompanying supporting Memorandum of Points and Authorities, the accompanying supporting declarations and exhibits thereto and Request for Judicial Notice, as well as the papers, evidence, and records on file in this action, and any other written or oral evidence or argument as may be presented at or before the time this Motion is heard by the Court.

Pursuant to section VIII.A of the Standing Order for Civil Cases Before Judge Eumi K. Lee, Plaintiffs certify that they were not reasonably able to meet and confer with Defendants before filing this Motion because service is not yet complete and no counsel have yet entered appearances for any Defendant. Plaintiffs are nonetheless filing this Motion now because they seek immediate relief. Plaintiffs will meet and confer with Defendants' counsel as soon as possible following their appearance and will withdraw this Motion if the parties can resolve the issues presented.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **INTRODUCTION**

In late April 2026, behind a privacy fence and a shroud of secrecy, Defendants began demolition and construction work on a 24.5-acre property on Holsclaw Road in a rural area of unincorporated Santa Clara County near Gilroy ("Holsclaw Property").  The federal Defendants had previously entered a 20-year lease for the property with the private landowner, Defendant ECG 6 LLC.  Surrounded by agricultural lands, the rural property has been historically used for agriculture and agriculture-compatible uses and has been legally restricted to such uses since 1967.  Defendants are now redeveloping the property into an immigration enforcement and holding facility ("the Project"), a use entirely incompatible with this property.

Plaintiffs County of Santa Clara and the State of California seek a preliminary injunction to prevent significant and potentially catastrophic environmental and public health harms if the Project is allowed to proceed in clear violation of the law.  Before making a final decision to develop this facility—let alone beginning demolition and construction—Defendants were required to analyze and publicly disclose the environmental impacts of the Project under the National Environmental Policy Act (NEPA).  But Defendants chose instead to ignore those impacts, claiming a baseless exemption.

Defendants' decision to flout the law and fast-track the Project will likely cause imminent and irreparable harm to human health, the surrounding environment, sensitive species in the area, and the agricultural viability of the property.  Their activity threatens to disturb and release into the environment hazardous waste that has accumulated at the property over the 30 years it was used as an agricultural research and development facility.  There is no indication that Defendants have taken any steps to identify and evaluate these hazardous materials, much less mitigate the risks they pose.

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL

Moreover, implementation of Defendants' poorly informed site plans will wreak havoc on the dramatically undersized onsite septic system, which could be damaged by construction and overwhelmed by the estimated *24-fold increase* in wastewater expected by Defendants' use. And Defendants also failed to take any steps to consider and analyze the impacts of their Project on more than a dozen endangered and special status species which rely on the surrounding protected habitat, including Llagas Creek, which runs directly alongside the Holsclaw Property.

In addition, the Intergovernmental Cooperation Act (ICA) obligated Defendants to consult with state and local governments, including Plaintiffs, to seek their input about the Project and to consider their views, but this did not occur. Indeed, if Defendants had complied with this basic consultation requirement, Plaintiffs would have been able to inform them about the myriad challenges this site presents for their Project. But rather than transparency and dialogue—rather than follow federal law and their own guidance—Defendants opted instead for obfuscation.

Plaintiffs now ask this Court to preliminarily enjoin Defendants' activities at the Holsclaw Property to preserve the status quo so that local and state stakeholders and the federal decisionmakers are properly informed by the environmental review and intergovernmental coordination that federal law demands.

## STATEMENT OF FACTS

### I. The Holsclaw Property Has Been Reserved Exclusively for Agriculture.

Situated in rural unincorporated Santa Clara County, the Holsclaw Property is an approximately 24.5-acre parcel with an agricultural field, a main building (approximately 18,000 square feet), a "headhouse" (5,200 square feet), maintenance building, and greenhouses. Decl. of Principal Planner Samuel Gutierrez ("Gutierrez Decl.") ¶ 4. It is surrounded by other agricultural lands. Along its western edge runs Llagas Creek, an area designated by the National Marine Fisheries Service as critical habitat essential to the conservation of the South-Central California Coast steelhead, which is a threatened species under the Endangered Species Act. 50 CFR § 226.211(i)(1)(iii); 16 U.S.C. § 1532(5)(A); Decl. of Erin Chappell ("Chappell Decl.") ¶ 13(c). Several other listed species and species prioritized as Species of Concern by the California Department of Fish and Wildlife inhabit this area, including the California red-legged frog,

9

Monterey hitch, California tiger salamander, northwestern pond turtle, least Bell's vireo, tricolored blackbird, American badger, Hoary bat, Pallid bat, Loma Prieta Hoita, and white-tailed kite. Chappell Decl. ¶ 13(a)–(i); Decl. of Robert Hamilton ("Hamilton Decl.") ¶ 6; Decl. of Dr. Tiffany Yap ("Yap Decl.") ¶ 9.

For decades, the County's General Plan, which is the County's long-term roadmap for land use, has included policies to protect agricultural land and promote the long-term economic viability of agricultural activities. Pls.' Req. for Judicial Not. ("RJN") Ex. 9. The Plan declares that "agricultural areas of greatest long term viability[,] . . . such as the lands south and east of Gilroy[,] should be considered for designation and preservation." *Id.* The Holsclaw Property is located in that area and zoned A-40Ac, which is an exclusive agriculture zoning district. Gutierrez Decl. ¶ 6. Since 1967, it has also been subject to a contract under the Williamson Act. Gutierrez Decl. ¶ 7; *see* Cal. Gov't Code § 51200 *et seq.* The Act establishes a policy and statutory framework to preserve, to the "maximum" extent, the "limited supply of agricultural land" in the state. Cal. Gov't Code § 51220(a). Under the contract, the property owner receives tax benefits in exchange for limiting use of the parcel to commercial agriculture. Cal. Rev. & Tax. Code §§ 421–23. Since 1993, structures on the Property have been permitted for agricultural research. Gutierrez Decl. ¶ 8.

Given its rural location, no sanitary sewer connection is available. Decl. of Envtl. Health Program Manager Darius Haghighi ("Haghighi Decl.") ¶ 6. The property relies instead on three onsite septic systems, permitted by the County in 1993, to collect and process wastewater. *Id*. ¶¶ 6–7. Domestic wastewater is piped to septic tanks, where solids settle out and liquid wastes are channeled into an underground dispersal field, where they decompose before reaching the groundwater. *Id.* Only one septic system serves the main building; the other two systems serve floor drains in adjacent buildings. *Id.* ¶ 7. The main system was sized for 40 daytime employees, with a peak capacity of approximately 600 gallons per day. *Id.*

Most of the Holsclaw Property is located within an area classified by the Federal Emergency Management Agency (FEMA) as a Special Flood Hazard Area, meaning it has a particularly high risk of flooding, and the remainder is classified as having an unknown flood hazard risk. *Id.* ¶ 13. Because portions of each of the three septic systems are located in the 100-year floodplain, each

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL

could fail during a flood event.  Such failure could result in direct discharge of raw or partially treated sewage into floodwaters, which would spread pathogens broadly across the landscape and into nearby surface water bodies such as Llagas Creek, and potentially the groundwater table where those pathogens can contaminate drinking water sources.  *Id*. ¶¶ 12–13.

From 1993 to 2023, the Holsclaw Property was used for agricultural research by Syngenta Seeds and affiliates, which included active agricultural cultivation and pesticide- and fungicide-treated seed experimentation and processing and laboratory operations.  Decl. of Hazardous Materials Compliance Div. Program Manager Mickey Pierce ("Pierce Decl.") ¶¶ 9–10.  The decades-long use of a portion of the property as a pesticide research facility is likely to have left unremediated hazardous waste on the property.  *Id*. ¶¶ 8-28 & Exs. A–C; Decl. of Deputy Dir. Michael Balliet ("Balliet Decl.") ¶¶ 8, 12.  Three decades of County inspections, conducted under the County's regulatory authority over hazardous materials, have documented extensive mismanagement of hazardous materials and hazardous wastes at the Holsclaw Property.  Pierce Decl. ¶¶ 8–28 & Exs. A–C; Balliet Decl. ¶¶ 8–9, 12.  As recently as 2020, County inspectors have repeatedly found evidence that laboratory and industrial process wastes were discharged to sinks and drains connected to the onsite septic systems, in violation of the County's Onsite Wastewater Treatment System Ordinance.  Pierce Decl. ¶ 16; Balliet Decl. ¶ 8.  Because the septic system releases liquid waste to an underground dispersal field located near Llagas Creek, any disturbance of the system—including through construction or increased wastewater loading—creates a risk that contaminants will migrate into soil, groundwater, or surface water.  Haghighi Decl. ¶¶ 12–13.  The septic system cannot treat laboratory and industrial wastes, which therefore threaten groundwater, aquatic ecosystems, and human health.  Haghighi Decl. ¶ 6.

## II. Defendants Cloaked in Secrecy Their Plans to Build an Immigration Enforcement and Holding Facility.

Between late 2022 and early 2023, a representative of private contractor Elmwood Capital Group ("Elmwood"), a company affiliated with ECG 6, informally contacted staff at the County Department of Planning and Development (DPD) to inquire about the Holsclaw Property.  Gutierrez Decl. ¶ 9.  When the DPD employee asked for more information, Elmwood forwarded a letter from

11

Defendant General Services Administration (GSA), dated June 21, 2023. *Id.* ¶ 10. The GSA letter stated only that it was seeking "office and operations space" as follows:

> [GSA] is seeking office and operations space under GSA Lease Solicitation No. 8CA3614. Elmwood Capital Group (or its affiliate) is an offeror under said solicitation and proposes to provide GSA with the required space through a lease at a building located at 7240 Holsclaw Road, Gilroy, CA. This lease will require construction work to be performed at the property. Because this lease will be entirely for Federal Government use, the construction project and the property should receive any exemptions, immunities or other flexibility available for such Federal Government uses under local zoning, planning and permitting regulations.

*Id.* Ex. C. Elmwood provided no additional information. *Id.* ¶ 10. At no time did Elmwood or GSA ever suggest that they intended to construct an immigration enforcement and holding facility. *Id.* ¶ 12. The County is not aware of DHS or GSA contacting any department or staff at any time about the Project.

**III.     Defendant ECG 6 Leased the Holsclaw Property to Defendant GSA.**

On January 8, 2025, GSA awarded a $26.5 million contract to ECG 6, the fee owner of the Holsclaw Property, for a 20-year lease allowing the federal government to use the Holsclaw Property. Decl. of Thuy Van Tsang ("Tsang Decl.") Ex. 1. The lease identifies ECG 6 as the fee owner of the Holsclaw Property and GSA as the lessee. *Id.* at 1. The lease covers 18,700 rentable square feet "of office and related Space" and an additional 5,300 rentable square feet of "free space." *Id.* at 5. The lease provides that ECG 6 will perform all necessary construction on the property for the Project. *Id.* at 11.

The lease includes several provisions requiring compliance with federal, state, and local law. For example, ECG 6 "must incorporate all mitigation measures identified and adopted by the Government in the design and construction drawings and specifications," where "the Government has determined that any or all of these mitigation measures should be or must be adopted to lessen the impact of these proposed actions." *Id.* at 25. GSA also requires that the "leased Space shall be free of hazardous materials, hazardous substances, and hazardous wastes, as defined by and according to applicable Federal, state, and local environmental regulations." *Id.* at 41.

A rider to the lease, GSA FORM 3517B GENERAL CLAUSES, also incorporates several standard compliance conditions. RJN Ex. 6. One such condition, GSAR 552.270-8, requires that

12

ECG 6 "comply with all Federal, state, tribal, and local laws applicable to its ownership and leasing of the property, including, without limitation, laws applicable to the construction, ownership, alteration or operation of all buildings, structures, and facilities located thereon, and obtain all necessary permits, licenses and similar items at its own expense." *Id.* at 8.

## IV.   Plaintiffs Discovered the Intended Use of the Holsclaw Property.

In early 2026, the County began investigating whether the Holsclaw Property would in fact be used merely as "office and related space," as stated in the title of the solicitation that GSA ultimately awarded to ECG 6.  Decl. of Cnty. Couns. Investigator Ricardo Murillo ("Murillo Decl.") ¶¶ 33–34 & Ex. L.  The details of the GSA solicitation also required "[p]roof of zoning for a 4,000 SF Detention Center," as well as a "Sally Port"—a secured and controlled entryway that prisons typically use to transfer detainees from a vehicle into a building (*see, e.g., Konah v. District of Columbia*, 915 F. Supp. 2d 7, 12 n.2 (D.D.C. 2013))—"large enough to accommodate a large passenger bus."  Murillo Decl. Ex. L.  The solicitation required that the "space shall not be in the 1-percent-annual-chance flood plain" (also known as the 100-year floodplain).  *Id*.  The County found that ECG 6 is an affiliate of Elmwood, a real estate investment firm that has leased properties in Montana and Texas that operate as DHS detention facilities.  *Id*. ¶¶ 36–37 & Ex. N.  The County also discovered a June 26, 2025 contract between DHS and Price Modern LLC for services related to "the enforcement and removal operations (ERO) office in Gilroy, CA."  RJN Ex. 7.

In early 2026, a County investigator began to observe the Holsclaw Property from publicly accessible locations.  Murillo Decl. ¶¶ 5–8.  After months of little activity on the site, the investigator began to see construction and demolition activity on April 27, 2026, which is still ongoing.  *Id*. ¶¶ 8–31.  He observed that a privacy fence had been installed around the perimeter of the property and noted the presence of portable toilets and several construction vehicles, including a utility truck belonging to GAMI Construction (which holds itself out as specializing in paving, grading, concrete, and demolition), which were involved in moving demolition debris.  *Id*. ¶¶ 9–10, 12, 14, 21–22.  He also observed construction workers moving materials from the interior of the main building into debris piles.  *Id*. ¶¶ 14–15, 22.  The frames of at least two of the smaller greenhouses on the property were also dismantled and removed over the course of his visits.  *Id*. ¶

13

23.  Indeed, when the County sought ECG 6's consent to inspect the property under the County's authority to regulate hazardous materials, an Elmwood representative confirmed on June 15, 2026 that "the property is an active construction site."  Pierce Decl. Ex. I.

The County searched its records and public sources for any notice from the federal government of its actions on the Holsclaw Property and found none.  Gutierrez Decl. ¶ 13. Defendants issued no notice of intent to begin environmental review, requested no public comment on any agency action (whether proposed or underway), and conducted no public consultation. Murillo Decl. ¶ 41.

Defendants also failed to consult with the State.  The Governor's Office of Land Use and Climate Innovation (LCI), formerly known as the Governor's Office of Planning and Research, is designated under State of California Executive Order D-24-83 as the State's Single Point of Contact for transmitting official State and local government comments on federal proposals under review pursuant to the ICA and Executive Order 12372, requiring Intergovernmental Review of Federal Programs.  Decl. of Matt Read ("Read Decl.") ¶ 2.  LCI has received no communication from the federal government about any plans to develop the Holsclaw Property.  *Id.* ¶¶ 5–6.

Defendants instead initially refused to acknowledge the existence of the immigration enforcement and holding facility; when the media asked DHS to comment for a story printed on May 13, 2026, the agency refused to confirm or deny plans for the facility.  Murillo Decl. Ex. F.  Just weeks after declining to comment, when the same media outlet presented DHS with a 111-page document showing site plans for the Project, Defendants could not deny their actions any longer.  At that time, an ICE spokesperson said, "The new Gilroy office will enable ICE to support local operations and enhance coordination with regional partners to ensure the enforcement of federal immigration laws at the operating standards of other offices nationwide."  Haghighi Decl. Ex. A at PDF 4.

The site plans, which are dated September 17, 2025 and bear the logos of GSA, ICE, and DHS, illustrate demolition and construction plans for the Holsclaw Property.  *Id*. at PDF 7-117. The plans show that the main building will be redeveloped to include six concrete-reinforced holding rooms for detainees with concrete benches, detainee processing areas, interview and visitation

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL

rooms, an armory for weapons and ammunition, and a tactical equipment storage room. *Id.* Based on specifications in ICE, *Facility Design Guide* (2016), RJN Ex. 5 at 5-140 to 5-145, the site plans and the GSA solicitation suggest that the Holsclaw Property is being developed to accommodate 60 federal government employees and approximately 150 detainees at any given time. Murillo Decl. Ex. M (stating there will be 60 parking spaces); Haghighi Decl. Ex. A (detailing dimensions of holding rooms). The site plans also show a new paved parking area, a portion of which is sited over the existing septic tank and dispersal field that serves the main building. Haghighi Decl. ¶ 17 & Ex. A at PDF 11.

On June 19, 2026, Plaintiffs learned of partially redacted GSA documents that a government transparency group obtained through a Freedom of Information Act request and then published. Murillo Decl. Exs. T–V. These new documents include a GSA "NEPA Memo to File" identifying the Holsclaw Property lease by number. *Id.* Ex. U ("NEPA Memo"). The NEPA Memo describes the "action" as "20 years/15 years firm New/Replacing Lease (relocation from existing building)." *Id.* It alleges that the action qualifies for a NEPA categorical exclusion for "[a]cquisition of space within an existing structure, either by purchase or lease, where no change in the general type of use and only minimal change from previous occupancy level is proposed." *Id.* This was the first time Plaintiffs became aware that Defendants were claiming that the Project was subject to a NEPA categorical exclusion. The documents also include an undated GSA "Floodplain Memorandum" identifying the Project by the GSA solicitation number. *Id.* Ex. V ("Floodplain Memo"). The Floodplain Memo admits that the action is located "in the 100-year floodplain" and alleges that "there are no practicable alternatives" to locating the action there. *Id.*

Based on all the gathered information, it appears Defendants are developing the Holsclaw Property, at least in part, into an ICE Enforcement and Removal Operations (ERO) holding facility. ICE Directive 11087.2 defines a holding facility as a "facility that contains hold rooms that are primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency." RJN Ex. 3 (ICE, Policy No. 11087.2, *Operations of ERO Holding Facilities* (Jan. 31, 2024)). In this definition, "short-term" is "defined as a period not to exceed 12 hours, absent exceptional

15

circumstances." *Id.* However, on June 24, 2025, ICE waived the 12-hour policy in response to "increased enforcement efforts," allowing detentions of 72 hours or more.[1] *Id*. Ex. 12. Under another recent change in federal policy, ERO facilities are now prohibited from discretionarily releasing detainees. *See Herrera v. Knight*, 798 F. Supp. 3d 1184, 1191 & n.1 (D. Nev. 2025) (discussing this policy's implementation through the July 8, 2025 DHS memorandum entitled "Interim Guidance Regarding Detention Authority for Applications for Admission," which was directed to all ICE employees, and confirming that DHS and ICE "do not contest the authenticity of" the policy document); *see also*, Am. Immigration Lawyers Ass'n, *ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission* (July 8, 2025), https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission. As a result, ERO facilities are routinely over capacity and unable to provide adequate water, toilets, and showering facilities to detainees. *See, e.g.*, *Mercado v. Noem*, 800 F. Supp. 3d 526, 540–43, 547 (S.D.N.Y. 2025) (alleging that detainees were packed into "incredibly overcrowded" spaces and denied water, toilet, and showering facilities); *see also D.N.N. v. Liggins*, 822 F. Supp. 3d 543, 565–66, 589 (D. Md. 2026) (discussing how detainees were subjected to rampant overcrowding, with rooms designed for 56 people holding over 120).

## ARGUMENT

The four factors that a district court must consider in deciding a preliminary injunction motion all support issuing an injunction here. A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, the federal government is a party, the final two factors merge. *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020).[2]

---

[1] Just yesterday, Judge Pitts of this Court vacated the 12-hour policy waiver, finding its adoption was arbitrary and capricious. *Pablo Sequen v. Albarran*, No. 25-CV-06487-PCP, 2026 WL 1805114 (N.D. Cal. June 23, 2026).

[2] In the Ninth Circuit, courts evaluate these factors on a "sliding scale" such that "where the balance of hardships tips sharply towards the plaintiff, a plaintiff need only show serious questions going to the merits, rather than likelihood of success on the merits, to warrant preliminary injunctive relief." *Roman*, 977 F.3d at 941 (citation modified). "'Serious questions' . . . involve a fair chance of

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL

## I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

Defendants' decision to undertake this Project without environmental review or intergovernmental consultation is a final agency action that violates the Administrative Procedure Act (APA), NEPA, and the ICA.  Defendants violated NEPA by failing to issue an Environmental Impact Statement (EIS), or at a minimum, an Environmental Assessment (EA), despite the likely significant environmental impacts of this Project on the Holsclaw Property and the surrounding natural and human environment.  Defendants' apparent reliance on a categorical exclusion was patently improper.  Defendants also violated the ICA by completely failing to consider or solicit Plaintiffs' views, instead opting to flout the statute by pursuing their plans in secret.  These violations render Defendants' actions arbitrary, capricious, and not in accordance with law, in violation of the APA.  *See Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 871 (9th Cir. 2022) ("[J]udicial review of agency decisions under NEPA is governed by the APA."); *see also City of Rochester v. USPS*, 541 F.2d 967, 976 (2d Cir. 1976) (discussing agency's "affirmative obligation to develop a reviewable record" under ICA so that a "reviewing court can determine whether the agency has acted arbitrarily or capriciously").

### A.    Defendants' Decision Violates NEPA.

Defendants have firmly committed themselves to this Project, from awarding the solicitation, to entering a lease to construct and operate the facility that legally binds GSA to provide tens of millions of dollars in federal funding to the Project, to beginning construction.  The Project is a final, "major Federal action" with a "reasonably foreseeable significant effect on the quality of the human environment," for which Defendants should have completed NEPA review before making any decision.[3]  42 U.S.C. § 4336(b)(1); *see also id.* § 4332(C); *Dep't of Transp. v. Pub. Citizen*, 541 U.S.

___

success on the merits." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024) (citation modified).

[3] Although ECG 6 is a private party, an injunction under NEPA is appropriate against it as a "person[] who [is] in active concert or participation with" the Federal Defendants.  Fed. R. Civ. P. 65(d)(2)(C).  Moreover, an "injunction may issue against a non-federal party in a NEPA action" when the party acts with the federal government to advance a federal project.  *Sierra Club v. U.S. Fish & Wildlife Serv.*, 235 F. Supp. 2d 1109, 1123 (D. Or. 2002) (enjoining non-federal party conduct when it received "federal assistance for the challenged activity"); *see also Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1397 (9th Cir. 1992) ("Nonfederal defendants may be enjoined" where

752, 757 (2004).

NEPA review requires a hard look at the environmental consequences before acting. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 993 (9th Cir. 2025). Before committing to the federal action, agencies must analyze the environmental impacts, feasible mitigations, and lesser-impact alternatives to a proposed action in an EIS or EA and make the document publicly available for review and comment. 42 U.S.C. §§ 4336(b), 4332(C); *Sakr v. City of Portland*, 821 F. Supp. 3d 1237, 1260 (D. Or. 2026) (holding that agencies' obligation to study, develop, and describe appropriate alternatives applies under 42 U.S.C. § 4332(H) "regardless of whether an agency is preparing an EIS or an EA"). Defendants apparently concluded that the Project was covered by a categorical exclusion for the reuse of existing facilities, which by its terms is plainly inapplicable to the Project. They thus satisfied none of their obligations under NEPA, in violation of the APA.

### 1.     Defendants' Decision Is a Major Federal Action.

NEPA defines "major Federal action" as an action that is "subject to substantial federal control and responsibility." 42 U.S.C. § 4336e(10)(A). Substantial federal control is evident from the nature of the federal funds and the degree of federal control. *See Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1101 (9th Cir. 2007). Likewise, federal agency action is final when it reflects "the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (citation modified). Based on those factors, Defendants' action easily clears this threshold.

The Project readily qualifies as a major federal action. At all times, from GSA's presolicitation through the start of demolition, Defendants have dictated and maintained control of the financing, design, development, and construction of the Project. The federal government is funding the Project in its entirety, including an expenditure of at least $19.5 million, and up to $26.5 million, on the lease. *See* Murillo Decl. Exs. L, M. The solicitation, lease, purchase orders, and site

---

federal and nonfederal participation in a project is "sufficiently interrelated to constitute a single federal action for NEPA purposes").

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL

plans further make clear that GSA, DHS, and ICE are directly procuring services and specifying the details of property development. *See* Tsang Decl. Ex. 1 (lease); Murillo Decl. Exs. L–M (solicitation and award notice); Haghighi Decl. Ex. A (site plans); RJN Ex. 7 (purchase order). Here, the exclusive federal funding and, at minimum, substantial federal control render the Project a major federal action. *See Rattlesnake*, 509 F.3d at 1101.

This action became final when GSA awarded the solicitation and entered into the lease with ECG 6. *See, e.g., Hamrick v. GSA*, 107 F. Supp. 3d 910, 926 (C.D. Ill. 2015) (finding the GSA's entrance into a contract with a private entity to be a major federal action). Moreover, Defendants' ongoing demolition and construction demonstrates that the Project has moved *past* final approval and into implementation. *See* Murillo Decl. ¶¶ 9–28; *see also Citizens Advisory Comm. on Priv. Prisons, Inc. v. USDOJ*, 197 F. Supp. 2d 226, 242 (W.D. Pa. 2001), *aff'd*, 33 F. App'x 36 (3d Cir. 2002) (concluding that an agency violated NEPA when it awarded a contract to a private entity and allowed construction on the project to proceed without first conducting environmental review).

### 2. Defendants' Decision Will Have Reasonably Foreseeable Significant Environmental Impacts That Defendants Should Have Studied and Disclosed in an EIS or EA.

NEPA requires federal agencies to prepare an EIS if the proposed project raises "substantial questions" as to whether a project "*may* cause significant degradation of some human environmental factor." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864–65 (9th Cir. 2005). This requirement "presents a 'low standard' that is permissive for environmental challenge," and accordingly, "plaintiffs need not prove that significant environmental effects *will* occur." *Envtl. Def. Ctr.*, 36 F.4th at 879–80. The standard reflects the fact that without an EIS "there may be little if any information about prospective environmental harms and potential mitigating measures." *Winter*, 555 U.S. at 23. When it is uncertain whether a proposed action will have a significant impact on the environment, federal agencies may prepare an EA that provides sufficient evidence and analysis for the agency to determine whether a more detailed EIS is necessary or a finding of no significant impact is justified. 42 U.S.C. § 4336(b)(2); *Envtl. Def. Ctr.*, 36 F.4th at 872.

Defendants failed to comply with these requirements, preparing neither an EA nor an EIS for

the Project. Defendants' failure to produce an EIS and to communicate transparently with Plaintiffs or the public also violated NEPA's requirement that the EIS and "the comments and views of the appropriate Federal, State, and local agencies" be made available to "the public." *See* 42 U.S.C. § 4332(C); *see also League of Wilderness Defs./Blue Mtns. Biodiversity Project v. Connaughton*, 752 F.3d 755, 761 (9th Cir. 2014) ("Informed public participation in reviewing environmental impacts is essential to the proper functioning of NEPA.").

Because Defendants have proceeded under a shroud of secrecy, they have made it impossible for Plaintiffs to fully assess the scope of potential impacts. Nevertheless, even with the limited record available to Plaintiffs, the evidence shows a number of potentially significant impacts of the Project that are not only reasonably foreseeable but likely to occur, as described below.

Defendants' decision to develop an immigration enforcement and holding facility without conducting the environmental review that NEPA requires is likely dangerous in light of hazardous materials on the Holsclaw Property. Pierce Decl. ¶¶ 8–28 & Exs. A–C; Balliet Decl. ¶¶ 8–9, 12. Over the course of nearly 30 years, the property's use for agricultural research involved the handling, use, and releases of highly toxic hazardous materials for which there is no record of adequate closure or remediation. Pierce Decl. ¶¶ 11, 21, 23. Proceeding with demolition and construction work without a full evaluation of the associated impacts significantly heightens the risk of releasing additional contaminants into the surrounding environment, including surface waters, groundwater, and neighboring agricultural properties. Pierce Decl. ¶ 28. Given Defendants' apparent failure to consider, study, and mitigate on-site hazardous wastes, no mitigation measures were taken, likely endangering the health and safety of construction workers and eventual staff and detainees from exposure to hazardous substances during the Project's demolition, construction, and operation. Balliet Decl. ¶¶ 11–12; Pierce Decl. ¶ 28.

The Project also threatens numerous protected species with habitat in the Holsclaw Property's immediate vicinity, including many that are listed as threatened or endangered under the federal and state Endangered Species Acts. Hamilton Decl. ¶ 6; Yap Decl. ¶ 9; Chappell Decl. ¶ 13. Llagas Creek, which abuts the Holsclaw Property, is designated as critical habitat for the federally threatened South-Central California Coast steelhead, which means it is essential to the conservation

20

of that species. Hamilton Decl. ¶ 4; *see* 16 U.S.C. § 1532(5)(A). The least Bell's vireo is federally and state listed as endangered, and the northwestern pond turtle is considered globally imperiled, which means it is at high risk of extinction. Chappell Decl. ¶ 13(b), (d). Both species depend on aquatic habitats. Hamilton Decl. ¶ 9(a). These and more than a dozen other special status species that may be present in the Project area could be harmed by water contamination, increased noise, increased traffic, release of hazardous materials, degradation of water quality in Llagas Creek and adjacent aquatic habitats, and light pollution. Chappell Decl. ¶¶ 13–14; Hamilton Decl. ¶¶ 9–11; Yap Decl. ¶¶ 4–12.

Further still, the Project's substantially more intensive use of the Holsclaw Property will overburden the existing onsite septic system, risking contamination of the site and surrounding areas. Haghighi Decl. ¶¶ 7–12. Even housing just six detainees 24 hours per day on the site would overwhelm the existing septic system, which was sized for a modest daytime office use more than three decades ago. Haghighi Decl. ¶ 11. County wastewater experts estimate that use of the facility by 150 detainees would require managing a peak daily wastewater flow of 15,000 gallons per day or more, which is more than *24 times* the design flow for which the existing main septic system was permitted in 1993. *Id.* ¶¶ 7, 10–11. Shockingly, the Project site plans do not indicate any expansion of the existing septic system and instead suggest the Project will connect to a nonexistent sewer line. *Id.* ¶ 17. The Project site plans also contemplate a new parking area that would pave over a portion of the main septic system dispersal field that is critical to ensuring the treatment and decomposition of effluent from the septic system. *Id.* Paving over the dispersal field causes soil compaction, which threatens to compromise the field's decomposition function and its piping system. *Id.* The paving design also appears to remove inspection risers from the dispersal field, which are essential to monitor and manage water levels in the dispersal field. *Id.* ¶ 18. If the dispersal field cannot absorb waste, effluent can migrate into the groundwater where it can contaminate drinking water wells with nitrates, coliform bacteria, and other harmful constituents. *Id.* ¶ 12. This is a particularly serious hazard in this rural area dependent on groundwater wells to provide potable water. *Id.* Overflow can also reach nearby surface waters such as streams, wetlands, or ponds, contributing nutrients that cause harmful algal blooms, oxygen depletion, and the death of aquatic life. *Id.* This could affect

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL

Llagas Creek and adjacent aquatic habitats, harming the aquatic and riparian species that depend on those habitats.  Hamilton Decl. ¶ 9(a).  All of these risks are compounded by the fact that the Project is located in a high-risk flood hazard area; flood events can inundate the septic system and cause direct discharge of sewage into floodwaters.  Haghighi Decl. ¶ 13.

### 3.    Defendants Improperly Relied on an Inapplicable Categorical Exclusion.

Defendants' attempt to excuse their noncompliance with NEPA by relying on a categorical exclusion that, on its face, does not apply to the Project was improper.  Categorical exclusions are designated by federal agencies for "actions that . . . normally do[] not significantly affect the quality of the human environment within the meaning of [NEPA]."  42 U.S.C. § 4336e(1).

GSA relied on an exclusion that covers only "[a]cquisition of space within an existing structure, either by purchase or lease, where no change in the general type of use and only minimal change from previous occupancy level is proposed."  Murillo Decl. Ex. U; *see* RJN Ex. 4 (GSA, *PBS National Environmental Policy Act Desk Guide* (Oct. 1999) ("Desk Guide") § 5.3(b)).  By its plain terms, this exclusion cannot apply here.

First, the Project involves far more than mere acquisition of space within an existing structure.  The plans show demolition of existing structures, complete reconstruction of the interior of the main building, and new external paving and construction, including a Sally Port.  Haghighi Decl. Ex. A at PDF 18, 20, 22.  Second, the Project involves a change in the general type of use from the preexisting agricultural use to an immigration enforcement and holding facility.  Gutierrez Decl. Ex. B (use permit).  Finally, it involves more than only "minimal" change from the previous occupancy level.  The prior use involved about 40 daytime employees, Haghighi Decl. ¶ 7, whereas the new use includes housing up to 150 detainees, 24 hours per day, and approximately 60 employees, *Id*. Ex. A at PDF 11 (showing 60 parking spaces), 39 (showing dimensions of holding rooms); RJN Ex. 5 (Design Guide), at 5-140 to 5-145 (ICE design guidelines describing holding cell features and minimum area per detainee).  Indeed, the increased intensity of the Project is so significant that it is expected to generate wastewater usage at least 24 times that of the site's prior use.  *Id.* ¶ 11.  Each of these factors is an independent bar on the use of the Section 5.3(b) categorical exclusion for this Project.

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL

* * *

Defendants' failure to perform the required NEPA review prior to making a final decision to undertake a major federal action constitutes final agency action that is arbitrary, capricious, and not in accordance with law, in violation of the APA. Plaintiffs are therefore likely to succeed on the merits of their NEPA and APA claims.

### B.    Defendants' Actions Violate the ICA.

The ICA requires that federal agencies, "[t]o the extent possible," consider "all national, regional, State, and local viewpoints . . . in planning development programs and projects of the United States Government." 31 U.S.C. § 6506(c). The ICA "constitut[es] a meaningful national recognition" from Congress "that the objectives of state and local governments and their planning agencies . . . be incorporated into the federal decisionmaking process." *City of Rochester*, 541 F.2d at 975. Agency contacts with local government entities will be deemed insufficient where those contacts fail to "indicate that the [agency] did anything to promote the purposes of, or to comply with the language of, the ICA," which establish that federal agencies must consider local views "for the purposes of 'plan formulation, evaluation, and review'" to comply with the ICA. *Id.* at 976. The ICA, like NEPA, also imposes "an affirmative obligation" on federal agencies "to develop a reviewable record" that includes an explanation of any "decision to act in disharmony with local planning objectives, so that a reviewing court can determine whether the agency has acted arbitrarily or capriciously in claiming it has fully considered, but rejected, local planning objectives." *Id.* The ICA is enforceable via the APA. *See id.* (discussing agency's "affirmative obligation to develop a reviewable record" under the ICA so that a "reviewing court can determine whether the agency has acted arbitrarily or capriciously").

Executive Order (EO) 12372 implements these directives and requires "Federal agencies" to "provide opportunities for consultation by elected officials of those State and local governments . . . that would be directly affected by . . . direct Federal development." *Intergovernmental Review of Federal Programs*, 47 Fed. Reg. 30,959 (July 14, 1982). EO 12372 also directs federal agencies to "[u]tilize the State process to determine official views of State and local elected officials" and to "[c]ommunicate with State and local elected officials as early in the program planning cycle as is

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL

reasonably feasible to *explain specific plans and actions*." *Id.* (emphasis added).

Defendants failed to consult—let alone solicit and consider the views of—Plaintiffs or other local and regional entities prior to undertaking the Project, in plain violation of the ICA. Defendants' Project is a "development . . . project[] of the United States Government." 31 U.S.C. § 6506(c). Case law makes clear that federal development projects encompass the construction or renovation of buildings that federal agencies operate. *See, e.g.*, *City of Rocheste*r, 541 F.2d at 970, 974 ("construction" of a federal agency facility is a "development project"); *see also Azzolina v. USPS*, 602 F. Supp. 859, 863–64 (D.N.J. 1985) (applying the ICA to siting and constructing new post office). And Plaintiffs are among the government entities "directly affected by . . . direct Federal development," given Plaintiffs' interests and responsibilities in analyzing and permitting activities on and around the property and in protecting its agricultural resources. *See* EO 12372, 47 Fed. Reg. 30,959; *see also* Read Decl. ¶¶ 2, 7; Tsang Decl. ¶¶ 2–3; Gutierrez Decl. ¶¶ 6–7.

Defendants' past compliance with these requirements demonstrates consultation with state and local entities is certainly "possible" and thus required by the ICA. 31 U.S.C. § 6506(c). For example, prior to establishing a detention facility in Merrimack, New Hampshire, DHS provided site-specific documentation to Governor Kelly Ayotte and met with state officials to discuss the project and the concerns of the state, the Town of Merrimack, and community members. *See* RJN Exs. 10, 11. And prior to purchasing a warehouse in Maryland to construct a detention facility, DHS sent site-specific plans to multiple parties, including state and local planning officials. *Maryland v. Mullin*, No. CV 26-733-BAH, 2026 WL 1045503, at *8 (D. Md. Apr. 17, 2026). Defendants took no such action for the Project.

Here, by contrast, a representative of Elmwood (which is itself an affiliate of the private property owner—not DHS or GSA) merely inquired with County planning staff about what uses would hypothetically be allowed on the Holsclaw Property were it to be leased to the federal government. Gutierrez Decl. ¶ 9. After the County's request for more information, that representative forwarded a one-paragraph letter from GSA indicating that "[t]his lease will require construction work to be performed at the property" and asserting that "the property should receive any exemptions, immunities or other flexibility available for such Federal Government uses under

24

local zoning, planning and permitting regulations," in a plain attempt to shut the door to input on the Project. *Id.* ¶¶ 10–11, Ex. C. The Project also conflicts with the County's General Plan, which is the official document that sets forth the County's planning objectives, and Defendants made no attempt to avoid that conflict. And although ECG 6 must obtain a Public Water System permit from the State Water Board, it has not provided sufficient information for the Board to evaluate the application, including information about how the Holsclaw Property is to be used. Tsang Decl. ¶¶ 5–6. Defendants never sought Plaintiffs' viewpoints, let alone considered and incorporated them into the federal decision-making process, as required by the ICA. *See* 31 U.S.C. § 6506(c); *see also City of Rochester*, 541 F.2d at 976. Nor have Defendants produced the required "reviewable record" to explain their decision to advance a project that undermines local and state planning objectives to preserve agricultural uses at the site. *Id.* at 976.

No Defendant disclosed to Plaintiffs that the federal government would use the Holsclaw Property to convert an agriculture-supporting facility into an immigration enforcement and holding facility. No Defendant shared any site plans with Plaintiffs or provided them with any additional details about the Project. Finally, no Defendant provided any information to LCI as the agency designated by the State to collect information about the federal government's planned use of the Holsclaw Property. Read Decl. ¶ 5. In fact, Defendants refused to even acknowledge the facility publicly until equivocating to the press in early June 2026 that "[t]he new Gilroy office will enable ICE to support local operations and enhance coordination with regional partners to ensure the enforcement of federal immigration laws at the operating standards of other offices nationwide," and expressing a commitment to "work with community leaders" and "be good partners." Haghighi Decl. Ex. A at PDF 4. Yet no Defendant has since contacted Plaintiffs.

The ICA does not tolerate bulldozing over State and local interests, figuratively and, in this case, literally. Courts have found federal consultation wanting in circumstances with *far* more intergovernmental outreach. In *City of Rochester*, for example, the federal government failed to meet this bar even after several different federal personnel visited three towns and met with multiple local officials about the project in question, including a mayor, a county manager, a city manager, staff in a city assessor's office and a town assessor's office. 541 F.2d at 976. Here, Defendants did

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL

not meet with *any* representative of either Plaintiff and have *not at all* considered any viewpoints other than Defendants' own, much less documented any such consideration.

Had Defendants complied with the ICA here—in particular by providing advance notice of and information regarding the Project—the parties could have worked together to assess potential environmental, human health, and economic impacts, and discussed mitigation options for minimizing those impacts, as the ICA demands. *See, e.g.*, *City of Waltham v. USPS*, 11 F.3d 235, 244 (1st Cir. 1993) (discussing a federal agency's mitigation efforts in ICA coordination); *see also Azzolina*, 602 F. Supp. at 863–64 (indicating that compliance with the ICA allowed parties to pause construction and consider alternatives for six months); *Vill. of Palatine v. USPS*, 756 F. Supp. 1079, 1091–92 (N.D. Ill. 1991) (detailing extensive iterative discussions between federal and local officials over a U.S. Postal Service project). But not only did Defendants fail to consult, they affirmatively masked their intended use of the Holsclaw Property, refused to acknowledge their plans for the facility until the media presented Defendants with their own construction plans, and worst of all, failed to take advantage of valuable state, local, and community input about the construction and operation of the federal Project.

Defendants' failure therefore violates the ICA and renders its action arbitrary, capricious, and an abuse of discretion, in violation of the APA. Plaintiffs are therefore likely to succeed on the merits of these claims.

## II.    Defendants' Actions Are Causing Plaintiffs Imminent and Irreparable Harm.

Plaintiffs must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22.[4] "The analysis focuses on irreparability, 'irrespective of the magnitude of

---

[4] Plaintiffs' showing of irreparable harm also establishes their Article III standing. *See Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1286–87 (9th Cir. 2013). In any case, a local government has standing to protect its "proprietary interests," which include "its ability to enforce land-use and health regulations," its "interest in protecting its natural resources from harm," and its "powers of revenue collection and taxation." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1198 (9th Cir. 2004). A state has standing to vindicate its proprietary, financial, sovereign, and quasi-sovereign interests, among others. *Massachusetts v. EPA*, 549 U.S. 497, 518–19 (2007). Defendants' actions pose a reasonable probability of harm to these interests. *Envtl. Prot. Info. Ctr. v. Van Atta*, 692 F. Supp. 3d 879, 892–93 (N.D. Cal. 2023). These injuries are fairly traceable to Defendants' demolition and construction activities because those activities would have the "direct" environmental impacts discussed here. *Id.* at 893. And Plaintiffs' injuries are redressable because

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL

the injury.'" *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999)).  An irreparable harm is a "harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545 (1987).  "Plaintiffs [meet] their burden to establish a likelihood of irreparable harm by showing that [the federal action] will have some environmental impacts, even if the extent of those impacts are not fully known." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25 (D.D.C. 2009).

Defendants' decision to proceed with the Project without review or consultation poses urgent and irreparable environmental harm in several areas, including: (1) mishandling and release of hazardous materials, (2) paving over necessary components of the wastewater treatment system, and (3) harming sensitive species protected under both California and federal law.  These consequences are immediately impending because Defendants are actively conducting demolition and construction on the property.  And beyond this physical harm, Plaintiffs are suffering the procedural harm caused by Defendants' decision to begin construction without conducting environmental analysis and without Plaintiffs' viewpoints or notice—contrary to the purpose of NEPA and the ICA.  *See Ctr. for Biological Diversity*, 141 F.4th at 993 (NEPA's procedural requirements mandate "hard look" at environmental consequences); *Los Padres Forestwatch v. U.S. Forest Serv.*, 776 F. Supp. 2d 1042, 1051 (N.D. Cal. 2011) (finding NEPA violation resulted in both procedural and substantive injury); *W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1022–23 (D. Or. 2019)(courts generally find irreparable harm where procedural violation is combined with showing of environmental injury).

***Hazardous Materials.***  Defendants' ongoing demolition and construction create serious risks of mishandling and releasing hazardous materials.  Despite the longstanding use of hazardous materials onsite, the property never underwent the required "closure" process to assess the remaining

---

requiring Defendants to follow the proper procedures under NEPA and the ICA "*could* result in a different decision." *Id.* at 894.

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL

storage of hazardous materials at the property; identify existing contaminants in the buildings, soil, and septic system; and remediate hazardous waste before construction could begin. Pierce Decl. ¶¶ 21, 23. In prior visits, County inspectors already verified industrial discharges to the Holsclaw Property's septic systems have occurred, including multiple toxic substances. Balliet Decl. ¶ 7. Because the septic system discharges to a dispersal field that is located near Llagas Creek, disturbing the system through demolition and construction increases the risk that contaminants will migrate to soil, groundwater, or surface water. *Id.* ¶ 11; Haghighi Decl. ¶¶ 12, 13. These contaminants will endanger not just construction workers today, but those who will use water from the onsite groundwater wells tomorrow. Balliet Decl. ¶¶ 11–12; Haghighi Decl. ¶ 12. Defendants' extensive demolition and construction and the entirely new and more intensive use of the site will severely aggravate the environmental and public health risks associated with the known and likely presence of hazardous materials on the property. Balliet Decl. ¶¶ 11–12. Without Defendants observing the proper NEPA and ICA procedures, it is impossible to know whether and how they are mitigating the risk of releasing and dispersing hazardous materials.

Furthermore, the potential for demolition and construction activities to release contaminants into the environment is greatly exacerbated because the Holsclaw Property is within a designated Special Flood Hazard Area. In a flood event, floodwaters can spread contaminants into drinking water sources and surface waters. Haghighi Decl. ¶ 13. The National Oceanic and Atmospheric Administration (NOAA) has found a 63 percent chance of a "very strong" El Niño weather pattern this fall, which increases the likelihood of flooding at the Holsclaw Property. RJN Ex. 8 at PDF 25.

***Wastewater.*** Proceeding with construction of a much more intensive use, particularly paving over the septic system's dispersal field, causes an imminent threat of harm to County and State resources and public health due to the risk of septic overflow and resulting contamination of the surrounding environment, and surface and groundwater. Haghighi Decl. ¶ 17. The site plans include a notation to connect to an existing sewer line, which is to be "V.I.F.," or verified in the field, but no such sewer line exists on or anywhere near the Holsclaw Property. *Id.* The plans also reference a "sanitary/septic waste management" location, which will be "determined during construction." *Id.* By leaving critical waste management infrastructure for later determination,

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL

Defendants have put the cart before the horse. Not only is there no sewer main connection available at the Holsclaw Property, but the septic system serving the main building is only designed to handle up to 600 gallons of wastewater per day, because it was sized for a daytime workforce of 40. *Id*. ¶ 7. Based on estimates of detainee population and wastewater use, the septic tank would need to handle a peak daily wastewater flow of 15,000 or more gallons per day to accommodate an around-the-clock detainee population of up to 150, which is 24 times the design capacity of the existing septic tank. *Id*. ¶¶ 9–11. And Defendants' plan to pave over the dispersal field of the main existing septic system could substantially compromise the system's function. *Id*. ¶ 17.

The only options for Defendants to potentially address the wastewater problem that they have ignored would greatly increase the scope of construction and promise their own significant environmental impacts. Defendants could try to design and build a sewer main connection, which would require excavation work for miles across County roads, critical habitats, farmland, and private property, or they could try to construct a much bigger on-site septic system and create two more dispersal fields of at least 6,000 linear feet each—a figure that is 12 times the length of each existing 500-linear-foot dispersal field. Haghighi Decl. ¶ 11. The Holsclaw Property, in all likelihood, cannot accommodate these expansions. *Id*. As discussed above, reliance on the existing on-site septic system without any changes will cause serious impacts to public health, safety, and the environment from an overwhelmed septic system. *Id*. ¶¶ 12–13. Therefore, the Court must enjoin construction to avoid the harm that will inevitably result if Defendants' ill-conceived design is implemented. *Save the Yaak Comm. v. Block*, 840 F.2d 714, 722 (9th Cir. 1988) (enjoining further reconstruction where the risk of environmental injury is sufficiently likely), *implied overruling on other grounds recognized by Cascadia Wildlands v. Scott Timber Co.*, 105 F.4th 1144, 1150–53 (9th Cir. 2024).

***Sensitive Species.*** Demolition and construction activities on the Holsclaw Property are likely to disturb structures, soils, and septic components that are known to be contaminated with hazardous substances, potentially releasing those substances into the environment, which could then migrate into groundwater or be transported by stormwater runoff into nearby surface waters such as Llagas Creek and adjacent aquatic habitats. Pierce Decl. ¶¶ 25, 28; Hamilton Decl. ¶ 9(a). These known

contaminants include thiram, a fungicide that is highly toxic to aquatic life. Pierce Decl. ¶¶ 14, 15; Hamilton Decl. ¶ 9(a); Yap Decl. ¶ 19. The release of these substances would degrade water quality in Llagas Creek—critical habitat for South-Central California Coast steelhead—as well as adjacent aquatic habitats. Hamilton Decl. ¶¶ 4, 9(a). This would likely harm the threatened steelhead and other aquatic and riparian species that depend on those habitats, including Monterey hitch, California tiger salamander, California red-legged frog, northwestern pond turtle, least Bell's vireo, tricolored blackbird, and white-tailed kite. Hamilton Decl. ¶ 9(a); Yap Decl. ¶¶ 20, 27. Construction could also lead to increased noise levels and traffic and light pollution, all of which could have significant adverse effects on special status species. Hamilton Decl. ¶ 9(b)–(d); Yap Decl. ¶¶ 26–35; Chappell Decl. ¶ 13(a)–(i). The potential for construction activities to release contaminants into the environment is greatly exacerbated here because the Holsclaw Property is within a designated Special Flood Hazard Area. In a flood event, floodwaters can spread contaminants into drinking water sources and surface waters. Haghighi Decl. ¶ 13.

None of these harms can be rectified after trial, especially as Defendants are proceeding at this very moment without any regard for environmental impact or intergovernmental consultation. The district court in *Mullin* issued a preliminary injunction even though construction there had not yet started. *Mullin*, 2026 WL 1045503 at \*17, \*33 ("[T]here is no better time for Plaintiffs to raise NEPA compliance than [when] Defendants are ready and able to commence the transformation of [a facility] into a detention center at any moment."). Here, Defendants have already begun construction and must be enjoined before it is too late. *League of Wilderness Defs./Blue Mtns. Biodiversity Project*, 752 F.3d at 764 (concluding that the destruction of natural resources "cannot be remedied easily if at all," rendering such harm "irreparable for the purposes of the preliminary injunction analysis").

**III.    The Balance of the Equities and the Public Interest Favor a Preliminary Injunction.**

The irreparable harm to Plaintiffs from denying the requested preliminary injunction outweighs any harm to Defendants from the limited delay resulting from the injunction for three reasons. *See Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993). First, Plaintiffs' high likelihood of success on the merits strongly indicates that a preliminary injunction

30

would serve the public interest. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). There is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (citation modified).

Second, the public interest also favors a preliminary injunction because, lacking an injunction, Plaintiffs would face the immediate serious and irreparable consequences detailed above—harms for which there is no adequate remedy at law if they are allowed to continue and the Court later finds Defendants' actions to be illegal. *See All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1138 (9th Cir. 2011) ("This court has also recognized the public interest in careful consideration of environmental impacts before major federal projects go forward, and we have held that suspending such projects until that consideration occurs 'comports with the public interest.'"); *see also Envtl. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 992 (9th Cir. 2020) ("The public interest is served by requiring [an agency] to comply with the law.").

Third, on the other side of the ledger, Plaintiffs' proposed injunction would pose little risk to the Defendants' interests. The proposed injunction is limited and targets only the single Project at issue. It reasonably requests that Defendants maintain the status quo on the Holsclaw Property until they comply with their obligations under federal law, as determined by this Court. Temporarily halting construction would not bar the Project from ever being built, nor harm Defendants' ability to continue to enforce federal immigration law, as the Project is not currently facilitating that purpose.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to enter their proposed injunction.

Dated: June 24, 2026

Respectfully submitted,

TONY LOPRESTI
County Counsel
KAVITA NARAYAN
Chief Assistant County Counsel
ELIZABETH G. PIANCA
Assistant County Counsel
MEREDITH A. JOHNSON
Lead Deputy County Counsel
SONIA N. WILLS
CRISTINA STELLA
RAJIV NARAYAN
Deputy County Counsels

31

LEILY ARZY
Litigation Fellow

By: */s/Tony Lopresti*
TONY LOPRESTI
County Counsel

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

Dated:  June 24, 2026

ROB BONTA
Attorney General of California
ABIGAIL BLODGETT
Supervising Deputy Attorney General

By: */s/Jessica Durney*
JESSICA DURNEY
STACY LAU
ASHLEY WERNER
ERIN GANAHL
Deputy Attorneys General

Attorneys for Plaintiff
STATE OF CALIFORNIA

I, Matthew D. Zinn, hereby attest that each of the above signatories have concurred in the filing of this document.

Dated:  June 24, 2026                          SHUTE, MIHALY & WEINBERGER LLP

By:          */s/ Matthew D. Zinn*
WILLIAM J. WHITE
MATTHEW D. ZINN
CALEB E. HERSH

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 5:26-cv-05604-EKL