# Exhibit 1

Jean Larsen, SBN 351989
Jenny Ma
Christopher Peña
Patrick Archer
**PUBLIC RIGHTS PROJECT**
490 43rd Street, #115
Oakland, CA 94609
Tel: (510) 738-6788
*jeany.larsen@publicrightsproject.org*

### UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

COUNTY OF SANTA CLARA;
STATE OF CALIFORNIA, by and through
Attorney General Rob Bonta,

                         *Plaintiffs*,

        v.

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT; UNITED
STATES GENERAL SERVICES
ADMINISTRATION; UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY; EDWARD FROST, in his
official capacity as Administrator of the
General Services Administration;
MARKWAYNE MULLIN, in his official
capacity as Secretary of Homeland Security;
DAVID VENTURELLA, in his official
capacity as Senior Official Performing the
Duties of the Director of Immigration and
Customs Enforcement; and ECG 6 LLC,

                        *Defendants*.

Case No. 5:26-cv-05604

**[PROPOSED] BRIEF OF *AMICI CURIAE* MONTEREY COUNTY AND OTHER BAY AREA AND CENTRAL COAST LOCAL GOVERNMENTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Date: September 8, 2026
Time: 2:00 pm
Crtrm: 7, 4th floor

Hon. Eumi K. Lee

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604

## TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................................... 1

SUMMARY OF ARGUMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 2

    I.    The Holding Facility Will Harm Local Economies, and the Agricultural Industry in Particular ................................................... 4

    II.    The Construction of the Holding Facility Will Harm Public Safety, Public Health, and Families and Children in *Amici* Communities ................................................................................... 8

    III.    The Federal Government's Failure to Coordinate with Local Stakeholders Violates the ICA and Harms *Amici* ....................... 12

CONCLUSION ...................................................................................................... 14

ADDITIONAL COUNSEL ................................................................................... 15

# TABLE OF AUTHORITIES

**CASES**

*Arizona v. United States*,
    567 U.S. 387, 394 (2012)..................................................................................3

*Buenrostro-Mendez v. Blanche*,
    166 F.4th 494 (5th Cir. 2026) ..........................................................................2

*Lopez-Campos v. Raycraft*,
    175 F.4th 713 (6th Cir. 2026) ..........................................................................3

**LEGISLATIVE MATERIALS**

U. S. General Accounting Off., GAO/GGD-99-23, *Report to the Honorable Stephen Horn Committee on Government Reform House of Representatives: Key Elements of Federal Building and Facility Partnerships* (Feb. 1999) .................................................................................12

U.S. Senate, Permanent Subcomm. on Investigations, *Unchecked Authority: Examining the Trump Administration's Extrajudicial Immigration Detentions* (Dec. 9, 2025) .................................................................................3

**OTHER AUTHORITIES**

Am. Immigr. Council, *U.S. Citizen Children Impacted by Immigration Enforcement* (June 24, 2021) ..........................................................................10

Andrew M. Camp et al., *Immigration Enforcement Actions and Empty Desks: Persistent and Acute Attendance Effects* (Annenberg Inst. at Brown Univ., Working Paper No. 26-1453, Apr. 2026) ...................................................10, 11

Ashley McBride, *With threats of a federal 'surge,' absences spiked on Thursday among Oakland's immigrant students,* Oaklandside (Oct. 28, 2025) ...............................................................................................................12

Azul Dahlstrom-Eckman, *Santa Clara County Leaders Say They'll Fight Planned ICE Facility in Gilroy*, KQED (May 14, 2026)................................13

Bay Area Council Econ. Inst., *The Economic Impact of Immigration Enforcement in the Bay Area* 8 (Mar. 2026).......................................5, 6, 9, 10

Beth Meyerhoff, *Attendance Issues Could Drive a Change in How School District Funding is Calculated*, Cal. State PTA ............................................11

Brandon Pho, *Santa Clara County sues to stop planned ICE facility*, San Jose Spotlight (June 10, 2026)................................................................................4

Cal. Dep't of Food & Agric., *California Agricultural Production Statistics* ..........7

Drishti Pillai et al., *KFF/New York Times 2025 Survey of Immigrants: Health and Health Care Experiences During the Second Trump Administration*, Kaiser Fam. Found. (Nov. 18, 2025) ...................................................9

Ed Shanahan & Hamed Aleaziz, *ICE Says Detainees are 'Worst of the Worst.' Government Data Disagrees.*, N.Y. Times (June 6, 2026)................................8

Edward Orozco Flores, Jennifer Elena Cossyleon & Keila Luna Monterrey, *The effects of recent federal immigration enforcement on private sector employment in California and Washington, D.C.*, U.C. Merced Cmty. & Labor Ctr. (Dec. 2025).......................................................................4

Elizabeth Cox & Chloe N. East, *Labor Market Impacts of ICE Activity in Trump 2.0* at 2 (Nat'l Bureau of Econ. Rsch., Working Paper No. 35129, April 2026).........................................................................5

Exequiel Hernandez, *ICE-ing the Economy: Immigration Enforcement Under Trump 2.0 and Local Economic Activity* at 2 (Working Paper, May 16, 2026) ....................................................................4

Gabriel R. Sanchez & Rashawn Ray, *ICE is disrupting societal norms and democratic ideals*, Brookings (Mar. 30, 2026) ...................................9

Gabriella Alvarez & Chris Benner, *Dignity in the Fields: Securing Latino and Indigenous Farmworker Well-Being and Prosperity in the Salinas Valley* 19, U.C. Santa Cruz Inst. for Soc. Transformation (Mar. 2026) ..................7, 8

Hamutal Bernstein, Dulce Gonzalez & Diana Guelespe, Immigrant Families Express Worry as They Prepare for Policy Changes, Urban Inst. (Mar. 12, 2025) ...........................................................................9

Hussain Khan, *Fearing ICE, California's Immigrant Seniors Retreat from Social and Health Services*, KQED (Dec. 21, 2025) .......................................9

*Inclusion and Immigrant Resources*, Monterey Cnty. Off. of Educ......................11

InfrastructureDC, *Washington Union Station Project Delivery and Governance Study* (Apr. 2024) ........................................................12

Jerod MacDonald-Evoy, *ICE director envisions Amazon-like mass deportation system: 'Prime, but with human beings'*, Ariz. Mirror (Apr. 8, 2025) ..............2

Joseph Geha, *As ICE Fears Grow, San José Approves $1.5 Million to Support Immigrants*, KQED (June 12, 2025) .................................................6

Josephine Campbell, *Farm-to-table*, EBSCO (2020) ...........................................7

Joyce Chu, *ICE fears keep San Jose students away from school*, San Jose Spotlight (Aug. 6, 2025) ................................................................11

KRON4, *Mission District businesses respond to federal agent deployment in SF* (YouTube, Oct. 22, 2025).................................................................6

*LA County report: ICE raids result in $3.7 million in business losses*, NBC4 L.A. (Feb. 10, 2026)...................................................................4

Leah Fieger, *ICE is Expanding Across the US at Breakneck Speed. Here's Where It's Going Next*, Wired (Feb. 10, 2026)......................................2

Lei Chen et al., *Immigrants' Enforcement Experiences and Concern about Accessing Public Benefits or Services*, 25 J. of Immigrant & Minority Health 1077 (2023) ..............................................................9

Marcela Escobari, Ian Seyal & Paul Beach, *Shock, awe, and economic fallout: The employment effects of ICE enforcement in US cities*, Brookings (May 29, 2026) ...........................................................4

Mariah Timms, *Basic Services in Minneapolis Are Straining Under ICE Presence and Protests*, Wall St. J. (Jan. 31, 2026) .........................................9

Marin Cnty. Dep't Agric., *Economic Contributions of Marin County Agriculture* (2025) ...........................................................7

Michael Alferes, Cal. Legis. Analyst's Off., *Update on Local Control Funding Formula Costs* (May 1, 2026)...........................................................11

Monterey Cnty. Agric. Comm'r, *Economic Contributions of Monterey County Agriculture* 4 (Nov. 2025).................................................6, 7

Monterey Cnty. Farm Bureau, *Facts, Figures & FAQ* ...........................................6

Oscar Palma, *After immigration scare, S.F. educators want district to do more*, Mission Local (Oct. 28, 2025) ...........................................................11

*Research Highlight: Long-term consequences of school absenteeism by Dr. Arya Ansari*, Crane Ctr. for Early Childhood Rsch. & Pol'y (Sept. 2020)......11

Santa Clara Valley Open Space Authority, *Preserving Our Heritage in the Valley of Heart's Delight* ...........................................................6

Sasha Pesci & Catherine Brinkley, *Can a Farm-to-Table restaurant bring about change in the food system?: A case study of Chez Panisse*, 25 Food, Culture & Soc'y 997 (2022) ...........................................................7

[PROPOSED] BRIEF OF *AMICI CURIAE*      iv
Case No. 5:26-CV-05604

Shannon M. Sedgwick et al., *Economic Impacts of Federal Immigration Enforcement in Los Angeles County* at iv-v, L.A. Cnty. Econ. Dev. Corp. (Jan. 2026)...................................................................................................3

Sharan Kuganesan & Oset Babür-Winter, *The Best Food Cities in the US: 2025 Readers' Choice Awards*, Conde Nast Traveler (Nov. 24, 2025).....................8

*Sonoma Valley Tourism Statistics*...............................................................................8

Susan Landry, *A new path for undocumented farmworkers,* Voices of Monterey Bay (Nov. 21, 2019)..........................................................................5

Sustainable Agric. Educ. & Am. Farmland Tr., *The Bay Area Food Economy: Existing Conditions and Strategies for Resilience* 3 (Oct. 2017) ......................8

Thomas J. Miles & Adam B. Cox, *Does Immigration Enforcement Reduce Crime? Evidence from Secure Communities*, 57 J. of L. & Econ. 937, 937 (Nov. 2014) ...............................................................................................9

Tom K. Wong, *Large-Scale Immigration Enforcement and Its Consequences: The Impact of Operation Metro Surge* 7, U.S. Immigr. Pol'y Ctr. (Mar. 24, 2026) ...................................................................................................4

U.S. Dep't of Homeland Sec., *ICE Detention Reengineering Initiative* (Feb. 13, 2026) ...............................................................................................2

Valerie Lacarte, Michael Fix, & Allison Rutland, *Rooted in the Valley: Immigrants in Napa County's Communities and Economy* 5, Migration Pol'y Inst. (May 2026)......................................................................................8

Warwick McKibbin, Megan Hogan & Marcus Noland, *The International Economic Implications of a Second Trump Presidency* 24 (Peterson Inst. for Int'l Econs., Working Paper No. 24-20, Sept. 2024) ..................................7

**STATEMENT OF INTEREST**

*Amici* are Monterey County and other Bay Area and Central Coast cities and counties that support Plaintiffs' request for a preliminary injunction. Like Plaintiffs, *amici* share an interest in averting the severe harms that will inevitably follow from the construction and subsequent operation of the federal immigrant holding facility in Santa Clara County, California (the "Holding Facility").

The Holding Facility will cause substantial damage, including the creation of significant environmental hazards, the misuse of historically preserved farmland, myriad economic harms to local government entities, and the same form of mistreatment and neglect immigrant detainees have experienced throughout the country. *See generally* Compl. ¶¶ 1–17. These harms, and those described below, are not distant to *amici*. The Holding Facility is situated only a mile off Route 101, a highway that thousands of commuters and tourists use to travel to and from our communities each day. And the Holding Facility will likely hold detained residents and community members from *amici*'s local jurisdictions. It is in the interest of preventing harms to our communities that *amici* ask this Court to grant Plaintiffs' request for injunctive relief.

**SUMMARY OF ARGUMENT**

The public interest and the threat of irreparable harm—essential prongs of injunctive relief—weigh in favor of granting Plaintiffs' request for a preliminary injunction. Moreover, the federal Government's demonstrated willingness to unlawfully expand its power to arrest and detain only exacerbate each of the described ramifications of the Holding Facility.

*First*, research unsurprisingly demonstrates that an increase in detention capacity correlates with an increase in enforcement activity in surrounding communities. That increase, in turn, produces significant economic harms, including reduced labor force participation, decreased business activity, and lost local tax revenue. Such effects would be particularly damaging in the Bay Area and Central Coast, where immigrants play a vital role across multiple sectors within local economies, including agriculture.

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604

*Second*, expanded immigration enforcement undermines public safety and health. When residents fear immigration consequences, they are less likely to report crimes, seek medical care, or participate in public institutions, creating measurable risks for entire communities. The effects of increased enforcement fall particularly heavily on children and mixed-status families, leading to school absenteeism, family instability, and long-term developmental harms that local governments, including *amici*'s, must address.

*Finally*, the federal Government's failure to coordinate with and consider Plaintiffs' viewpoints deprives local jurisdictions of the opportunity to prepare for and mitigate the foreseeable repercussions of the proposed facility. In sum, these far-reaching harms underscore the urgent need to enjoin construction of the Holding Facility before additional irreparable damage is done.

## ARGUMENT

The Holding Facility must be understood in the context of the Administration's broader immigration goal: to deport one million people per year through an expanded network of field offices, holding facilities, and detention centers.[1] DHS's own memos and leaders lay out federal plans to "fully implement a new detention model by the end of Fiscal Year 2026,"[2] in which ICE's deportation process runs "like [Amazon] Prime, but with human beings."[3] The Holding Facility is part of an integrated system that will allow ICE to significantly ramp up local arrests. The severity of the harms inflicted by these planned mass detentions are made all the more extreme when coupled with the Administration's recent efforts to detain immigrants indefinitely without bond. *See, e.g., Buenrostro-Mendez v. Blanche*, 166 F.4th 494 (5th Cir. 2026) (holding that all

---

[1] *See* Leah Fieger, *ICE is Expanding Across the US at Breakneck Speed. Here's Where It's Going Next*, Wired (Feb. 10, 2026), https://perma.cc/J8Q2-RCT8.

[2] U.S. Dep't of Homeland Sec., *ICE Detention Reengineering Initiative* (Feb. 13, 2026), https://perma.cc/665N-H8JR; *see also* Compl. ¶¶ 106–07.

[3] Jerod MacDonald-Evoy, *ICE director envisions Amazon-like mass deportation system: 'Prime, but with human beings',* Ariz. Mirror (Apr. 8, 2025), https://perma.cc/HDH7-HHTS.

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604

noncitizens who are in the U.S. without admission are subject to mandatory detention without bond); *cf.*, *Lopez-Campos v. Raycraft*, 175 F.4th 713 (6th Cir. 2026) (joining the Second, Seventh, and Eleventh Circuits in affirming that interior immigrant arrestees are eligible for release on bond). In short, the Holding Facility could become a site from which residents are briefly held and then sent to a distant jurisdiction to be detained indefinitely.[4]

*Amici*'s residents are not only at risk of being indefinitely separated from their families and communities, but they are also at risk of significant harms in DHS custody, as is evident from the long record of civil liberty violations, physical injury, and even wrongful death of arrestees and detainees.[5] While the federal Government undoubtedly has authority to lawfully execute the immigration laws of the United States,[6] it cannot deploy that authority in dangerous and illegal ways.

But beyond escalating personal liberty infringements, an increase in immigration enforcement carries significant negative economic impacts to surrounding communities.[7] Targeted jurisdictions also suffer worsening health and public safety outcomes, and strains on communities and families. Inflamed here by the total bypassing of intergovernmental processes, recent history teaches that, barring intervention, these same harms will land upon *amici* and our residents.

---

[4] *See* Compl. ¶¶ 131–35 (describing plans to use the Holding Facility as a temporary holding center).

[5] *See* U.S. Senate, Permanent Subcomm. on Investigations, *Unchecked Authority: Examining the Trump Administration's Extrajudicial Immigration Detentions* (Dec. 9, 2025), https://perma.cc/LTT9-S2DC; *see also* Maanvi Singh, *A year after ICE raids terrorized Los Angeles, a rattled city counts its scars: 'The arrests never really stopped'* (June 14, 2026), The Guardian, https://perma.cc/ZVM2-BHYD.

[6] *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 394 (2012) (noting that the "[federal] Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens.").

[7] *See* Shannon M. Sedgwick et al., *Economic Impacts of Federal Immigration Enforcement in Los Angeles County* at iv-v, L.A. Cnty. Econ. Dev. Corp. (Jan. 2026), https://perma.cc/VN2X-UWV6.

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604                    3

## I.    The Holding Facility Will Harm Local Economies, and the Agricultural Industry in Particular

The economies of *amici* communities have and will continue to suffer from the construction and eventual use of the Holding Facility. Research shows that communities near ICE facilities see an increase in immigration arrests, which leads to negative economic impacts.[8] For example, the missed work hours caused by the increased presence of federal law enforcement during Operation Metro Surge last winter led to an estimated $189.2 million in lost wages in Minneapolis and another $54.6 million in lost wages in St. Paul.[9] Similarly, raids in Los Angeles in 2025 caused 70% of businesses in the targeted areas to experience staffing shortages, with many workers reporting fear as the reason they were not reporting to work.[10]

Nationally, in cities where ICE carried out the largest enforcement surges, total employment was down by almost one percent in 2025, costing the nation close to 700,000 jobs and costing California more than 465,000 jobs.[11] Increased immigration enforcement has also led to lower foot traffic and declines in spending at small businesses.[12]

---

[8] *See* Brandon Pho, *Santa Clara County sues to stop planned ICE facility*, San Jose Spotlight (June 10, 2026), https://perma.cc/A9R9-A4P9.

[9] Tom K. Wong, *Large-Scale Immigration Enforcement and Its Consequences: The Impact of Operation Metro Surge* 7, U.S. Immigr. Pol'y Ctr. (Mar. 24, 2026), https://perma.cc/WSD2-PVKA.

[10] *See LA County report: ICE raids result in $3.7 million in business losses*, NBC4 L.A. (Feb. 10, 2026), https://perma.cc/7LGL-VUJQ.

[11] *See* Marcela Escobari, Ian Seyal & Paul Beach, *Shock, awe, and economic fallout: The employment effects of ICE enforcement in US cities*, Brookings (May 29, 2026), https://perma.cc/7BZ2-VNT9; Edward Orozco Flores, Jennifer Elena Cossyleon & Keila Luna Monterrey, *The effects of recent federal immigration enforcement on private sector employment in California and Washington, D.C.*, U.C. Merced Cmty. & Labor Ctr. (Dec. 2025), https://perma.cc/8RSV-MPL7.

[12] *See* Exequiel Hernandez, *ICE-ing the Economy: Immigration Enforcement Under Trump 2.0 and Local Economic Activity* at 2 (Working Paper, May 16, 2026), https://perma.cc/3CF4-YYWE (finding that these decreases occurred "regardless of whether the visitor resides, or the [business] is located, in a neighborhood with high levels of immigrant or Hispanic residents").

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604                    4

Likewise, enforcement surges decrease the likelihood that undocumented immigrants, who are more likely to hold jobs than their American-born counterparts,[13] will work. And there is no evidence of any correlating positive economic effects for U.S. citizens.[14] In fact, enforcement surges harm U.S.-born workers who work in immigrant-heavy sectors, likely because employers in those sectors tend to adjust for decreased labor supply rather than try to replace it.[15]

In the Bay Area, more than 477,000 undocumented immigrants reside in our communities and play an essential role in our region's economic vitality.[16] Yet, the Bay Area could lose $67 billion in annual economic output—approximately 5-6% of the region's total GDP—if large numbers of undocumented residents are deported.[17] These economic harms will be acutely felt in the construction, hospitality, caregiving, and food services industry.[18] Of the more than 90,000 farmworkers employed in Monterey and Santa Cruz counties, more than half are estimated to be non-citizens.[19] For administrative and building maintenance roles in these counties, undocumented workers make up 19% of the workforce, and more than 15% of those working in food service and accommodations.[20] Indeed, the threat of immigration enforcement alone has *already* caused *amici* measurable harm—for instance, San Francisco's Mission District recently experienced a drop in

---

[13] *See* Bay Area Council Econ. Inst., *The Economic Impact of Immigration Enforcement in the Bay Area* 8 (Mar. 2026), https://perma.cc/3UC3-JFK2 (noting that undocumented immigrants' labor force participation is 82% in the Bay Area, which is the highest of any group).

[14] *See* Elizabeth Cox & Chloe N. East, *Labor Market Impacts of ICE Activity in Trump 2.0* at 2 (Nat'l Bureau of Econ. Rsch., Working Paper No. 35129, April 2026), https://perma.cc/YTV6-QRLP.

[15] *Id.* at 10-12; *see also* Bay Area Council Econ. Inst., *supra* note 13, at 16.

[16] *See* Bay Area Council Econ. Inst., *supra* note 13, at 7-9.

[17] *Id.* at 15; *see also id.* at 13 (noting that "large-scale deportations would . . . shrink productive capacity, drive up operating costs, tighten supply, and slow overall economic growth").

[18] *Id.* at 2.

[19] Susan Landry, *A new path for undocumented farmworkers,* Voices of Monterey Bay (Nov. 21, 2019), https://perma.cc/K3QK-TPDJ.

[20] Bay Area Council Econ. Inst., *supra* note 13, at 13.

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604                                        5

customers, retailers, and street vendors following reports of potential immigration enforcement operations.[21]

Moreover, if mass deportation occurs in Bay Area communities, *amici* would be negatively impacted by the loss of tax revenue and the costs of responding to the ensuing disorder. Removing undocumented workers from the Bay Area would eliminate approximately $8 billion in annual tax revenue.[22] This loss would have enormous consequences for local government services and programs, harming not just undocumented community members, but all residents.[23] Relatedly, cities must often set aside funds to provide for services or families who are unable to make ends meet in the aftermath of the detention of a wage-earning adult; for example, the City of San Jose recently allocated one million dollars to provide support to families in crisis after immigration arrests.[24]

The location of the Holding Facility also matters: situated directly between agricultural fields, it broadcasts a clear threat to local farmworking communities. And indeed, for both Plaintiffs and *amici,* the harm to farming communities will be particularly acute. Santa Clara County is known for its robust agricultural production—which is the source of $371 million annually in agricultural commodities.[25] In Monterey County, agriculture is the source of $11.7 billion dollars in the local economy and is the source of over 80,000—or one in every five—jobs.[26]

---

[21] KRON4, *Mission District businesses respond to federal agent deployment in SF* (YouTube, Oct. 22, 2025), https://perma.cc/S5WH-22QK.

[22] *See* Bay Area Council Econ. Inst., *supra* note 13, at 17.

[23] *See id.*

[24] Joseph Geha, *As ICE Fears Grow, San José Approves $1.5 Million to Support Immigrants*, KQED (June 12, 2025), https://perma.cc/YR9X-BGSP

[25] *See* Santa Clara Valley Open Space Authority, *Preserving Our Heritage in the Valley of Heart's Delight*, https://perma.cc/KAU6-DKNF.

[26] *See* Monterey Cnty. Agric. Comm'r, *Economic Contributions of Monterey County Agriculture* 4 (Nov. 2025), https://perma.cc/S9T5-EWA2.

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604                            6

In Marin County, agriculture was the source of over $257 million in contributions to the local economy in 2025—or $700,000 dollars per day[27]

Agricultural businesses are vital to Bay Area economies and provide a critical food source for the rest of the country.[28] Nationally, half of the vegetables and three quarters of the fruit and nuts that Americans eat come from California.[29] Monterey County, for example, is the nation's leading grower of lettuce, celery, broccoli, spinach, cauliflower, and strawberries, all of which require careful harvesting to bring to market.[30] If farmworkers are afraid to go to work or are deported en masse, disruptions to the national supply of produce will ensue, leading to increased prices and potential shortages.[31] One recent study estimated that deporting 1.3 million undocumented immigrants would result in a 1.7% increase in prices of agricultural goods nationwide over multiple years.[32]

Agricultural labor shortages will also bleed into acute harms for Bay Area restaurant and tourism industries. Known for their vibrant food culture and focus on locally grown produce,[33] Bay Area restaurants often advertise themselves as farm-to-table.[34] The food industry, in turn,

---

[27] *See* Marin Cnty. Dep't Agric., *Economic Contributions of Marin County Agriculture* (2025), https://perma.cc/CYP7-ZF8Q.

[28] Gabriella Alvarez & Chris Benner, *Dignity in the Fields: Securing Latino and Indigenous Farmworker Well-Being and Prosperity in the Salinas Valley* 19, U.C. Santa Cruz Inst. for Soc. Transformation (Mar. 2026), https://perma.cc/A2VJ-USAA.

[29] *See* Cal. Dep't of Food & Agric., *California Agricultural Production Statistics*, https://perma.cc/2XJA-H4BL.

[30] See Monterey Cnty. Farm Bureau, *Facts, Figures & FAQ*, https://perma.cc/Z4PK-8UBS; *see also* Monterey Cnty. Agric. Comm'r, *supra* note 26.

[31] *See* Warwick McKibbin, Megan Hogan & Marcus Noland, *The International Economic Implications of a Second Trump Presidency* 24 (Peterson Inst. for Int'l Econs., Working Paper No. 24-20, Sept. 2024), https://perma.cc/9RHS-8KSH.

[32] *Id.*

[33] Sasha Pesci & Catherine Brinkley, *Can a Farm-to-Table restaurant bring about change in the food system?: A case study of Chez Panisse*, 25 Food, Culture & Soc'y 997 (2022), https://perma.cc/L9R8-RVPU.

[34] Josephine Campbell, *Farm-to-table*, EBSCO (2020), https://perma.cc/KGS3-3CMD.

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604                 7

helps drive Bay Area tourism,[35] as does the wine industry, which also relies heavily on immigrant labor.[36] For instance, in 2023, visitors to Sonoma County brought more than $2.1 billion dollars into the local economy and generated over $177 million in tax revenue.[37]

Decreasing the number of farmworkers would disrupt the local agricultural industry and lead to unharvested produce.[38] These disruptions could lead restaurants to seek new suppliers from outside the region, raise prices for consumers, and manage a subsequent decline in the tourism industry. Hundreds of thousands of *amici* residents work within a highly regional food industry—from the vineyards of Sonoma, to the creameries of Marin County, to San Francisco's Chinatown, to the myriad taco trucks in Oakland, to the farmers markets with local berries in Monterey County, to the Gilroy Garlic Festival—all will face harm as result of the Holding Facility.[39]

## II. The Construction of the Holding Facility Will Harm Public Safety, Public Health, and Families and Children in *Amici* Communities

The expansion of immigration enforcement triggered, as described above, by a proximate detention processing center would also decrease public safety and increase costs to local governments. The vast majority of individuals that ICE detains have no criminal record,[40] and

---

[35] *See* Sharan Kuganesan & Oset Babür-Winter, *The Best Food Cities in the US: 2025 Readers' Choice Awards*, Conde Nast Traveler (Nov. 24, 2025), https://perma.cc/Z3XQ-KKF9 (ranking Oakland and San Francisco among the top food destinations in the country in a reader survey) .

[36] *See* Valerie Lacarte, Michael Fix, & Allison Rutland, *Rooted in the Valley: Immigrants in Napa County's Communities and Economy* 5, Migration Pol'y Inst. (May 2026), https://perma.cc/8A3B-C5JU; *see also id.* at 4.

[37] *Sonoma Valley Tourism Statistics*, https://perma.cc/PT9Z-NHXV.

[38] *See generally* Alvarez & Benner, *supra* note 28.

[39] *See* Sustainable Agric. Educ. & Am. Farmland Tr., *The Bay Area Food Economy: Existing Conditions and Strategies for Resilience* 3 (Oct. 2017), https://perma.cc/F79U-3GNW (noting in 2017 that "the food economy employs close to half a million people" in the Bay Area).

[40] *See* Ed Shanahan & Hamed Aleaziz, *ICE Says Detainees are 'Worst of the Worst.' Government Data Disagrees.*, N.Y. Times (June 6, 2026), https://perma.cc/ERQ9-XPLA.

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604                     8

studies show that the arrests ICE carries out do not make cities and counties safer.[41] Instead, the opposite is true: when ICE conducts indiscriminate raids, residents' sense of danger increases.[42] Immigrant residents are also deterred from reporting crimes to the local police and assisting with investigations.[43] And local law enforcement must expend considerable resources to ensure public safety during periods of heightened tension.[44]

Heightened enforcement leads immigrant residents of *amici* jurisdictions to avoid public benefits and services across the board, which can lead to community-wide public health harms.[45] When residents delay care out of fear, there's an increased reliance on emergency services, and greater communicable-disease risk, which burdens public health systems.[46]

Moreover, the proposed facility itself may pose a public health risk. In many detention facilities across the country—particularly those, like this one, which are built to be short term

---

[41] *See, e.g.*, Thomas J. Miles & Adam B. Cox, *Does Immigration Enforcement Reduce Crime? Evidence from Secure Communities*, 57 J. of L. & Econ. 937, 937 (Nov. 2014) (concluding that Secure Communities program "had no observable effect on the overall crime rate" in communities).

[42] *See, e.g.*, Bay Area Council Econ. Inst., *supra* note 13, at 23 (noting that "since early 2025, fear has been the dominant driver of behavior in the Bay Area"). Gabriel R. Sanchez & Rashawn Ray, *ICE is disrupting societal norms and democratic ideals*, Brookings (Mar. 30, 2026), https://perma.cc/H4WN-W6VU (highlighting fears of U.S. citizens that they will also get swept up in immigration raids)

[43] Hamutal Bernstein, Dulce Gonzalez & Diana Guelespe, Immigrant Families Express Worry as They Prepare for Policy Changes, Urban Inst. (Mar. 12, 2025), https://perma.cc/4YTV-3WBU.

[44] Mariah Timms, *Basic Services in Minneapolis Are Straining Under ICE Presence and Protests*, Wall St. J. (Jan. 31, 2026), https://perma.cc/6R6Z-GAZB.

[45] Hussain Khan, *Fearing ICE, California's Immigrant Seniors Retreat from Social and Health Services*, KQED (Dec. 21, 2025), https://perma.cc/8SSM-9YR7 (noting health care providers in San Francisco reported a noticeable drop in attendance at Healthy Aging and Disability Services Center as a result of fears about immigration enforcement.); Lei Chen et al., *Immigrants' Enforcement Experiences and Concern about Accessing Public Benefits or Services*, 25 J. of Immigrant & Minority Health 1077 (2023), https://perma.cc/T65B-SYHE.

[46] *See* Drishti Pillai et al., *KFF/New York Times 2025 Survey of Immigrants: Health and Health Care Experiences During the Second Trump Administration*, Kaiser Fam. Found. (Nov. 18, 2025), https://perma.cc/JL6L-R9QT (noting that 29% of all immigrant adults reported skipping or postponing health care in 2025).

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604                              9

processing facilities—individuals face deplorable conditions. *See* Compl. ¶ 3 & n.1. City and county first responders will be strained by increased emergency calls to the Holding Facility and corresponding costs, as well as a reduced capacity to handle other emergencies that arise within our communities. And disease outbreaks at the facility are likely to spread into the surrounding communities, burdening *amici*'s public health resources and safety net hospital systems.

Finally, the Holding Facility will devastate families and harm children across the Bay Area. As many as 130,000 mixed-status households call the Bay Area home, representing 536,000 residents, including 153,000 children, many of whom are U.S. citizens.[47] For these families, deporting a primary earner could "slash these households' median annual income by up to 69%, from $117,000 to $36,000."[48] In an area which has one of the highest costs of living in the nation, the effects of such a drastic reduction in income will be devastating for families.

Tragically, the detention or deportation of a parent is also associated with higher rates of suicidal thoughts among children, and most children experience significant negative behavioral changes as a result of one parent's detention.[49] These harms even extend to babies *before* they are born; in the aftermath of an immigration enforcement action, babies have lower birthweights and are more likely to be born prematurely.[50]

Additionally, following completion of the Holding Facility, increased ICE presence is likely to cause school attendance to drop. One recent study found that immigration enforcement activity increased the daily probability of absence among foreign-born students by 2.2 percentage points—an approximately 37% increase over baseline levels.[51] Another analysis of enforcement

---

[47] Bay Area Council Econ. Inst., *supra* note 13, at 19.

[48] *Id.* at 20.

[49] *See* Am. Immigr. Council, *U.S. Citizen Children Impacted by Immigration Enforcement* (June 24, 2021), https://perma.cc/H737-2VNU.

[50] *Id.*

[51] *See* Andrew M. Camp et al., *Immigration Enforcement Actions and Empty Desks: Persistent and Acute Attendance Effects* (Annenberg Inst. at Brown Univ., Working Paper No. 26-1453, Apr. 2026), https://perma.cc/ZD8R-RKWR.

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604                    10

activity in California's Central Valley found that school absences rose by roughly 22% following immigration raids, with increased absences rising to 35% among younger pre-kindergarten students.[52]

Indeed, school districts across the Bay Area, including San Jose, San Francisco, and Oakland's have experienced attendance declines during periods of heightened immigration enforcement activity or threatened activity.[53] For example, according to the Santa Clara County Office of Education, average attendance dropped by approximately 5,000 students in January and roughly 10,000 students in February 2025 as a result of increased immigration enforcement.[54]

With school funding in California tied to student attendance, these harms compound further.[55] Yet, here, the Holding Facility would create worse student outcomes for all students by depleting funding for local school districts.[56] And the burden to prepare families for the possibility of separation and the duty to repair the resulting long-term damage would fall primarily on *amici* local governments.[57] Indeed, several *amici* jurisdictions have already had to expend resources to create new protocols for staff and guides for families fearful of immigration enforcement.[58]

---

[52] *Id.*

[53] *See, e.g.*, Joyce Chu, *ICE fears keep San Jose students away from school*, San Jose Spotlight (Aug. 6, 2025), https://perma.cc/G5CD-KPY8; Oscar Palma, *After immigration scare, S.F. educators want district to do more,* Mission Local (Oct. 28, 2025), https://perma.cc/8U82-SHNX; Ashley McBride, *With threats of a federal 'surge,' absences spiked on Thursday among Oakland's immigrant students,* Oaklandside (Oct. 28, 2025), http://perma.cc/3WAX-NEYN.

[54] Chu, *supra* note 53.

[55] *See* Michael Alferes, Cal. Legis. Analyst's Off., *Update on Local Control Funding Formula Costs* (May 1, 2026), https://perma.cc/X5TN-TP5M.

[56] *See* Beth Meyerhoff, *Attendance Issues Could Drive a Change in How School District Funding is Calculated*, Cal. State PTA, https://perma.cc/PLU9-BB5P.

[57] *Research Highlight: Long-term consequences of school absenteeism by Dr. Arya Ansari*, Crane Ctr. for Early Childhood Rsch. & Pol'y (Sept. 2020), https://perma.cc/3GXF-R9AJ (summarizing the long-term effects of chronic absenteeism, including lower graduation rates and greater rates of economic hardship in young adulthood).

[58] *See, e.g., Inclusion and Immigrant Resources*, Monterey Cnty. Off. of Educ., https://perma.cc/YR2F-23PM (county website with school immigration policies for educational

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604                    11

**III.    The Federal Government's Failure to Coordinate with Local Stakeholders Violates the ICA and Harms *Amici***

The Intergovernmental Cooperation Act, 31 U.S.C. §§ 6501–6508 ("ICA"), reflects Congress's judgment that federal projects affecting local communities should not proceed without local consultation. Yet the federal Government not only failed to inform Plaintiffs about the Holding Facility—it's unclear they ever tried. Local governments thus could not rely, as they would normally, on information sourced directly from Plaintiffs.[59] Instead, through piecemeal public statements from DHS officials, *amici* have had to assemble loose bits of information by which to respond to the concerns and objections of our constituents.

In practice, federal agencies routinely comply with the ICA by notifying state and local officials of proposed projects, sharing planning materials, and soliciting feedback to identify and mitigate local impacts. And that is not only legally compliant, but makes good sense for both federal and local governments. During major projects, for example, federal agencies coordinate closely with state and local governments before proceeding. The Washington Union Station Expansion Project—an $8.8 billion federally supported infrastructure effort—proceeded only after years of coordination among the U.S. Department of Transportation, the District of Columbia government, and regional stakeholders, culminating in a multi-year environmental review and formal alignment on project governance before construction could proceed.[60] In other instances, including two in the Bay Area, the federal Government has even credited local influence for the direction and success of a project.[61] Coordination of this nature allows local governments to assess

---

staff, legal resources, family preparedness guidance, and a letter from the superintendent providing assurance that schools remain safe spaces); *see also* Palma, *supra* note 53.

[59] *See* Compl. ¶ 97 ("[N]o Defendant consulted with, sought input from, or coordinated with any other local government in the region or the State regarding the federal government's intended use of the Holsclaw Property").

[60] *See* InfrastructureDC, *Washington Union Station Project Delivery and Governance Study* (Apr. 2024), https://perma.cc/2HX7-YZBP.

[61] *See* U. S. General Accounting Off., GAO/GGD-99-23, *Report to the Honorable Stephen Horn Committee on Government Reform House of Representatives: Key Elements of Federal Building*

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604                    12

infrastructure needs, prepare public services, address land use concerns, and respond to community questions before construction begins. None of those *basic* steps occurred here. Had the federal Government engaged local stakeholders at the outset, it would have identified that the proposed site has been subject to long-standing legal restrictions limiting its use to agricultural purposes, potentially avoiding conflict and litigation altogether. Other concerns, including the disastrous environmental consequences of the Holding Facility, could have also been raised. Heeded prudently, such concerns may have presented insurmountable barriers that would have ended the poorly conceived plan to construct the Holding Facility before it ever began. Instead, the absence of coordination deprives *amici* of the opportunity to plan for foreseeable impacts on public safety services, health systems, schools, and local economies. It also forced local officials to divert critical public resources, including responding to constituent inquiries, holding public meetings, and evaluating potential impacts on local infrastructure and services without so much as access to complete federal plans.

These are precisely the harms the ICA is designed to prevent. By disregarding established intergovernmental processes, the federal Government shifted the burdens of planning and response onto local jurisdictions while denying them the tools necessary to carry out those responsibilities. Or, as Ken Christopher, an executive at a garlic farm that is the largest employer in Gilroy, observed: "Our communit[ies] deserve[] better, and the fact that they weren't part of the conversation, that's the downfall."[62]

---

*and Facility Partnerships* (Feb. 1999) (in reference to two public-private partnerships used to rehabilitate two former army bases—Fort Mason and the Presidio—"Park Service officials said that through lobbying efforts, *the local community* helped to influence the Park Service's decision to use partnerships rather than over-commercializing the parks' facilities.") (emphasis added), https://perma.cc/279K-7M2M.

[62] Azul Dahlstrom-Eckman, *Santa Clara County Leaders Say They'll Fight Planned ICE Facility in Gilroy*, KQED (May 14, 2026), https://perma.cc/U7NC-CGAF.

## CONCLUSION

The Holding Facility jeopardizes the well-being of the residents that *amici* serve and govern. For these reasons, and because the record demonstrates concrete irreparable harm and the public interest favors relief, *amici* urge the Court to grant Plaintiffs' request for a preliminary injunction.

Dated: July 27, 2026                    Respectfully submitted,

/s/ Jean Larsen

JEAN LARSEN
JENNY MA
CHRISTOPHER PEÑA
PATRICK ARCHER
**PUBLIC RIGHTS PROJECT**
490 43rd Street, #115
Oakland, CA 94609
(510) 738-6788
jeany.larsen@publicrightsproject.org

*Counsel for Amici Curiae*

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604                    14

## ADDITIONAL COUNSEL

YIBIN SHEN
City Attorney
2263 Santa Clara Avenue, Room 280
Alameda, CA 94501
*Attorney for the City of Alameda, California*

ANDREA L. WEDDLE
County Counsel
1221 Oak St.
Oakland, CA 94612
*Counsel for the County of Alameda,
    California*

FARIMAH FAIZ BROWN
City Attorney
2180 Milvia Street, 4th Floor
Berkeley, CA 94704
*Attorney for the City of Berkeley, California*

THOMAS L. GEIGER
County Counsel
1025 Escobar Street, 3rd Floor
Martinez, CA 94553
*Attorney for Contra Costa County,
    California*

MICHAEL RODRIQUEZ
City Attorney
Jarvis Fay, LLP
555 12th Street, Suite 1630
Oakland, CA 94607
*Attorney for the City of Gonzales, California
    & the City of Soledad, California*

JENNIFER P. THOMPSON
City Attorney
Lozano Smith, Attorneys at Law
733 Marsh Street, Suite 200
San Luis Obispo, Ca 93401
*Attorney for the City of Hollister, California*

ROY C. SANTOS
City Attorney
Burke, Williams & Sorensen, LLP
212 S Vanderhurst Avenue
King City, CA 93930
*Attorney for the City of King, California*

BRANDON HALTER
County Counsel
3501 Civic Center Drive, Suite 275
San Rafael, CA 94903
*Counsel for the County of Marin, California*

RENÉ ALEJANDRO ORTEGA
City Attorney
211 Hillcrest Avenue
Marina, CA 93933
*Attorney for the City of Marina, California*

M. CHRISTINE DAVI
City Attorney
512 Pierce Street
Monterey, CA 93940
*Attorney for the City of Monterey,
    California*

SUSAN K. BLITCH
County Counsel
188 W. Alisal Street, 3rd Floor
Salinas, CA 93901
*Attorney for the County of Monterey,
    California*

JANNIE QUINN
City Attorney
500 Castro Street
Mountain View, CA 94041
*Attorney for the City of Mountain View,
    California*

RYAN RICHARDSON
City Attorney
One Frank H. Ogawa Plaza, 6th Floor
Oakland, CA 94612
*Attorney for the City of Oakland, California*

CHRISTOPHER JENSEN
City Attorney
250 Hamilton Avenue
Palo Alto, CA 94301
*Attorney for the City of Palo Alto, California*

CHRISTOPHER A. CALLIHAN
City Attorney
200 Lincoln Avenue
Salinas, CA 93901
*Attorney for the City of Salinas, California*

BARBARA THOMPSON
County Counsel
481 4th Street, #2
Hollister, CA 95023
*Attorney for County of San Benito, California*

DAVID CHIU
City Attorney
City Hall Room 234 One Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
*Attorney for the City and County of San Francisco, California*

SUSANA ALCALA WOOD
City Attorney
200 East Santa Clara Street, 16th Floor
San José, CA 95113
*Attorney for the City of San José, California*

JOHN D. NIBBELIN
County Counsel
400 County Center, 6th Floor
Redwood City, CA 94063
*Attorney for the County of San Mateo, California*

GLEN R. GOOGINS
City Attorney
1500 Warburton Avenue
Santa Clara, CA 95050
*Attorney for the City of Santa Clara, California*

CASSIE BRONSON
Atchison, Barisone & Condotti
P.O. Box 481
Santa Cruz, CA 95061
*Attorney for the City of Santa Cruz, California*

JASON M. HEATH
County Counsel
701 Ocean Street, Room 505
Santa Cruz, CA 95060
*Attorney for the County of Santa Cruz, California*

JOSHUA MYERS
County Counsel
575 Administration Drive Room 105-A
Santa Rosa, CA 95403
*Attorney for the County of Sonoma, California*

REBECCA L. MOON
City Attorney
456 West Olive Ave.
Sunnyvale, CA 94086
*Attorney for the City of Sunnyvale, California*

SAMANTHA W. ZUTLER
City Attorney
275 Main Street, Suite 400
Watsonville, CA 95076
*Attorney for the City of Watsonville, California*

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604

16

**Appendix A - List of *Amici* Local Governments**

City of Alameda, California

County of Alameda, California

City of Berkeley, California

Contra Costa County, California

City of Gonzales, California

City of Hollister, California

City of King City, California

County of Marin, California

City of Marina, California

City of Monterey, California

County of Monterey, California

City of Mountain View, California

City of Oakland, California

City of Palo Alto, California

City of Salinas, California

County of San Benito, California

City and County of San Francisco, California

City of San José, California

County of San Mateo, California

City of Santa Clara, California

City of Santa Cruz, California

County of Santa Cruz, California

City of Soledad, California

County of Sonoma, California

City of Sunnyvale, California

City of Watsonville, California

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of July 2026, I electronically filed the foregoing Motion for leave to file together with the accompanying proposed brief of amici curiae, and proposed order with the Clerk of the court for the United States District Court for the Northern District of California by using the CM/ECF system, and soon thereafter mailed via federal express the chamber copies to the Honorable Eumi K. Lee, United States District Judge's Clerk's office. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Parties may access this filing through the Court's CM/ECF system.

/s/ Jean Larsen
JEAN LARSEN

*Counsel for Amici Curiae*

[PROPOSED] BRIEF OF *AMICI CURIAE*
Case No. 5:26-CV-05604                18