Gregory A. Nylen (SBN CA 151129)
GREENBERG TRAURIG, LLP
18565 Jamboree Road, Suite 500
Irvine, California 92612
Telephone: 949.732.6500
Facsimile: 949.732.6501
nyleng@gtlaw.com

Stacey M. Bosshardt (SBN CA 255231)
Dominic E. Draye (SBN CA 267079)
GREENBERG TRAURIG, LLP
2101 L Street NW, Suite 1000
Washington, D.C. 20037
Telephone: 202.331.3100
Facsimile: 202.331.3101
drayed@gtlaw.com
Stacey.Bosshardt@gtlaw.com

Attorneys for Defendant ECG6 LLC

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

COUNTY OF SANTA CLARA; STATE OF CALIFORNIA, by and through Attorney General Rob Bonta,

Plaintiff,

v.

UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES GENERAL SERVICES ADMINISTRATION; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; EDWARD FORST, in his official capacity as Administrator of the General Services Administration; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; DAVID VENTURELLA, in his official capacity as Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement; and ECG 6 LLC, a California limited liability company,

Defendant.

CASE NO. 5:26-cv-5604-EKL

Assigned to the Honorable Eumi K. Lee

**DEFENDANT ECG6 LLC's BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Action Filed: June 10, 2026

**TABLE OF CONTENTS**


I. BACKGROUND ..... 6

II. PLAINTIFFS ARE UNLIKELY TO PREVAIL ON THE MERITS OF THEIR NEPA CLAIM AGAINST ECG6 (COUNT ONE OF THE COMPLAINT), WHICH FAILS TO STATE A CLAIM UNDER RULE 12(B)(6) ..... 7

III. PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN OF SHOWING IRREPARABLE HARM ..... 9

IV. PLAINTIFFS HAVE NOT SHOWN THAT THE BALANCE OF EQUITIES SUPPORTS INJUNCTIVE RELIEF ..... 12

V. IF THE COURT GRANTS PLAINTIFFS' MOTION, IT SHOULD REQUIRE PLAINTIFFS TO POST A BOND THAT WOULD COVER DAMAGES TO ECG-6 DURING THE INJUNCTION PERIOD ..... 13

VI. CONCLUSION ..... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
480 U.S. 531 (1987) .......... 12

*Berryessa for All v. U.S. Bureau of Reclamation*,
No. C 07-259 SI, 2007 WL 4209551 (N.D. Cal. Nov. 27, 2007) .......... 9

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) .......... 9

*Churchill Cnty. v. Babbitt*,
150 F.3d 1072 (9th Cir. 1998) .......... 8

*Friends of the Earth v. Brinegar*,
518 F.2d 322, 323 (9th Cir. 1975) .......... 15

*Fund for Animals, Inc. v. Lujan*,
962 F.2d 1391 (9th Cir. 1992) .......... 8

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
607 F.3d 453 (7th Cir. 2010) .......... 14

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc.*,
725 F.3d 940 (9th Cir. 2013) .......... 10

*Klamath-Siskyou Wildlands Ctr. v. Heywood*,
No. 9-2252 (E.D. Cal. Aug. 28, 2009) .......... 14

*Landwatch v. Connaughton*,
905 F. Supp. 2d 1192 (D. Or. 2012) .......... 14

*Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) .......... 7

*Protect Our Communities Found. v. United States Dep't of Agric.*,
2011 WL 13356151 (S.D. Cal. Sept. 15, 2011) .......... 12

*Save Our Sonoran, Inc. v. Flowers*,
408 F.3d 1113 (9th Cir. 2005) .......... 14

*Save the Park & Build the Sch. v. Nat'l Park Serv.*,
No. 3:20-CV-1080-LAB-AHG, 2020 WL 4260801 (S.D. Cal. July 24, 2020) .......... 14

*The Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) .......... 12

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319 (9th Cir. 1985) ....................15

*W. Watersheds Project v. Salazar*, No. CV 11-00492 DMG (EX), 2011 WL 13124018 (C.D. Cal. Aug. 10, 2011)....................12, 13

*Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) ....................8

*Wilderness Watch v. Perdue*, 805 F. App'x 476 (9th Cir. 2020) ....................8

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)....................5, 10, 12

**Statutes**

5 U.S.C. § 701(b)(1) ....................7

5 U.S.C. § 704....................7

Administrative Procedure Act....................7, 8

National Environmental Policy Act .................... *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)....................7, 8

Fed. R. Civ. P. 24....................8

Fed. R. Civ. P. 65(c) ....................13

Defendant ECG6 LLC ("ECG6"), owned by real estate investment firm Elmwood Capital Group ("Elmwood"), joins in the arguments set forth in Federal Defendants' opposition brief, which explains that Plaintiffs have not met their burden of demonstrating any of the four pre-requisites for this Court to issue the extraordinary relief of a preliminary injunction. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). ECG6, which acquired the Holsclaw property at issue in this case as part of a portfolio it leases to various federal agencies, files this brief to address four arguments unique to its perspective as the nonfederal party in the case. This brief explains why (1) Plaintiffs are not likely to succeed on the merits of the National Environmental Policy Act ("NEPA") claim against ECG6 because the company is not a proper defendant under NEPA; (2) Plaintiffs have failed to meet their burden of demonstrating irreparable harm from the challenged action because their assertions of harm rely on false assumptions or are speculative; (3) the balance of the equities weighs against an injunction because the profound economic consequences to ECG6 and its principals from an injunction far outweigh the negligible environmental impacts of above-ground construction for a use no more intensive than the site's historic use; and (4) if the Court does choose to award an injunction, Plaintiffs should be required to post a bond in an amount sufficient to cover costs and damages ECG6 would sustain over the next six months (and it should be allowed to move to increase the amount of the bond should the injunction last longer than that amount of time).

Plaintiffs' contrived premise that ECG6's lease to the federal government for an Immigration and Customs Enforcement ("ICE") office and detention center proceeded under a cloak of secrecy is plausible only because of communications they misleadingly represent – including a memorandum provided to Plaintiff Santa Clara County on GSA letterhead that omits the caption of the memo ("Zoning", "Request for Lease Proposals 8CA3614", and "Immigration and Customs Enforcement"), *see* ECF No. 26-3, quoted in part at ECF No. 24 at 12 – and communications they exclude – namely, seventeen emails and multiple calls *initiated by* ECG6's representative with Santa Clara County's Principal Planner Samuel Gutierrez and his staff between January and August 2023 discussing the property and its proposed use, as well as follow-up correspondence from Mr. Gutierrez stating that "[t]he lease and operation of the building space under the GSA (Lease Solicitation No. 8CA3614) entirely for Federal Government use may proceed since the Federal Government is exempt from local regulations." As set forth in the attached declaration of company

co-founder and manager Noah Zeligman (attached hereto) and accompanying exhibits, those communications show that after being informed that the property was under consideration for a lease by ICE, and after communicating with his higher-ups ("upper management") at the County, Mr. Gutierrez green-lighted the property's use for its intended purpose. These facts are patently inconsistent both with claims that the lease proceeded under a "shroud of secrecy" and with the County's claims that after knowing for decades of the property's use for research and development by a seed company – including a period of nearly three years after learning that the previous owner had vacated the premises, during which it took no regulatory action – it has now realized that the project poses "potentially catastrophic environmental and public health harms" to the facility's surroundings. ECF No. 24 at 8.

## I. BACKGROUND

Defendant ECG6, the corporate entity that holds and operates the Holsclaw property, is owned by Elmwood Capital Group ("Elmwood"). Zeligman Decl. at ¶ 2. Elmwood is a Beverly Hills-based real estate investment firm consisting of three friends whose business is to procure and lease properties (sometimes after modifying them to meet government requirements) to federal agencies. *Id.* at ¶¶ 2-3. In the six years since it has been incorporated, Elmwood has procured nine properties for lease to various federal agencies, including the Environmental Protection Agency and the Social Security Administration. *Id*. at ¶¶ 3-4. Elmwood was not involved in GSA's NEPA analysis for any of its leases with the government. *Id.* at ¶ 6.

The lease for the Holsclaw property was negotiated and consummated during the prior Presidential administration in a response to a solicitation issued in 2024 after a presolicitation was published multiple times on the government's publicly available procurement website, www.sam.gov, between 2020-2024. *Id*. at ¶¶ 7-9. In the presolicitation (and later in its solicitation), the government sought expressions of interest for space in San Jose, California to be used by Immigration and Customs Enforcement ("ICE") as "office, detention" space, which would include "Proof of zoning for a 4,000 [square foot] Detention Center" with 60 parking spaces and a "Sally port [a secure passenger area] large enough to accommodate a large passenger bus." *Id.* at ¶ 8. By 2023, Elmwood identified the Gilroy property, a parcel to the west of a county-maintained road, previously used for agricultural research and development by a seed company and its affiliates, and which housed multiple single-story buildings or structures, including a main office,

laboratory building, warehouse, and chemical storage building, as well as five greenhouses, as a good candidate property for the GSA's presolicitation. *Id.* at ¶ 11. Elmwood asked GSA how the facility would be used and was told it would be used for short-term (less than 12 hour) detention, typically by fewer than five detainees, and would not be used for overnight detention. *Id.* at ¶ 25; Zeligman Decl. Ex. F (email dated November 8, 2022).

In order to comply with the requirements in GSA's presolicitation and solicitation notices, one of Elmwood's three owners (Noah Zeligman) communicated with the Santa Clara County Planning Department Principal Planner Samuel Gutierrez to confirm that the zoning would accommodate the government's proposed use of the site as an ICE office and 4,000 square foot detention center. After multiple communications (some by phone), Mr. Gutierrez confirmed that it would. ECF No. 26-3; *see also* Zeligman Decl. at ¶¶ 12-14. Moreover, after conferring with his superiors, Mr. Gutierrez sent a letter stating:

> The lease and operation of the building space under the GSA (Lease Solicitation No. 8CA3614) entirely for Federal Government use may proceed since the Federal Government is exempt from local regulations. . . . [A]ny changes or alterations of the existing buildings or uses on the property by the GSA would not be transferable to future non-government tenants or property owners without first applying for permitting by the County of Santa Clara Department of Planning and Development.

*Id.* at ¶ 16 & Ex. D.

## II. PLAINTIFFS ARE UNLIKELY TO PREVAIL ON THE MERITS OF THEIR NEPA CLAIM AGAINST ECG6 (COUNT ONE OF THE COMPLAINT), WHICH FAILS TO STATE A CLAIM UNDER RULE 12(B)(6)

As this Circuit has repeatedly recognized, NEPA itself does not include a cause of action; instead, NEPA actions are brought under the Administrative Procedure Act (APA). *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1238 (9th Cir. 2005). A pre-requisite for an APA claim is a "final [federal] agency action." 5 U.S.C. § 704; 5 U.S.C. § 701(b)(1) (defining "agency" as "each authority of the Government of the United States"). Therefore, a NEPA claim does not lie against a private citizen. As the Ninth Circuit has explained:

> the federal government is the only proper defendant in an action to compel compliance with NEPA . . . . [B]ecause NEPA requires action only by the government, only the

> government can be liable under NEPA. A private party cannot "comply" with NEPA, and, therefore, a private party cannot be a defendant in a NEPA compliance action.

*Churchill Cnty. v. Babbitt*, 150 F.3d 1072, 1082 (9th Cir. 1998), opinion amended and superseded on denial of reh'g, 158 F.3d 491 (9th Cir. 1998), *and abrogated by Wilderness Soc. v. U.S. Forest Serv.,* 630 F.3d 1173 (9th Cir. 2011). The Ninth Circuit later recognized, contrary to its holding in *Churchill County*, that private parties may and often do have protectable interests within the meaning of Rule 24 sufficient to *intervene* as defendants in a NEPA action, and the court therefore abandoned its prior rule prohibiting private party intervention in NEPA cases. *Wilderness Soc*., 630 F.3d at 1180. But the Ninth Circuit has not held that a private party may properly *be sued* under NEPA. As a factual matter, neither ECG6 nor its principals were involved with GSA's NEPA process for the lease. Zeligman Decl. at ¶ 6. Because ECG6 has not taken, and by definition cannot take "final agency action," Count One against ECG6 should be dismissed for failure to state a claim upon which relief may be granted, and Plaintiffs are unlikely to prevail on the merits of that claim.

Plaintiffs cite two cases in a footnote to justify naming ECG6 as a defendant for this claim, but neither supports their position that a NEPA claim lies against a private real estate investment firm. The Ninth Circuit has suggested that state or municipal defendants, when acting to jointly administer a federal program, may be enjoined – as in the case Plaintiffs cite, where the State of Montana was a co-defendant. *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1397 (9th Cir. 1992) ("Nonfederal defendants may be enjoined if 'federal *and state* projects are sufficiently interrelated to constitute a single 'federal action' for NEPA purposes.") (emphasis added). *But see Wilderness Watch v. Perdue*, 805 F. App'x 476, 479 (9th Cir. 2020) (limiting reach of *Fund for Animals* to cases where nonfederal defendant's action "cannot proceed without the prior approval" of federal agency). But whether it is proper, in rare circumstances, for the scope of a court's injunction to extend to state and local participants in a federal program, or recipients of federal assistance, does not bear on whether those entities have independent liability for violations of NEPA. Because the APA prerequisite of "final agency action" is not met as to ECG6, Plaintiffs are unlikely to succeed on the merits of that claim. Fed. R. Civ. P. 12(b)(6).

/ / /

/ / /

## III. PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN OF SHOWING IRREPARABLE HARM

"Speculative injury does not constitute irreparable injury ... a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Berryessa for All v. U.S. Bureau of Reclamation*, No. C 07-259 SI, 2007 WL 4209551, at *7 (N.D. Cal. Nov. 27, 2007) (denying preliminary injunction against demolition of trailer homes in recreational area where "any ensuing environmental harm to the Lake is speculative.").

Here, any impacts from construction itself *de minimis* given that the project involves primarily interior demolition and construction. Zeligman Decl. at ¶¶ 28-29. All construction and waste disposal will be conducted in a manner consistent with environmental laws, as stated in the lease. ECF No. 32-1 at §§ 3.04D–F, 3.52. Although Plaintiffs cite alleged environmental risks from development and future use of the property, the Court should discount these for several reasons. First, as shown by the May 21, 2026 article Plaintiffs cite, the County's public statements in response to the supposed discovery of this facility cited only opposition to the federal government's immigration policies, with no mention of any environmental basis to oppose it. ECF No. 29-6 (citing County Executive James Williams and multiple district supervisors). That suggests that the environmental concerns were an after-thought to add weight to Plaintiffs' claims, the gravamen of which remains their disagreement with federal immigration policy.[1] Indeed, when Mr. Zeligman discussed the proposed use with Mr. Gutierrez over the first six months of 2023 (during the previous Presidential administration), Mr. Gutierrez green-lighted the project after consulting with his "upper management," stating that "[t]he lease and operation of the building space under the GSA (Lease Solicitation No. 8CA3614) entirely for Federal Government use may proceed since the Federal Government is exempt from local regulations."[2] Zeligman Decl. at ¶ 16; *see also id.* Exs. C-D. That response is flatly inconsistent with Plaintiffs' contention in this litigation that the site's environmental

[1] Plaintiffs' brief states that Elmwood has leased two other facilities to DHS, presumably seeking to envelop Elmwood in this policy and political dispute. ECF No. 24 at 13. But Elmwood offers leases to federal agencies without regard to their mission, including five it has issued to the Social Security Administration and one to the EPA. Zeligman Decl. at ¶ 4. Moreover, none of the leases was awarded during the current Administration. *Id.* at ¶ 5.

risks make it unsuitable for its proposed use. Despite Mr. Gutierrez's clear awareness that ICE would be the tenant, *see* ECF No. 26-3, the County at no time during those conversations asserted that the discussed non-agricultural use would violate the Williamson Act, which generally restricts covered properties' uses. Although the County (the only plaintiff to assert that claim) does not brief the Williamson Act claim in its preliminary injunction, its change in position to Elmwood's detriment is also a factor the Court should weigh in determining whether to issue an injunction using its equitable powers. *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc.*, 725 F.3d 940, 947 (9th Cir. 2013) ("While the *Winter* factors 'are pertinent in assessing the propriety of any injunctive relief,' . . . traditional equitable considerations such as laches, duress and unclean hands may militate against issuing an injunction that otherwise meets *Winter*'s requirements.").

Second, Plaintiffs' concerns that the changed "intensity of use" at the former research, laboratory, and chemical storage buildings will be materially different are based on erroneous assumptions that the premises will be used for overnight occupancy by as many as 150 detainees. ECF No. 24 at 15-16, 21-22. A presumption of environmental harm cannot be based on those false assumptions. *See* Zeligman Decl. at ¶ 25; *see also* Zeligman Decl. Ex. F (ICE statement that typical number of detainees would be 5). Plaintiffs argue that a portion of a potential, future leachfield associated with the main septic tank will be paved over for parking (in fact, only one space would affect this area based on current plans), but that contention should also be rejected. Any required changes to ensure that the wastewater treatment system operates within all regulatory limits can be easily accommodated, and will be, during the construction process by moving one or more of the parking spots, or redesignating a different area as a potential leachfield. Zeligman Decl. at ¶ 30.

Third, Plaintiffs' claims that construction itself risks unleashing environmental contamination are baseless. The lease explicitly requires that "any waste materials encountered during the demolition or construction phase are found to contain lead, asbestos, polychlorinated biphenyls (PCBs) (such as fluorescent lamp ballasts), or other harmful substances . . . shall be handled and removed in accordance with Federal and state laws and requirements concerning hazardous waste."; that "[i]n addition to providing 'one time' removal and recycling of large scale demolition items such as carpeting or drywall, the Lessor shall provide continuous facilities for the recycling of incidental construction waste during the

initial construction"; that "Construction materials recycling records shall be maintained by the Lessor and shall be accessible to the LCO. Records shall include materials recycled or land-filled, quantity, date, and identification of hazardous wastes." ECF No. 32-1 at § 3.04D. – F; *see also id.* at § 3.52 ("Lessor must provide the Government with a summary report demonstrating completion of all required response actions prior to Substantial Completion."). Plaintiffs provide no basis to assume that ECG6 will not honor its contractual commitments to comply with these requirements. As a standard part of the purchase process for financed properties of this nature, the lender (a major financial institution with over $50 billion in assets) required evidence of environmental due diligence. Zeligman Decl. at ¶ 17. Elmwood retained AEI Consultants, a nationally-recognized firm based in the San Francisco Area, to survey the site and conduct studies analyzing the condition of the property. *Id*. The resulting study, comprising more than 1000 pages of sampling results and analysis of water, soil, and gas samples taken during on-site surveys, found that all chemicals were within the applicable regulatory limits for non-residential use. *Id*. The conclusions in these studies assured the lender and ECG6's principals that the property complied with all relevant environmental regulations and that there were no environmentally related transaction risks. *Id.* at ¶ 18.

In addition, although Plaintiffs' documents reflect that the County paid significant attention to hazardous waste compliance at the Holsclaw property in the 2000s, when a prior tenant (Syngenta Seeds) and others conducted research and development activities under county-issued hazardous waste generator permits, more recent records (to the extent they are provided) do not reflect any significant residual issues. For instance, an inspection report from 2020 concerning the property noted only the use of cleaners containing isopropyl alcohol and 10% bleach that had been discharged –after being *diluted* and used to disinfect equipment - into drains, and which recommended only various procedures for storing the containers of cleaners and a fee for a "minimal hazardous materials storage permit." ECF No. 30-5. Although Public Health Department Program Manager Mickey Pierce states that he attended an inspection of the facility in 2021, Plaintiffs provide no record of the results of that visit. ECF No. 30 at ¶ 7. Despite the County's discovery in September 2023 that the site's previous tenant had vacated the site, allegedly without performing closure procedures that would conform to the County Ordinance for hazardous materials, ECF No. 30 at ¶¶ 11, 21, & 22, the County does not claim that it took any action over the next three years to enforce that requirement or even contact the prior owner. Plaintiffs cannot bolster their weak

NEPA claim with supposed harms based on long-ago violations of California regulations governing hazardous wastes by previous owners, or unsupported speculation about the actions of the current owner, particularly where they have taken no other action consistent with their professed concerns.

Plaintiffs also assert that the alleged (but unsubstantiated) increased intensity of use may overload the wastewater management system, causing migration of harmful chemicals into Llagas Creek, which they claim would harm aquatic species in the Creek. ECF No. 24 at 22. That allegation is based on flawed assumptions about how ICE will use the facility, and fails to recognize Elmwood's flexibility to locate parking spaces where they will not interfere with the wastewater treatment system. Zeligman Decl. at ¶ 31. These speculative predictions also depend on the assumption, stated several times in Plaintiffs' brief, that the Creek "abuts the Holsclaw Property." ECF No. 24 at 20. In fact, the Creek is on the other side of a county-maintained road (Holsclaw Road), 141 feet away from the western boundary of the property. ECF No. 26-1. Plaintiffs have failed to meet their burden to show irreparable harm.

## IV. PLAINTIFFS HAVE NOT SHOWN THAT THE BALANCE OF EQUITIES SUPPORTS INJUNCTIVE RELIEF

For a court to issue an injunction, Plaintiffs must show that the balance of equities tips in their favor. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). Hardships to affected private parties "must be balanced against . . . claims of potential environmental injury." *The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (weighing hardships to intervenors if Forest Service project enjoined), *overruled on other grounds by Winter*, 555 U.S. 7. Factors a court must weigh include "[e]conomic harm, including jobs and the value of a project to the local community." *W. Watersheds Project v. Salazar,* No. CV 11-00492 DMG (EX), 2011 WL 13124018, at *18 (C.D. Cal. Aug. 10, 2011); *Protect Our Communities Found. v. United States Dep't of Agric.,* 2011 WL 13356151, at *12 (S.D. Cal. Sept. 15, 2011) ("[C]courts may consider economic harm when determining whether to grant injunctive relief."). Such harms also include financial costs to a developer, including penalties and costs from construction delays. *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987) (reversing and vacating preliminary injunction that would impose significant economic costs on private parties); *Protect Our Communities Found.*, 2011 WL 13356151 at *12 (denying motion for preliminary injunction where

"additional delay would increase the costs of constructing Sunrise Powerlink by $16 to $22 million per month"); *W. Watersheds Project*, 2011 WL 13124018 at *18.

Plaintiffs argue that they have made the requisite showing here because, *inter alia*, "[t]he proposed injunction is limited and targets only the single Project at issue." ECF No. 24 at 31. That is cold comfort to ECG6 given the significant harm to the company and its three founders. The lawsuit itself has inflicted significant harm on this small business, as Mr. Zeligman states:

> In addition to the carrying costs of interest payments and the costs of a paused jobsite, the lawsuit also has other impacts that are more difficult to quantify but which we experience acutely. Because we are a small private real estate operator with only a handful of people, these impacts land with disproportionate weight. We do not have the staff or balance sheet of a large institution to absorb the lawsuit's disruptive effects. Fielding calls from media outlets seeking comment, from our investors seeking assurance about their capital, and from our counsel seeking documents or information to defend the plaintiffs' claims are a drain on our limited resources. Our lenders are also concerned, which weakens our standing in financial conversations and makes it harder to secure new credit on favorable terms. Although there is no way to quantify these "cold shoulder" effects, we have a strong sense that the lawsuit's notoriety has made prospective partners, lenders, and investors less interested in pursuing opportunities with us.

Zeligman Decl. at ¶ 36. In addition to the impacts of being named as defendants, which may be considered a default event for the loan (with a current outstanding balance of $4.8 million) that the co-founders have personally guaranteed and threatens an additional loss of $1.7 million in investor equity, an injunction would cause costs and damages that could not be recouped. Zeligman Decl. at ¶ 37. The costs and damages the company would experience include the loss of $101,718 per month in rent and its monthly interest payment of at least $30,000 per month on their loan to purchase the building. *Id.* at ¶¶ 33-34. A six month delay of the company's ability to recover payment for building construction would further delay its ability to pay its contractor for work already performed. *Id.* at ¶ 31.

In contrast to these catastrophic losses, Plaintiffs' injuries if any would be *de minimis* given that the project involves only interior demolition and construction and some paving. *Id.* at ¶¶ 28-29; *see also supra* § IV. Plaintiffs have failed to meet their burden to show that the equities support an injunction.

## V. IF THE COURT GRANTS PLAINTIFFS' MOTION, IT SHOULD REQUIRE PLAINTIFFS TO POST A BOND THAT WOULD COVER DAMAGES TO ECG-6 DURING THE INJUNCTION PERIOD

Federal Rule of Civil Procedure 65(c) ("Security") states:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

Despite the Rule's mandatory language, the Ninth Circuit it to give courts discretion not to require a bond, or to impose a nominal bond, "where requiring security would effectively deny access to judicial review." *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005); *see also Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012) (noting that bonds can have "potential chilling effect" on environmental litigation); *compare with Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 460 (7th Cir. 2010) ("[T]he principle that nonprofit entities should pay their way, reimbursing the losses incurred by entities whose operations the nonprofits impede by obtaining preliminary injunctions later dissolved, is general."). The Ninth Circuit has stated that each case is fact-specific, and that the district court retains discretion to require a bond in environmental cases. *Save our Sonoran*, 408 F.3d at 1126 (upholding $50,000 preliminary injunction bond in NEPA case). In cases where courts have excused a bond for environmental plaintiffs, that decision has often turned on the plaintiffs' inability to post a bond or the federal government's presumed ability to absorb damages from being wrongfully enjoined. *But see Klamath-Siskyou Wildlands Ctr. v. Heywood*, No. 9-2252 (E.D. Cal. Aug. 28, 2009), attached hereto as Exhibit 1 (ordering plaintiffs to post TRO bond of $63,100 in challenge to salvage timber sale); *Save the Park & Build the Sch. v. Nat'l Park Serv.*, No. 3:20-CV-1080-LAB-AHG, 2020 WL 4260801, at *7 (S.D. Cal. July 24, 2020) (issuing order to show cause why $20,000 bond should not be imposed in case seeking to halt construction in park lands acquired under federal program).

A bond here is necessary to compensate Elmwood for substantial costs and damages it will suffer if its project is wrongfully enjoined, and does not implicate the two primary concerns sometimes cited against requiring a bond in NEPA cases. First, there is no prospect that requiring a security in an amount to protect ECG6's interests will "effectively deny [the State and County plaintiffs] access to judicial review"; the state and the county are far better positioned than small ENGOs bear the costs of the relief they seek. *Save Our Sonoran*, 408 F.3d at 1126 ("So long as a district court does not set such a high bond that it serves to thwart *citizen* actions, it does not abuse its discretion.") (emphasis added). Indeed, the Court may take judicial notice that the State has sued the federal government 82 times since the Presidential inauguration. Kevin Rector, *$207 billion saved for California from 82 lawsuits against Trump*

*administration, Bonta says*, L.A. Times (Aug. 4, 2026), https://www.latimes.com/california/story/2026-08-04/207-billion-saved-for-california-from-82-lawsuits-against-trump-administration-bonta-says. *Cf. People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985), amended, 775 F.2d 998 (9th Cir. 1985) (declining to impose bond where state agency fell within state statutory exemption and other plaintiff, "a non-profit environmental group, indicates that it is unable to post a substantial bond."). In contrast, Elmwood is a three-person real estate development business that would be significantly harmed by the injunction. As the Ninth Circuit explained in *Friends of the Earth v. Brinegar*, distinguishing a case in which the district court imposed a $3,500,000 appeal bond, in the case before it "a private organization and citizens, with limited resources, obtained an interlocutory injunction against construction by a governmental entity" which was "materially different" from a situation in which "the *State of California*, which has ample resources to post bond, obtained an interlocutory injunction against construction by *private developers*." 518 F.2d 322, 323 (9th Cir. 1975) (emphasis added). Here, it is the private company that stands against the State juggernaut.

As explained by Elmwood manager and owner Noah Zeligman in his declaration, a six-month injunction would cause $790,308 in damage to the company. Zeligman Decl. at ¶ 35. Because any injunction is likely to last at least that long, if Plaintiffs' motion is granted, the Court should require them to post a bond that will ensure that Elmwood can be made whole in the event the preliminary injunction is lifted after the case is resolved on the merits. ECG6 also reserves the right to seek enlargement of the bond in the event that an injunction lasts longer than six months.

## VI. CONCLUSION

The Court should decline to issue an injunction because, in addition to the reasons set forth in Federal Defendants' opposition brief, Plaintiffs are unlikely to succeed on the merits of their NEPA claim against nonfederal defendant ECG6. In addition, Plaintiffs have failed to establish irreparable harm or to show that a balancing of the equities tips in favor of an injunction, particularly given the draconian costs an injunction would inflict on Elmwood and the minimal risk of environmental harm given that the planned new use of the site is no more intensive than its use over the last three decades. Finally, if the Court does grant an injunction, it should require Plaintiffs to post a bond for $790,308. Only a bond in the full amount

of the costs and damages to the company and its principals can fully protect their interests, and the State and County clearly have the wherewithal to post a bond in that amount.

Requiring a bond is also equitable here; Elmwood here did nothing more than acquire and modify a property to be leased to a government agency, as it has done many other times before. It did so in response to a solicitation issued repeatedly during the previous Presidential administration and awarded to Elmwood during that administration. The State and County are free to oppose the immigration policies of the current Administration, but Elmwood's principals are simply landlords who have no involvement in those policies and should not become casualties of or bear the financial brunt of Plaintiffs' ideological agenda.

DATED: August 12, 2026

GREENBERG TRAURIG, LLP

By ______________________

Gregory A. Nylen
Stacey M. Bosshardt
Dominic E. Draye
Attorneys for Defendant ECG6 LLC