Gregory A. Nylen (SBN CA 151129)
GREENBERG TRAURIG, LLP
18565 Jamboree Road, Suite 500
Irvine, California 92612
Telephone: 949.732.6500
Facsimile: 949.732.6501
nyleng@gtlaw.com

Stacey M. Bosshardt (SBN CA 255231)
Dominic E. Draye (SBN CA 267079)
GREENBERG TRAURIG, LLP
2101 L Street NW, Suite 1000
Washington, D.C. 20037
Telephone: 202.331.3100
Facsimile: 202.331.3101
drayed@gtlaw.com
Stacey.Bosshardt@gtlaw.com

Attorneys for Defendant ECG6 LLC

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COUNTY OF SANTA CLARA; STATE OF CALIFORNIA, by and through Attorney General Rob Bonta,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES GENERAL SERVICES ADMINISTRATION; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; EDWARD FORST, in his official capacity as Administrator of the General Services Administration; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; DAVID VENTURELLA, in his official capacity as Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement; and ECG 6 LLC, a California limited liability company,<br><br>Defendant. | CASE NO. 5:26-cv-5604-EKL<br><br>Assigned to the Honorable Eumi K. Lee<br><br>**DECLARATION OF ECG 6 MANAGER AND CO-FOUNDER NOAH ZELIGMAN**<br><br>Action Filed: June 10, 2026 |

1. My name is Noah Zeligman. I have personal knowledge of the facts set forth below, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated in this declaration.

2. I am a manager and co-founder of the corporation Elmwood Capital Group, a group that owns, operates, and develops real estate. One of our investments, using the same initials, operates as ECG6 LLC.

3. My colleague Max Stern and Elliot Sassover, with whom I went into business in 2020, are also managers of the company. Our office is located at 9460 Wilshire Boulevard, Suite 410, Beverly Hills, CA 90212. Our business plan involves acquiring commercial properties (office, industrial, or retail) at sites across the country and leasing them to government agencies through opportunities offered by the General Services Administration (GSA).

4. We have previously leased office facilities through GSA to federal agencies, such as the Environmental Protection Agency and the Social Security Administration (SSA). We have leased five properties to the SSA. In addition, we have two other properties that are leased by the Department of Homeland Security. We have owned nine buildings that were leased to GSA.

5. Since entering into a lease for the property at issue in this case, located at 7240 Holsclaw Road, Gilroy, CA ("Holsclaw property"), on January 9, 2025, we have not entered another lease with the government.

6. We have not for this lease or any of our previous leases participated in GSA's National Environmental Policy Act ("NEPA") process.

7. GSA published a solicitation for lease proposals for this facility in 2024, with bids due August 23, 2024, with a Notice ID of 8CA3614. ECF No. 29-8. The solicitation for a non-residential property lease in San Jose, California, seeking 15,000-17,000 square feet for "office, detention" space, stated among other things that pre-requisites for the project were that the space accommodate 60 parking spaces and that interested parties provide "Proof of zoning for a 4,000 SF Detention Center" and that "[a] Sally Port, large enough to accommodate a large passenger bus, is required." *Id.*

8. This same information (i.e., that GSA was seeking "office, detention" space for a non-residential property lease with 60 parking spots, proof of zoning for a "4,000 SF Detention Center, and a

Sally Port large enough to accommodate a large passenger bus"), was listed in a "presolicitation" bearing the same Notice ID first published as early as December 2020 on a publicly available platform, www.sam.gov, with expressions of interest due in January 2021. A true and correct copy of the original presolicitation is attached hereto as **Exhibit A**.

9. The presolicitation and solicitation notices were each republished multiple times between 2021 and 2024. True and correct copy of screenshots showing that the notices were published and republished on multiple occasions are attached hereto as **Exhibit B**.

10. In response to the presolicitation, my colleagues and I searched for a property that would satisfy GSA's requirements and began negotiations with the owner. Starting in around 2021, we interacted with GSA's representatives to respond to the presolicitation and solicitation. In 2022 or 2023, we identified the Holsclaw property and began discussing a sales price and terms with the owner.

11. The Holsclaw property had formerly been used for agricultural research and development. A portion of the property was very developed, with a frontage road and multiple single-story buildings, including a main office, laboratory building, warehouse, and chemical storage building, as well as several greenhouses.

12. Because the presolicitation required evidence that the zoning would accommodate a 4000 square foot detention center, I reached out to the County of Santa Clara Planning Department and had multiple interactions with Santa Clara County Principal Planner Samuel Gutierrez to confirm that the zoning would accommodate a combined office building and detention facility. As demonstrated in the attached e-mail thread, I called the Planning Department in January of 2023 with "planning questions regarding APN: 841-22-105 for Federal government use regarding non- conforming lease," and followed up multiple times. **Exhibit C** is a true and correct copy of the emails included in the thread, with a forwarding email redacted for privilege. *See also* ECF No. 26 at ¶¶ 9-10. This email thread shows that I sent emails to Mr. Gutierrez, often cc'ing his staff, 17 separate times between January 3, 2023 and August 2, 2023. Several of the emails reflect that I tried (and sometime succeeded) to reach Mr. Gutierrez by phone on multiple occasions. In addition, several emails show Mr. Gutierrez responding to my outreach.

/ / /

/ / /

13. Mr. Gutierrez states in his affidavit that I never disclosed "that the Holsclaw Property might be used as a holding or detention facility." *Id.* at ¶ 12. My recollection is different; I recall specifically discussing the proposed use with him.

14. My recollection is borne out by the documents. At my request (responding to a request by Mr. Gutierrez), GSA Lease Contracting Officer Stephen Janssen signed a memorandum to Santa Clara on June 21, 2023 with a "Subject" line stating: "Zoning", "Request for Lease Proposals 8CA3614", and "Immigration and Customs Enforcement." ECF No. 26-3. Mr. Gutierrez admits that he received and read this memorandum after a conversation with me. ECF No. 26 at ¶ 10.

15. After providing this letter, I followed up multiple times with Mr. Gutierrez by email. On June 29, he emailed me that he had to meet with his "upper management" to discuss the letter. **Exhibit C**.

16. After I followed up by email multiple times, on August 2, 2023 Mr. Gutierrez provided a letter, attached hereto as **Exhibit D**, bearing the number of the GSA lease solicitation and stating that "[t]he lease and operation of the building space under the GSA (Lease Solicitation No. 8CA3614) entirely for Federal Government use may proceed since the Federal Government is exempt from local regulations." (Although the letter is dated May 11, 2023, this was provided with a cover email stating the same conclusion on August 2, 2023, *see* **Exhibit C**).

17. As a standard part of the purchase process for financed properties of this nature, the lender – a major financial institution with > $50 billion in assets – required evidence of environmental due diligence. Elmwood Capital Group retained a nationally-recognized firm based in the San Francisco Area, AEI Consultants, which surveyed the site and conducted studies analyzing the condition of the property. The resulting study, comprising more than 1000 pages of sampling results and analysis of water, soil, and gas samples taken during on-site surveys, found that all chemicals were within the applicable regulatory limits for non-residential use.

18. The conclusions in these studies assured us and our lender that the property complied with all relevant environmental regulations and that there were no environmentally related transaction risks.

19. Being awarded the lease was an important step to obtain the necessary financing to purchase the property, and this sequence of events is standard in our experience. On January 24, 2025, we closed on the Holsclaw property. The property is a 24.5 acre parcel near Gilroy, California. The vast majority of the

property (23+ acres) is leased to a bok choy farmer and is actively farmed. Approximately one acre, where prior owners engaged in research and development, is subject to the GSA lease.

20. The architect we retained for the project was required to attend a three day workshop at an ICE facility to learn the requirements for these types of facilities (Enforcement and Removal Operations).

21. The lease was awarded on January 9, 2025 with a total value of $26,551,532.00.

22. Plaintiffs have reproduced a copy of the lease, which is accurate, at ECF No. 32-1. However, the lease was amended on March 26, 2026. A true and correct copy of the lease amendment is attached hereto as **Exhibit E**.

23. Among other things, the amendment approves certain tenant improvement construction costs and provides that ECG6 will be reimbursed in that amount, including payment of a lump sum of $8,656,150.69 once the property is turned over to the government and is inspected. *Id*. at § 7.09. Until then, we will be unable to meet our obligations to our contractor.

24. In addition, only after our contractor completes and the government accepts this work does the lease term – and the government's obligation to pay rents – begin. ECF No. 32-1 at §§ 3.07(a), 4.11.

25. I am aware that the plaintiffs in this lawsuit allege that ICE will use the facility to hold detainees overnight and/or indefinitely. That is directly contrary to what GSA represented to us; we were explicitly told that detainees would be held no longer than 12 hours and, if they had not been released by the end of that period, would be transferred to an overnight detention center. In an email forwarded to me and my colleagues by GSA on November 8, 2022, ICE official Harvey Lusk stated that "individuals would not be kept in the holding cells for more than 12 hours and there is no overnight housing or beds on site." A true and correct copy of the email, with redactions of non-relevant and privileged forwarding emails, is attached hereto as **Exhibit F**. The email also stated "No one is held for over 12 hours (typical time is less than 4 hours)." *Id.* The email described the maximum number of detained individuals for a facility of this type as "Maximum – Fewer than 100 (depending on facility size)" but "Typical – Fewer than 5." *Id.*

26. In addition, the lease, which provides for business hours of 8:00 a.m. to 4:00 p.m., Monday through Friday, is also consistent with this understanding. ECF No. 32-1 at § 6.01A; *see also* ECF No. 24 at 15 (citing ICE documents describing holding facilities as "primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention

facility, other holding facility, or other agency" and define "short-term" as "not to exceed 12 hours, absent exceptional circumstances.").

27. I am aware that the complaint alleges that the nature of this planned facility was kept under a "cloak of secrecy." That is contrary to my recollection. In addition to the clear discussion of the project's purpose in the solicitation and presolicitations, publicly available documents available from 2020-2024 on www.sam.gov, GSA addressed a memorandum dated June 21, with a "Subject" line stating: "Zoning", "Request for Lease Proposals 8CA3614", and "Immigration and Customs Enforcement" to Santa Clara (ECF No. 26-3), which I personally provided to Mr. Gutierrez in 2023. A true and correct copy of the email providing the memorandum, with redactions of non-relevant and privileged forwarding emails, is attached hereto as **Exhibit G**. Of course, the solicitation number corresponded to a publicly available document for "office, detention" space capable of hosting a 4000 square foot "detention center" and "Sally port large enough to accommodate a large passenger bus."

28. I am aware that the plaintiffs have alleged that the property will be subject to more "intensive use." That is contrary to my understanding, since the lease does not contemplate overnight occupancy and the number of parking spaces is consistent with the 1993 building permit introduced by the plaintiffs in this case, which requires the property-owner to provide "a minimum of 55 off-street PARKING spaces." ECF No. 26-2 at 5.

29. The lease requires that ECG6 is responsible for building the project to GSA's specifications. ECF No. 32-1 at §§ 4.01, 7.10. The project will involve mostly interior demolition and the removal of greenhouse space and addition of approximately 28 parking spaces. As for the sally port, that will use the existing drive aisle and will simply involve fencing it off.

30. I am aware that the plaintiffs have said that they fear hazardous substances could be released during construction. Because primarily interior demolition and some paving is involved, nothing supports these speculative concerns. Moreover, the lease has multiple provisions that require the safe handling and disposal of wastes during construction, all of which we intend to comply with. *Id.* at § 3.04D – F; *see also id.* at § 3.52A. ("Lessor must provide the Government with a summary report demonstrating completion of all required response actions prior to Substantial Completion.").

31. I am aware that the plaintiffs allege that the current plans will "pave over necessary parts of the wastewater treatment system." The current plans would place only one parking spot over the current designated future leachfield (if necessary). However, this can easily be avoided in two ways; by placing the parking spot or parking area in one of the areas previously occupied by the greenhouses (which are already paved), or by designating another location on site for future use of a leachfield, in the event that it is ultimately needed.

32. We had planned to tender the property to the government, and begin receiving rents, in January 2027. Under the lease amendment, ECG6 is entitled to a lump sum payment of $8,656,150.69 once the building is built to GSA's specifications. **<u>Exhibit E</u>** at § 7.10 (lease amendment). If we are enjoined from building the property, that will delay the date when we are able to deliver the property to GSA for final acceptance.

33. Each month that we do not receive rent because of this lawsuit is a month of rent we would otherwise have been able to collect.

34. The annual rent for the first several years of the lease is $ 1,220,612.60, to be paid in monthly installments. ECF No. 32-1 at § 1.03. Based on a monthly rent of $101,718, even a delay of six months that would result if construction were enjoined would cause us to lose $610,308 in rent during the time we expected to receive that income, and a delay of a year would cost $1,220,612.60

35. Our monthly interest payment on the loan for this month is $30,055.48 – that monthly amount is only likely to go up in the coming months. A monthly statement is attached hereto as **<u>Exhibit H</u>**.

36. Even if a preliminary injunction were lifted after six months, we will have lost $790,308.

37. In addition to the carrying costs of interest payments and the costs of a paused jobsite, the lawsuit also has other impacts that are more difficult to quantify but which we experience acutely. Because we are a small private real estate operator with only a handful of people, these impacts land with disproportionate weight. We do not have the staff or balance sheet of a large institution to absorb the lawsuit's disruptive effects. Fielding calls from media outlets seeking comment, from our investors seeking assurance about their capital, and from our counsel seeking documents or information to defend Plaintiffs' claims are a drain on our limited resources. Our lenders are also concerned, which weakens our standing

in financial conversations and makes it harder to secure new credit on favorable terms. Although there is no way to quantify these "cold shoulder" effects, we have a strong sense that the lawsuit's notoriety has made prospective partners, lenders, and investors less interested in pursuing opportunities with us.

38. I and the other principals of ECG6 personally guaranteed the loan for the purchase of the property (the outstanding balance of which is $4.8 million today). That balance, along with $1.7 million in investors' equity, represents the current investment in the project. Because Plaintiffs' lawsuit triggered a default of our loan, we are at risk of the lender calling in our loan. We would need to sell the property and if the sale proceeds were less than the amount of the loan, we would be personally liable for any difference.

39. Any such outcome could be at a minimum very stressful, and at worst, catastrophic for us and our businesses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed on this 12th day of August, 2026, at Beverly Hills, California.

Noah Zeligman