CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
ROMAN A. SWOOPES (CABN 274167)
Assistant United States Attorney
60 South Market Street, Suite 1200
San Jose, California 95113
Telephone: (408) 535-5084
FAX: (408) 535-5081
Roman.Swoopes@usdoj.gov

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division
KRYSTAL-ROSE PEREZ (Texas Bar No. 24105931)
Senior Trial Attorney
Natural Resources Section
150 M Street NE
Washington, DC 20002
(202) 532-3266
krystal-rose.perez@usdoj.gov

*Attorneys for Federal Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| COUNTY OF SANTA CLARA; STATE OF CALIFORNIA, by and through Attorney General Rob Bonta,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>Defendants. | CASE NO. 5:26-cv-05604-EKL<br><br>**FEDERAL DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: September 8, 2026<br>Time: 2:00 pm<br>Location: Courtroom 7, 4th Floor<br><br>Judge: Hon. Eumi K. Lee |

**TABLE OF CONTENTS**


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

A. ICE Facilities Support Enforcement of U.S. Immigration Laws ..... 2

B. GSA Manages Real Estate Needs for Federal Agencies ..... 3

C. GSA's Search for Suitable Properties Led to the Holsclaw Property ..... 5

D. GSA Executed a Lease for the Holsclaw Property in Compliance with Law ..... 5

III. LEGAL STANDARD ..... 6

IV. ARGUMENT ..... 7

A. Plaintiffs Have Failed to Show Likelihood of Success on Their NEPA Claim ..... 7

B. Plaintiffs Have Failed to Show Likelihood of Success on Their ICA Claim ..... 10

1. Plaintiffs Have Not Shown that the ICA Even Applies to GSA's Leasing Activities to Date ..... 11

2. Federal Defendants Are Considering Local Views to the Extent Required ..... 12

C. Plaintiffs Have Not Established Irreparable Harm ..... 15

D. The Balance of Equities and Public Interest Favor Denying Injunctive Relief ..... 17

V. CONCLUSION ..... 19

## TABLE OF AUTHORITIES

Page(s)

Cases

*Alaska Ctr. For Env't v. U.S. Forest Serv.*,
189 F.3d 851 (9th Cir. 1999) ........ 8, 10
*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ........ 7, 17
*Amoco Prod. Co. v. Vill. of Gambell, AK*,
480 U.S. 531 (1987) ........ 15
*Azzolina v. U.S. Postal Serv.*,
602 F. Supp. 859 (D.N.J. 1985) ........ 10, 11
*Bergen Cnty. v. Dole*,
620 F. Supp. 1009 (D.N.J. 1985) ........ 10
*Border Power Plant Working Grp. v. Dep't of Energy*,
260 F. Supp. 2d 997 (S.D. Cal. 2003) ........ 9
*California v. Norton*,
311 F.3d 1162 (9th Cir. 2002) ........ 7, 8
*City of Oberlin v. Fed. Energy Regul. Comm'n*,
937 F.3d 599 (D.C. Cir. 2019) ........ 9
*City of Rochester v. U.S. Postal Serv.*,
541 F.2d 967 (2d Cir. 1976) ........ 11, 14
*City of Waltham v. U.S. Postal Serv.*,
11 F.3d 235 (1st Cir. 1993) ........ 11, 12
*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........ 16
*Clinton Twp. v. U.S. Postal Serv.*,
638 F. Supp. 763 (D.N.J. 1986) ........ 10, 11, 12, 14
*Ctr. for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) ........ 7
*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) ........ 17
*Earth Island Inst. v. Muldoon*,
82 F.4th 624 (9th Cir. 2023) ........ 8
*Herb Reed Enters., LLC v. Fla. Ent. Mgmt.*,
736 F.3d 1239 (9th Cir. 2013) ........ 16
*Hope v. Warden York Cnty. Prison*,
972 F.3d 310 (3d Cir. 2020) ........ 17
*Klamath Siskiyou Wildlands Ctr. v. Grantham*,
424 F. App'x 635 (9th Cir. 2011) ........ 10
*Klamath-Siskiyou Wildlands Ctr. v. Grantham*,
785 F. App'x 467 (9th Cir. 2019) ........ 17
*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ........ 7, 15
*Lopez v. Brewer*,
680 F.3d 1068 (9th Cir. 2012) ........ 6
*Maryland v. Mullin*,
831F. Supp. 3d 325 (D. Md. 2026) ........ 11, 16, 17
*Native Ecosystems Council v. Krueger*,
40 F. Supp. 3d 1344 (D. Mont. 2014) ........ 17
*Nken v. Holder*,
556 U.S. 418 (2009) ........ 17
*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) ........ 7, 8, 10

*Starbucks Corp. v. McKinney*,
602 U.S. (2024) .... 7
*Tribal Vill. of Akutan v. Hodel*,
859 F.2d 662 (9th Cir. 1988) .... 15
*Vill. of Palatine v. U.S. Postal Serv.*,
742 F. Supp. 1377 (N.D. Ill. 1990) .... 14
*Vill. of Palatine v. U.S. Postal Serv.*,
756 F. Supp. 1079 (N.D. Ill. 1991) .... 11
*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) .... 6, 7, 15, 17

Statutes

31 U.S.C. § 6506 .... 10, 11, 14
42 U.S.C. § 4336 .... 7, 8
42 U.S.C. § 9601 .... 9

## TABLE OF EXHIBITS

| Document | Abbreviation |
|---|---|
| Declaration of Joanna Bayardo | Bayardo Decl. |
| Declaration of Russel Larson | Larson Decl. |
| GSA Leasing Desk Guide, Chapter 2 | Larson Decl. Ex. 1 |
| GSA Form 4002 (Automatic Categorical Exclusion NEPA Memo to File) | Larson Decl. Ex. 2 |
| Justification of No Practicable Alternatives | Larson Decl. Ex. 3 |
| Critical Action Determination Letter | Larson Decl. Ex. 4 |

In addition to the materials cited above, Federal Defendants cite documents that have already been filed with the Court by ECF No.

## I. INTRODUCTION

On January 5, 2025, the U.S. General Services Administration ("GSA") executed a lease agreement with Defendant ECG 6 LLC to lease space for an Immigration and Customs Enforcement ("ICE") office, with a temporary holding area, at 7240 Holsclaw Rd., Gilroy, California, 95020 (the "Holsclaw Property"). The lease requires ECG 6 to renovate existing structures before it goes into effect. The County of Santa Clara and State of California do not want ICE to use the property. Armed with an 800-page stack of questionable assumptions about the current state of the Holsclaw Property and ICE's planned use for it, Plaintiffs have asked the Court for a preliminary injunction to halt development.[1] ECF No. 24 ("Mot."); ECF Nos. 25-36 (supporting documents). Plaintiffs claim that Defendants did not prepare the appropriate level of environmental analysis under the National Environmental Policy Act ("NEPA") and did not consult Plaintiffs as required under the Intergovernmental Cooperation Act ("ICA").

The Court should deny the requested injunction. First, Plaintiffs are unlikely to succeed on the merits of their claims. The Holsclaw Property is categorically excluded from further NEPA review because neither ICE's planned use for the site, as an office building, nor the building's planned occupancy, is materially different from the prior use. Plaintiffs' speculation that ICE will overload the septic system at the site by holding 150 detainees, 24 hours a day, plus 60 staff members, lacks support. While the site does have a temporary holding area, ICE presently estimates that it will hold 10 detainees on average.

Plaintiffs are also unlikely to succeed on their ICA claims. Plaintiffs have not shown that the ICA even applies to GSA's leasing activities to date, and Plaintiffs ignore that the Santa Clara County planner received correspondence from GSA about the Holsclaw Property and told ECG 6's principals that there should be no zoning problems with the federal government's planned use. Under these circumstances, the Federal Defendants more than satisfied any consultation requirement with state or local officials.

Second, and perhaps most importantly, Plaintiffs have not shown irreparable harm. Plaintiffs justify their motion in terms of environmental concerns, including septic safety, alleged hazardous materials, and endangered species. But Plaintiffs' own brief alleges that they knew the prior owners of

[1] Defendants voluntarily agreed to pause development at the property until the scheduled date for the hearing on Plaintiffs' motion, September 8, 2026. ECF No. 41.

the Holsclaw Property engaged in pesticide research and mismanaged hazardous materials at the site for decades, *see* Mot. at 11—apparently without Plaintiffs attempting to shut down those businesses. Plaintiffs have no evidence that the site is *currently* contaminated, and they have not shown that using the facility as an office space (without any pesticide or other agricultural research) will cause more environmental harm than the uses that Plaintiffs allowed for years.

Third and finally, the public interest and balance of equities favor denying the injunction. ICE needs the Holsclaw Property to support its mission of enforcing the nation's immigration laws. The closest alternative facility in Morgan Hill, California has a lease expiring at the end of this month. If the Gilroy project is delayed, ICE would have to rely on existing facilities that are farther away and already support other operational needs. Delaying the Gilroy project would also place a significant burden on individuals in removal proceedings who are out of custody and have reporting requirements with ICE. Compared with speculative environmental harm, the balance of equities favors denying the injunction.

## II. BACKGROUND

### A. ICE Facilities Support Enforcement of U.S. Immigration Laws

ICE is a federal law enforcement agency within the Department of Homeland Security. Bayardo Decl. ¶ 2. ICE is responsible for enforcing federal immigration laws and protecting public safety and national security. *Id.* Within ICE, the Enforcement and Removal Operations division carries out ICE's immigration enforcement mission in the interior of the United States. *Id.* ERO identifies, arrests, detains, and removes foreign nationals who are present in the United States in violation of law. *Id.* ERO also works with federal, state, local, and foreign law enforcement partners to locate individuals subject to immigration enforcement action, including foreign nationals wanted for crimes committed abroad. *Id.*

ERO's offices serve a variety of purposes. For example, they may contain office space for ERO personnel and contracted personnel who support ERO operations. Bayardo Decl. ¶ 12. Public-facing areas may accommodate noncitizens who need to report for interviews and check-in requirements. *Id.* The facilities may contain space needed to temporarily hold and process foreign nationals present in the United States in violation of law, including aliens who are pending removal, who have failed to appear for immigration proceedings, or who are otherwise subject to ICE custody. *See* Bayardo Decl. ¶ 10. The public areas of ERO offices may accommodate visits by attorneys or family of individuals who are

temporarily in custody, allowing them to deliver medication, property, or other necessary items. *Id.* ¶ 12.

**B. GSA Manages Real Estate Needs for Federal Agencies**

GSA is "the nation's largest public real estate organization, providing workspace for over one million federal workers." https://www.gsa.gov/real-estate/leasing. Many federal agencies, including ICE, often obtain their office space through GSA's work. Before GSA enters a lease with a private entity, GSA undertakes eight processes:

*New or Replacing Lease—Process View*




*See* Larson Decl. Ex. 1 *GSA's Leasing Desk Guide*, Chapter 2 at 2-iii.

Each process requires several steps to complete. Relevant here, the market survey process requires a pre-solicitation notice and an environmental analysis:




Larson Decl. Ex. 1. at 2.2-2.

During the pre-solicitation process, GSA posts a notice on the public website SAM.gov. *See* Larson Decl. ¶ 9. These notices serve as a formal public announcement by GSA that informs property owners and vendors of upcoming federal real estate lease opportunities. *Id.*

For the environmental review, GSA takes a four-phase approach. *See* Larson Decl. Ex. 1 at 2.2-13 ("Properties responding to presolicitation notices and market survey information must be reviewed for compliance with historic preservation, floodplains and wetlands, and National Environmental Policy Act (NEPA)."). In the first phase, the development of the project stage, a NEPA specialist "provides initial advice on the appropriate level of NEPA compliance required for the procurement." *Id.* at 2.2-19. For the second phase (market outreach), the NEPA specialist confirms the "appropriate level of NEPA compliance based on potential buildings under consideration" for lease. *See id.* Then in phase three, GSA

documents its NEPA compliance through a categorical exclusion, environmental assessment, or an environmental impact statement. *See id.*

Finally, in the last phase when the contract has been awarded, GSA's leasing specialist and NEPA specialist work together to properly document the environmental analysis. *Id.*

**C. GSA's Search for Suitable Properties Led to the Holsclaw Property**

ICE has been operating a facility in Morgan Hill, California, and its lease is set to expire on August 31, 2026. Larson Decl. ¶ 9. In anticipation of the lease expiring at the Morgan Hill facility, GSA published a public pre-solicitation notice on December 22, 2020 with a response deadline of January 22, 2021. *General Services Administration Seeks Office and Related Space in San Jose, CA* (Dec. 22, 2020), https://sam.gov/workspace/contract/opp/0452f1ec30cc43ee9f885d68894a8e83/view, ECF No. 54-3 Ex. A. The lease pre-solicitation records indicate that GSA was seeking "Office [and] Detention" space, of 15,000 to 17,000 square feet, with "[p]roof of zoning for a 4,000 SF Detention Center" and 60 parking spaces, among other things. *Id.*

Further pre-solicitation notices were published in 2021 and 2022. *See* ECF No. 54-3 Ex. B. "[T]he project was put on hold due to a lack of agency RWA [Reimbursable Work Authorization] funds." Larson Decl. Ex. 3 at 1. The project resumed in August 2024. *See id.*

Following a further public process to solicit lease offers, *see* ECF No. 29-12, GSA received expressions of interest for three properties, one of which was the Holsclaw Property at issue in this case. Larson Decl. Ex. 3 at 3.

**D. GSA Executed a Lease for the Holsclaw Property in Compliance with Law**

GSA executed a lease for the Holsclaw Property on January 5, 2025, but Federal Defendants are not yet in possession of the Holsclaw Property. The lease states that the lease term "begin[s] upon acceptance of the Premises as required by this Lease." ECF No. 32-1 at 1. Moreover, it states: "The commencement date of this Lease, along with any applicable termination and renewal rights, shall be more specifically set forth in a Lease Amendment upon substantial completion and acceptance of the Space by the Government." ECF No. 32-1 at 1.

The lease assumes that some renovation will occur before the Federal Defendants take possession. *See* ECF No. 32-1 at 26. Specifically, planned improvements include construction of office space within

the existing structure; construction of a sally port near the hold-room area (which would be an open-air fence structure without overhead cover adjacent to an entrance into the building); and perimeter fencing. Bayardo Decl. ¶ 15. Because renovation is not complete, the Government has not accepted possession of the Holsclaw Property, and its obligation to pay rent has not commenced.

ICE estimates that when remodeling is complete, 50 ERO personnel and contractors will work at the site, around 25 members of the public would be allowed in the lobby area at one time, and around 10 detainees might ordinarily be held in the holding area temporarily at one time. Bayardo Decl. ¶ 13. Maximum occupancy of the facility will be determined once remodeling is complete. *See id.*

GSA completed all legally required steps before authorizing the lease for the Holsclaw Property that Plaintiffs challenge in this case. After receiving expressions of interest, GSA properly documented its NEPA compliance through a categorical exclusion—a type of environmental review for projects that do not pose a significant impact on the quality of the human environment. *See* Larson Decl. Ex. 1 at 2.2-18; Larson Decl. Ex. 2 (Automatic Categorical Exclusion NEPA Memo to File). GSA concluded that a categorical exclusion was appropriate because, among other things, there was no change in the general type of use and only minimal change from previous occupancy level. *See* Larson Decl. ¶ 14.

Moreover, although not required, in 2023, GSA communicated with Santa Clara County planning authorities through the potential private lessors of the property (principals at defendant ECG 6) to ensure that there were no zoning issues. *See* Larson Decl. ¶ 13; ECF No. 26-3 at 1. Although Santa Clara County now claims that their records show the prior owners of the Holsclaw Property improperly disposed of hazardous materials at the site for several years, *see, e.g.*, ECF No. 25 ¶ 7, ECF No. 30 ¶¶ 16-21, Plaintiffs' filings do not suggest that the County ever informed Defendants of these issues. GSA received no indication of any opposition to the GSA lease or any zoning or other problems. *See* Larson Decl. ¶ 13.

## III. LEGAL STANDARD

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). To obtain relief, the moving party must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*,

555 U.S. 7, 20 (2008). Alternatively, "'serious questions going to the merits' and a hardship balance that tips *sharply* toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (emphasis added).[2]

## IV. ARGUMENT

### A. Plaintiffs Have Failed to Show Likelihood of Success on Their NEPA Claim

Plaintiffs fail to establish a likelihood of success on their NEPA claim because GSA properly applied a categorical exclusion when authorizing the lease for the Holsclaw Property. The Court reviews the likelihood of success on the merits of a NEPA claim under the APA's highly deferential "arbitrary and capricious" standard, which presumes agency action to be valid. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Nat. Res. Def. Council,* 555 U.S. 7 (2008).

NEPA "is a purely procedural statute" that "does not require the agency to weigh environmental consequences in any particular way." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025). It "is a procedural cross-check, not a substantive roadblock." *Id.* A federal agency satisfies NEPA through (1) an environmental impact statement (EIS) if the agency determines the action will have significant environmental impacts, (2) an environmental assessment (EA) to assess whether the action will have significant environmental impacts, or (3) a categorical exclusion (CE) for types of actions that an agency has determined do not significantly affect the environment. *See* 42 U.S.C. § 4336(b)(1)-(2). Actions covered by CEs do not require an EA or EIS unless extraordinary circumstances exist. 42 U.S.C. § 4336e(1). And agencies generally do not analyze extraordinary circumstances unless "substantial evidence" suggests a need to do so. *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002).

"Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an environmental impact statement or an environmental assessment is necessary." *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096

[2] Defendants respectfully submit that this relaxed test is invalid under the Supreme Court's ruling in *Starbucks Corp. v. McKinney*, 602 U.S. 346, 345-46 (2024), which reaffirmed that courts must adhere to the traditional four-factor test set forth in *Winter* absent clear congressional command.

(9th Cir. 2013). "[T]he entire point of categorical exclusions is to reduce the administrative burden of approving certain projects." *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 636 (9th Cir. 2023) ("Where agency action falls under a categorical exclusion, it need not comply with the requirements of an environmental impact statement or environmental assessment."). Thus, an agency may issue "a brief statement that a categorical exclusion is being invoked will suffice." *California v. Norton*, 311 F.3d at 1176. And NEPA's public disclosure requirements do not apply. 42 U.S.C. § 4336(a)(2) (stating that an environmental document is not required if the proposed agency action is categorically excluded, with no mention of any public notice requirement).

During a NEPA review, "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail" of its written analysis. *Seven Cnty.*, 605 U.S. at 182-83. "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id*. at 182-83 (emphasizing deference owed to agency in deciding "how far to go in considering indirect environmental effects from the project at hand"). Particularly in reviewing the application of a CE, the Court simply considers whether the activity "falls within the general scope of the exclusion." *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857-58 (9th Cir. 1999).

Before authorizing a lease, GSA prepares an environmental analysis to evaluate the potential impacts of a proposed lease. *See* Larson Decl. Ex. 1 (GSA Leasing Desk Guide, Chapter 2) at 2.2-17. GSA's "[r]egional NEPA program managers and regional NEPA specialists determine the appropriate level of environmental analysis for a proposed action and prepare the NEPA compliance documentation for the lease contract file." *Id.* As the Desk Guide explains, most GSA leases qualify for a CE because they either "acquire space in an existing building which does not change the type or intensity of use" or simply extend, renew, or succeed existing leases. *Id.* at 2.2-18.

Here, GSA reasonably exercised its discretion in applying a CE to authorize the Holsclaw Property lease. GSA also relied on its substantial expertise in reaching a factual determination that the lease falls under GSA's CE 5(b), which applies to an acquisition by purchase or lease of (1) an existing structure (2) that requires no change in the general type of use, and (3) only minimal change from previous occupancy level is proposed. ECF No. 29-21. The Holsclaw Property readily satisfies this CE's elements. First,

simply looking at photos of the property reveals that several structures, including a large office building, already exist on the property. *See* ECF No. 29-8; Larson Decl. ¶¶ 7, 10. And as Plaintiffs tacitly acknowledge, no construction of new buildings will occur under the lease. Mot. at 22. Instead, GSA plans only *interior* renovations, demolition of *existing* buildings, and a basic sally port to prevent unauthorized entries and exits. *See* Bayardo Decl. ¶ 15. Next, GSA required "[p]roof of zoning" for ICE's use of any potential property, ensuring that the type of use would be consistent in general. *See* ECF No. 29-12 at 3. Plaintiffs attack GSA's expert judgment in real estate uses but offer no support to argue there has been a general change in uses. Instead, they simply cite the 1993 use permit without identifying any provisions inconsistent with ICE's planned use. *See* Mot. at 22. Finally, the change in occupancy is minimal: the 1993 use permit required a *minimum* of 55 parking spaces, ECF No. 26-2 at 5, whereas ICE's planned use adds only five more spaces, ECF No. 29-21. Contrary to Plaintiffs' mistaken belief, the Holsclaw Property is not planned to house 150 detainees. Mot. at 22. Their challenge to the applicability of CE 5(b) to the Holsclaw Property therefore fails.

Likewise, Plaintiffs' claim of potential significant impacts falls short of establishing that GSA should have prepared further NEPA analysis. *See* Mot. at 20-22. Their baseless fears of hazardous materials are addressed by the lease provisions that require the lessor to handle and remove any hazardous waste encountered during demolition or construction "in accordance with Federal and state laws and requirements concerning hazardous waste." ECF No. 32-1 at 15; *see also id.* at 26 ("Lessor is responsible for performing all necessary 'response' actions" as defined in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601(25) (CERCLA) to address "any contamination of the Property where such contamination is not attributable to the Government."). By imposing environmental control and management strategies in accordance with legal requirements, GSA reasonably determined that no extraordinary circumstances exist. *See City of Oberlin v. Fed. Energy Regul. Comm'n*, 937 F.3d 599, 610 (D.C. Cir. 2019) (compliance with another agency's standards sufficient to show no significant impact under NEPA); *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1020-22 (S.D. Cal. 2003) (same).

The rest of Plaintiffs' concerns are based on incorrect capacity anticipated at the Holsclaw Property or speculate about alleged impacts on wildlife. *See* ECF No. 28 ¶¶ 8a (speculating that 150 detainees

would be housed "on a continuous basis"), 9 ("Based on the foregoing project parameters . . ."); ECF No. 36 ¶ 6 ("Constructing and operating an around-the-clock facility where up to 150 people would be incarcerated would have significant impacts on the area's biological resources."); ECF No. 27 ¶ 10 ("If the Facility were to house 150 detainees"); ECF No. 35 ¶ 13 ("species *may* occur in proximity to the Holsclaw Property and *may* be impacted by construction at the Holsclaw Property" (emphasis added)); *Klamath Siskiyou Wildlands Ctr. v. Grantham*, 424 F. App'x 635, 638 (9th Cir. 2011) ("Proximity of a project to a sensitive area does not *per se* warrant an EIS."). Such erroneous factual underpinnings and wholly speculative potential effects in no way undermine GSA's reasonable and informed decision that a CE applied.

By relying on the CE, GSA complied with NEPA. *See e.g., Alaska Ctr. For Env't.*, 189 F.3d at 858 (affirming "agency's interpretation of its categorical exclusion" and rejecting NEPA challenge). GSA made factual determinations and relied on agency expertise to conclude that the Holsclaw Property falls within the CE. These factual determinations and conclusions are entitled to substantial deference as the Supreme Court's *Seven County* decision recently reaffirmed. 605 U.S. at 183. The Court should deny Plaintiffs' Motion for Preliminary Injunction.

**B. Plaintiffs Have Failed to Show Likelihood of Success on Their ICA Claim**

As explained below, Federal Defendants have satisfied their obligations under the ICA. The statute requires, in relevant part, that "[t]o the extent possible, all national, regional, State, and local viewpoints shall be considered in planning development programs and projects of the United States Government or assisted by the Government." 31 U.S.C. § 6506(c). Executive Order 12372, which was issued to implement the ICA, states, in relevant part, that "Federal agencies shall provide opportunities for consultation by elected officials of those State and local governments that would provide the non-Federal funds for, or that would be directly affected by, proposed Federal financial assistance or direct Federal development." 47 FR 30959 (July 14, 1982). The ICA and Executive Order 12372 require federal agencies to "consult" with local representatives "in connection with *certain* federal projects." *Azzolina v. U.S. Postal Serv.*, 602 F. Supp. 859, 862 (D.N.J. 1985) (emphasis added). Importantly, the "ICA does not require that a federal agency incorporate the views of local planning agencies." *Bergen Cnty. v. Dole*, 620 F. Supp. 1009, 1065 (D.N.J. 1985), *aff'd*, 800 F.2d 1130 (3d Cir. 1986); *see also Clinton Twp. v. U.S.*

*Postal Serv.*, 638 F. Supp. 763, 767 (D.N.J. 1986) ("No provision in the ICA expressly or implicitly vests local planning boards with the power to veto proposed federal construction projects.").

**1. Plaintiffs Have Not Shown that the ICA Even Applies to GSA's Leasing Activities to Date**

Fatal to Plaintiffs' claim, the ICA does not apply to private land owners like ECG 6, and the Government has not even taken possession of the Holsclaw Property, much less engaged in development or assistance activities that would trigger obligations under the ICA. "[N]either the Act nor the Order requires a federal agency to begin consultations before the agency makes *any* commitment to a particular project or takes *any* steps towards carrying out such a project." *City of Waltham v. U.S. Postal Serv.*, 11 F.3d 235, 244 (1st Cir. 1993) (Breyer, J.). The plain text of the ICA makes it applicable only to "development programs and projects of the United States Government or assisted by the Government." 31 U.S.C. § 6506(c). Similarly, EO 12372 applies to "Federal financial assistance or direct Federal development."

Here, the closest the Federal Defendants have come to "development" on the Holsclaw Property is soliciting, negotiating, and signing a lease. Plaintiffs supply no evidence that the *Federal Defendants* have engaged in construction or other development activities on the property.

Federal Defendants have not found any case holding that executing a lease, without more, triggers obligations under the ICA. All of the cases Plaintiffs cite in asserting that Defendants' actions violate the ICA refer to construction on federal land, not leasing private land on which remodeling is to occur. *See* Mot. at 23-26; *City of Rochester v. U.S. Postal Serv.*, 541 F.2d 967, 977 (2d Cir. 1976) ("The Postal Service . . . had 'agreed to purchase' the Henrietta site."); *Azzolina*, 602 F. Supp. at 861 ("the U.S.P.S. accepted the offer to buy the Harmony Road site"); *Maryland v. Mullin*, 831 F. Supp. 3d 325 (D. Md. 2026) (referring to government "purchasing a large warehouse"); *City of Waltham*, 11 F.3d at 238 (postal service "decided to buy a 36 acre parcel of land"); *Vill. of Palatine v. U.S. Postal Serv.*, 756 F. Supp. 1079, 1082 (N.D. Ill. 1991) ("[T]he Postal Service purchased the McDade site."). Although *Clinton Township* seems to assume that ICA obligations can apply to leased land, *see* 638 F. Supp. at 764 ("the Postal Service invited bids for the construction of a new facility to be leased by the Postal Service"), the opinion does not indicate that the parties in that case raised the threshold issue of whether the ICA even applied.

Moreover, the district court ultimately held that "the injunctive remedy sought by Clinton Township cannot emanate from the Postal Service's asserted failure to comply with [the ICA]." *Id.* at 767.

To the extent that Plaintiffs argue that lease payments constitute federal financial "assistance" under the ICA, the lease term here has not even begun. The lease, which Plaintiffs submitted with their motion, states that the lease term "begin[s] upon acceptance of the Premises as required by this Lease." ECF No. 32-1 at 1. Moreover, it states: "The commencement date of this Lease, along with any applicable termination and renewal rights, shall be more specifically set forth in a Lease Amendment upon substantial completion and acceptance of the Space by the Government." ECF No. 32-1 at 1. Because remodeling is not complete, the Government has not accepted possession of the Holsclaw Property, and its obligation to pay rent has not commenced.

GSA was not required under the ICA to consult with the State or County before merely executing its lease on the Holsclaw property. "Nor does the language of the Act or Order suggest an intent to give state or local officials the right to veto federal projects, where, say, speed is important or practical considerations indicate that a degree of pre-consultation federal bureaucratic activity is desirable." *City of Waltham*, 11 F.3d at 244. Here, speed is important given the need to combat illegal immigration and given that ICE's lease on its space in Morgan Hill is set to expire at the end of August 2026. Plaintiffs will not be able to show that Federal Defendants' actions to date violate the ICA.

#### 2. Federal Defendants Are Considering Local Views to the Extent Required

Even assuming that leasing an existing facility that needs to be remodeled can be considered a "development program[] and project[,]" Plaintiffs are unlikely to succeed on the ICA claim for at least two reasons: (1) GSA and ECG 6's predecessors did, in fact, solicit local government input; and (2) nothing in Section 6506(c) requires the Government to exhaust or reconcile all input before moving forward with a project.

The County's planner Mr. Gutierrez admits that "late 2022 or early 2023, [he] was forwarded an inquiry from Noah Zeligman, who identified himself as a leasing agent, about the Holsclaw Property." ECF No. 26 ¶ 9. Mr. Gutierrez "recall[ed] speaking with Mr. Zeligman about questions related to the possibility of leasing the Holsclaw Property to the federal government, and which uses are allowed on the property." *Id.* Mr. Gutierrez asserts that he "requested additional documentation from Mr. Zeligman

regarding the federal government's intent to lease the Holsclaw Property." *Id.* ¶ 10. In response, the leasing agent forwarded a memo from GSA dated June 21, 2023. *Id.* ¶ 10.

In that memo, Stephen Janssen, a GSA Lease Contracting Officer, wrote:

> SUBJECT: Zoning
> Request for Lease Proposals 8CA3614
> Immigrations and Customs Enforcement (ICE)
> The United States General Services Administration (GSA) is seeking office and operations space under GSA Lease Solicitation No. 8CA3614. Elmwood Capital Group (or its affiliate) is an offeror under said solicitation and proposes to provide GSA with the required space through a lease at a building located at 7240 Holsclaw Road, Gilroy, CA. This lease will require construction work to be performed at the property. Because this lease will be entirely for Federal Government use, the construction project and the property should receive any exemptions, immunities or other flexibility available for such Federal Government uses under local zoning, planning and permitting regulations.

ECF NO. 26-3 at 1. The text above noted that ICE was looking to lease the Holsclaw Property and that "this lease will require construction work." *Id.* The memo contained GSA Lease Solicitation No. 8CA3614.

As Plaintiffs are aware, if searched on the website SAM.gov, this lease number yields the GSA's public pre-solicitation, solicitation, and award records for the lease in question. *See* ECF No. 29 ¶ 33, ECF No. 29-12, 29-13. The lease solicitation records that Plaintiffs filed indicate that GSA was seeking "Office [and] Detention" space, of 15,000 to 17,000 square feet, with "Proof of zoning for a 4,000 SF Detention Center" and 60 parking spaces. ECF No. 29-12. What Plaintiffs omit is that the solicitation records in question were published on November 28, 2022,[3] and the pre-solicitation records were published on December 22, 2020.[4] In other words, for years before Plaintiffs filed the instant suit, they had actual or constructive notice of the Federal Defendants' planned use for the Holsclaw Property. Plaintiffs' assertion that Defendants "affirmatively masked their intended use of the Holsclaw Property," Mot. at 26, is demonstrably false.

Mr. Gutierrez also omits that in 2023, he informed Mr. Zeligman that "[t]he lease and operation of the building space under the GSA (Lease Solicitation No. 8CA3614) entirely for Federal Government

---

[3] *See* https://sam.gov/workspace/contract/opp/366b0e870bc44458a5bec0eeb4f62c7b/view (last visited Aug. 12, 2026).

[4] *See* https://sam.gov/workspace/contract/opp/0452f1ec30cc43ee9f885d68894a8e83/view, ECF No. 54-3 Ex. A.

use may proceed since the Federal Government is exempt from local regulations." ECF No. 54-2 ¶ 16; ECF No. 54-3 Ex. D. At this point, the Federal Defendants and ECG 6 could have reasonably assumed that local authorities did not object to the project, and they could proceed without generating an additional written record of correspondence. Plaintiffs' reliance on *City of Rochester* is therefore misplaced because the agency in that case had already begun construction with 18% completed and still had not considered local concerns. 541 F.2d at 977.

To the extent Plaintiffs argue that Defendants should have also consulted with the Governor's Office of Land Use and Climate Innovation (LCI), courts have rejected attempts to enjoin projects simply for consulting with local offices other than a designated office. *See Vill. of Palatine v. U.S. Postal Serv.,* 742 F. Supp. 1377, 1397 (N.D. Ill. 1990) ("If indeed the Postal Service's direct dealings with local planning officials did meet the concerns that prompted Congress to enact the [ICA], then we are not inclined to grant injunctive relief simply because the Postal Service violated in technical respects its own regulation that requires a written explanation to the SPOC."); *Clinton Township*, 638 F. Supp. at 767 (granting summary judgment for defendant despite Postal Service's failure to send notice to designated contact where "local authorities clearly were advised of the [contract] by February 1982, at the latest, and have demonstrated no real prejudice from not having received an A–95 form at an earlier date.")

That Plaintiffs have not gotten their way is not evidence of disregard for local concerns. The ICA (at most) requires "consideration," but only "to the extent possible." 31 U.S.C. § 6506(c). Notably, the ICA does not require Federal Defendants to yield to objections or to reconcile their national security mission with local preferences. A requirement to "consider" is a weak procedural one; it does not require door-knocking to solicit extra views or a formal analysis of the views submitted. The ICA also did not require DHS to consult state or local officials before leasing the Holsclaw Property, as the ICA does not specify when during "planning" that viewpoints must be considered. *Compare* 31 U.S.C. § 6506(c) *with* Mot. at 25. That Plaintiffs have not had their way does not mean they have not had their say.

Plaintiffs' comparison to New Hampshire or Maryland facilities, *see* Mot. at 24, are of no moment for determining ICA compliance here, just as Government preparation of EAs for other facilities has no bearing on NEPA compliance for this facility.

Finally, given that the Federal Defendants have not yet taken possession of the property, it is still

possible that specific local concerns—other than a generalized objection to immigration enforcement—might still be accommodated. But even if they are not accommodated, the fact that that Federal Defendants proceed does not mean that "local viewpoints" were ignored, it just means they did not outweigh other equities. For the reasons above, Plaintiffs are not likely to succeed on their ICA claim.

**C. Plaintiffs Have Not Established Irreparable Harm**

To obtain the extraordinary relief of a preliminary injunction, Plaintiffs must show "that irreparable injury is *likely* in the absence of an injunction" while the case is pending. *Winter*, 555 U.S. at 22. The Court cannot presume irreparable harm simply because Plaintiffs allege environmental injuries, as they may be outweighed by other considerations. *See Lands Council*, 537 F.3d at 1005 (finding that preventing risks of catastrophic fire, insect infestation, and disease, and aiding the struggling local economy may outweigh alleged harm to individual species); *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987) (reversing Ninth Circuit because "presumption" of irreparable environmental harm was "contrary to traditional equitable principles" with no basis in law); *Tribal Vill. of Akutan v. Hodel*, 859 F.2d 662, 663-64 (9th Cir. 1988) (noting harm to the public interest weighed against granting a preliminary injunction). As *Winter* made clear, "[i]ssuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." 555 U.S. at 22 (emphasis added).

Plaintiffs have not made the requisite clear showing because their alleged harm is neither certain nor immediate. As to the uncertainty, Plaintiffs speculate about hazardous materials potentially contaminating the Holsclaw Property and surrounding area. Mot. at 28; *see e.g.*, ECF No. 30 ¶ 23 (conceding that the County has not confirmed any contamination at the Holsclaw Property); ECF No. 25 ¶ 8 ("*if* construction continues *before* the hazards are assessed and/or addressed" (emphasis added)). But as mentioned above, the lease requires the owner to handle "harmful substances" in accordance with state and federal laws, like CERCLA and other pollution control statutes. ECF No. 32-1 at 15, 26. To the extent Mr. Balliet's declaration suggests that these laws will be violated, the suggestion relies on wholly irrelevant bases: observations of alleged violations from more than ten years ago that the State never pursued and an enforcement action involving a completely different owner, operator, and, most

importantly, location miles away from the Holsclaw Property. *See* ECF No. 25 ¶¶ 7, 9 (summarizing litigation against Syngenta Seeds for alleged violations at 5355 Monterey Frontage Road, Gilroy, CA 95020); *see also* ECF No. 30 ¶¶ 22-23, 27 (explaining that the County confirmed the Holsclaw Property was vacant in September 2023 but made no attempt to inspect the premises until the day this lawsuit was filed). Thus, Plaintiffs' concerns about hazardous materials are pure conjecture that cannot sustain a preliminary injunction. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (finding "fears of hypothetical future harm" insufficient to establish injury).

For the same reasons, Plaintiffs' concern about hazardous materials or operations impacting sensitive species is not supported. Mot. at 29-30. Further, they rely on the incorrect capacity to speculate about harm to sensitive species. *See* ECF No. 36 ¶ 6 (assuming "150 people would be incarcerated"); ECF No. 28 ¶ 8a (same). Plaintiffs rest their argument about sensitive species on guesswork that these species are present or even have suitable habitat at the Holsclaw Property. *See* ECF No. 35 ¶ 13 (describing that the search for species records encompassed "two miles around the project site" and that species "*may* occur in *proximity* to the Holsclaw Property" (emphasis added)); ECF No. 28 ¶ 6 (identifying species with the "potential to occur" in "the *vicinity* of the Property" (emphasis added)). Surely with all the accusations of past contamination, the State would have sent "a qualified biologist [to] evaluate the potential habitat" present at the Holsclaw Property. *See* ECF No. 35 ¶ 14. Even so, Plaintiffs offer only conclusory opinions about "increased noise levels and traffic and light pollution" affecting sensitive species without providing any explanation about *how* species would be impacted *irreparably*. Mot. at 30. Plaintiffs therefore fail to establish they would be irreparably harmed absent a preliminary injunction. *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (reversing district court's grant of preliminary injunction because irreparable harm cannot be "grounded in platitudes rather than evidence").

Finally, Plaintiffs express concern about "the risk of septic overflow" but that risk stems from the operation of the facility, again based on the incorrect capacity. Mot. at 28; *see* Haghighi Decl. ¶¶ 10-13 (assuming a capacity 15 times more than anticipated to theorize that hazardous materials could harm the septic system and floodplain); Bayardo Decl. ¶ 13. Plaintiffs' concern is neither imminent nor likely. And their reliance on the District of Maryland's decision in *Maryland v. Mullin*, 831 F. Supp. 3d 325 (D. Md.

2026), is misplaced. That case has no application here because a completely different CE was at issue there. Besides, the *Maryland* opinion has significant flaws that should limit its application here. For example, the court in that case considered factors irrelevant to NEPA compliance such as the time it took the agency to prepare its NEPA analysis. *See* 831 F. Supp. 3d at 336 ("what review was done appears to have proceeded at a rocket's pace"), *id.* at 341 ("just hours before Defendants purchased the Williamsport Warehouse, they completed a Record of Environmental Consideration"), *id.* at 364 ("the Court has serious concerns about the timing of Defendants' decision-making"). However, the court noted that "some actions Defendants seek to engage in now do not immediately relate to the imminent environmental harm alleged" and allowed DHS to proceed with certain work. *Id.* at 375.

In short, the Court should be skeptical of Plaintiffs' claimed irreparable harm because they have not shown that the impacts they allege are "likely to occur," let alone "possible," if Defendants are not immediately enjoined. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, Plaintiffs' "generalized allegations of an abstract environmental injury" are "insufficient to constitute irreparable harm required for an injunction." *Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344, 1349 (D. Mont. 2014).

**D. The Balance of Equities and Public Interest Favor Denying Injunctive Relief**

When one party is a United States agency, the public interest and the agency's interest merge, and the public interest weighs in favor of the agency's decision. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A federal court must deny a preliminary injunction, even where irreparable injury to the movant exists, if the injunction is contrary to the public interest. *See Winter*, 555 U.S. at 23; *see also Klamath-Siskiyou Wildlands Ctr. v. Grantham*, 785 F. App'x 467, 469 (9th Cir. 2019) (finding that district court abused its discretion when it issued a preliminary injunction without paying "particular regard for the public consequences").

The Court may not "abandon a balance of harms analysis just because a potential environmental injury is at issue." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010). Instead, the Court must be "sufficiently specific" and cannot "merely acknowledg[e] that the public's interest is not served by the Government violating" the ICA or NEPA. *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 332 (3d Cir. 2020).

Here, there is a public interest in efficiently enforcing immigration laws to allow Federal Defendants to take the steps necessary to begin operating the Holsclaw Property as an ICE facility. As Gilroy is approximately one and a half to two hours from four other ERO offices within the San Francisco Field Office's area of responsibility, it provides several operational advantages. Bayardo Decl. ¶ 8. The location would allow nearby offices to assist one another more efficiently and reduce travel time for emergency response, routine transportation, and the movement of individuals held in ERO custody. *Id.*

The site will also better support local noncitizens than existing facilities. The Holsclaw Property provides a larger publicly accessible lobby area than ICE's nearby Morgan Hill facility, which will soon close in any event. Bayardo Decl. ¶ 10; *see* Larson Decl. ¶ 9. The public-facing areas at the Holsclaw Property are intended to accommodate individuals who need to report for interviews and check-in requirements, address bond-related matters, attorney and family visits during a temporary hold period, deliver medication, property, or other necessary items. Bayardo Decl. ¶ 12. The planned office space will support ERO personnel and contracted personnel who support ERO operations. *Id.* Delaying the Gilroy project would place a significant burden on those individuals in removal proceedings who are out of custody and have reporting requirements with ERO. *Id.* ¶ 16. The Gilroy office provides a closer alternative office to report as required versus driving to other offices within the San Francisco field office's area of responsibility. *Id.* ¶ 16.[5]

The facility will also give ERO space needed to temporarily hold and process foreign nationals who are present in the United States in violation of law, including those pending removal, who have failed to appear for immigration proceedings, or who are otherwise subject to ICE custody. Bayardo Decl. ¶ 10. ICE's Acting Deputy Field Office Director explains that the site is not intended for long-term detention. *Id.* ¶ 10. The hold rooms will be used for temporary custody only and will operate under applicable ICE policies and standards. *Id.* ¶ 10. The best current estimate is that approximately 50 ERO personnel and contracted personnel will work at the site, and on average, approximately 10 detainees total might be held in the on-site holding area temporarily at one time, though the maximum capacity may be higher. *Id.* ¶ 13.

[5] Thus, contrary to the amici's characterization of the facility as part of an immigration enforcement "surge," *see* ECF No. 49 at 5, enjoining the Holsclaw Property—which has been in the works for years—will pose additional hardship on noncitizens in the South Bay and their families who need to have dealings with ICE.

If the Gilroy project were delayed or enjoined, ERO would be forced to continue operating without the office space and hold-room needed in this part of the San Francisco Field Office's area of responsibility. Bayardo Decl. ¶ 16. ERO would have to rely on existing facilities that are farther away and already support other operational needs. *Id.* ¶ 16. That would increase transport times, require more officers to be taken away from other duties, and limit ERO's ability to respond quickly to operational needs as they arise. *Id.* ¶ 16. Meeting these logistical challenges would strain ERO operations and reduce ERO's ability to enforce the nation's immigration laws and protect public safety. *Id.* ¶ 16. It would also make it more difficult to process individuals in custody, move them to detention facilities, arrange medical care when needed, and provide access for attorneys and family members during temporary custody. *Id.* ¶ 16.

In comparison to the speculative and distant future harms claimed by Plaintiffs, the public interest and balance of the equities favor denial of Plaintiffs' Motion.

## V. CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

DATED: August 12, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Roman A. Swoopes*
ROMAN A. SWOOPES
Assistant United States Attorney

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division

*/s/ Krystal-Rose Perez*
KRYSTAL-ROSE PEREZ
Senior Trial Attorney

Attorneys for Federal Defendants
United States Immigration & Customs Enforcement;
David Venturella (in his official capacity);
United States General Services Administration;
Edward Forst (in his official capacity);
United States Department of Homeland Security;
Markwayne Mullin (in his official capacity)