TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
ELIZABETH G. PIANCA, SBN 241244
Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
SONIA N. WILLS, SBN 259892
CRISTINA STELLA, SBN 305475
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
LEILY ARZY, SBN 364187
Litigation Fellow
OFFICE OF THE COUNTY COUNSEL
70 West Hedding St., East Wing, Ninth Fl.
San José, California 95110-1770
Telephone: (408) 299-5900
Facsimile: (408) 292-7240
rajiv.narayan@cco.sccgov.org
cristina.stella@cco.sccgov.org

WILLIAM J. WHITE, SBN 181441
MATTHEW D. ZINN, SBN 214587
CALEB E. HERSH, SBN 356318
SHUTE, MIHALY & WEINBERGER LLP
550 California St., Ste. 1200
San Francisco, California 94104
Telephone: (415) 552-7272
Facsimile: (415) 552-5816
white@smwlaw.com
zinn@smwlaw.com
chersh@smwlaw.com

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

ROB BONTA, Attorney General of California
ABIGAIL BLODGETT, SBN 278813
Supervising Deputy Attorney General
STACY LAU, SBN 254507
ASHLEY WERNER, SBN 282217
JESSICA DURNEY, SBN 326816
ERIN GANAHL, SBN 248472
Deputy Attorneys General
1515 Clay St. 20th Fl.
Oakland, California 94612-0550
Telephone: (510) 879-1973
Facsimile: (510) 622-2270
stacy.lau@doj.ca.gov

Attorneys for Plaintiff
STATE OF CALIFORNIA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSÉ DIVISION

| | |
|---|---|
| COUNTY OF SANTA CLARA; STATE OF CALIFORNIA, by and through Attorney General Rob Bonta,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br>Defendants. | No. 5:26-cv-05604-EKL<br><br>**PLAINTIFFS' REPLY TO OPPOSITIONS TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: September 8, 2026<br>Time: 2:00 p.m.<br>Crtrm: 7, 4th Floor<br>Judge: Hon. Eumi K. Lee |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ....................................................................................................3
INTRODUCTION ..............................................................................................................7
I. Plaintiffs Are Likely to Succeed on the Merits. ................................................................8
  A. Plaintiffs Are Likely to Succeed on the Merits of Their NEPA Claim. .........................8
  B. Plaintiffs Are Likely to Succeed on the Merits of Their ICA Claim. ...........................15
    1. The ICA Applies to Federal Defendants' Actions to Date. ..............................15
    2. Federal Defendants Failed to Comply with the ICA. ......................................17
II. Plaintiffs Have Established Irreparable Harm Absent an Injunction. ...................................20
III. The Balance of Equities Leans Sharply in Favor of an Injunction. ......................................24
IV. The Court Must Enjoin Both ECG6 and Federal Defendants. ..............................................28
V. Defendant ECG6 Has Not Shown a Bond Is Appropriate in This Public Interest Case. .........29
CONCLUSION ...............................................................................................................31

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Al Otro Lado v. Wolf*,
497 F. Supp. 3d 914 (S.D. Cal. 2020) ..... 29

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020) ..... 27

*Alaska Ctr. for Env't v. U.S. Forest Serv.*,
189 F.3d 851 (9th Cir. 1999) ..... 8, 12

*Alaska v. Bernhardt*,
500 F. Supp. 3d 889 (D. Alaska 2020) ..... 12

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) ..... 20, 25, 28

*Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*,
464 F.3d 1003 (9th Cir. 2006) ..... 16

*Arizona v. Mullin*,
No. 2:26-CV-02857 (D. Ariz. Apr. 24, 2026) ..... 7

*Aurora World, Inc. v. Ty Inc.*,
719 F. Supp. 2d 1115 (C.D. Cal. 2009) ..... 25

*Azzolina v. USPS*,
602 F. Supp. 859 (D.N.J. 1985) ..... 18

*Barahona-Gomez v. Reno*,
167 F.3d 1228 (9th Cir. 1999) ..... 29

*Bergen County v. Dole*,
620 F. Supp. 1009 (D.N.J. 1985) ..... 18

*Blue Mountains Biodiversity Project v. Blackwood*,
161 F.3d 1208 (9th Cir. 1998) ..... 13

*Border Power Plant Working Group v. Department of Energy*,
260 F. Supp. 2d 997 (S.D. Cal. 2003) ..... 14

*California v. Azuma Corp.*,
No. 2:23-CV-00743, 2023 WL 5835794 (E.D. Cal. Sept. 8, 2023) ..... 30

*California v. U.S. Dep't of Agric.*,
800 F. Supp. 3d 1015 (N.D. Cal. 2025) ..... 25

*Centro Legal de la Raza v. Exec. Off. for Immigr. Rev.*,
524 F. Supp. 3d 919 (N.D. Cal. 2021) ..... 26

*Churchill County v. Norton*,
276 F.3d 1060 (9th Cir. 2001) ..... 10

*Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961 (9th Cir. 2003) ........ 24

*Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2d 1059 (N.D. Cal. 2007) ........ 9

*City & County of San Francisco v. Trump*, 783 F. Supp. 3d 1148 (N.D. Cal. 2025) ........ 25, 30

*City of Oberlin v. Federal Energy Regulatory Commission* 937 F.3d 599 (D.C. Cir. 2019), ........ 14

*City of Social Circle v. U.S. Immigr. & Customs Enf't*, No. 3:26-CV-00054 (M.D. Ga. May 13, 2026) ........ 7

*City of South Pasadena v. Slater*, 56 F. Supp. 2d 1106 (C.D. Cal. 1999) ........ 29, 30

*City of Waltham v. USPS*, 11 F.3d 235 (1st Cir. 1993) ........ 15, 16, 18

*Clinton Township v. USPS*, 638 F. Supp. 763 (D.N.J. 1986) ........ 15, 18, 19

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878 (9th Cir. 2003) ........ 30

*County of Santa Clara v. Noem*, 815 F. Supp. 3d 979 (N.D. Cal. 2025) ........ 25

*Earth Island Inst. v. U.S. Forest Serv.*, No. 2:05-CV-1608-MCE, 2006 WL 3359192 (E.D. Cal. Nov. 20, 2006) ........ 31

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir. 2022) ........ 13

*Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322 (9th Cir. 1975) ........ 30

*Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543 (9th Cir. 2024) ........ 10

*Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391 (9th Cir. 1992) ........ 28

*Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095 (9th Cir. 2016) ........ 14

*Jones v. Gordon*, 792 F.2d 821 (9th Cir. 1986) ........ 8, 12

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755 (9th Cir. 2014) ........ 20

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874 (N.D. Cal. 2006) ........ 21

*Maryland v. Mullin*,
831 F. Supp. 3d 325 (D. Md. 2026) .......... 7, 25, 26

*Metcalf v. Daley*,
214 F.3d 1135 (9th Cir. 2000) .......... 8, 9, 14

*Michigan v. U.S. Dep't of Homeland Sec.*,
No. 2:26-CV-10968 (E.D. Mich. Mar. 24, 2026) .......... 7

*M-J-M-A- v. Hermosillo*,
822 F. Supp. 3d 1147 (D. Or. 2026) .......... 25

*Ms. L. v. U.S. Immigr. & Customs Enf't*,
310 F. Supp. 3d 1133 (S.D. Cal. 2018) .......... 26, 27, 28

*Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n*,
677 F.2d 883 (D.C. Cir. 1981) .......... 10

*Nken v. Holder,*
556 U.S. 418 (2009) .......... 25

*Pablo Sequen v. Albarran*,
No. 25-CV-06487-PCP, 2026 WL 1805114 (N.D. Cal. June 23, 2026) .......... 11

*Regal Knitwear Co. v. NLRB*,
324 U.S. 9 (1945) .......... 29

*Save Our Sonoran, Inc. v. Flowers*,
408 F.3d 1113 (9th Cir. 2005) .......... 30, 31

*Se. Alaska Conservation Council v. U.S. Forest Serv*.,
413 F. Supp. 3d 973 (D. Alaska 2019) .......... 28

*Seven Cnty. Infrastructure Coal. v. Eagle County*,
605 U.S. 168 (2025) .......... 8, 12

*Sierra Club v. Bosworth*,
510 F.3d 1016 (9th Cir. 2007) .......... 13

*Sierra Club v. Marsh*,
872 F.2d 497 (1st Cir. 1989) .......... 21, 28

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
235 F. Supp. 2d 1109 (D. Or. 2002) .......... 28

*Sierra Club v. U.S. Forest Serv.*,
843 F.2d 1190 (9th Cir. 1988) .......... 28

*Sionix Corp. v. Moorehead*,
299 F. Supp. 2d 1082 (S.D. Cal. 2003) .......... 30

*Steamboaters v. FERC*,
759 F.2d 1382 (9th Cir. 1985) .......... 12

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*,
766 F.2d 1319 (9th Cir. 1985) .......... 29, 31

*Vill. of Palatine v. USPS*,
742 F. Supp. 1377 (N.D. Ill. 1990) .......... 18, 19

*WeBoost Media S.R.L. v. LookSmart Ltd.*,
No. C-13-5304-SC, 2014 WL 824297 (N.D. Cal. Feb. 28, 2014) .......... 31

*WHIC LLC v. NextGen Lab'ys, Inc.*,
341 F. Supp. 3d 1147 (D. Haw. 2018) .......... 27

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 7, 20

**CALIFORNIA CASES**

*Reserve Ins. Co. v. Pisciotta*,
30 Cal. 3d 800 (1982) .......... 31

**FEDERAL STATUTES**

31 U.S.C. § 6506 .......... 15, 16

**CALIFORNIA STATUTES**

Cal. Gov't Code § 65040.10 .......... 19

**RULES**

Fed. R. Civ. P. 65 .......... 29

**REGULATIONS**

*Intergovernmental Review of Federal Programs*, 47 Fed. Reg. 30,959 (July 14, 1982) .......... 15, 18

**COUNTY OF SANTA CLARA ORDINANCE CODE**

§ 1.20.040(A) .......... 18

§ 1.20.040(D) .......... 19

§ 2.10.020(A) .......... 18

§ B11-66 .......... 22

## INTRODUCTION

The facts of this case reflect the latest page from a playbook Federal Defendants have been using across the country: Build now and (maybe) follow the law later. In cities and counties nationwide, Federal Defendants have attempted to construct immigration enforcement and holding facilities in flagrant violation of federal laws, stopping only when challenged.[1] Now that Defendants are trying to do the same in Santa Clara County, Plaintiffs ask this Court to enjoin Defendants from proceeding unless and until they follow the law.

Defendants fail to rebut Plaintiffs' showing that they meet the standard for a preliminary injunction. Plaintiffs' voluminous evidence establishes that Plaintiffs are likely to succeed on the merits and suffer irreparable harm absent an injunction and that the balance of equities and the public interest favor a preliminary injunction. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Defendants argue in response that a categorical exclusion for acquisition of office space within an existing structure, with no change in the type of use and only a minimal change in the occupancy level, satisfies the National Environmental Policy Act (NEPA), on the basis that building an immigration enforcement and holding facility ("the Project") and associated infrastructure on the site of a former seed research laboratory will categorically have *no* environmental impact. But this defies common sense and the facts. The Project is not remotely similar to a greenhouse used to test commercial pesticides, and Defendants' own estimates show the occupancy will increase at least 300% from the existing permitted use. Plaintiffs have demonstrated the Project goes well beyond the scope of the claimed categorical exclusion. The construction and expanded use of the property will have environmental impacts that demand review, and no authority supports Defendants' reliance on the general terms of their lease to excuse their NEPA obligations.

Federal Defendants also claim compliance with the Intergovernmental Cooperation Act

---

[1] *See Maryland v. Mullin*, 831 F. Supp. 3d 325 (D. Md. 2026) (issuing preliminary injunction*); see also Arizona v. Mullin*, No. 2:26-CV-02857 (D. Ariz. Apr. 24, 2026) (Complaint); *New Jersey v. U.S. Immigr. & Customs Enf't*, No. 2:26-CV-02884 (D.N.J. Mar. 20, 2026) (Complaint); *Michigan v. U.S. Dep't of Homeland Sec.*, No. 2:26-CV-10968 (E.D. Mich. Mar. 24, 2026) (Complaint); *City of Social Circle v. U.S. Immigr. & Customs Enf't*, No. 3:26-CV-00054 (M.D. Ga. May 13, 2026) (Complaint).

(ICA) based on ECG6's limited query to a County staffer and a one-paragraph letter from GSA taking a unilateral position that the federal government should be exempt from all laws. This is a far cry from the active solicitation and consideration of local governments' views that is required by the ICA. Regardless, Federal Defendants do not even attempt to argue they reached out in any way to the State, as the ICA also requires. Defendants' assurances that they will comply with the ICA after construction is complete and Immigration and Customs Enforcement (ICE) takes possession misconstrue the plain text and purpose of the ICA, which requires meaningful consultation during the planning stages of a federal development project.

None of this should distract the Court from Defendants' desire to paper over their unlawful actions. Plaintiffs established that NEPA and the ICA do apply here, nothing excuses Defendants' failure to satisfy both, and these failures are causing Plaintiffs imminent and irreparable harm, contrary to the public interest. Accordingly, the Court should issue a preliminary injunction.

## I. Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs have shown, and Defendants' arguments do not change, that Plaintiffs are likely to succeed on the merits of their NEPA and ICA claims.

### A. Plaintiffs Are Likely to Succeed on the Merits of Their NEPA Claim.

Federal Defendants do not contest that the Project is a major federal action or that NEPA applies. Instead, they claim the Project is subject to a categorical exclusion and therefore exempt from either an environmental assessment (EA) or environmental impact statement (EIS).

Federal Defendants' arguments fail. NEPA requires that federal agencies take a "hard look" at the environmental consequences before embarking on a major federal action. *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000). "When an agency decides to proceed with an action in the absence of an EA or EIS," such as by applying a categorical exclusion, "the agency must adequately explain its decision." *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999) (citing *Jones v. Gordon*, 792 F.2d 821, 827 (9th Cir. 1986)); *see also Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 180 (2025) (holding agency NEPA decisions must be "reasonable and reasonably explained"). To determine whether an agency's decision to rely on a categorical exclusion was arbitrary and capricious, the Court must determine whether the agency

considered the relevant facts and if there has been a clear error of judgment. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2d 1059, 1082 (N.D. Cal. 2007).

Here, Federal Defendants' arguments fail for two reasons: (1) the Project does not come within the plain terms of their claimed categorical exclusion; and (2) the hazardous waste, septic, floodplain, and protected species impacts at the Holsclaw Property are extraordinary circumstances that preclude application of any categorical exclusion. By rubber-stamping the Project with a categorical exclusion that, on its face, does not apply, and by ignoring the significant impacts the Project is likely to cause to human health and the environment, Defendants have entirely failed to take the "hard look" NEPA demands. *See Metcalf*, 214 F.3d at 1142.

**1. Defendants' Claimed Categorical Exclusion Is Inapplicable by Its Own Terms.**

Federal Defendants claim the Project falls under a categorical exclusion for "[a]cquisition of space within an existing structure, either by purchase or lease, where no change in the general type of use and only minimal change from previous occupancy level is proposed." ECF No. 34-4 ("GSA Desk Guide") at 13, § 5.3(b); ECF No. 55 ("Fed. Opp.") at 8. Their position is untenable. The Project meets none of the three requirements of this categorical exclusion.

First, the Project does not merely involve "[a]cquisition of space within an existing structure." Rather, as Defendants concede, they are renovating the interiors of existing buildings, demolishing others, and building a new sally port, ECF No. 54 ("ECG6 Opp.") at 9, as well as paving and/or grading additional parking spaces on top of the current septic system leachfield and other wastewater infrastructure. ECF No. 27 ("Haghighi Decl.") ¶ 17. Indeed, the County has observed exterior construction activities at and modifications to the Holsclaw Property, including piles of debris and ground-disturbing work. ECF No. 29 ¶¶ 9, 10, 12, 14–16; Decl. of Darius Haghighi in Supp. of Pls.' Reply ("Haghighi Reply Decl."), Ex. A. None of this construction or demolition activity is allowed by the claimed categorical exclusion, which is limited *only* to the "acquisition of space within an existing structure." Notably, Federal Defendants did not rely on a categorical exclusion for acquisitions that *also involve* construction, "expansion," or "improvement," which GSA's NEPA guidelines distinguish from basic acquisitions. *See* GSA Desk Guide, § 5.4(b). In recognition of the higher likelihood of impacts when construction is involved in an acquisition,

this categorical exclusion can only be used when four additional factors are met, *id.*, none of which are met here. It was arbitrary and capricious for Federal Defendants to approve a larger construction project under a categorical exclusion that was clearly meant to encompass a more limited action.

To squeeze into this ill-suited categorical exclusion, Federal Defendants essentially argue that because *part* of the Project—the interior demolition and construction—is purportedly covered by a categorical exclusion, they can evade studying and disclosing the environmental consequences of the rest. The Ninth Circuit has rejected federal agency attempts to rely on categorical exclusions for isolated parts of a singular project, noting that "[a]ny project can be broken down into seemingly innocuous independent acts" that may not individually trigger an EA or EIS. *Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543, 557 (9th Cir. 2024) (prohibiting agency from combining multiple categorical exclusions to address different aspects of the same project). This is consistent with NEPA's overall purpose and application, which "prohibit an agency from 'breaking up a large or cumulative project into smaller components'" to avoid preparing an EA or EIS. *Churchill County v. Norton*, 276 F.3d 1060, 1076 (9th Cir. 2001) (quoting *Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 890 (D.C. Cir. 1981)). For a categorical exclusion to apply, it must apply to the whole of the project, and here the evidence clearly demonstrates that it does not.

Second, the Project will profoundly and substantially change the "general type of use" of the Property. The entirety of Federal Defendants' argument on this requirement is that GSA's pre-solicitation notice required "[p]roof of zoning" for ICE's use of the Property and that Plaintiffs have not identified provisions of the prior use permit that are "inconsistent" with Federal Defendants' planned use. Fed. Opp. at 14. The information set forth in the prior use permit, which was granted for an agricultural research facility, ECF No. 26-2, demonstrates there will be a change in use. Irrespective of whether the prior permit provisions are consistent or inconsistent with ICE's planned use, which is beside the point, it is self-evident that a warehouse used to test commercial pesticides is not remotely the same use as an immigration enforcement and holding facility. As Plaintiffs have amply demonstrated, Defendants' planned change in use would be substantial, *see* Haghighi Decl. ¶¶ 7, 11, and it was arbitrary and capricious for Federal Defendants to ignore these facts and conclude otherwise.

Third, the Project would make more than a "minimal change from [the] previous occupancy level." The prior use was limited to 40 daytime staff. *Id.* ¶ 7. Comparing only staff numbers, Federal Defendants admit that there will be a 25 percent increase in staff levels at the facility. *See* Fed. Opp. at 11 (there will be 50 personnel and contractors working at the site). But in addition, Federal Defendants' own plans show six holding areas which, read in combination with ICE's facility design guide, establish the capacity to hold up to 150 detainees. ECF No. 34-5 ("ICE Facility Design Guide") at 6–11; ECF No. 27-1; *see also* ECF No. 56 ("Bayardo Decl.") ¶¶ 13–14 (ICE's current approximations add up to 120 people). Moreover, Department of Homeland Security (DHS) and ICE directives compel them to detain more individuals, hold them for longer, and refrain from releasing them—practices that have led to inhumane conditions at nearby Enforcement and Removal Operations (ERO) facilities and have been enjoined by this Court. *See* Mot. at 15–16 (describing ICE's recent history of overcrowding its facilities); *see also Pablo Sequen v. Albarran*, No. 25-CV-06487-PCP, 2026 WL 1805114 (N.D. Cal. June 23, 2026), *appeal filed sub nom. Garcia v. Albarran*, No. 26-4310 (9th Cir. July 7, 2026).

Federal Defendants now claim the Project is not anticipated to ordinarily house more than 10 detainees at a time, Fed. Opp. at 11; ECG6 Opp. at 10, but also expressly admit the maximum number of detainees is unknown. Fed. Opp. at 11 ("Maximum occupancy of the facility will be determined once remodeling is complete."); Bayardo Decl. ¶ 14 (same). Even assuming ICE might *typically* detain fewer than 150 people at the Holsclaw Property, more than six detainees on the site would be sufficient to overburden the existing septic system due to additional wastewater flow. Haghighi Decl. ¶ 11. There is no record, nor even any argument in Federal Defendants' brief, indicating Federal Defendants took this change in occupancy into account when opting to use a categorical exclusion that, on its face, does not apply to the Project. In any event, this argument misses the point: Plaintiffs have established the potential for environmental impacts due to *construction* of the Project, which will occur regardless of the number of detainees. Mot. at 27; ECF No. 36 ¶¶ 11–12 (construction of facility will likely lead to runoff to nearby waterways); *id.* ¶ 23 ("edge effects" of construction); *id.* ¶¶ 26–28 (traffic impacts from construction); *id.* ¶¶ 29–33 (noise impacts from construction); *id.* ¶ 36 (chemical, microplastic, and heavy metal contamination from

construction).

Citing the Supreme Court's *Seven County* decision, Federal Defendants make a hollow appeal for deference to GSA's purported "series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry" and the supposed "'length, content, and level of detail' of its written analysis." Fed. Opp. at 13 (citing *Seven Cnty.*, 605 U.S. at 182–83). But *Seven County* addressed a challenge to an agency's 3,600-page EIS for a proposed project. 605 U.S. at 173. In stark contrast, GSA here applied an "automatic" categorical exclusion using a standardized one-page form that did not describe or consider any of the construction or demolition work, nor the associated impacts of the Project. ECF No. 57-2 at 2. Defendants provided no other record of consideration. There is no evidence of "policy-laden choices," any "depth" or "breadth" of inquiry, or "written analysis" to which this Court may defer. *See Alaska v. Bernhardt*, 500 F. Supp. 3d 889, 909 (D. Alaska 2020) (granting plaintiff summary judgment where agency failed to give sufficient reasons that categorical exclusion applied). Instead, Federal Defendants ignored all evidence—including of substantial construction, demolition, and ground-disturbing work to facilitate a significantly different and higher-intensity use—to impermissibly ram the Project through a categorical exclusion that expressly applies only to acquisitions of existing buildings without changes in use or occupancy. This violates NEPA. *See, e.g.*, *Jones*, 792 F.2d at 828 ("An 'agency cannot . . . avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment.'" (quoting *Steamboaters v. FERC*, 759 F.2d 1382, 1393 (9th Cir. 1985))).

**2. Extraordinary Circumstances Preclude Application of a Categorical Exclusion.**

Federal Defendants' reliance on a categorical exclusion fails for an additional and independent reason: as Federal Defendants recognize, a categorical exclusion is not appropriate if extraordinary circumstances exist. Fed. Opp. at 12, 14. Yet, Federal Defendants did not consider whether extraordinary circumstances exist here. Plaintiffs document several, which Federal Defendants fail to rebut either with their record or argument. As an initial matter, "[c]ategorical exclusions, by definition, are limited to situations where there is an insignificant or minor effect on the environment." *Alaska Ctr.*, 189 F.3d at 859. Accordingly, for a categorical exclusion to apply,

the federal agency must not just document, but meaningfully consider, whether the proposed action's effects will be insignificant because the "threshold question in a NEPA case is whether a proposed project will 'significantly affect' the environment, thereby triggering the requirement for an EIS." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1027 (9th Cir. 2007) (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)). Plaintiffs have already demonstrated the myriad ways in which the Project may significantly impact human health and the surrounding environment, Mot. at 19–22, thus making a categorical exclusion inapplicable.

Federal Defendants' own definitions of extraordinary circumstances include "a potentially significant effect on public health or safety"; "a potentially significant effect on an environmentally sensitive area"; "a potential or threatened violation of a Federal, State, or local law or requirement imposed to protect the environment," specifically including "Federal, Tribal, State, or local requirements to control hazardous or toxic substances" and "environmental permits"; "an effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, or likely to involve unique or unknown environmental risks"; and "significantly greater scope or size than normally experienced for this particular category of action." ECF No. 34-2 at V-5 to V-6; *see also* GSA Desk Guide § 3.5.1 (equivalent factors). Any one of these extraordinary circumstances is sufficient to render a categorical exclusion inapplicable. Here, most—if not all—of these circumstances are present.

In their opposition, Federal Defendants argue that because *their lessor*, ECG6, is obligated by the terms of the lease to handle any hazardous waste encountered during demolition or construction "in accordance with Federal and state laws and requirements concerning hazardous waste," there are no extraordinary circumstances at the Holsclaw Property. Fed. Opp. at 14. Federal Defendants do not cite any caselaw—because none exists—for the proposition that merely stating in a lease that the lessor will comply with existing environmental laws is sufficient to satisfy NEPA. Setting aside the fact that Defendants' compliance with hazardous waste laws is in question, *see infra* at 23, compliance with separate environmental laws—here, a third party's promised compliance pursuant to a lease—does not satisfy NEPA or guarantee significant impacts will not occur. *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 874–75 (9th Cir. 2022) (finding it arbitrary

and capricious for an agency to assume compliance with federal or state discharge permits would render environmental impacts insignificant); *see also Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1103–04 (9th Cir. 2016) (determining the issuance of a state air permit was not sufficient to avoid analysis of potential air quality impacts). And importantly, NEPA requires that federal agencies analyze potential environmental impacts *before* acting on a project; it does not allow them to demolish first and remediate later, as Federal Defendants appear to propose throughout their brief. *See Metcalf*, 214 F.3d at 1143 (indicating agencies are required to prepare NEPA documents before committing to a project).

Federal Defendants' cases on this point are inapposite. Rather than supporting their claim that prospective compliance with *other* environmental laws somehow obviates the need for NEPA analysis, these cases merely state that, in their NEPA analyses, federal agencies may consider and rely on the standards and expertise developed by other agencies. In *City of Oberlin v. Federal Energy Regulatory Commission*, the court found it was appropriate for an agency preparing an EIS to reference compliance with Department of Transportation (DOT) safety standards because the agency "explained in detail how compliance with DOT standards would address the specific safety concerns" of the proposed pipeline and "enumerated specific actions . . . to account for safety risks that DOT regulations might not fully address." 937 F.3d 599, 610–11 (D.C. Cir. 2019). In *Border Power Plant Working Group v. Department of Energy*, the court upheld an EA that evaluated a project's potential impacts on air quality and public health by relying on air emissions thresholds established by the Environmental Protection Agency. 260 F. Supp. 2d 997, 1020–21 (S.D. Cal. 2003). In both cases, the NEPA analyses occurred prior to taking agency action and the challenged agency decisions were supported by an EA or EIS that referenced federal standards; those cases did not excuse federal agencies from considering impacts merely because other laws exist and should be followed. Here, Federal Defendants failed to evaluate potential hazardous waste impacts before committing to the Project—and indeed, they are already out of compliance with federal, state, and local standards. Any claim that Federal Defendants or ECG6 will start complying with the law *later* does not avoid the need for NEPA review now.

**B. Plaintiffs Are Likely to Succeed on the Merits of Their ICA Claim.**

Federal Defendants argue the ICA does not apply to their actions at the Holsclaw Property, and that even if it did, Federal Defendants did and will consider local views to the extent required by the ICA. These arguments miss the legal mark.

**1. The ICA Applies to Federal Defendants' Actions to Date.**

Federal Defendants assert the ICA is not triggered by a lease, and if it were, it would not be triggered until the lease term begins, at which point the Federal Government takes possession of the Holsclaw Property and begins paying rent—long after Federal Defendants committed to the use of the Property for 15 years and after completing redevelopment, all with substantial federal funding. Fed. Opp. at 17. These arguments fail because the ICA "requires 'consider[ation]' of 'local viewpoints' during the 'planning' stages of a project," before development occurs. *City of Waltham v. USPS*, 11 F.3d 235, 244 (1st Cir. 1993) (quoting 31 U.S.C. § 6506(c)); *see also* 31 U.S.C. § 6506(b)(1) (requiring federal agencies to make "reasoned choices" about "appropriate land uses"). Executive Order (EO) 12372 requires the same; it directs agencies to "[c]ommunicate with State and local elected officials as early in the program planning cycle as is reasonably feasible to explain specific plans and actions." *Intergovernmental Review of Federal Programs*, 47 Fed. Reg. 30,959 (July 14, 1982). Applying the ICA's requirements only under the narrow circumstances urged by Defendants, after irreversible commitments are made and a development project is completed, would render the ICA meaningless.

Federal Defendants first attempt to narrow the scope of the ICA from "direct Federal development" to direct Federal development *on federal land* by arguing the federal government is merely a leaseholder and that no caselaw explicitly holds "executing a lease, without more, triggers obligations under the ICA." Fed. Opp. at 16. They then contradict themselves by providing a case in which a leased project *did* trigger ICA coordination, *Clinton Township v. United States Postal Service*, 638 F. Supp. 763, 765 (D.N.J. 1986). Indeed, no caselaw distinguishes between a leasehold interest and fee ownership for purposes of ICA compliance. Nor is such a narrowing supported by the plain language of the statute, which calls for viewpoints to be considered in planning "projects of the United States Government." 31 U.S.C. § 6506(c). It cannot be disputed that the redevelopment

of the Holsclaw Property is a development "project[] of the United States Government." *Id.* Through actions dating back to 2020, Federal Defendants originated, designed, and controlled this Project. ECF No. 54-2 ("Zeligman Decl.") ¶¶ 7–9, 19–20, 23–24, 29, 32. The 2023 GSA letter Federal Defendants reference in their brief asserts the Project "will *require construction work* to be performed at the property [and] is *entirely* for Federal Government use." Fed. Opp. at 18 (emphasis added) (quoting ECF No. 26-3 at 1). And Federal Defendants' declarant details ICE's purported need for and planned use of the Holsclaw Property. Bayardo Decl. ¶¶ 8, 10. Leaving no room for doubt, ECG6 emphasizes that it is developing the Project in reliance on Federal Defendants' reimbursements and future rent payments. Zeligman Decl. ¶¶ 23–24.

Second, Federal Defendants argue that, even if the lease triggers the ICA, it does not do so *yet* because construction has not finished and rent is not due. Fed. Opp. at 17. But delaying consultation until Federal Defendants complete construction and pay rent is inconsistent with the legislative intent to consult when *planning* a project. Any other interpretation renders the ICA meaningless and ineffective at achieving Congress's objectives. *See* 31 U.S.C. § 6506(b) (identifying "wise development," "conservation of all natural resources," and "properly planned" facilities as among those objectives). Consultation that occurs only after multiyear and multimillion-dollar commitments to develop are made, and after development is complete, forecloses the option to implement any viewpoints later sought and received. In such a scenario, consultation would be a hollow exercise. Federal Defendants' reliance on leasehold possession would lead to absurd results and reveals their attempted end run around the plain language of the statute, as it will be too late to meaningfully consult when the federal government takes possession. Statutory interpretations that lead to absurd results are to be avoided, and the Court should reject Defendants' implausibly narrow interpretation of the ICA's application. *See Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006) ("When a natural reading of [a statute] leads to a rational, common-sense result, an alteration of meaning is not only unnecessary, but also extrajudicial.").

Finally, while courts do make some allowances where "speed is important or practical considerations indicate that a degree of pre-consultation federal bureaucratic activity is desirable," *City of Waltham*, 11 F.3d at 244, no such circumstances are present here. Federal Defendants strain

credulity by framing the design, demolition, and construction work as merely "bureaucratic activity" that need not be informed by state and local consultation. Nor can Federal Defendants credibly claim "speed is important given the need to combat illegal immigration," Fed. Opp. at 17, when they are over six years into the Project. *Id.* at 18; Zeligman Decl. ¶ 8. It is clear the ICA's obligations attached to the Project years before either of these post-hoc excuses for avoiding them.

**2. Federal Defendants Failed to Comply with the ICA.**

Federal Defendants entertain the possibility "that specific local concerns . . . might still be accommodated," Fed. Opp. at 20, but their arguments only underscore the urgent need for an injunction. Federal Defendants present the following as fully sufficient for the ICA: (1) outreach from a *private* entity that had no contractual relationship with GSA inquiring about a *hypothetical and undefined* project; and (2) a forwarded one-paragraph letter from GSA unilaterally extinguishing local input. *Id*. at 17–18. These communications do not demonstrate any attempt whatsoever by Federal Defendants to comply with, let alone satisfy, the ICA's requirement to make meaningful efforts to solicit and consider state and local concerns before development occurs.

ECG6 and its affiliate Elmwood Capital Group did not consult the County on behalf of Federal Defendants. ECG6's declarations confirm what Plaintiffs already recounted: Mr. Zeligman contacted mid-level staff in the County Department of Planning and Development to ask, hypothetically, if a non-conforming use would be subject to the County's zoning requirements were the federal government to lease it. *Compare* ECF No. 26 ("Gutierrez Decl.") ¶ 9, *with* Zeligman Decl. ¶ 12. Mr. Zeligman then conveyed a one-paragraph, peremptory GSA letter asserting "the property should receive any exemptions, immunities or other flexibility available for such Federal Government uses under local zoning, planning and permitting regulations." Gutierrez Decl., Ex. C.

From this limited exchange, Federal Defendants claim they "could have reasonably assumed that local authorities did not object to the project, and they could proceed without generating an additional written record of correspondence." Fed. Opp. at 19. They further assert that if the staffer had used the lease number provided in Mr. Zeligman's email and "searched on the website SAM.gov," he would have found "the GSA's public pre-solicitation, solicitation, and award records for the lease in question." *Id*. at 18. Regardless, Federal Defendants' faulty assumptions cannot

convert this minor interaction, which ultimately sought to foreclose local input, into federal compliance with the ICA. These arguments demonstrate, at best, a misunderstanding of the ICA. It is Federal Defendants—not a private party with which Federal Defendants had no agency relationship at the time—who were required to "provide opportunities for consultation and communication and to make efforts to accommodate state and local concerns." *Azzolina v. USPS*, 602 F. Supp. 859, 863 (D.N.J. 1985). What Federal Defendants effectively argue is that a prospective bidder on a federal contract, prior to even owning the property in question, can conduct outreach on behalf of the Federal Government sufficient to satisfy the ICA. Allowing any private party that is potentially considering bidding on a federal project to satisfy the federal government's obligations under the ICA by making a singular contact with one individual in one affected state or local agency would render the ICA meaningless and is contrary to the law. *See, e.g.*, *City of Waltham*, 11 F.3d at 244 (noting 12 meetings with local officials over three years); *see also Vill. of Palatine v. USPS*, 742 F. Supp. 1377, 1397 (N.D. Ill. 1990) (noting 11 meetings with multiple agencies and efforts to accommodate concerns and examine other sites); *Clinton Twp.*, 638 F. Supp. at 765 (noting multiple contacts with several agencies over two years); *Bergen County v. Dole*, 620 F. Supp. 1009, 1065 (D.N.J. 1985) (finding record replete with documentation of correspondence and conferences with "all concerned local, state, regional and federal agencies and citizen groups"). Moreover, consideration of local and state viewpoints on a project, as required by the ICA, is dependent on the federal government's provision of meaningful and accurate project information to local, regional, and state stakeholders—something which did not occur here. 47 Fed. Reg. 30,959 (July 14, 1982) (noting communication with State and local elected officials shall "explain specific plans and actions"). The ICA is an affirmative mandate on *federal* agencies; it does not impose—as Defendants would have it—an obligation for *local* and *state* agencies to follow a trail of breadcrumbs.

ECG6's brief interaction does not satisfy Federal Defendants' ICA obligations. Moreover, although it would not have cured the ICA violation, ECG6's communication does not even come close to following the County's required processes for requesting official interpretation of zoning requirements, *see* County of Santa Clara Zoning Ordinance §§ 1.20.040(A), 2.10.020(A), which

seems to have been the sole purpose of its communication. And zoning is just one of many requirements involved in formal review of a project, about which Mr. Zeligman did not inquire. *See id.* § 1.20.040(D) (noting the Zoning Ordinance is just one of "many other laws, regulations, and ordinances that apply to land use, development, and construction activities," which must also be followed). Further distancing ECG6's interaction from potential ICA consultation, it occurred before ECG6 submitted a bid to the Federal Government, before Federal Defendants chose the Holsclaw Property for the Project, and before Defendants entered into any contractual relationship. And to the extent Defendants now assert the federal government has no ICA duties with respect to the property until *ECG6*'s construction is complete, it is incongruous to also argue that ECG6's zoning inquiry prior to its bid being accepted somehow meets Federal Defendants' notice and consultation requirements on their behalf.

But Federal Defendants' emphasis on the informal exchange between ECG6 and a single County staffer is a misdirection. Defendants indisputably failed to engage with Plaintiff State's Single Point of Contact (SPOC), which is the State Clearinghouse, as demanded by EO 12372, designated by State regulation, and recognized by federal regulation. *See* ECF No. 31 ¶ 6; *see also* Cal. Gov't Code § 65040.10; Off. of Mgmt. & Budget, Intergovernmental Review (SPOC List) 1 (July 2026) https://www.whitehouse.gov/wp-content/uploads/2026/07/IntergovernmentalReviewSPOC_List_2026.pdf (providing the current list of SPOCs). That failure alone shows Plaintiffs are likely to prevail and is sufficient for an injunction to issue.

Federal Defendants cannot seek refuge in *Village of Palatine*, which did not involve a failure to consult with a SPOC. *See* 742 F. Supp. at 1397. Rather, it concerned the Postal Service's failure to provide a written explanation for not accommodating SPOC concerns after consultation—an explanation required only by Postal Service regulations. *Id*. Federal Defendants' duty to consult with the SPOC here, in contrast, is imposed by EO 12372 itself. Nor can Federal Defendants rely on *Clinton Township*, where the Postal Service had so many meetings with different agency officials that the failure to send a particular form was deemed de minimis. *See* 638 F. Supp. at 765–66.

Rather than consult Plaintiffs, Federal Defendants rebuffed Plaintiffs' multiple attempts to

engage. Indeed, after ECG6 had entered an agency relationship with Federal Defendants by signing the lease, ECG6 and Federal Defendants declined to respond to information requests from two County offices and one State office on a broader range of issues than the specific zoning question underlying ECG6's single contact with the County Planning staffer. ECF No. 32 ("Tsang Decl.") ¶¶ 5–6 (noting the insufficient documents supplied for a water system permit notwithstanding requests); ECF No. 30 ¶ 27 (noting an unsuccessful attempt to gain consent to inspect the Holsclaw Property); ECF No. 1 ¶ 127 (noting an unsuccessful attempt to have ECG6 complete an Agricultural Survey Questionnaire about the Holsclaw Property). And Defendants even declined to acknowledge to the media the existence of the Holsclaw Property as a site for ICE until presented with their own blueprints—which they had kept from Plaintiffs and the public—in an article published by a news outlet. *Compare* ECF No. 29-6, *with* ECF No. 27-1. Federal Defendants provide no explanation for any of these failures and wave away the fact of their apparent willingness to consult with state and local officials in New Hampshire and Maryland. Their assertion that Plaintiffs' views "might still be accommodated" in the future once the Project has already been designed and constructed, Fed. Opp. at 20, is cold comfort—and an outright violation of the letter and intent of the law. Only an injunction will address this harm.

**II. Plaintiffs Have Established Irreparable Harm Absent an Injunction.**

Plaintiffs have met their burden to "demonstrate that irreparable injury is likely in the absence of an injunction," *see Winter*, 555 U.S. at 22 (emphasis omitted), through evidence of the many imminent and substantial environmental harms resulting from Defendants' actions, Mot. at 26–30, which by their nature are irreparable. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014); *see also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Rather than present any evidence responding to Plaintiffs' evidence of harms, Defendants misrepresent the scope of the Project, claiming that construction is limited to interior alterations and that the facility will be used by far fewer people than it is designed to hold. ECG6 Opp. at 9–10; Fed. Opp. at 21. Defendants otherwise dismiss Plaintiffs' claims on the basis that their lease agreement requires them to eventually comply with state and federal hazardous materials laws. ECG6 Opp. at 9; Fed. Opp. at 20. These arguments

distract rather than detract from Plaintiffs' showing of irreparable harm.

First, as Defendants know, the Project is not limited to interior demolition in either design or reality. While Defendants have not submitted their plans to Plaintiffs or the Court, the publicly available construction plans clearly show soil-disturbing exterior work for the proposed parking area that will pave over part of the onsite wastewater treatment system, for potential connection to a sewer line (which does not actually exist), and for unidentified "sanitary/septic waste management" that is to be "determined during construction." Haghighi Decl. ¶ 17. In fact, Defendants have *already* performed extensive exterior work by digging trenches from the facility to the existing septic system, likely in an attempt to accommodate the additional wastewater flows that Plaintiffs have described. Haghighi Reply Decl. ¶¶ 2–3 & Ex. A. These ongoing soil-disturbing activities are exactly the type that Plaintiffs have established will cause irreparable harm absent an injunction. Mot. at 26–30; ECF No. 30 ¶¶ 25, 28. Defendant ECG6 does not address, and Federal Defendants summarily dismiss without a modicum of evidence, Plaintiffs' established facts about the risks to sensitive species and waterways from excavating potentially contaminated soil, Fed. Opp. at 21, which constitute irreparable harms under NEPA. *See Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874, 913–14 (N.D. Cal. 2006) (irreparable injury "consists of the *added risk* to the environment" that results from failure to comply with NEPA (quoting *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989))). Instead, Defendants ask the Court to ignore the clear evidence of what is occurring at the site.

Because Plaintiffs have established imminent and irreparable harms arising from the construction of the facility, Mot. at 27, they are entitled to preliminary injunctive relief irrespective of the scale at which the facility will actually operate—a scale which is apparently unknown even to Defendants. *See, e.g.*, Bayardo Decl. ¶ 13 ("ERO will not be able to determine the maximum occupancy for the Gilroy facility hold room until work is completed and inspected."). Nonetheless, the harms that will arise from the imminent operation of the facility provide an additional basis for preliminary relief. Defendants argue Plaintiffs' asserted harms are based on "false assumptions" that the property will be used by up to 150 detainees. ECG6 Opp. at 10; Fed. Opp. at 21. Those "assumptions" about operational capacity are not Plaintiffs'—they are based on *Federal Defendants'*

*own* plans, which show six holding rooms, ECF No. 27-1 at 13, and *Federal Defendants' own* design guidelines, which establish that, based on their size, these six rooms are designed to hold up to 150 detainees. ICE Facility Design Guide at 6–11. Notably, ECG6's own records expressly state that the facility would hold up to 100 detainees, not including personnel or visitors. ECF No. 54-3 at 32. And this estimate was provided in 2022 before a slew of immigration policy changes took effect that have dramatically increased immigration detention, often in excess of capacity. Mot. at 16.

Tellingly, Federal Defendants do not repeat ECG6's claim—or make any assertion—that detainees will not be held overnight. And their lease certainly does not prevent overnight detention. ECF No. 32-1 at 36, § 6.01(A) (giving ICE access "*at all times*" (emphasis added)). The most ICE can offer as "[t]he best current estimate" is that "approximately" 50 personnel and "approximately" 10 detainees "might ordinarily" be held at the facility, "though the . . . maximum capacity may be above that level," and "[t]he capacity of the hold room area will be determined based on applicable space and standards requirements," which they note may change over time. Bayardo Decl. ¶¶ 13–14. These numbers are in addition to "approximately" 60 members of the public who "might" be present. *Id.* ¶ 13. ICE is also careful to add, "ERO will not be able to determine the maximum occupancy for the Gilroy facility hold room until work is completed and inspected." *Id.* Federal Defendants' brief further qualifies the detainee number provided is an "average," not the maximum. Fed. Opp. at 23. The only thing that is clear from Federal Defendants' statements is they do not know, or will not say, how many people will actually be held at this facility. But even using Defendants' own conservative numbers—which do not reflect the reality that ERO facilities are routinely overcrowded, *see* Mot. at 16—up to 100 detainees or an average of 120 people will be using the facility at any given time. *See* ECF No. 54-3 at 32 (ICE's 2022 representation to ECG6 that facility will hold up to 100 detainees); *see also* Bayardo Decl. ¶¶ 13–14 (ICE's current approximations that add up to 120 people). This more than validates Plaintiffs' estimates. Critically, septic system requirements are based on *maximum* use, not minimum; thus, how *few* people a facility may hold does not determine septic size and capacity. *See* County of Santa Clara Ordinance Code § B11-66 (regulation based on "peak" wastewater flow). Given that Plaintiffs have established even six detainees would overwhelm the existing septic system, Mot. at 21, 29; Haghighi

Decl. ¶ 11, Defendants' argument simply has no merit.

Defendants also suggest the lease will eliminate Plaintiffs' harm because it requires compliance with federal and state hazardous materials laws. ECG6 Opp. at 9–11; Fed. Opp. at 20. But Defendants refuse to acknowledge what the evidence shows: they are *already* in violation of these laws. ECF No. 30 ¶ 25. Plaintiffs enforce these laws and are the regulatory authorities to which Defendants would be reporting if they were complying. *Id.* ¶ 5. Notably, Defendants claim compliance without proffering any evidence to demonstrate it. ECG6's conclusory statement that the environmental report it commissioned found "chemicals" were "within the applicable regulatory limits"—without providing the report, sampling results, or the relevant regulatory limits—offers no assurance that hazardous waste and contaminated soil are being properly handled. *See* ECG6 Opp. at 11.[2] In any event, it is Plaintiffs, not Defendants, that determine whether an entity is complying with California Health and Safety Code requirements for hazardous materials registration, reporting, permitting, handling, and disposal. As Plaintiffs have demonstrated, there is no evidence Defendants have even attempted to comply with these requirements for the Project. ECF No. 30 ¶¶ 20–21.

Recognizing this point, Defendants turn next to projection, pondering why Plaintiffs have not themselves addressed the hazardous materials. Fed. Opp. at 21; ECG6 Opp. at 11–12. But since the County learned of active demolition and construction at the Holsclaw Property earlier this year—activities that precipitously changed the risk profile of the site, which had, to the County's knowledge, been left unoccupied and undisturbed since the prior use—County inspectors have in fact been attempting to inspect the property. ECF No. 30 ¶ 27. Contrary to Defendants' assurances they will comply with hazardous materials law, ECG6 has not even granted access to the inspectors.

[2] Upon learning from ECG6's brief that it used AEI Consultants to survey the site, the County verified AEI submitted a public records request to the County for hazardous materials records pertaining to the Holsclaw Property. The County provided AEI the requested records, which included the inspection reports showing the *exact* releases and potential releases that support Plaintiffs' urgency in requesting preliminary relief. Decl. of Tanaya Farahani in Supp. of Pls.' Reply ¶¶ 2–3. ECG6 was, at a minimum, on notice of the Holsclaw Property's hazardous materials risk and the need to follow its own lease terms, which require compliance with federal, state, and local hazardous materials law.

*Id*.

ECG6 similarly dismisses Plaintiffs' wastewater-related harms with the suggestion that "[a]ny required changes to ensure that the wastewater treatment system operates within all regulatory limits can be easily accommodated." ECG6 Opp. at 10. Here again, Plaintiffs are the regulators that determine regulatory compliance, and again, Defendants fail to acknowledge they are *already* not meeting State and County regulatory requirements. *See* Tsang Decl. ¶¶ 2–3, 5 (describing state law requirements for operating a public water system that have not been met); *see also* Haghighi Decl. ¶¶ 14–16 (describing pre-construction permitting requirements for septic system upgrades that have not been met). In fact, a septic system that is properly sized for Defendants' proposed use may not be feasible on the site at all, Haghighi Decl. ¶ 11, which is precisely why state and local law require designs to be approved before construction begins, *id.* ¶¶ 14–15. *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970–71 (9th Cir. 2003) (noting the purpose of NEPA is to ensure federal agencies make informed decisions). If Defendants were committed to "accommodating" regulatory compliance, as they claim to be, they would have sought regulatory clearance from Plaintiffs *before* developing the Holsclaw Property, instead of evading regulatory review and now merely contemplating potential future compliance.

Defendants conceal their plans and stymie efforts to glean information, while asserting Plaintiffs cannot show clear evidence of harm. Even now, Defendants argue they have no obligation to inform Plaintiffs or the public about this Project. Fed. Opp. at 13. When Defendants' claims are considered in the context of their actions, it is clear they are trying to shift the blame by holding Plaintiffs responsible for Defendants' own failures to provide information that Plaintiffs sought. Regardless, Plaintiffs have established irreparable harm.

## III. The Balance of Equities Leans Sharply in Favor of an Injunction.

As set forth in Plaintiffs' Motion, the public interest and the balance of equities overwhelmingly favor Plaintiffs. Mot. at 30–31. Defendants' opposition attempts to tip the balance in their favor with vague and speculative harms that pale in comparison to Plaintiffs' concrete and immediate harms and, in Federal Defendants' case, by skewing the legal standard. In fact, an injunction here would not harm Defendants; it would simply maintain the status quo and prevent

serious and irreparable harm and impairment of the public interest while the Court evaluates the merits of this case. *See Maryland v. Mullin*, 831 F. Supp. 3d at 376. Federal Defendants make the broad assertion that where a party is a federal agency, the public interest automatically weighs in favor of that agency's decision. Fed. Opp. at 22. This is false; there is no thumb on the scale in favor of federal agencies, particularly when state and local interests are on the other side. Federal Defendants provide no authority for any such presumption; the case they cite holds no such thing. *Nken v. Holder* addresses the standards for staying an individual's deportation pending judicial review, not for preliminary injunctions sought by state and local government entities. *See* 556 U.S. 418, 435–36 (2009). It does not hold that the balance of harms weighs in favor of the federal government whenever it is a party.

Rather, courts assess the balance of harms and public interest on a case-by-case basis. *See Aurora World, Inc. v. Ty Inc.*, 719 F. Supp. 2d 1115, 1169 (C.D. Cal. 2009) ("In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." (quoting *Amoco*, 480 U.S. at 542)); *see also California v. U.S. Dep't of Agric.*, 800 F. Supp. 3d 1015, 1029 (N.D. Cal. 2025) (balancing the hardships on the specific facts of the case and finding the plaintiff States' interests outweighed those of the federal agency defendant). And courts regularly find the balance of harms favors state and local entities when enjoining federal defendants. *See, e.g.*, *City & County of San Francisco v. Trump*, 783 F. Supp. 3d 1148 (N.D. Cal. 2025); *see also County of Santa Clara v. Noem*, 815 F. Supp. 3d 979 (N.D. Cal. 2025), *appeal filed*, No. 26-402 (9th Cir. Jan. 20, 2026). None of these cases conflated the federal government's convenience with the public interest. When federal action is alleged to violate federal law, as here, "the combined balance of equities and public interest generally weighs in favor of the plaintiffs." *M-J-M-A- v. Hermosillo*, 822 F. Supp. 3d 1147, 1183–84 (D. Or. 2026).

As a second line of defense, Federal Defendants proffer a straw man, arguing the Court may not "abandon" the balance of harms analysis simply because an environmental injury is at issue. Fed. Opp. at 22. But Plaintiffs do not ask the Court to abandon this analysis; Plaintiffs rigorously engage in the balance of harms analysis, demonstrating it clearly weighs in Plaintiffs' favor.

Federal Defendants offer the general public interest in efficient enforcement of immigration laws, pointing to the convenience of the Holsclaw Property's location. Fed. Opp. at 23–24. But the Holsclaw Property is not currently being used for immigration enforcement, or any other immigration-related purpose, and the injunction merely maintains that status quo. Thus, the preliminary injunction sought would neither interrupt, nor compel any change to, any immigration enforcement operations. *See*, *e.g.*, *Centro Legal de la Raza v. Exec. Off. for Immigr. Rev*., 524 F. Supp. 3d 919, 950 (N.D. Cal. 2021) (enjoining immigration procedural rule to maintain the status quo); *see also Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1148 (S.D. Cal. 2018), *modified by* 330 F.R.D. 284 (S.D. Cal. 2019) (granting injunction where enjoining family separation would not impair the government's ability to enforce immigration laws); *Mullin*, 831 F. Supp. 3d at 376 (preliminarily enjoining the construction of an ICE facility where it would "not change how [Federal] Defendants are enforcing" immigration laws but would merely "preserve the status quo").

Federal Defendants conjure a variety of speculative harms based on potential benefits of the Project once complete. *See* Bayardo Decl. ¶¶ 10, 16; Fed. Opp. at 18–19. But these hypothetical benefits ignore that the injunction would only maintain, not change, the status quo. In Federal Defendants' own words, if the Project is enjoined, they "would be forced to *continue operating*" as they have been. Bayardo Decl. ¶ 16 (emphasis added). It necessarily follows that operations will remain essentially the same under an injunction. But Federal Defendants go on to claim an injunction will somehow strain their operations and reduce their ability to enforce the law by leading to increased transport times and requiring more officers to be taken away from other duties. *Id.*; *see also* Fed. Opp. at 23–24. They never explain how maintenance of the status quo could cause any such changes. Nor do they explain how continuing to operate as they currently are—with four nearby ICE facilities, *see* Bayardo Decl. ¶ 8—could alter their operations for the worse or harm the public interest in any way. Even if they base any alleged harms on the termination of the Morgan Hill lease, *see* Fed. Opp. at 7, 23, which is not proffered or clearly articulated in their response or declarations, Federal Defendants never explain why the Morgan Hill lease cannot be renewed, either temporarily during the pendency of an injunction, or permanently. Finally, Federal Defendants' argument that the Project will better support local noncitizens, in addition to being purely

hypothetical and detached from maintenance of the status quo, rings hollow in light of the amicus curiae brief submitted by local cities and counties, which provides data to the contrary. *See generally* ECF Nos. 45, 49.

Because the requested injunction would maintain the status quo and not impede immigration enforcement, the balance of harms and the public interest tip away from Federal Defendants and in favor of Plaintiffs. *See Ms. L.*, 310 F. Supp. 3d at 1148 (granting injunction where federal agency defendants could not substantiate alleged harm to immigration enforcement).

Similarly, ECG6 offers only speculative harms to its bottom line to counter the concrete and immediate harms demonstrated by Plaintiffs. ECG6 claims it will suffer "catastrophic" financial losses from an injunction maintaining the status quo. ECG6 Opp. at 13. But while a court may consider economic harms in the balance of harms analysis, a critical limitation exists: self-inflicted wounds, particularly those that are foreseeable, undermine a party's claims of harm. *See WHIC LLC v. NextGen Lab'ys, Inc.*, 341 F. Supp. 3d 1147, 1166 (D. Haw. 2018) (balance of harms favored plaintiff where only harm to defendants from injunction stemmed from defendants' "own improper actions"); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (same). ECG6 entered into a lease with Federal Defendants that, at a minimum, runs afoul of the nearly 60-year-old contract with the County under the Williamson Act that restricts the use of the land to agricultural purposes. ECF No. 1 ¶ 17. By ECG6's own admission, it was aware that Federal Defendants planned for a "4,000 [square-foot] Detention Center," Zeligman Decl. ¶ 8—a use of the property that is patently incompatible with the agricultural restrictions on the land. Any economic harms from entering into and failing to adhere to the requirements of this invalid leasing arrangement are self-inflicted by ECG6 and cannot constitute irreparable injury or outweigh the harms from Defendants' moving forward with this Project before adjudication of Plaintiffs' claims.

Moreover, even if ECG6's harms had not been self-inflicted, they are vague, speculative, and cannot weigh more heavily than the harms to Plaintiffs and the environment. ECG6 predicts that it will be harmed by having to field phone calls from concerned parties, that it will suffer from lenders being "concerned" and other "cold shoulder" effects, and that the lawsuit "may be" considered a default event for its loan. ECG6 Opp. at 13. These harms are hypothetical and predicated on a

specific timeframe for the Project's completion, before the necessary NEPA review or ICA consultation have taken place. Thus, they put the cart before the horse and amount to speculation. These harms cannot compare to those Plaintiffs established with concrete evidence. *See* Mot. at 26–30; *see also supra* Section II. And "when environmental injury is 'sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.'" *Sierra Club v. U.S. Forest Serv*., 843 F.2d 1190, 1195 (9th Cir. 1988) (quoting *Amoco*, 480 U.S. at 545). Defendants' NEPA and ICA violations underscore the public interest in pausing this Project until the merits of this case can be decided. Allowing the Project to move forward commits Defendants to the Project as planned, eviscerating the public's interest in the consultation and environmental harm reduction purposes of the ICA and NEPA. *See Marsh*, 872 F.2d at 500 ("[T]he harm consists of the added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment." (emphasis omitted)).

Thus, the balance of the concrete harms established by Plaintiffs, and the public interest in maintaining the status quo to prevent further harms, weighs sharply against the vague and speculative harms alleged by Defendants and warrants injunctive relief. *See Se. Alaska Conservation Council v. U.S. Forest Serv*., 413 F. Supp. 3d 973, 985 (D. Alaska 2019) (holding the balance of harms "tips sharply in Plaintiffs' favor" where a preliminary injunction would preserve the status quo and the plaintiffs alleged irreparable environmental harm); *see also Ms. L.*, 310 F. Supp. 3d at 1148.

**IV. The Court Must Enjoin Both ECG6 and Federal Defendants.**

ECG6 wrongly claims it is not a proper NEPA defendant so the Court cannot enjoin it. ECG6 Opp. at 7–8. Whether ECG6 has "*independent* liability for violations of NEPA" is beside the point for purposes of an injunction. *See id*. at 8 (emphasis added). ECG6 and Federal Defendants' actions are "sufficiently interrelated to constitute a single federal action for NEPA purposes." *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1397 (9th Cir. 1992) (cleaned up); *see also Sierra Club v. U.S. Fish & Wildlife Serv.*, 235 F. Supp. 2d 1109, 1123 (D. Or. 2002) (enjoining non-federal defendant). ECG6's attempts to distinguish these cases, ECG6 Opp. at 8, are unsupported, as neither

holding turned on the defendant's governmental status. The challenged action involves ECG6's development of the Holsclaw Property exclusively for the Federal Defendants' purposes and with their authorization, plans, and funds.

Regardless, ECG6 does not dispute that Rule 65(d) of the Federal Rules of Civil Procedure provides an independent basis for the Court to enjoin it. Mot. at 17 n.3; *see* Fed. R. Civ. P. 65(d)(2)(B)–(C) (stating an injunction may issue against a party's "agents" or anyone "in active concert or participation with" the party, whether named or not); *see also Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945) (noting Rule 65(d) exists to stop enjoined parties from evading injunctions through third-party "aiders and abettors"). The lease requires ECG6 to develop the Holsclaw Property for the benefit of Federal Defendants, to their specifications, and only after receiving their notice to proceed. *See* ECF No. 32-1, §§ 1.18, 3.02–3.53, 4.01–4.10 (construction schedule); ECF No. 54-3, Ex. E, §§ 7.08, 7.10 (authorizing ECG6 to proceed with, and payment for, construction). This is straightforward federal support and shows ECG6 is plainly in "active concert" with Federal Defendants. *See Al Otro Lado v. Wolf*, 497 F. Supp. 3d 914, 930 n.4 (S.D. Cal. 2020) (noting "active concert or participation" is met by "purposeful acts done toward the same end"). Accordingly, an injunction against Federal Defendants under NEPA should reach ECG6 too.

**V. Defendant ECG6 Has Not Shown a Bond Is Appropriate in This Public Interest Case.**

As ECG6 concedes, courts have broad "discretion to dispense with the security requirement, or to request mere nominal security" where appropriate. *See Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985), *amended by* 775 F.2d 998 (9th Cir. 1985). Courts consider various factors when determining the "amount of security required, if any," *see Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999), *supplemented*, 236 F.3d 1115 (9th Cir. 2001), including the type of litigation at hand, the status of the parties, and whether the enjoined party presented sufficient evidence of harm.

First, the Court should not impose a bond because this is a public interest case brought under NEPA. *See City of South Pasadena v. Slater*, 56 F. Supp. 2d 1106, 1148 (C.D. Cal. 1999) (declining to impose bond in a NEPA case because "[c]ourts routinely impose either no bond or a minimal bond in public interest environmental cases"); *see also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d

1113, 1126 (9th Cir. 2005) (reiterating "long-standing precedent" in the Ninth Circuit that "*nominal* bonds [are] perfectly proper in public interest litigation" (emphasis added)). Here, Plaintiffs seek to enjoin Defendants from proceeding with a project that poses unexamined, and likely significant, environmental and public health harms. This case falls squarely within the realm of public interest where courts routinely dispense with any bond requirement or set nominal amounts. *See, e.g.*, *California v. Azuma Corp.*, No. 2:23-CV-00743, 2023 WL 5835794, at *14 (E.D. Cal. Sept. 8, 2023) (setting a nominal bond in a state government-initiated case that "implicated" the "strong public interest"), *aff'd*, No. 23-16200, 2024 WL 4131831 (9th Cir. Sept. 10, 2024); *see also Slater*, 56 F. Supp. 2d at 1148 (similar).

Second, ECG6 has failed to meet its "obligation of presenting evidence that a bond is needed." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003). ECG6's bare assertion that it would be "significantly harmed" as a business of "three friends" is insufficient. *See* ECG6 Opp. at 6, 15. Nor can ECG6's "strong sense" that it has suffered unquantifiable "cold shoulder effects" on its investment opportunities justify a bond. *See id.* at 13. This effect is, by ECG6's own admission, due to "[t]he lawsuit itself," *id.*, and cannot be due to an *injunction* that has *not yet* issued. *See Sionix Corp. v. Moorehead*, 299 F. Supp. 2d 1082, 1086 (S.D. Cal. 2003) ("Damages on an injunction bond are limited to those actually and proximately resulting from the effect of the *injunction itself*." (emphasis added)).

In its bid for an injunction bond, ECG6 presents itself as an underdog—a "private company that stands against the State." *See* ECG6 Opp. at 15. But ECG6 stands *alongside* a far mightier "juggernaut": the federal government.[3] *See id.* And in its own right, ECG6 is a private investment firm with at least nine properties subject to lucrative federal government contracts, *see* Zeligman Decl. ¶ 4—not at all similar to the "nonprofit environmental organization" *plaintiffs* "with limited resources" in *Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322, 322–23 (9th Cir. 1975), to whom

[3] Separately, it would not be appropriate to require a bond with respect to Federal Defendants, which have not requested one. *See Conn. Gen. Life*, 321 F.3d at 882 (explaining that courts dispense with the bond requirement where parties fail to request one); *see also City & County of San Francisco*, 783 F. Supp. 3d at 1203 ("It is highly unusual for the [federal] Government to request a bond.").

ECG6 likens itself. *See* ECG6 Opp. at 6, 15. The value of just one government lease—that of the Holsclaw Property—is over $26 million. *See* Zeligman Decl. ¶ 21. And under the lease agreement, ECG6 is entitled to an *additional* lump-sum payment of over $8.5 million once the Holsclaw Property is built to the federal government's specifications. *See id.* ¶ 32. These figures give context to ECG6's speculated costs, which reflect rent that would be *delayed* but not "lost" from an injunction requiring environmental review and intergovernmental consultation. *See id.* ¶¶ 34–36.

In any event, courts do not "set bonds that approximate actual damages." *Save Our Sonoran*, 408 F.3d at 1126. Critically, ECG6 cannot be harmed by delayed rent where it agreed to a lease that fully anticipates this precise risk. *See* ECF No. 32-1, §§ C, 4.10(e), 4.11 (indicating ECG6 agreed to having rental payments "commence" upon "acceptance" of the premises by the federal government, thereby assuming the risk of delayed or unpaid rent); *see also* Fed. Opp. at 17 (similar); *cf. WeBoost Media S.R.L. v. LookSmart Ltd.*, No. C-13-5304-SC, 2014 WL 824297, at *5 (N.D. Cal. Feb. 28, 2014) ("It is axiomatic that [absent contrary public policy] parties to a private agreement may allocate risks in any manner they may choose." (quoting *Reserve Ins. Co. v. Pisciotta*, 30 Cal. 3d 800, 814 (1982))). That ECG6's contracting partner is the federal government—subject to political winds, democratic input, and enhanced public scrutiny—is an investment risk of its own making, not a harm to be subsidized through a court's equitable powers.

Finally, given Defendants' blatant disregard for the basic procedural requirements of NEPA and the ICA, Plaintiffs' strong likelihood of success on the merits further "tips" the scale "in favor of a minimal bond or no bond at all." *See Van De Kamp*, 766 F.2d at 1326; *see also Earth Island Inst. v. U.S. Forest Serv.*, No. 2:05-CV-1608-MCE, 2006 WL 3359192, at *4 (E.D. Cal. Nov. 20, 2006) (similar). Plaintiffs request that the Court deny a bond. In the alternative, if the Court concludes a bond is appropriate here, Plaintiffs request that the amount be nominal.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to enter their proposed injunction and deny Defendant ECG6's request for a bond.

Dated: August 26, 2026

Respectfully submitted,

TONY LOPRESTI
County Counsel
KAVITA NARAYAN
Chief Assistant County Counsel
ELIZABETH G. PIANCA
Assistant County Counsel
MEREDITH A. JOHNSON
Lead Deputy County Counsel
SONIA N. WILLS
CRISTINA STELLA
RAJIV NARAYAN
Deputy County Counsels
LEILY ARZY
Litigation Fellow

By: *_/s/ Tony LoPresti_*
TONY LOPRESTI
County Counsel

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

Dated: August 26, 2026

ROB BONTA
Attorney General of California
ABIGAIL BLODGETT
Supervising Deputy Attorney General

*_/s/ Stacy Lau_*
STACY LAU
JESSICA DURNEY
ERIN GANAHL
ASHLEY WERNER
Deputy Attorneys General

Attorneys for Plaintiff
STATE OF CALIFORNIA

I, Matthew D. Zinn, hereby attest that each of the other signatories have concurred in the filing of this document.

Dated: August 26, 2026

SHUTE, MIHALY & WEINBERGER LLP

*_/s/ Matthew D. Zinn_*
WILLIAM J. WHITE
MATTHEW D. ZINN
CALEB E. HERSH
Attorneys for Plaintiff
COUNTY OF SANTA CLARA