United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COUNTY OF SANTA CLARA, et al.,

Plaintiffs,

v.

UNITED STATES IMMIGRATION & CUSTOMS ENFORCEMENT, et al.,

Defendants.

Case No. 26-cv-05604-EKL

**ORDER GRANTING PRELIMINARY INJUNCTION**

Re: Dkt. No. 24

Plaintiffs the State of California and the County of Santa Clara bring this action to require the Federal Government and a private developer to halt construction of an immigration enforcement and detainee holding facility in Gilroy, California – an agricultural hub known as the "garlic capital of the world." Among other claims, Plaintiffs contend that Defendants failed to analyze the potential environmental consequences of the construction and future use of the facility. Plaintiffs submit that environmental harms are likely because the site of the proposed holding facility was used for 30 years to conduct agricultural research that resulted in known hazardous waste violations. Plaintiffs seek a preliminary injunction to pause construction of the holding facility, thereby providing enough time to conduct a proper environmental review. *See* Mot. for Prelim. Inj., ECF No. 24 ("Mot."). Defendants oppose the motion. Although Defendants offer no proof that they conducted a meaningful environmental analysis before starting construction, they assert that the environmental risks are exaggerated and outweighed by the Federal Government's mission to enforce its immigration laws.

The Court reviewed the entire record and relevant legal authorities and heard argument on September 8, 2026. For the following reasons, the Court GRANTS Plaintiffs' motion for a preliminary injunction as set forth below.

## I. BACKGROUND

Although the public has only recently learned of it, the project challenged by this lawsuit has been contemplated for years. On December 22, 2020, the Government Services Administration ("GSA") – an agency responsible for managing and acquiring property for use by the Federal Government – posted a "pre-solicitation" notice indicating that GSA sought to lease office and detention space near San Jose, California. Zeligman Decl. Ex. A, ECF No. 54-3. Similar notices were published in 2021 and 2022, *see* Zeligman Decl. Ex. B, but the project was put on hold due to lack of funding, Larson Decl. Ex. 3 at 1, ECF No. 57-3. After funds became available, GSA posted a solicitation notice on August 9, 2024. Murillo Decl. Ex. 12, ECF No. 29-12. Through this process, GSA identified three properties as candidates for the facility, which would be operated by U.S. Immigration and Customs Enforcement ("ICE") – specifically, its Enforcement and Removal Operations ("ERO") division. Larson Decl. Ex. 3 at 3. One of the three properties, the Holsclaw Property in Gilroy, California, was ultimately selected as the site for ICE's immigrant detainee holding facility ("Gilroy Holding Facility").

Defendant ECG6 LLC ("ECG6") is the "corporate entity that holds and operates the Holsclaw Property." ECG6 Opp. at 6, ECF No. 54. ECG6 is an investment vehicle of Elmwood Capital Group, "a Beverly Hills-based real estate investment firm consisting of three friends whose business is to procure and lease properties (sometimes after modifying them to meet government requirements) to federal agencies." *Id.* Relevant here, ECG6 acquired the Holsclaw Property and entered into a lease with GSA in January 2025. Zeligman Decl. ¶ 5, ECF No. 54-2. Over the 20-year lease term, ECG6 may receive up to $26,551,532.00 in rent payments from GSA. *Id.* ¶ 21; *see also* Tsang Decl. Ex. 1 at 1, 5, ECF No. 32-1 ("GSA Lease"). The lease was amended in March 2026 to approve certain construction costs, for which ECG6 will be reimbursed $8,656,150.69 "once the property is turned over to the government and is inspected." Zeligman Decl. ¶ 23. The lease term begins once ECG6 completes this work to GSA's satisfaction. *Id.* ¶ 24; GSA Lease §§ 3.07(a), 4.11. On April 23, 2026, ECG6 began developing the Holsclaw Property. *See* Notice, ECF No. 65. ECG6 planned to complete work by January 2027, Zeligman Decl. ¶ 32, but it has not submitted any evidence that it can meet this target.

United States District Court
Northern District of California

ICE plans to use the Holsclaw Property in part as a holding facility. A holding facility "contains hold rooms that are primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency." Arzy Decl. Ex. 3 § 3.2, ECF No. 34-3. Based on site plans obtained by the San José Spotlight, Plaintiffs allege that the facility will contain four small hold rooms and two larger ones that could hold up to 150 detainees in total. Compl. ¶¶ 132-133, ECF No. 1. Figures 1 and 2 are excerpts of ICE's facility design guide showing that the rooms feature benches and a lavatory with a "suicide resistant grab bar." Arzy Decl. Ex. 5, ECF No. 34-5.

**Figure 1: Small Holding Room**



United States District Court
Northern District of California

**Figure 2: Large Holding Room**




The ICE facility would host personnel, contractors, "individuals temporarily held in the hold room area, and members of the public who come to the site for interviews, check-ins, bond-related matters, attorney or family visits, or to deliver medication, property, or other necessary items." Bayardo Decl. ¶ 13, ECF No. 56. Defendants dispute that the facility could detain up to 150 people, but their counter-estimates are inconsistent and non-committal. ICE initially told ECG6 that the maximum detention capacity would be "fewer than 100" people, and that typically "fewer than 5" people would be detained on site. Zeligman Decl. ¶ 25 & Ex. F at 32-33, ECF No. 54-3. But now, ICE's "best current estimate" is that 60 members of the public, 50 personnel,

and approximately ten detainees might be present at the Gilroy Holding Facility "over the course of the day during normal operations." Bayardo Decl. ¶ 13. In sum, ICE expects the Gilroy Holding Facility to host at least 120 people over the course of a normal day once operations begin. However, the ICE representative who offers this estimate has "not personally visited the Gilroy site," and she concedes that ICE "will not be able to determine the maximum occupancy for the Gilroy facility hold room until work is completed and inspected." *Id.* ¶¶ 7, 13. Thus, the number of detainees may be higher than currently estimated.

The Holsclaw Property was never previously used to hold immigrant detainees. Instead, the site was used to conduct agricultural research. *See* Zeligman Decl. ¶ 11 (explaining that the Holsclaw Property contains a "laboratory building, warehouse, and chemical storage building, as well as several greenhouses"). From 1993 to 2023, several agricultural research companies operated on the site, including Syngenta Seeds and its affiliates. Pierce Decl. ¶ 9, ECF No. 30; Gutierrez Decl. ¶ 8, ECF No. 26; *see* Gutierrez Decl. Ex. B at 2-3, ECF No. 26-2 (agricultural research permit). These agricultural research companies were permitted by the County as "hazardous waste generator facilities" due to their management of toxic chemicals including "pesticides such as thiram and Physan, chemicals used in DNA sequencing and extraction such as Puregene and ethidium bromide, calcium hypochlorite, solvents, acids, alkaline cleaners, and other laboratory reagents." Pierce Decl. ¶¶ 10, 14-15 & Ex. D, ECF No. 30-4 (manifests of hazardous materials).

The County has documented numerous instances of hazardous material mismanagement at the Holsclaw Property. Balliet Decl. ¶ 7, ECF No. 25; Pierce Decl. ¶¶ 16-19. Inspections of the Holsclaw Property conducted by the County's Public Health Department revealed "multiple violations indicating a release or threat of release of hazardous materials or waste." Balliet Decl. ¶¶ 2, 6, 7. These violations included "unpermitted discharges of laboratory and process wastes into sinks and drains connected to the onsite septic system." *Id.* ¶ 7. Syngenta Seeds acknowledged that a "key problem" affecting its compliance with hazardous waste laws at the Holsclaw Property was the "lack of internal training on the handling and disposal of hazardous

United States District Court
Northern District of California

waste."[1] Balliet Decl. Ex. C, ECF No. 25-3. In 2023, the County discovered that the agricultural research companies operating at the Holsclaw Property had "vacated the site." Pierce Decl. ¶ 22. The companies failed to complete facility closure requirements that are "necessary to ensure that all remaining equipment, structures, and soil were properly decontaminated and that all hazardous wastes and hazardous waste contaminants were properly removed." *Id.* ¶¶ 11, 21.

In late April and early May 2026, a County investigator observed demolition and construction work at the Holsclaw Property. Murillo Decl. ¶¶ 9-10, 14-23, ECF No. 29. On June 10, 2026, after learning that the Holsclaw Property was being developed into an immigrant detainee holding facility, the County "attempted to access the Holsclaw Property for an inspection" given the site's history of hazardous waste violations. Pierce Decl. ¶ 27. ECG6 refused access "and referred [County] staff to the federal General Services [Administration] and Department of Homeland Security to coordinate any inspection." *Id.*; *see also* Pierce Decl. Ex. I, ECF No. 30-9 (correspondence from ECG6 denying the County permission to enter); Murillo Decl. ¶¶ 9, 21, 30 (explaining that ECG6 used privacy fences to block access to the Holsclaw Property). To date, Defendants have not allowed Plaintiffs to inspect the Holsclaw Property.

Based on known hazardous waste violations at the Holsclaw Property, and the agricultural research companies' failure to complete site closure requirements, the County's Public Health Department has concluded that "the contamination of structures, soils, the septic system, and groundwater at the Holsclaw Property is likely if construction continues before the hazards are assessed and/or addressed." Balliet Decl. ¶ 8; *see also* Pierce Decl. ¶ 28. Specifically, construction activities such as "demolition, interior gutting, excavation, and rebuilding" are "likely to disturb potentially contaminated structures, concrete foundations, soils, and septic components, creating a risk of hazardous substance releases at a facility that handled numerous hazardous materials for decades." Balliet Decl. ¶ 11.

---

[1] In connection with another facility in Gilroy, Syngenta Seeds was prosecuted for various hazardous waste violations, including illegal disposal "of more than 70,000 pounds of pesticide treated seeds" and "failure to train employees." Balliet Decl. ¶ 9. Syngenta Seeds stipulated to a judgment and paid a fine to resolve the charges. Balliet Decl. Ex. E at 5, 12-17, ECF No. 25-5.

United States District Court
Northern District of California

On June 10, 2026, Plaintiffs filed the complaint in this action against ECG6, as well as ICE and its acting Director, the U.S. Department of Homeland Security ("DHS") and its Secretary, and GSA and its Administrator (together, "Federal Defendants"). Compl. ¶¶ 25-31. Plaintiffs assert violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; the Immigration and Nationality Act, 8 U.S.C. § 1231(g)(1)-(2); the Intergovernmental Cooperation Act ("ICA"), 31 U.S.C. § 6506(c); and the Williamson Act, Cal. Gov't Code § 51200 *et seq.* Compl. ¶¶ 170-223. On June 24, 2026, Plaintiffs moved for a preliminary injunction on their NEPA and ICA claims. The parties agreed to an extended briefing schedule and Defendants paused "construction, demolition, and development activities, except for such activities necessary to address immediate safety concerns, at the Holsclaw Property until September 9, 2026 or until further order from the Court." Stip. & Order at 3, ECF No. 41. At the preliminary injunction hearing, the parties extended the pause through September 15, 2026. Min. Entry, ECF No. 64.

## II. LEGAL STANDARD

In order to obtain a preliminary injunction, a plaintiff must establish that: (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) the "balance of equities tips in his favor," and (4) the "injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "Where, as here, the party opposing the injunctive relief is a government entity, the third and fourth factors – the balance of equities and the public interest – merge." *Hubbard v. City of San Diego*, 139 F.4th 843, 854 (9th Cir. 2025) (citation modified).

## III. DISCUSSION

Based on the record before the Court, Plaintiffs are likely to succeed on the merits of their claim that the Federal Defendants failed to conduct the required environmental analysis under NEPA before undertaking the Gilroy Holding Facility project.[2] Plaintiffs have also shown that

[2] Because Plaintiffs have shown that they are likely to succeed on their NEPA claim, the Court does not reach the ICA claim at this stage. *See Museum of Handcar Tech. LLC v. Transp. Agency for Monterey Cnty.*, 778 F. Supp. 3d 1065, 1079 n.8 (N.D. Cal. 2025) (A plaintiff "does not need to show a likelihood of success on *every* claim in order to obtain a preliminary injunction.").

irreparable environmental harms are likely to result if construction proceeds without considering the environmental risks. Because Plaintiffs have identified specific irreparable environmental harms, and Defendants have not shown how a delay of construction would materially impede immigration enforcement or cause substantial economic hardship, the balance of the equities and the public interest also favor an injunction.

### A. Likelihood of Success

#### 1. Statutory Framework

NEPA requires "the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331. "NEPA's dual mission is thus to generate federal attention to environmental concerns and to reveal that federal consideration for public scrutiny." *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001) (citation modified). "NEPA facilitates informed decisionmaking by requiring agencies to consider the environmental impacts of their actions." *Friends of Animals v. Burgum*, 164 F.4th 738, 749-50 (9th Cir. 2026); *see also Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,* 141 F.4th 976, 993 (9th Cir. 2025) (NEPA "requires the federal government to take a hard look at the environmental consequences before acting." (citation modified)). "Informed public participation in reviewing environmental impacts is essential to the proper functioning of NEPA." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 761 (9th Cir. 2014).

Before undertaking a "major Federal action,"[3] an agency must follow one of three paths to comply with NEPA: (1) prepare a robust environmental impact statement ("EIS"); (2) prepare a more streamlined environmental assessment ("EA"); or (3) invoke a categorical exclusion. *See* 42 U.S.C. § 4336; *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004). Where a proposed action would have a "reasonably foreseeable significant effect on the quality of the human

---

[3] It is presently uncontested that the Gilroy Holding Facility constitutes a "major Federal action" that triggers NEPA's requirements. *See* 42 U.S.C. § 4336e(10)(A) (defining "major Federal action" as an action "subject to substantial Federal control and responsibility"). The parties instead dispute the degree of environmental review that was required for the project.

environment," the agency proposing the action must prepare an EIS. 42 U.S.C. § 4336(b)(1). An EIS is a "detailed statement" analyzing the action's potentially significant environmental effects as well as a "reasonable range of alternatives" to the action. *Id.* §§ 4332(C), 4336(b)(1). By contrast, an EA is required when there is not a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of the effect is unknown. 42 U.S.C. § 4336(b)(2). An EA is a "concise public document" that provides evidence that helps determine whether an EIS is ultimately necessary. *Id.*; *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022). Regardless of whether the agency prepares an EIS or an EA, the document must: (1) be made publicly available; (2) be conducted prior to undertaking the action; and (3) consider alternatives to the proposed action. 42 U.S.C. §§ 4336(b), 4332(C); *see also Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005) ("The alternatives provision of NEPA applies whether an agency is preparing an EIS or an EA.").

An agency may forgo preparation of an EIS or EA if it invokes a valid categorical exclusion before undertaking the proposed action. *See* 42 U.S.C. § 4336(a)(2). A categorical exclusion is "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of [NEPA]." *Id.* § 4336e(1). "Categorical exclusions, by definition, are limited to situations where there is an insignificant or minor effect on the environment." *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999). Therefore, invoking a categorical exclusion is not proper if there are "extraordinary circumstances" indicating that a particular proposed action "may have a significant environmental effect, necessitating further environmental impact analysis." *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 781 (9th Cir. 2019) (citation modified); *see also* Arzy Decl. Ex. 4 § 5.2, ECF No. 34-4 ("GSA NEPA Desk Guide") (providing that some categorical exclusions cannot be applied where "extraordinary circumstances" exist). Ultimately, "[w]hen an agency decides to proceed with an action in the absence of an EA or EIS" by applying a categorical exclusion, "the agency must adequately explain its decision." *Alaska Ctr. for Env't*, 189 F.3d at 859.

Courts review an agency's compliance with NEPA under the standards set forth in the Administrative Procedure Act ("APA"). *Friends of Animals*, 164 F.4th at 746. Under the APA, an agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Friends of Animals*, 164 F.4th at 746 (citation modified). Ultimately, the question is "whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 180 (2025).

**2. Application to the Gilroy Holding Facility**

Here, Plaintiffs are likely to succeed on their claim that the Federal Defendants' conduct was arbitrary and capricious. The Federal Defendants did not prepare an EIS or an EA to comply with NEPA. Instead, GSA – the agency that leased the Holsclaw Property – merely completed a one-page "GSA Form 4002 (Automatic Categorical Exclusion NEPA Memo to File)" to invoke a categorical exclusion for the project. Larson Decl. ¶ 8, ECF No. 57. The only categorical exclusion that GSA invoked applies to the "[1] acquisition of space within an existing structure, either by purchase or lease, [2] where no change in the general type of use and [3] only minimal change from previous occupancy level is proposed." *Id.* ¶ 14; *see also* Larson Decl. Ex. 2, ECF No. 57-2. The one-page standard form does not explain how the Gilroy Holding Facility project satisfies these conditions, and it is facially implausible that the categorical exclusion applies here.

First, the Gilroy Holding Facility project is not an acquisition of space within an existing structure, but rather a substantial demolition and construction project to create a new space. The scope of the contemplated demolition and construction work is discussed in greater detail below. *See infra* Section III.B.1. Second, the use of the Holsclaw Property for "office and detention" purposes is a change in its general type of use given that it was previously used for agricultural

research and hazardous waste storage for 30 years.[4] Third, the planned occupancy of the Gilroy Holding Facility – now estimated at 120 people each day, on average – is a significant change compared to its prior occupancy of just 40 daytime staff. Reply at 11, ECF No. 60. ICE produced no evidence to support its implicit position that a ***threefold increase*** is the type of "minimal change" in occupancy level contemplated by the categorical exclusion.[5] The arbitrary and capricious standard of review is "deferential." *Env't Def. Ctr.*, 36 F.4th at 871; *see also Seven Cnty. Infrastructure Coal.*, 605 U.S. at 179 ("[T]he central principle of judicial review in NEPA cases is deference."). But here, the record is devoid of evidence that the Federal Defendants engaged in any reasoned decision-making or considered material facts necessary to invoke the categorical exclusion. Therefore, based on the dearth of the agency record alone, Plaintiffs are likely to succeed on the merits of their NEPA claim.

Even if the Gilroy Holding Facility project theoretically fit within this categorical exclusion, Plaintiffs are likely to establish that extraordinary circumstances precluded the Federal Defendants from relying on the exclusion. *See Ilano*, 928 F.3d at 781. Both DHS and GSA recognize that "potentially significant effect[s] on public health or safety" and compliance with "requirements to control hazardous or toxic substances" are extraordinary circumstances that preclude invocation of a categorical exclusion. Arzy Decl. Ex. 2 at V-5 to V-6, ECF No. 34-2 ("DHS NEPA Manual"); *see also* GSA NEPA Desk Guide §§ 5.2, 5.9. Plaintiffs have shown a

[4] Construction plans for the Gilroy Holding Facility include "six concrete-reinforced holding rooms for detainees with concrete benches, detainee processing areas, interview and visitation rooms, an armory for weapons and ammunition, and a tactical equipment storage room." Mot. at 14-15; *see* Haghighi Decl. Ex. A, ECF No. 27-1. The agricultural research facility did not have these types of rooms. At the preliminary injunction hearing, Defendants asserted that the construction plans are not final, but they did not identify any specific inaccuracy.

[5] The categorical exclusion form states that the proposed site was expected to host 75 *personnel*; it does not reflect the expected total occupancy of the site. Larson Decl. Ex. 2. The GSA representative who approved the categorical exclusion relied on this estimate to conclude that the project would not result in a "significant change from previous occupancy limits." Larson Decl. ¶ 12. But GSA fails to explain how the initial estimate of 75 personnel is an insignificant change compared to the prior occupancy of 40 staff. Moreover, according to the Federal Defendants' representations in this litigation, that estimate significantly understates the expected typical occupancy of the Gilroy Holding Facility. *See* Fed. Defs. Opp. at 1, 18, ECF No. 55; *see also* Bayardo Decl. ¶ 13 (ICE "will not be able to determine the maximum occupancy for the Gilroy facility hold room until work is completed and inspected.").

likelihood that these extraordinary circumstances are present here, but the Federal Defendants failed to consider them. For example, construction activities such as "land clearing, grading, vegetation removal, soil compaction, and new areas of concrete and asphalt" "will increase erosion, sedimentation, and runoff in Llagas Creek and significantly impact sensitive species." Yap Decl. ¶ 12, ECF No. 36; *see also* Hamilton Decl. ¶ 4, ECF No. 28; Env't Amici Br. at 9, ECF No. 47-1 ("Encroachment and over-aggressive removal and degradation of riparian areas have been identified as major drivers of declines in California's freshwater and anadromous fish."). The intensified use of the Holsclaw Property at the scale currently contemplated "could also strain the wastewater treatment infrastructure that is currently on site for existing agricultural operations, causing an increase in the potential for sewage overflows and wastewater runoff." Yap Decl. ¶ 14. "Sewage overflows pose a threat to human health and ecosystems. They can lead to increases in the presence of dangerous bacteria or pathogens, harsh chemicals used in cleaning and sanitation, nutrients like phosphorous and nitrogen (as ammonia) that can create conditions for eutrophication and harmful algal blooms, and other pollutant discharges." Env't Amici Br. at 9; *see also* Haghighi Decl. ¶ 12.

The Federal Defendants argue that they "reasonably determined that no extraordinary circumstances exist" because the lease requires ECG6 to "remove any hazardous waste encountered during demolition or construction 'in accordance with Federal and state laws and requirements concerning hazardous waste.'" Fed. Defs. Opp. at 9 (referencing ECG6's obligations under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA")). But at most this lease provision addresses potential *mitigation* of environmental risk; it does not satisfy NEPA's core requirement of assessing environmental risk *before* undertaking a project. Moreover, Defendants cite no authority for the proposition that a federal agency can fully outsource its NEPA compliance to a private developer. *Cf.* DHS NEPA Manual at IV-11 ("DHS remains fully responsible for NEPA activities performed by contractors[.]"). Nor is there any support for the proposition that a federal agency can determine that "no extraordinary circumstances exist" merely by imposing contractual obligations on a developer. *See* Fed. Defs.

Opp. at 9.[6] In any event, ECG6 disavows any involvement in the NEPA process. Zeligman Decl. ¶ 6 ("We have not for this lease or any of our previous leases participated in GSA's [NEPA] process."). Thus, the Federal Defendants have no legal or factual support for abdicating their NEPA compliance obligations.

In sum, Plaintiffs will likely succeed on their NEPA claim because the Federal Defendants invoked an inapposite categorical exclusion and failed to consider whether extraordinary circumstances required a more robust environmental review.

**B. Irreparable Harm**

To be irreparable, harm must be "imminent and not remote or speculative." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016). Typically, irreparable harms are not quantifiable, and thus "cannot be fully remedied with a financial award." *See Novedades Y Servicios, Inc. v. Fin. Crimes Enf. Network*, 181 F.4th 961, 977 (9th Cir. 2026). By contrast, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). However, "there is nothing in NEPA that allows courts considering injunctive relief to put their 'thumb on the scales'" in finding irreparable harm; rather, a plaintiff must still "demonstrate that irreparable injury is likely in the absence of an injunction" even if a NEPA violation is likely. *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1089 (9th Cir. 2015) (first quoting *Winter*, 555 U.S. at 22; and then quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010)).

---

[6] The Federal Defendants rely upon *City of Oberlin v. Federal Energy Regulatory Commission*, 937 F.3d 599, 610 (D.C. Cir. 2019). That case does not suggest that a federal agency may delegate NEPA compliance to a private developer. In *City of Oberlin*, one federal agency conducted a "thorough analysis" of a project's risks by considering another agency's relevant safety standards. *Id*. Here, the Federal Defendants have not conducted any analysis of environmental risks under NEPA. Instead, they rely on a contractual provision that requires ECG6 to comply with another environmental law (CERCLA), and there is no record that ECG6 has done so.

Here, Plaintiffs submitted extensive and largely unrebutted evidence identifying irreparable harms arising from both the construction of the Gilroy Holding Facility and its subsequent use by ICE. First, Plaintiffs have shown that hazardous materials are likely present on the Holsclaw Property, and ECG6's construction is likely to disturb these materials and cause them to spread into the environment. Second, Plaintiffs have established a likelihood of environmental harm because the existing septic system would be overburdened by the threefold increase in occupancy of the Holsclaw Property, which may result in toxic backflow or dispersal of hazardous materials into the environment.[7]

**1. Construction**

The record reflects many instances of mismanagement of hazardous waste at the Holsclaw Property. *See supra* Section I. Despite this troubling record, the Holsclaw Property never underwent the closure procedure required for facilities that store hazardous materials that is intended to minimize or eliminate the "threat to public safety" posed by "residual hazardous materials." Pierce Decl. ¶ 21. The closure process at Syngenta's other nearby facility was extensive, "including decontamination and decommissioning of the warehouse building, laboratory, seed wash area, the [above ground storage tank], and underground piping from the seed wash area to the [above ground storage tank]," but it still left behind residual contamination. Balliet Decl. ¶ 10. Because this process was never completed at the Holsclaw Property, "the County is unable to confirm the extent of contamination that may remain . . . and serious questions exist as to whether hazardous materials and hazardous wastes remain on site." Pierce Decl. ¶ 23. These questions persist to this day. The County, aware of the construction of the Gilroy Holding Facility and the long history of hazardous material mismanagement, attempted to inspect the Holsclaw Property on June 10, 2026, but was denied access. Pierce Decl. ¶ 27; Pierce Decl. Ex. I (reflecting that ECG6 denied access due to the pendency of this litigation). Accordingly, nothing in the record indicates that hazardous material concerns have abated.

[7] Given the risk to human health, Plaintiffs need not establish that the spread of hazardous materials may also harm sensitive species in the area. *See* Mot. at 29-30; *see also* Chappell Decl. ¶¶ 10-13 (identifying a series of sensitive and protected species that may be present within two miles of the Holsclaw Property); Hamilton Decl. ¶¶ 4-7 (same); Yap Decl. ¶¶ 5-6, 8-11 (same).

The record also reflects that ECG6's construction and demolition work, which was only temporarily paused due to this litigation, increases the risk of releasing hazardous materials into the environment. *See* Mot. at 28; Balliet Decl. ¶¶ 11-12; Pierce Decl. ¶ 28. Construction activities may include "land clearing, grading, vegetation removal, soil compaction, and new areas of concrete and asphalt, which will increase erosion, sedimentation, and runoff." Yap Decl. ¶ 12. Moreover, "demolition, interior gutting, excavation, and rebuilding" are "likely to disturb potentially contaminated structures, concrete foundations, soils, and septic components, creating a risk of hazardous substance releases." Balliet Decl. ¶ 11. It appears that construction has already begun in the same areas of the Holsclaw Property where hazardous materials were previously handled and improperly disposed. Pierce Decl. ¶¶ 26-27; *see also* Murillo Decl. ¶¶ 8-17, 22-23.

Defendants argue that the scope of construction work is limited, and they characterize the project as a simple "office move." This assertion is absurd and contradicted by the record.[8] Plaintiffs submitted evidence from a County investigator who observed heavy machinery on site, including a bulldozer moving concrete and other materials, and debris piles that are "consistent with demolition and construction work." Murillo Decl. ¶¶ 12, 15 & Exs. D-E, ECF Nos. 29-4, 29-5. Additionally, ICE's declarant concedes that "[t]he project is expected to involve renovation of some existing structures, demolition of some structures, and new construction to make the property suitable for ERO's intended use." Bayardo Decl. ¶ 15. ECG6 also acknowledges that the work includes "interior demolition and the removal of greenhouse space and addition of approximately 28 parking spaces." Zeligman Decl. ¶ 29. Finally, the fact that the lease amendment provides for an $8.6 million payment to ECG6 for "tenant improvement construction costs" further undermines any suggestion that construction work will be minimal. *See id.* ¶ 23.

Defendants also contend that the presence of hazardous materials at the Holsclaw Property is speculative. *See* Fed. Defs. Opp. at 15. This argument is unpersuasive. The Federal Defendants have no factual basis to contest Plaintiffs' evidence because they failed to conduct an

---

[8] Incredibly, the Federal Defendants also argued that the development of the Gilroy Holding Facility is not a change in use of the Holsclaw Property because the existing agricultural research facility and the planned ICE facility both include "office" space. *See* Fed. Defs. Opp. at 8-9.

environmental review before undertaking the project. It is true that Plaintiffs have not presented recent test results confirming the presence of hazardous materials. But the absence of more definitive evidence is due to Defendants' refusal to allow the County to inspect the Holsclaw Property. *See* Pierce Decl. ¶ 5 & Ex. I. In any event, Plaintiffs offer unrebutted circumstantial evidence of contamination based on a history of repeated hazardous material violations. The agricultural research companies' failure to complete the mandatory closure process before vacating the Holsclaw Property further indicates that hazardous materials likely remain on site. Plaintiffs have also submitted declarations from County officials who specialize in hazardous materials compliance explaining that construction and demolition work is likely to disturb these materials and endanger the environment. *See* Balliet Decl. ¶¶ 11-12; Pierce Decl. ¶ 28.

ECG6 represents that it hired a consultancy to "conduct studies analyzing the condition of the property," which resulted in a 1,000-page report that "found that all chemicals were within the applicable regulatory limits for non-residential use." Zeligman Decl. ¶ 17. This study purportedly "assured [ECG6] and [its] lender that the property complied with all relevant environmental regulations and that there were no environmentally related transaction risks." *Id.* ¶ 18. But the Court cannot credit these supposed findings because ECG6 inexplicably declined to submit the report as part of the preliminary injunction record. ECG6's conclusory description of the contents of the report is no substitute for the report itself.

As the record stands, Defendants have not submitted evidence that undermines the extensive history of hazardous material production, storage, and mismanagement at the Holsclaw Property.

**2. Increased Occupancy**

The primary environmental risk posed by the use and increased occupancy of the Holsclaw Property arises from the unavoidable strain on the septic system. The Holsclaw Property utilizes a septic system to manage its wastewater because there is no available sewer connection due to its rural location. Mot. at 10; Haghighi Decl. ¶ 6, ECF No. 27. Septic systems function by collecting raw wastewater through drains, separating solids from liquids in a septic tank, and then dispersing the liquid effluent into a designated underground area known as a dispersal field. *Id.* ¶ 6. There

are three septic systems on-site, but only one system serves the main building. Haghighi Decl. ¶ 7. This septic system "consists of a 1,500-gallon two-compartment septic tank discharging to a [dispersal field] comprising a 500-linear-foot primary field and a 500-linear food secondary field." *Id*.

Concerningly, County inspections found that hazardous materials were discharged to the Holsclaw Property's septic system during Syngenta Seeds' occupancy. Balliet Decl. ¶ 7; Pierce Decl. ¶¶ 16-17. For example, in 2005, a County inspection found that hazardous materials, including DNA sequencing and extraction waste, were being disposed of in the facility drains that were connected to the septic tank. Balliet Decl. ¶ 7 & Ex. A. Additionally, in 2002, 2003, and 2005, sampling of septic system effluent detected the presence of hazardous materials such as formaldehyde and volatile organic compounds. Pierce Decl. ¶ 17 & Ex. F. In 2020, inspectors similarly observed hazardous materials such as bleach and acidic wash water being discharged to the septic system. Pierce Decl. ¶ 16. Because the septic system discharges this hazardous-material-containing liquid into the underground dispersal field, there is a risk that these underground toxic chemicals will migrate to groundwater, surface water, or the soil due to increased usage of the septic system beyond capacity. *See* Haghighi Decl. ¶¶ 6, 12-13; Pierce Decl. ¶¶ 16-17, 23; Balliet Decl. ¶ 8; Yap Decl. ¶¶ 14, 16.

The existing septic system was designed for a daytime workforce of approximately 40 people. Haghighi Decl. ¶ 7. Though the ultimate capacity of the Gilroy Holding Facility is disputed and unknown, the Federal Defendants assume that the main building will have a typical capacity of 120 people during normal operations. *See* Fed. Defs. Opp. at 6; Bayardo Decl. ¶¶ 13-14 (estimating 50 staff, 60 members of the public, and an average of 10 detainees). Because of this threefold increase in average occupancy, the septic system will become overburdened if it is not expanded; however, the size of an expanded dispersal field may be too large to be accommodated on the Holsclaw Property. Haghighi Decl. ¶¶ 9-11.

Either overburdening the existing septic system or constructing a new system pose a risk of irreparable environmental harm. An overburdened septic system presents "serious public health, safety, and environmental risks" because it can cause untreated sewage to "surface or back up into

structures" and can oversaturate the soil, causing the migration of pathogen-containing effluent beyond the dispersion field. *Id.* ¶ 12. Therefore, overburdening creates a risk that humans or wildlife could be directly exposed to the raw or partially treated effluent and that adjacent groundwater or surface water could become contaminated, harming all who rely on nearby groundwater wells (including the Holsclaw Property) and the quality of local aquatic environments. *Id.* The construction or expansion of the septic system to accommodate the increased flow – which requires a permitting process that has not been completed – poses the previously discussed risk of disturbing and disseminating the likely present hazardous materials within the septic system components. *Id.* ¶¶ 14-16; Balliet Decl. ¶ 11.

The Federal Defendants argue that concerns about overburdening the septic system are based on overestimates of the occupancy of the Gilroy Holding Facility. *See* Fed. Defs. Opp. at 16; ECG6 Opp. at 10. However, Defendants' own estimate of 120 people places the occupancy at a minimum of three times the previous level of 40. *See* Bayardo Decl. ¶¶ 13-14; Haghighi Decl. ¶ 7. Based on the analysis of a County septic system official, even a far less substantial increase in occupancy would overwhelm the septic system. *See* Haghighi Decl. ¶ 11. Therefore, the record reflects that the existing septic system is insufficient even under Defendants' estimate of future occupancy.

ECG6 argues that any required changes to the construction plan "to ensure that the wastewater treatment system operates within all regulatory limits can be easily accommodated, and will be." ECG6 Opp. at 10. But it appears that ECG6 has already begun construction of the septic system, and it has not complied with the mandatory pre-construction permitting process. *See* Haghighi Reply Decl. ¶ 3 (describing June 10, 2026 images of trenches that appear to be for the purpose of septic system piping); Haghighi Decl. ¶¶ 14-16 (describing pre-construction septic system permitting procedures that have not been undertaken). These actions present imminent risk of disturbing hazardous materials within the septic system. *See* Haghighi Reply Decl. ¶ 3; Balliet Decl. ¶¶ 11-12; Pierce Decl. ¶ 28. Ultimately, concerns about overburdening the septic system and releasing hazardous waste should have been addressed before construction began, not in response to litigation.

***

Defendants contend that the environmental risks are overstated and unlikely to materialize. But "[p]art of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures." *Winter*, 555 U.S. at 23. Here, the Federal Defendants declined to prepare an EIS or an EA, and thereby avoided the process designed to identify potential environmental risks from the construction and use of the Gilroy Holding Facility. Moreover, Defendants have blocked Plaintiffs from accessing the Holsclaw Property to conduct their own environmental analysis. Given that Defendants' conduct is responsible for the state of the record, Plaintiffs cannot be faulted for relying on known information and making reasonable inferences based on their experience in regulating hazardous materials.

**C. Balance of Equities and Public Interest**

Courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co.*, 480 U.S. at 542. "Both the economic and environmental interests are relevant factors, and both carry weight in this analysis." *Connaughton*, 752 F.3d at 765. Courts "must consider only the portion of the harm that would occur while the preliminary injunction is in place." *Id*.

Here, as discussed above, Plaintiffs face likely irreparable environmental harm in the absence of a preliminary injunction. These injuries are imminent because they would be triggered by construction of the Gilroy Holding Facility, which may resume as soon as September 16, 2026, absent an injunction. *See* ECF Nos. 41, 64. The environmental harms triggered by use of the Gilroy Holding Facility are also imminent based on ECG6's current plan to turn the property over to the Federal Defendants in January 2027. Zeligman Decl. ¶ 32. Under this timeline, the Holsclaw Property will be subject to a significant increase in occupancy and use before an environmental assessment or impact statement can be prepared.

The Federal Defendants emphasize that "there is a public interest in efficiently enforcing immigration laws." Fed. Defs. Opp. at 18. However, the Federal Defendants fail to substantiate how the temporary delay of constructing one facility will materially impede their immigration

enforcement efforts. The Federal Defendants state generally that, without the Gilroy Holding Facility, they "would have to rely on existing facilities that are farther away and already supporting other operational needs." Bayardo Decl. ¶ 16 (explaining that the Gilroy location "provides a closer alternative office" compared to others in the area). This would in turn "strain" ICE's operations, "reduce" its ability to enforce immigration laws, and burden "individuals in removal proceedings who are out of custody and have reporting requirements." *Id*. But ICE was already prepared to carry out its enforcement efforts for at least five months without the Gilroy Holding Facility, given that the lease on its current Morgan Hill facility expired in August 2026, and ECG6 does not expect to complete construction until January 2027. Larson Decl. ¶ 9. In fact, the Federal Defendants revealed at the preliminary injunction hearing that ICE has continued to operate the Morgan Hill facility despite the lease expiring, and it could possibly renegotiate a lease for that space. Moreover, the Gilroy Holding Facility project has been contemplated for years, so there was ample time to complete the required environmental review under NEPA without delaying construction. *See* Bayardo Decl. ¶¶ 8-9. Finally, there is significant tension between the Federal Defendants' argument that the Gilroy Holding Facility will be used to temporarily hold a minimal number of detainees and their assertion that any delay in construction would jeopardize enforcement efforts more broadly. In sum, the record reflects that ICE can draw from other resources to carry out its duties, and a preliminary injunction would impose temporary logistical burdens at most.

ECG6 also identifies short-term financial hardship that it may face if an injunction is entered. ECG6 Opp. at 14-15. As explained below, the Court doubts that the financial hardship can be fairly attributed to an injunction. But even if ECG6's financial hardship is fully credited, it is outweighed by the risk of irreparable harm to humans and the environment that may result absent preliminary relief. Environmental harms are more durable and broader in scope than the financial harm to ECG6, as exposure to hazardous materials and contamination could affect the health and welfare of many members of the public, detainees, and even ICE agents.[9] Ultimately,

[9] ECG6 also argues that it cannot be held directly liable for a NEPA violation because it is not a federal agency. *See* ECG6 Opp. at 7-8. At this stage, the relevant question is whether ECG6 can

the "balance of equities tips toward . . . [P]laintiffs, because the harms they face are permanent, while the [Defendants] face temporary delay." *Connaughton*, 752 F.3d at 765; *see also Amoco Prod. Co.*, 480 U.S. at 545 ("If such [irreparable environmental] injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.").

**D. Bond**

In general, a court may issue a preliminary injunction only if the party requesting relief "gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Federal Rule of Civil Procedure 65(c) confers upon district courts "discretion as to the amount of security required, if any." *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). A movant's strong likelihood of success on the merits may counsel "in favor of a minimal bond or no bond at all." *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1326 (9th Cir.), *amended by*, 775 F.2d 998 (9th Cir. 1985). The party affected by the injunction bears the "obligation of presenting evidence that a bond is needed." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003).

Here, ECG6 asks the Court to impose a bond of $790,308.00 to compensate it for the "substantial costs and damages it will suffer if its project is wrongfully enjoined" for an estimated six-month period. ECG6 Opp. at 14-15. ECG6 contends that the injunction would delay its ability to collect rent under the lease because rent is not due until the lease term begins – *i.e.*, when ICE takes over the Gilroy Holding Facility – and in the meantime ECG6 must pay interest on the loan it used to finance the project. Zeligman Decl. ¶¶ 34-35 (explaining that ECG6 stands to earn

be *enjoined*, and the answer is yes. Federal Rule of Civil Procedure 65(d) provides that an injunction may bind not only a party to the litigation, but also their "agents" and "other persons who are in active concert or participation" with the party. Thus, a developer may be enjoined regardless of its direct liability for a NEPA violation. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1117-19 (9th Cir. 2005) (affirming preliminary injunction entered against a private developer that "suspend[ed] development during the pendency of the litigation"). Here, ECG6 may be enjoined because its construction work is performed subject to a GSA lease for the benefit of ICE. *See* Zeligman Decl. ¶¶ 3, 24, 29 ("The lease requires that ECG6 is responsible for building the project to GSA's specifications."); *see also* Tsang Decl. Ex. 1.

$101,718 in rent each month). Although hardships may be relevant when setting a bond, courts are not "required to set bonds that approximate actual damages." *Save Our Sonoran, Inc.*, 408 F.3d at 1126. To the contrary, the Ninth Circuit's "long-standing precedent [is] that requiring nominal bonds is perfectly proper in public interest litigation." *Id.*; *see also California v. Azuma Corp.*, No. 2:23-cv-00743-KJM-DB, 2023 WL 5835794, at *14 (E.D. Cal. Sep. 8, 2023) (granting a preliminary injunction sought by the State of California and setting a nominal bond of $1,000 given "the strong public interest implicated" in the case), *aff'd*, No. 23-16200, 2024 WL 4131831 (9th Cir. Sep. 10, 2024).

Here, setting a bond based on delayed completion of the project is not appropriate for two reasons. First, ECG6 has not shown that it can complete construction and satisfy the preconditions of the lease by January 2027 even in the absence of an injunction. Instead, the record shows that parts of the construction plan are unsettled, and ECG6 has not applied for or obtained necessary permits to complete the work. *See, e.g.*, Tsang Decl. ¶¶ 5-7, ECF No. 32; Haghighi Decl. ¶ 17. Therefore, the Court cannot conclude that an injunction – rather than typical construction delays or lack of planning diligence – will delay the start of the lease term. Second, the lease states that the project is subject to NEPA requirements, and that GSA may determine that environmental mitigation measures are required. *See* GSA Lease § 3.52. The lease further provides that "[a]ll costs and expenses" for such measures "are the sole responsibility" of ECG6. *Id*. Therefore, ECG6 expressly accepted the risk of incurring costs associated with NEPA compliance. It is unfortunate for ECG6 that the Federal Defendants did not take greater care in evaluating environmental consequences before breaking ground, but their failure is no reason to require Plaintiffs to post a bond.

For these reasons, the Court will require Plaintiffs to post a nominal bond of $1,000.

## IV. INJUNCTION

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for a preliminary injunction. At the hearing, Defendants requested an opportunity to meet and confer with Plaintiffs regarding the scope of the injunction based on the Court's findings in this order. Accordingly, the parties shall meet and confer and file a joint proposed preliminary injunction order by **September**

United States District Court
Northern District of California

**30, 2026**. If the parties cannot agree, then by the same deadline the parties shall file a joint status report, not to exceed five pages, explaining the areas of disagreement and attaching the proposals.

While the parties confer, the Court enters the following provisional preliminary injunction based on the terms of the parties' stipulated stay, ECF No. 41:

1. Defendants and their agents, and all persons in active concert or participation with any of them, shall pause construction, demolition, and development activities, except for such activities necessary to address immediate safety concerns, at the Holsclaw Property.
2. Defendants are not enjoined from engaging in the preparation of an environmental impact statement or an environmental assessment, or from soliciting regional, state, and local viewpoints with respect to their plans for the Holsclaw Property.
3. This order remains in effect pending further order of this Court.
4. Pursuant to Federal Rule of Civil Procedure 65(c), Plaintiffs shall post a bond in the amount of $1,000 with the Clerk of Court, and must file proof of the bond by September 18, 2026.

**IT IS SO ORDERED.**

Dated: September 11, 2026

Eumi K. Lee
United States District Judge